Nos. 13-17102, 13-17154

**IN THE**

# United States Court of Appeals
# For The Ninth Circuit

———————————————————

FACEBOOK, INC.,
*Plaintiff-Appellee*,

v.

POWER VENTURES, INC.

&

STEVEN SURAJ VACHANI,
*Defendants-Appellants*.

———————————————————

Appeal from the United States District Court
for the Northern District of California
Case No. 5:08-cv-05780-LHK, The Honorable Lucy Koh

———————————————————

**SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME I OF II**

———————————————————

Eric A. Shumsky
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005
(202) 339-8400

I. Neel Chatterjee
Monte Cooper
Brian P. Goldman
Robert L. Uriarte
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
(650) 614-7400

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

## VOLUME I OF II

**Record Entry**[*]                                                    **SER**

### *District Court Orders*

Order Denying Leave to File Motion for Reconsideration, Finding
      Defendant Steven Vachani Liable as a Matter of Law, and
      Granting Damages and Permanent Injunctive Relief,
      Dkt. No. 372 (Filed September 25, 2013) ................................................. 1

Order Denying Motion to Dismiss and Granting in Part and Denying
      in Part Motion for Definite Statement,
      Dkt. No. 38 (Filed May 11, 2009) ........................................................ 35

### *Other Record Materials*

Excerpts from the Expert Report of Richard J. Ostiller,
      Exhibit 25 to the Declaration of Monte Cooper in Support of
      Facebook Inc.'s Supplemental Brief Regarding Damages
      and Liability of Defendant Steve Vachani,
      Dkt. No. 300-1 (Filed Apr. 17, 2012) .................................................... 46

---

[*] None of the documents in the Supplemental Excerpts of Record is confidential, although some are so marked. Some of the documents were stamped confidential but never sealed (Dkt. Nos. 236-2, 236-6, 248-2, 248-7). Other documents were filed under seal, but were later unsealed by the district court. *See* Dkt. No. 298 (unsealing Dkt. Nos. 299-3, 299-6, 299-9, 299-10, 299-15, 299-21, 299-35); Dkt. No. 395 (unsealing Dkt. Nos. 213-2, 213-4, 217, 300-1, 372, 396).

Excerpts from the March 7, 2012 deposition transcript of Steve
            Vachani,
            Exhibit 2 to the Declaration of Monte Cooper in Support of
            Facebook Inc.'s Supplemental Brief Regarding Damages
            and Liability of Defendant Steve Vachani,
            Dkt. No. 299-3 (Filed Apr. 17, 2012)..................................................... 52


December 2, 2008, Email Chain between Steve Vachani and Eric
            Santos,
            Exhibit 4 to the Declaration of Monte Cooper in Support of
            Facebook Inc.'s Supplemental Brief Regarding Damages
            and Liability of Defendant Steve Vachani,
            Dkt. No. 299-5 (Filed Apr. 17, 2012)..................................................... 81


December 29, 2008, Email Chain among Power employees,
            Exhibit 5 to the Declaration of Monte Cooper in Support of
            Facebook Inc.'s Supplemental Brief Regarding Damages
            and Liability of Defendant Steve Vachani,
            Dkt. No. 299-6 (Filed Apr. 17, 2012)..................................................... 84


December 1, 2008, Press Release for Power.com,
            Exhibit 8 to Declaration of Monte Cooper in Support of
            Facebook Inc.'s Supplemental Brief Regarding Damages
            and Liability of Defendant Steve Vachani,
            Dkt. No. 299-9 (Filed Apr. 17, 2012)..................................................... 90


November 26, 2008, Email from Eric Santos to Bruno Carvalho,
            Exhibit 9 to the Declaration of Monte Cooper in Support of
            Facebook Inc.'s Supplemental Brief Regarding Damages and
            Liability of Defendant Steve Vachani,
            Dkt. No. 299-10 (Filed Apr. 17, 2012) ................................................ 98

Excerpts from the July 20, 2011, Deposition Transcript of Steve
Vachani,
Exhibit 12 to the Declaration of Monte Cooper in Support of
Facebook Inc.'s Supplemental Brief Regarding Damages and
Liability of Defendant Steve Vachani,
Dkt. No. 299-13 (Filed Apr. 17, 2012) ............................................... 102

Excerpts from the January 9, 2012, Deposition Transcript of Steven
Vachani (as Power Ventures, Inc.'s 30(b)(6) designee),
Exhibit 14 to the Declaration of Monte Cooper in Support of
Facebook Inc.'s Supplemental Brief Regarding Damages
and Liability of Defendant Steve Vachani,
Dkt. No. 299-15 (Filed Apr. 17, 2012) ............................................... 141

December 4, 2008, Email from Felipe Herrera to Steve Vachani,
Exhibit 20 to the Declaration of Monte Cooper in Support of
Facebook Inc.'s Supplemental Brief Regarding Damages
and Liability of Defendant Steve Vachani,
Dkt. No. 299-21 (Filed Apr. 17, 2012) ............................................... 158

Power Ventures Inc.'s Supplemental Responses to Facebook's
Interrogatories,
Exhibit 22 to the Declaration of Monte Cooper in Support of
Facebook Inc.'s Supplemental Brief Regarding Damages
and Liability of Defendant Steve Vachani,
Dkt. No. 299-23 (Filed Apr. 17, 2012) ............................................... 162

December 26, 2008, Email from Steve Vachani to Eric Santos,
Exhibit 34 to the Declaration of Monte Cooper in Support of
Facebook Inc.'s Supplemental Brief Regarding Damages
and Liability of Defendant Steve Vachani,
Dkt. No. 299-35 (Filed Apr. 17, 2012) ............................................... 171

November 9, 2011, Email from Timothy Fisher to Facebook's
        Counsel,
        Exhibit 35 to the Declaration of Monte Cooper in Support of
        Facebook Inc.'s Supplemental Brief Regarding Damages
        and Liability of Defendant Steve Vachani,
        Dkt. No. 299-36 (Filed Apr. 17, 2012) ................................................ 177

Transcript of Proceedings Held on Feb. 24, 2012, before Magistrate
        Judge Joseph C. Spero,
        Dkt. No. 280 (Filed Feb. 27, 2012) ...................................................... 182

January 26, 2012, Joint Discovery Letter re: Compelling Production
        of Emails,
        Dkt. No. 269 (Filed Feb. 10, 2012) ...................................................... 199

Transcript of Proceedings Held on Jan. 23, 2012, before Chief Judge
        James Ware,
        Dkt. No. 257 (Filed Jan. 27, 2012)....................................................... 207

Transcript of July 18, 2005, Chat between Steve Vachani and "abi",
        Exhibit 2 to the Declaration of I. Neel Chatterjee in Support
        of Facebook Reply Memorandum in Support of Facebook's
        Motions for Partial Summary Judgment,
        Dkt. No. 248-2 (Filed Jan. 20, 2012) ................................................... 247

January 3, 2009, Email from Felipe Herrera to Steve Vachani,
        Exhibit 7 to the Declaration of I. Neel Chatterjee in Support
        of Facebook Reply Memorandum in Support of Facebook's
        Motions for Partial Summary Judgment,
        Dkt. No. 248-7 (Filed Jan. 20, 2012) ................................................... 255

# VOLUME II OF II

**Record Entry**                                          **SER**

*Other Record Materials (con't)*

Excerpts from Defendants' Memorandum of Points and Authorities in
Opposition to Facebook's Motion for Partial Summary
Judgment Under California Penal Code § 502 and the
Computer Fraud and Abuse Act, 18 U.S.C. § 1030,
Dkt. No. 242 (Filed Jan. 19, 2012).....................................................261

Excerpts from the July 20, 2011, Deposition Transcript of Defendant
Steve Vachani,
Exhibit 2 to the Declaration of Morvarid Metanat in Support
of Facebook's Motion for Partial Summary Judgment Under
California Penal Code § 502 and CFAA,
Dkt. No. 236-2 (Filed Jan. 19, 2012) ................................................265

Excerpts from Power Ventures, Inc.'s Responses to Facebook, Inc's
First Set of Interrogatories,
Exhibit 4 to the Declaration of Morvarid Metanat in Support
of Facebook's Motion for Partial Summary Judgment Under
California Penal Code § 502 and CFAA,
Dkt. No. 236-4 (Filed Jan. 19, 2012) ................................................276

December 1, 2008, Email from Steve Vachani to Felipe Herrera and
Eric Santos,
Exhibit 6 to the Declaration of Morvarid Metanat in Support
of Facebook's Motion for Partial Summary Judgment Under
California Penal Code § 502 and CFAA,
Dkt. No. 236-6 (Filed Jan. 19, 2012) ................................................284

December 17-18, 2008, Emails among Power Employees,
   Exhibit 7 to the Declaration of Morvarid Metanat in Support
   of Facebook's Motion for Partial Summary Judgment Under
   California Penal Code § 502 and CFAA,
   Dkt. No. 236-7 (Filed Jan. 19, 2012) ................................................ 287

December 1, 2008, Cease and Desist Letter,
   Exhibit A to the Declaration of Joseph Cutler in Support of
   Facebook, Inc.'s Motion for Partial Summary Judgment For
   Liability Under The CAN-SPAM Act,
   Dkt. 233 (Filed Jan. 19, 2012)............................................................ 297

December 12-26, 2008, Email Chain between Steve Vachani and
   Facebook Counsel Joseph Cutler,
   Exhibit B to the Declaration of Joseph Cutler in Support of
   Facebook, Inc.'s Motion for Partial Summary Judgment For
   Liability Under The CAN-SPAM Act,
   Dkt. 233-1 (Filed Jan. 19, 2012) ........................................................ 301

Excerpts from Power Ventures, Inc.'s Responses to Facebook, Inc.'s
   First Set of Interrogatories,
   Exhibit 5 to the Declaration of Monte M.F. Cooper in
   Support of Facebook, Inc.'s Motion for Partial Summary
   Judgment on Count I under the CAN-SPAM Act,
   Dkt. No. 232-2 (Filed Jan. 19, 2012) ................................................. 310

Excerpts from Power Ventures, Inc.'s Responses to Facebook, Inc.'s
   First Set of Requests for Admissions,
   Exhibit 6 to the Declaration of Monte M.F. Cooper in
   Support of Facebook, Inc.'s Motion for Partial Summary
   Judgment on Count I under the CAN-SPAM Act,
   Dkt. No. 232-3 (Filed Jan. 19, 2012) ................................................. 320

Excerpts from the July 20, 2011, Deposition Transcript of Steven
        Vachani,
        Exhibit 2 to the Declaration of Monte M.F. Cooper in
        Support of Facebook Inc.'s Motion for Partial Summary
        Judgment on Count I under the CAN-SPAM Act
        Dkt. No. 229 (Filed Jan. 19, 2012)..................................................... 333

Declaration of Lawrence Melling in Support of Facebook, Inc.'s
        Motion for Partial Summary Judgment On Count I under the
        CAN-SPAM Act,
        Dkt. No. 217 (Filed Jan. 19, 2012)..................................................... 375

Declaration of Joseph Cutler in Support of Facebook, Inc.'s Motion
        for Partial Summary Judgment For Liability under the CAN-
        SPAM Act,
        Dkt. No. 213-2 (Filed Jan. 19, 2012) ................................................. 389

Declaration of Ryan McGeehan in Support of Facebook's Motion for
        Partial Summary Judgment on Count I under the CAN-
        SPAM Act,
        Dkt. No. 213-4 (Filed Jan. 19, 2012) ................................................. 393

Transcript of Proceedings Held on Nov. 4, 2011, before Magistrate
        Judge Joseph C. Spero,
        Dkt. No. 176 (Filed Nov. 21, 2011) .................................................... 401

Amended Answer and Counterclaims of Defendants Power Ventures,
        Inc. and Steve Vachani,
        Dkt. No. 54 (Filed Nov. 23, 2009) ...................................................... 412

### District Court Orders Regarding Sealed Documents

Order Permitting the Public Filing of Portions of Facebook Inc.'s
        Supplemental Brief Regarding Damages and Liability of
        Defendant Steve Vachani,
        Dkt. No. 298 (Filed Apr. 17, 2012)..................................................... 439

Order Sealing Certain Portions of Facebook, Inc's Motions for Partial
      Summary Judgment and Facebook's Opposition to
      Defendants' Motion for Summary Judgment,
      Dkt. No. 203 (Filed Dec. 19, 2011) .................................................... 441

Order Granting Facebook Inc.'s Motion for Administrative Relief to
      File Under Seal Pursuant to Civil Local Rule 79-5(B),
      Dkt. No. 183 (Filed Nov. 28, 2011) .................................................... 444

Order Granting Facebook Inc.'s Motion for Administrative Relief to
      File Under Seal the Declarations of Ryan McGeehan and
      Joseph Cutler and Portions of Facebook's Motion for Partial
      Summary Judgment Pursuant to Civil Local Rule 79-5(B),
      Dkt. No. 182 (Filed Nov. 28, 2011) .................................................... 446

Stipulated Protective Order for Standard Litigation,
      Dkt. No. 95, (Filed Feb. 4, 2011) ....................................................... 448

***Material Filed Following Limited Remand to Expand the Record, per 9th Cir.***
      ***Dkt. No. 35***

Expert Report of Bob Zeidman and Lawrence Melling,
      Dkt. No. 396 (Filed May 29, 2014) .................................................... 467

Stipulation and Order Pursuant to Civil Local Rule 7-12, to File
      Previously Lodged Material and Unseal Previously Sealed
      Materials,
      Dkt. No. 395 (Filed May 29, 2014) .................................................... 506

Case5:08-cv-05780-LHK   Document372 *SEALED*   Filed09/25/13   Page1 of 34

SEALED BY ORDER OF THE COURT

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| FACEBOOK, INC., | Case No.: 08-CV-5780-LHK |
| Plaintiff, | |
| v. | ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF |
| POWER VENTURES, INC., a Cayman Island corporation, and STEVE VACHANI, an individual, | |
| Defendants. | |

Defendant Power Ventures, Inc. ("Power Ventures") and Defendant Steve Vachani ("Vachani") (collectively, "Defendants") request leave to file a motion for reconsideration of the February 16, 2012 summary judgment order issued by Judge James Ware. Plaintiff, Facebook, Inc. moves for statutory and compensatory damages, permanent injunctive relief, and a grant of summary judgment holding that Vachani is personally liable for violations of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM Act"), 15 U.S.C § 7701; the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; and California Penal Code § 502. Pursuant to Civil Local Rule 7-1(b), the Court finds a hearing unnecessary for

1

1   resolution of these matters and accordingly VACATES the hearing and case management

2   conference set for September 26, 2013.  Having considered Defendants' papers and the record in

3   this case, Defendants' request for leave to file a motion for reconsideration is DENIED.  Plaintiff's

4   motion for statutory and compensatory damages, motion for permanent injunctive relief, and

5   motion for summary judgment on the issue of Vachani's personal liability are GRANTED.  The

6   Court proceeds to discuss each issue in turn.

7   **I.   BACKGROUND**

8       **A.   Factual Background**

9          Facebook owns and operates the eponymous social networking website located at

10  facebook.com.  First Amended Complaint ("FAC") ¶ 2.  Power Ventures is a corporation

11  incorporated in the Cayman Islands and doing business in California.  Answer ¶ 10.  It operates the

12  website www.power.com, which offers to integrate users' various social media accounts into a

13  single experience.  FAC ¶ 5; Answer ¶ 5.  Vachani is the Chief Executive Officer of power.com.

14  Answer ¶ 11.

15         Facebook brought this action against Defendants in December 2008, alleging violations of

16  the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-

17  SPAM Act"), 15 U.S.C § 7701; the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030;

18  California Penal Code § 502; and the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §

19  1201; copyright infringement under 17 U.S.C. § 101; trademark infringement under 15 U.S.C. §§

20  1114 and 1125(a) and California law; and violations of California Business and Professions Code

21  Section 17200.  ECF Nos. 1, 9.  Facebook complains that Defendants employ Facebook's

22  proprietary data without its permission by inducing Facebook users to provide their login

23  information and then using that information to "scrape" Facebook's proprietary material.  FAC ¶¶

24  49, 50, 52.  Defendants then display Facebook's material on power.com.  FAC ¶ 52.  Facebook

25  asserts that it never gave Defendants permission to use its material in this way.  FAC ¶ 54.

26         Facebook also accuses Defendants of sending unsolicited and deceptive email messages to

27  Facebook users.  FAC ¶¶ 65-69.  To launch their site, Defendants promised power.com users a

28  

<div style="text-align:center">2</div>

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

<div style="writing-mode:vertical-rl; text-orientation:mixed;">United States District Court<br>For the Northern District of California</div>

1    chance to win $100 if they invited and signed up the most new users to Defendants' site. FAC ¶

2    65. Defendants provided to their users a list of the users' Facebook friends from which the users

3    could choose people to whom to send the invitation. FAC ¶ 66. Power.com sent unsolicited

4    commercial emails to those friends that included on the "from" line a "@facebookmail.com"

5    address. FAC ¶¶ 66, 68. The content of the message included a line that the message was from

6    "The Facebook Team." FAC ¶ 69, 70. Facebook contends that it never gave permission to send

7    these messages and that the emails were deceptive because they "do not properly identify the

8    initiators of the messages, nor do they provide clear or conspicuous notice that the messages are

9    advertisements for" power.com. FAC ¶ 71.

10           **B.      Procedural Background**

11           On February 18, 2011, Judge Ware granted the parties' stipulation to dismiss Facebook's

12   DMCA claim, copyright and trademark infringement claims, and claims for violations of California

13   Business and Professions Code Section 17200. ECF No. 97. On May 9, 2011, Defendants moved

14   for summary judgment on Facebook's CFAA, Section 502, and CAN-SPAM Act claims. ECF No.

15   98. On November 17, 2011, Facebook moved for summary judgment on Facebook's § 502 and

16   CFAA claims. ECF No. 214 ("§ 502/CFAA Motion"). On November 18, 2011, Facebook moved

17   for summary judgment on Facebook's CAN-SPAM Act claim. ECF No. 215 ("CAN-SPAM

18   Motion"). On February 16, 2012, Judge Ware issued an order denying Defendants' motion for

19   summary judgment and granting summary judgment in Facebook's favor as to Facebook's § 502,

20   CFAA, and CAN-SPAM Act claims. ECF No. 275 ("February 16 order").

21           In the February 16 order, Judge Ware requested additional briefing regarding Vachani's

22   individual liability and the amount of damages Facebook should receive in light of the February 16

23   order. *Id.* at 19. On March 30, 2012, Facebook filed its supplemental brief regarding damages and

24   the liability of Vachani. ECF No. 299 ("Facebook Damages/Liability Brief"). The same day,

25   Defendants lodged with the court a brief regarding damages and the liability of Vachani. ECF No.

26   288 ("Defendants' Damages/Liability Brief"). On August 15, 2012, Vachani also submitted a

27

28   Case No.: 08-CV-5780-LHK

3

ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

1    supplemental brief regarding damages and his personal liability. ECF No. 317 ("Vachani

2    Damages/Liability Brief").

3         On June 4, 2012, the attorneys representing Vachani and Power Ventures moved to

4    withdraw as counsel. ECF Nos. 302, 303. On July 2, 2012, Judge Ware granted the motions to

5    withdraw. ECF No. 306. In the order granting the withdrawal requests, Judge Ware required

6    Vachani and Power Ventures to file Notices of Identification of Substitute Counsel no later than

7    July 17, 2012. *Id.* Judge Ware noted that although Vachani could proceed *pro se*, Power Ventures

8    had to be represented by a member of the bar pursuant to Civil L.R. 3-9(b). *Id.* Judge Ware

9    cautioned Defendants that a failure to file timely Notices of Identification of Substitute Counsel

10   may result in default of the case. *Id.*

11        On July 19, 2012, after neither Vachani nor Power Ventures had filed a Notice of

12   Identification of Substitute Counsel, Judge Ware ordered both parties to appear on August 6, 2012

13   to respond to an Order to Show Cause regarding Defendants' failure to obtain counsel. ECF No.

14   308. On August 6, 2012, the parties appeared for the hearing, and on August 8, 2012, Judge Ware

15   issued an order regarding Defendants' failure to obtain counsel ("August 8 order"). ECF No. 313.

16   Because Power Ventures had failed to identify replacement counsel, Judge Ware found good cause

17   to strike Power Ventures' answer to Facebook's complaint and enter default against Power

18   Ventures. *Id.* Judge Ware permitted Vachani a short extension to find new counsel, which was

19   conditioned on Vachani's immediate filing of a Notice of Self-Representation. *Id.* The Clerk

20   entered default against Power Ventures on August 9, 2012. ECF No. 314.

21        On August 15, 2012, new counsel filed a Notice of Appearance on behalf of Power

22   Ventures. ECF No. 316. That same day, Power Ventures moved for leave to file a motion for

23   reconsideration of Judge Ware's August 8 order requiring entry of default against Power Ventures.

24   ECF No. 318. Judge Ware gave Power Ventures leave to file the motion for reconsideration on

25   August 21, 2012. ECF No. 320. On August 23, 2012, Power Ventures filed its motion for

26   reconsideration. ECF No. 321. On August 27, 2012, Facebook filed its response and

27   simultaneously requested entry of default judgment against Power Ventures. ECF No. 322.

28   4

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

1    On August 27, 2012, Defendants provided notice that both Power Ventures and Vachani

2    had filed for bankruptcy. ECF Nos. 323, 324. Noting that pursuant to 11 U.S.C. § 362(a)(1), a

3    voluntary petition for bankruptcy operates as an automatic stay of any judicial actions involving the

4    petitioners, Judge Ware stayed the proceedings and administratively closed the case on August 29,

5    2012. ECF No. 325. In the same order, Judge Ware denied as premature Power Ventures' motion

6    for reconsideration of the August 8 order requiring entry of default. *Id.*

7    On March 20, 2013, Facebook notified the Court that the Bankruptcy Court had dismissed

8    Power Ventures' bankruptcy case and had granted Facebook's request for relief from the automatic

9    stay in Vachani's bankruptcy case. ECF No. 327. Facebook sought to reopen the case. *Id.*

10    Facebook also sought reassignment to a new judge because on August 31, 2012, while the

11    automatic stay was in effect, Judge Ware resigned from the bench. *Id.* On April 8, 2013, the

12    undersigned judge, as the Duty Judge at the time Facebook filed its motion, granted Facebook's

13    request. ECF No. 328. The undersigned judge ordered that the stay be lifted, the case be reopened,

14    and the case be reassigned. *Id.* The case then was reassigned to the undersigned judge. ECF No.

15    329.

16    On April 25, 2013, Vachani moved for clarification of the February 16 order regarding

17    whether Vachani's liability had been determined in the February 16 order. ECF No. 332. On April

18    29, 2013, Facebook filed a case management statement in which Facebook again requested that

19    default judgment be entered against Power Ventures. ECF No. 333. On the same day, Defendants

20    filed a consolidated case management statement in which Power Ventures again sought to set aside

21    default. ECF No. 334. Defendants also stated their intent to request leave to file a motion for

22    reconsideration of the February 16 order. *Id.* In Facebook's and Defendants' respective case

23    management statements, the parties acknowledged that Vachani's liability and the issues of

24    damages and injunctive relief still need to be addressed. ECF No. 333, 334.

25    On May 2, 2013, following a case management conference, the Court issued a case

26    management order. ECF No. 340. In that order, the Court clarified that the February 16 order did

27    not decide Vachani's liability. *Id.* The Court granted Power Ventures' request to set aside default

28    
5

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

*United States District Court*
*For the Northern District of California*

Case5:08-cv-05780-LHK   Document372 *SEALED*   Filed09/25/13   Page6 of 34

1    and denied Facebook's request for entry of default judgment against Power Ventures. *Id.* The

2    Court also set a briefing schedule for the damages and injunctive relief issues. *Id.* The Court set a

3    hearing date of September 26, 2013 to consider Vachani's liability, as well as the remedies issues.

4    *Id.*

5        On August 1, 2013, Power Ventures filed its request for leave to file a motion to reconsider

6    the February 16 order. ECF No. 353. On August 1, 2013, Facebook filed its supplemental

7    memorandum in support of its request for injunctive relief. ECF No. 354 ("Facebook Injunction

8    Brief"). On August 15, 2013, Defendants filed a response to Facebook's request for injunctive

9    relief. ECF No. 357 ("Defendants' Inj. Opp.") On August 22, 2013, Facebook filed its reply. ECF

10   No. 358 ("Facebook Injunction Reply").[1]

11   **II.   LEGAL STANDARDS**

12   **A.   Motion for Reconsideration**

13       Pursuant to Civil Local Rule 7–9, "[b]efore the entry of a judgment adjudicating all of the

14   claims and the rights and liabilities of all the parties in a case, any party may make a motion before

15   a Judge requesting that the Judge grant the party leave to file a motion for reconsideration of any

16   interlocutory order made by that Judge on any ground set forth in Civil L.R. 7–9(b). No party may

17   notice a motion for reconsideration without first obtaining leave of Court to file the motion." Civil

18   Local Rule 7-9(b) provides three grounds for reconsideration of an interlocutory order:

19       (1)    That at the time of the motion for leave, a material difference in fact or
20              law exists from that which was presented to the Court before entry of the
                interlocutory order for which reconsideration is sought. The party also
21              must show that in the exercise of reasonable diligence the party applying
                for reconsideration did not know such fact or law at the time of the
22              interlocutory order; or

23   ─────────────────────────
     [1] Vachani has appealed Magistrate Judge Joseph Spero's order granting Facebook fees and costs for
24   Vachani's second Rule 30(b)(6) deposition, which Judge Spero granted because of Defendants'
     misconduct during discovery. ECF No. 356 (Order granting fees); ECF No. 360 (Notice of Appeal
25   by Vachani). Vachani's appeal does not divest this Court of jurisdiction over the issues resolved in
     this order because the filing of a notice of appeal divests the district court of jurisdiction only over
26   the matters appealed. *Masalosalo by Masalosalo v. Stonewall Ins. Co.*, 718 F.2d 955, 956 (9th Cir.
     1983) ("A notice of appeal only transfers jurisdiction to the appellate court over matters contained
27   in the appeal."); *Donovan v. Mazzola*, 761 F.2d 1411 (9th Cir. 1985) ("Appeal of one order does
     not necessarily deprive the district court of jurisdiction over issues not raised in that order.").

28   Case No.: 08-CV-5780-LHK
     ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
     VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
     RELIEF

United States District Court
For the Northern District of California

6

1    (2)   The emergence of new material facts or a change of law occurring after
           the time of such order; or

2

3    (3)   A manifest failure by the Court to consider material facts or dispositive
           legal arguments which were presented to the Court before such
           interlocutory order.

4

5        Rule 7-9(c) further requires that "[n]o motion for leave to file a motion for reconsideration

6    may repeat any oral or written argument made by the applying party in support of or in opposition

7    to the interlocutory order which the party now seeks to have reconsidered." In general, motions for

8    reconsideration should not be frequently made or freely granted. *See generally Twentieth Century–*

9    *Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338, 1341 (9th Cir. 1981).

10   **B.   Summary Judgment Regarding Liability of Vachani**

11       Summary judgment is appropriate if, viewing the evidence and drawing all reasonable

12   inferences in the light most favorable to the nonmoving party, there are no genuine disputed issues

13   of material fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a);

14   *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of

15   the suit under the governing law," and a dispute as to a material fact is "genuine" if there is

16   sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party.

17   *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or

18   is not significantly probative," the court may grant summary judgment. *Id.* at 249-50. (citation

19   omitted). At the summary judgment stage, the Court "does not assess credibility or weigh the

20   evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*,

21   547 U.S. 518, 559-60 (2006).

22       The moving party has the burden of demonstrating the absence of a genuine issue of fact for

23   trial. *Celotex*, 477 U.S. at 323. It "must either produce evidence negating an essential element of

24   the nonmoving party's claim or defense or show that the nonmoving party does not have enough

25   evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire &*

26   *Marine Ins. Co. v. Fritz Companies, Inc.*, 310 F.3d 1099, 1102 (9th Cir. 2000) (citation omitted).

27

28

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

*United States District Court*
*For the Northern District of California*

Case5:08-cv-05780-LHK   Document372 *SEALED*   Filed09/25/13   Page8 of 34

1    Once the moving party has satisfied its initial burden of production, the burden shifts to the

2    nonmoving party to show that there is a genuine issue of material fact. *Id.* at 1103.

3    **C.    Permanent Injunctive Relief**

4            A party seeking a permanent injunction must make a four-part showing: (1) that it has

5    suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are

6    inadequate to compensate for that injury; (3) that, considering the balance of hardships between the

7    plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not

8    be disserved by a permanent injunction. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388,

9    390 (2006).

10   **III.   ANALYSIS OF DEFENDANTS' MOTION FOR RECONSIDERATION**

11          Defendants proffer three grounds in support of their request for reconsideration, notably

12   none of which arise out of a material difference in fact or law either at the time the February 16

13   order was issued or in the intervening period. Defendants instead assert that the February 16 order

14   represents a "manifest failure" to consider "material facts or dispositive legal arguments which

15   were presented" and that the order includes "conclusions of law counter to precedent controlling

16   authorities." Mot. Recons. at 2. In support of their position, Defendants argue that (1) the

17   February 16 order incorrectly applied the law by finding that the email messages were materially

18   misleading; (2) the order incorrectly considered the issue of data ownership under the CFAA and §

19   502 claims; and (3) the order incorrectly classified Facebook's damages in determining that

20   Facebook had standing to litigate its claims. Mot. Recons. at 3.

21   **A.    Materially Misleading Emails**

22          Defendants argue that the February 16 order incorrectly applied the law by finding that the

23   email messages Defendants caused to be sent to Facebook users were materially misleading.

24   Defendants assert that the header information was not materially misleading because within the

25   body of the email, Defendants were identified and because no one complained about being misled.

26   Mot. Recons. at 3-4.

27

28                                              8
     Case No.: 08-CV-5780-LHK
     ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
     VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
     RELIEF

United States District Court
For the Northern District of California

1      To establish liability under the CAN-SPAM Act, Facebook had to establish that

2   Defendants' emails were materially misleading. 15 U.S.C. § 7704(a)(1). The Act provides that

3   "[i]t is unlawful for any person to initiate the transmission, to a protected computer of a

4   commercial electronic mail message . . . that contains, or is accompanied by, header information

5   that is materially false or materially misleading." *Id.* The Act defines "materially" "when used

6   with respect to false or misleading header information" to include:

> the alteration or concealment of header information in a manner that would impair
> the ability of an Internet access service processing the message on behalf of a
> recipient, a person alleging a violation of this section, or a law enforcement
> agency to identify, locate, or respond to a person who initiated the electronic mail
> message or to investigate the alleged violation, or the ability of a recipient of the
> message to respond to a person who initiated the electronic message.

11   15 U.S.C. § 7704(a)(6).

12      Defendants' arguments fail to meet the standard for reconsideration for three reasons. First,

13   Defendants presented essentially the same arguments to Judge Ware in their opposition to

14   Facebook's CAN-SPAM Motion. ECF No. 239. In Defendants' opposition to the CAN-SPAM

15   Motion, Defendants asserted that the header information was not materially misleading because

16   Facebook in fact had generated the emails and because no one complained about being misled.

17   ECF No. 239 at 11-12. The significant overlap in the arguments alone warrants denial of

18   Defendants' request. Moreover, to the extent Defendants failed to present these arguments in

19   Defendants' opposition to Facebook's CAN-SPAM Motion, Defendants have provided no reason

20   why they could not have done so at that time.

21      Second, Judge Ware considered Defendants' arguments in his order. In the February 16

22   order, Judge Ware addressed whether the "from" line in the emails rendered the emails materially

23   misleading as required under the CAN-SPAM Act. ECF No. 275 at 13. Judge Ware also

24   addressed Defendants' argument that the body of the email corrected any misrepresentation in the

25   header information. *Id.* Judge Ware therefore did not manifestly fail to consider Defendants' legal

26   theories or material facts.

27

28   Case No.: 08-CV-5780-LHK
     ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
     VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
     RELIEF

9

United States District Court
For the Northern District of California

1    Third, Judge Ware's consideration of Defendants' argument was not clear error. The

2  February 16 order correctly states that a false or misleading statement is considered material if "the

3  alteration or concealment of header information" would impair the ability of an Internet Service

4  Provider ("ISP") or the recipient of the email to "identify, locate, or respond to a person who

5  initiated the electronic mail message." 15 U.S.C. § 7704(a)(6). The parties did not dispute that the

6  "from" line of the emails Defendants caused to be sent listed the address "@facebookmail.com."

7  ECF No. 375 at 13. Judge Ware found that the "@facebookmail.com" failed to provide the

8  recipient with an ability to identify, locate, or respond to Defendants. ECF No. 275 at 13. As a

9  result, Judge Ware concluded that the headers were materially misleading as defined by the statute.

10  *Id.* Judge Ware did not, as Defendants argue, hold that misleading header information is a per se

11  violation of the CAN-SPAM Act.

12    Defendants have failed to meet their burden for leave to request reconsideration of the

13  February 16 order on this issue.

14  **B.    Violations Under the CFAA and § 502**

15    Defendants next argue that reconsideration of the February 16 order is warranted because

16  Judge Ware failed to address whether the information Defendants took from Facebook had value.

17  Mot. Default J. at 4-5. Defendants assert that a determination of value was necessary because

18  violations under the CFAA and § 502 require a showing that the taken information had value. *Id.*

19  The Court first addresses Defendants' CFAA argument.

20    The CFAA prohibits several types of activities involving fraud and unauthorized access to

21  protected computers. 18 U.S.C. § 1030(a)(1)-(7). The CFAA provides a civil cause of action for a

22  violation of any of its provisions. Specifically, the CFAA provides that "[a]ny person who suffers

23  damage or loss by reason of a violation of this section [i.e. Section 1030] may maintain a civil

24  action against the violator to obtain compensatory damages and injunctive relief or other equitable

25  relief." 18 U.S.C. § 1030(g).

26    Notably, the CFAA defines "loss" and "damage" separately from the actions prohibited

27  under the CFAA. *See* 18 U.S.C. § 1030(a)(1)-(7) (describing prohibited activities); § 1030(e)(8)

28  10

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

*United States District Court*
*For the Northern District of California*

1   (defining "damage"); § 1030(e)(11) (defining "loss"). The Court addresses in this section only the

2   violations of the CFAA that serve as the basis of Facebook's CFAA cause of action and addresses

3   the "damage or loss" requirement in Section C below.

4         In Facebook's § 502/CFAA Motion, Facebook alleged that Defendants had violated both

5   18 U.S.C. § 1030(a)(2)(C) and 18 U.S.C. § 1030(a)(4). Either violation could serve as the basis for

6   Facebook's CFAA cause of action. Section 1030(a)(2)(C) prohibits a person from "intentionally

7   access[ing] a computer without authorization or exceed[ing] authorized access, and thereby

8   obtain[ing] . . . information from any protected computer." Section 1030(a)(4) meanwhile

9   prohibits a person from:

> knowingly and with intent to defraud, access[ing] a protected computer without
> authorization, or exceed[ing] authorized access, and by means of such conduct
> further[ing] the intended fraud and obtain[ing] anything of value, unless the object
> of the fraud and the thing obtained consists only of the use of the computer and
> the value of such use is not more than $5,000 in any 1-year period.

13  Notably, while Section 1030(a)(4) prohibits unauthorized access to a protected computer that

14  results in obtaining "anything of value," Section 1030(a)(2)(C) prohibits unauthorized access that

15  results in obtaining only "information." Thus, Section 1030(a)(2)(C) does not require a showing

16  that the taken information had value.

17        In the February 16 order, Judge Ware determined that Defendants had violated Section

18  1030(a)(2)(C). ECF No. 275 at 17-18. In his analysis, Judge Ware found that an admission by

19  Defendants that Defendants had taken, copied, or used data from Facebook's site established that

20  Defendants had "obtain[ed] information" from Facebook, as required to establish a violation under

21  Section 1030(a)(2)(C). ECF No. 275 at 18. Because Judge Ware found a violation of the CFAA

22  under Section 1030(a)(2)(C), Judge Ware did not need to address Facebook's alternative argument

23  that Defendants had also violated Section 1030(a)(4), which would require a showing that the taken

24  information had value. Accordingly, as Defendants correctly point out, Judge Ware in the

25  February 16 order did not explicitly analyze whether the taken information had value. Thus,

26  Defendants' argument is meritless. Defendants have not shown that Judge Ware manifestly failed

27  to consider a dispositive legal argument or that Judge Ware clearly erred.

28

United States District Court
For the Northern District of California

11

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

1        Defendants' arguments regarding § 502(c) likewise are unavailing. Section 502(c)

2    prohibits, among other things, a person from "knowingly access[ing] and without permission

3    tak[ing], cop[ying] or ma[king] use of any data from a computer, computer system or computer

4    network." Cal. Penal Code § 502(c)(2). Section 502(e)(1) confers standing for a civil cause of

5    action on an "owner or lessee of the . . . data who suffers damage or loss by reason of a violation of

6    any of the provisions of subdivision (c)." In Section C below, the Court addresses the "damage or

7    loss" requirement.

8        Judge Ware determined that Defendants' admission established that Defendants had

9    violated § 502(c), and Judge Ware further determined that Facebook had suffered a loss as a result

10   of that violation. ECF No. 275 at 14-15; ECF No. 89 at 8. As with Section 1030(a)(2)(C) of the

11   CFAA, the plain language of § 502(c) does not require that any data that was taken be valuable.

12   Defendants offered no case law in their opposition to Facebook's § 502/CFAA Motion and do not

13   offer any case law in this motion suggesting that § 502(c) requires that the data that was taken be

14   valuable. *See* ECF No. 242 at 4-5; Mot. Default. J. at 5. Thus, Defendants have not shown that

15   Judge Ware's finding that Defendants were liable under § 502(c) reflects a manifest failure to

16   consider a dispositive legal theory or clear error.

17       Defendants also include a new argument in the motion for leave to seek reconsideration that

18   because Defendants did not destroy any information or data Defendants are not liable under the

19   CFAA or § 502.[2] Mot. Default J. at 5. Nothing in the plain language of either Section

20   1030(a)(2)(C) or § 502 requires that taken information be destroyed, and Defendants do not point

21   to any case law suggesting otherwise. Furthermore, Defendants do not explain why Defendants did

22   not or could not raise the new argument in their opposition to Facebook's § 502/CFAA Motion.

23   The Court thus finds Defendants' new argument is not grounds for leave to request reconsideration.

24   **C.   Standing**

25   ――――――――――

[2] Defendants also assert that Facebook never had ownership over the information and that the
26   information did not have proprietary value. Mot. Recons. at 5. The Court finds these arguments to
     be duplicative of arguments that Defendants presented to Judge Ware in their opposition to
27   Facebook's Section 502/CFAA Motion. The Court thus finds these arguments do not constitute
     grounds for leave to seek reconsideration.

28                             12
     Case No.: 08-CV-5780-LHK
     ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
     VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
     RELIEF

1    Defendants finally argue that Judge Ware erred in finding that Facebook had established

2    sufficient harm to have standing under the CAN-SPAM Act, § 502, and the CFAA.  Mot. Recons.

3    at 5-6.  Defendants have not made the requisite showing to justify reconsidering the February 16

4    order.

5        1.    **CAN-SPAM Act**

6        To recover under the CAN-SPAM Act, Facebook had to establish that it was "adversely

7    affected by a violation of . . . or a pattern or practice that violates" the Act.  15 U.S.C. § 7706(g)(1).

8    In *Gordon v. Virtumundo, Inc.*, the Ninth Circuit held that to be "adversely affected" under the

9    CAN-SPAM Act, an ISP must experience harm that is "both real and the type experienced by

10   ISPs."  575 F.3d 1040, 1053 (9th Cir. 2009).

11       In this motion, Defendants argue that Facebook's harm evidence fails to meet the standard

12   under *Gordon*.  Defendants' argument, however, is recycled from the argument Defendants made

13   before Judge Ware in opposition to Facebook's CAN-SPAM Motion.  In their opposition to the

14   CAN-SPAM Motion, Defendants argued that under *Gordon* Facebook's claimed injuries do not

15   give rise to standing under the statute.  ECF No. 239 at 14-15.  Defendants repeat that argument in

16   this motion.  Accordingly, Defendants have not established that leave for reconsideration is

17   warranted.

18       The Court further finds that Judge Ware considered Defendants' argument in the February

19   16 order.  In his order, Judge Ware addressed *Gordon* and concluded that Facebook's evidence of

20   costs incurred as a result of investigating Defendants' unauthorized access and the legal fees

21   incurred in trying to stop Defendants' unauthorized access sufficed to confer standing on Facebook

22   under the CAN-SPAM Act.  ECF No. 275 at 8-9.  The analysis of *Gordon* and Facebook's

23   evidence in the February 16 order precludes any claim by Defendants that Judge Ware manifestly

24   failed to address either material facts or legal arguments.  *See id.*

25       There is no clear error or manifest injustice in Judge Ware's analysis.  The February 16

26   order describes how Facebook's evidence of injury from having to address Defendants'

27   unauthorized access amounts to the type of specialized harm against which the CAN-SPAM Act

28

13

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

1    protects. ECF No. 275 at 7-8. *Gordon* advises that "the threshold of standing should not pose a

2    high bar for the legitimate service operations contemplated by Congress" in instituting the CAN-

3    SPAM Act, and so for "well-recognized ISPs or plainly legitimate [ISPs] . . . adequate harm might

4    be presumed." 575 F.3d at 1055. In light of that advice, the Court finds no clear error or manifest

5    injustice in Judge Ware's holding.

6        **2.    CFAA and § 502**

7        In this motion, Defendants argue that the costs Facebook incurred from investigating

8    Defendants' actions and having Facebook's attorneys respond to Defendants' activities are

9    insufficient to show harm under the CFAA and § 502.

10        The CFAA defines "loss" as:

11        any reasonable cost to any victim, including the cost of responding to an offense,
       conducting a damage assessment, and restoring the data, program, system, or
12        information to its condition prior to the offense, and any revenue lost, cost
       incurred, or other consequential damages incurred because of interruption of
13        service[.]

14    18 U.S.C. § 1030(e)(11).

15        § 502(e)(1) in turn provides that:

16        the owner or lessee of the computer, computer system, computer network,
       computer program, or data who suffers damage or loss by reason of a violation of
17        any of the provisions of subdivision (c) may bring a civil action against the
       violator for compensatory damages and injunctive relief or other equitable relief.
18        Compensatory damages shall include any expenditure reasonably and necessarily
       incurred by the owner or lessee to verify that a computer system, computer
19        network, computer program, or data was or was not altered, damaged, or deleted
20        by the access.

21    § 502 does not further define "loss."

22        Defendants' argument in support of its request for leave to move for reconsideration is

23    unavailing. First, Defendants raised this argument in the opposition to Facebook's § 502/CFAA

24    Motion. ECF No. 242 at 11. To the extent Defendants repeat arguments from their opposition to

25    the § 502/CFAA Motion, Defendants have not established grounds for seeking reconsideration.

26    Defendants add new case law in this motion, but Defendants offer no reasons why they did not or

27    could not present these decisions in Defendants' opposition to Facebook's § 502/CFAA Motion.

28                       14
   Case No.: 08-CV-5780-LHK
   ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
   VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
   RELIEF

United States District Court
For the Northern District of California

1    Second, Judge Ware addressed Defendants' arguments regarding harm under the CFAA and

2  § 502. Judge Ware specifically determined that the costs Facebook incurred to block Defendants

3  from the site, to investigate Defendants' activities, and to have its attorneys attempt to stop

4  Defendants from continuing the activities were sufficient to establish loss under the CFAA and §

5  502. ECF No. 275 at 18; ECF No. 89 at 8. Defendants therefore cannot assert that the order

6  reflects a manifest failure to consider either material facts or dispositive legal arguments.

7    Third, the Court finds no manifest injustice or clear error in the February 16 order regarding

8  Facebook's "loss" under the CFAA or § 502. Given that the CFAA explicitly identifies the "cost

9  of responding to an offense" and "conducting a damage assessment" as types of losses for which

10  the CFAA confers standing, the Court finds no clear error in Judge Ware's determination that

11  Facebook's costs meet the definition of "loss" provided by the CFAA. *See Multiven, Inc. v. Cisco*

12  *Sys., Inc.*, 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010) ("Costs associated with investigating

13  intrusions into a computer network and taking subsequent remedial measures are losses within the

14  meaning of the statute."). The Court also finds that Judge Ware's determination that Facebook's

15  costs satisfy the "loss" requirement under § 502 is not clear error. *See Yee v. Lin*, No. C 12-02474

16  WHA, 2012 WL 4343778, at *3 (N.D. Cal. Sept. 20, 2012) (finding that plaintiff's expenses

17  "associated with responding" to defendant's unauthorized access were sufficient to meet loss

18  requirement under § 502).

19    The Court further finds no manifest injustice or clear error in the February 16 order based

20  on Defendants' late-added case law. *See AtPac, Inc. v. Aptitude Solutions, Inc.*, 730 F. Supp. 2d

21  1174, 1184 (E.D. Cal. 2010) (noting that under the CFAA, "[c]ognizable costs also include the

22  costs associated with assessing a hacked system for damage"); *Farmers Insurance Exchange v.*

23  *Steele Insurance Agency, Inc.*, No. 2:13-cv-00784-MCE-DAD, 2013 WL 3872950, at *21 (E.D.

24  Cal. July 25, 2013) (same).

25    Defendants have not established that leave to request reconsideration of the February 16

26  order is warranted.

27

28

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

## IV.   STEVEN VACHANI'S PERSONAL LIABILITY FOR VIOLATIONS OF THE CAN-SPAM ACT, CFAA, AND CALIFORNIA PENAL CODE § 502

The next issue before the Court is whether there is a genuine issue of material fact as to whether Defendant Steve Vachani, who was CEO of Power Ventures during the time period in question, is personally liable for statutory violations of the CAN-SPAM Act, CFAA, and California Penal Code § 502. For the reasons explained below, the Court concludes Vachani is personally liable as a matter of law and is thus jointly and severally liable with Power Ventures for violations of these statutory provisions.

Before analyzing Vachani's personal liability, the Court first summarizes this Court's previous findings regarding the precise conduct by Power Ventures that led to Judge Ware's finding of Power Venture's liability under the CAN-SPAM Act, CFAA, and California Penal Code § 502. *See* ECF No. 275. The Court first held that Power Ventures, by creating the Launch Promotion and the software that caused Facebook's servers to send out the misleading emails with "@facebookmail.com" addresses to Facebook users, violated the provision of the CAN-SPAM Act which makes it unlawful "for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message, or a transactional or relationship message, that contains, or is accompanied by, header information that is materially false or misleading," 15 U.S.C. § 7704(a)(1). ECF No. 275 at 9-14. Second, the Court held that Power Ventures, by intentionally circumventing technical barriers to take, copy, or make use of data from the Facebook website without permission, violated California Penal Code § 502, which provides that a person is guilty of a public offense if he (1) knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network; (2) knowingly and without permission uses or causes to be used computer services; or (3) knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network. California Penal Code §§ 502(c)(2)(3) & (7). ECF No. 275 at 14-17. Third, the Court held that Power Ventures, by accessing Facebook without authorization, and obtaining information from the Facebook website, violated the provision of CFAA that imposes liability on any party that "intentionally accesses a computer without authorization or exceeds authorized access, and thereby

16

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF

United States District Court
For the Northern District of California

1    obtains . . . information from any protected computer," 18 U.S.C. § 1030(a)(2)(C).  ECF No. 275 at

2    17-19.

3        The Court must decide whether Vachani should be held personally liable for violating these

4    statutory provisions.  The Ninth Circuit has held that "a corporate officer or director is, in general,

5    personally liable for all torts which he authorizes or directs or in which he participates,

6    notwithstanding that he acted as an agent of the corporation and not on his own behalf."  *Comm.*

7    *for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996) (quoting *Transgo, Inc. v.*

8    *Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985)).  "Cases which have found

9    personal liability on the part of corporate officers have typically involved instances where the

10   defendant was the 'guiding spirit' behind the wrongful conduct, . . . or the 'central figure' in the

11   challenged corporate activity."  *Davis v. Metro Productions, Inc.*, 885 F.2d 515, 523 n.10 (9th Cir.

12   1989).  Under such circumstances, both the corporation and the officers or directors who

13   participated in the tortious conduct may be held liable.  *See Moseley v. U.S. Appliance Corp.*, 155

14   F.2d 25, 27 (9th Cir. 1946).  Thus, where an officer authorized, directed, or participated in a

15   corporation's tort or statutory violation, the officer can be held personally liable.  *See United States*

16   *v. Reis*, 366 Fed. Appx. 781, 782 (9th Cir. 2010) (finding personal liability where corporate officer

17   was an active participant in the acts giving rise to corporate liability under the Resource

18   Conservation and Recovery Act); *Dish Network, LLC v. Sonicview USA, Inc.*, 2012 WL 1965279,

19   at *11 (S.D. Cal. May 31, 2012), *reconsideration denied*, 2012 WL 4339047 (finding personal

20   liability of several corporate officers who were the "guiding spirits" of the corporation's statutory

21   violations of the Digital Millennium Copyright Act and the Federal Communications Act).

22       In this case, the Court must assess whether there is a genuine issue of material fact as to

23   whether Vachani directed and authorized the specific activities giving rise to Power Ventures'

24   liability to a degree that reflects more than simply his supervisory role as CEO of the company.

25   More specifically, the Court assesses whether he was a "guiding spirit" or "central figure" in Power

26

27

28

<div style="text-align:center">17</div>

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

1    Venture's unlawful access to and use of the Facebook website.[3] *Davis*, 885 F.2d at 523 n.10.

2    Again, the unlawful activities that led to Power Venture's liability under the three relevant statutes

3    were 1) creating the Launch Promotion and the software that caused Facebook's servers to send out

4    the misleading emails to Facebook users; 2) circumventing technical barriers to take, copy, or make

5    use of data from the Facebook website without permission; 3) accessing Facebook without

6    authorization and obtaining information from the Facebook website without authorization. ECF

7    No. 275 at 9-19. Drawing all reasonable inferences in the light most favorable to Vachani, the

8    Court concludes that the undisputed facts prove that Vachani authorized and directed these

9    activities.

10    First, with respect to the creation of the Launch Promotion[4] and the software through which

11    Power Ventures caused Facebook's servers to send out the misleading emails to Facebook users,

12    Vachani admitted he was "controlling and directing [Power's] activities as it related to Facebook,"

13    including "controlling and directing the activities related to the use of the Power 100 campaign in

14    conjunction with Facebook users." ECF No. 299-3 at 27. Vachani also admitted that the Power

15    100 Campaign was his very own idea, ECF No. 229 at 7, and Defendants admit he managed the

16    campaign's implementation. ECF No. 232-2 at 5-6 (Power Venture's Response to Interrogatories,

17    noting Vachani was the "director responsible for developing the technology to allow Power or

18    Power users to continue to access the Facebook website following Facebook's IP blocking" and for

19

20    [3] The Court notes that Facebook does not argue an alter ego theory; namely, it does not ask the Court to pierce the corporate veil in order to hold Vachani liable. In any event, courts have held

21    that where officers direct, order, or participate in the company's tortious conduct, there is no need to pierce the corporate veil to establish the personal liability of the corporate officer. *Chase Inv.*

22    *Servs. Corp. v. Law Offices of Jon Divens & Assocs.*, No. 09–9152, 2010 WL 4056022, at *28 (C.D .Cal. Oct. 14, 2010) ("This principle applies regardless of the piercing of the corporate veil.")

23    [4] Around December 2008, Power Ventures began integrating with Facebook by allowing users to

24    enter their Facebook account information and access the Facebook site through Power.com. FAC ¶ 49-50; Answer ¶ 49-50. Later, Power Ventures initiated a "Launch Promotion," or the Power 100

25    Campaign, that promised Power Venture's users the chance to win a $100 award if they invited and signed up new users. FAC ¶ 65; Answer ¶ 65. Power Ventures gave existing users a list of their

26    Facebook friends Power Ventures had obtained from Facebook, and users had to select the friends who would receive a Power Ventures invitation, which would contain a "@facebookmail.com"

27    sender address. *Id.* ¶ 66-68; *Id.* ¶ 66-68.

28    Case No.: 08-CV-5780-LHK
     ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF

18

United States District Court
For the Northern District of California

1   "creating the email messages sent to Facebook users asking Facebook users to use the Power

2   website to access the Facebook website").[5]  Given these admissions, the Court finds there is no

3   genuine dispute regarding whether Vachani actually led the effort to create the Launch Promotion

4   and to develop the software behind Power Venture's illegal actions.

5           Second, with respect to Power Venture's circumvention of Facebook's technical barriers to

6   take, copy, or make use of data from the Facebook website without permission, the undisputed

7   facts show that Vachani anticipated Facebook's attempts to block Power Venture's access and

8   oversaw the implementation of a system that would be immune to such technical barriers so that

9   Power Ventures could access Facebook's network.  Vachani admitted that he directed the

10  company's decision to circumvent Facebook's blocks of Power Venture's IP addresses.  ECF No.

11  299-3 at 6-7 (Vachani deposition in which he admits he "was the person making the executive

12  decision . . . to ensure that Facebook could not block Power.com"); ECF No. 299-3 at 28-29

13  (Vachani deposition admitting he controlled and directed employees' activities related to ensuring

14  that Power Ventures continued to have access to Facebook); *see also* ECF No. 232-2 at 5-6 (Power

15  Venture's Response to Interrogatories noting that Vachani was the "director responsible for

16  developing the technology to allow Power or Power users to continue to access the Facebook

17  website following Facebook's IP blocking").  There is also other evidence that Vachani instructed

18  employees to circumvent the blocks he anticipated.  ECF No. 236-6 at 2 (Email from Vachani to

19  staff members stating that "we need to be prepared for Facebook to try and block us . . ."); ECF

20  No. 299-5 at 2 (Email from Vachani to employee noting, "please just make sure they cannot block

21  us").[6]

22          Third, with respect to *obtaining* information from the Facebook website without

23  authorization, Defendants admitted that they "took, copied, or made use of data from the Facebook

---

[5] Defendants also admitted to the court in other papers that Vachani has "been personally involved
in all of Power's operations including the Facebook integration that occurred in December 2008
that gave rise to this litigation."  ECF No. 269 at 7 (response to Judge Joseph Spero regarding
discovery dispute in this litigation).
[6] There is evidence that Vachani took other actions himself as well.  ECF No. 299-3 at 8-9
(Vachani admitting he sent Facebook an email informing Facebook that Power Ventures would
continue to try to access Facebook's services despite Facebook's request that the company stop).

19

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

1  website without Facebook's permission to do so." ECF No. 241-3 at 6 (Defendants' Reponses to

2  Interrogatories). Vachani's admission that he controlled and directed "the activities related to the

3  use of the Power 100 campaign in conjunction with Facebook users," ECF No. 299-3 at 27,

4  suffices to show that there is no genuine dispute regarding whether he led the company's quest to

5  obtain proprietary Facebook information, as that information was a necessary ingredient to the

6  Power 100 Campaign. Ultimately, the Court concludes that these uncontroverted facts demonstrate

7  Vachani was the "guiding spirit" behind Power Venture's efforts to send the misleading spam

8  emails to Facebook users, and thus should be held personally liable.

9      Defendants' arguments to the contrary are unpersuasive. First, Defendants concede that

10  corporate officers may be held liable for torts they authorize or direct, *see* Defendants'

11  Damages/Liability Brief at 4-5, but claim that "corporate executives like Vachani cannot be held

12  liable merely by virtue of their office for the torts of the corporation." *Id*. at 5. This argument

13  neglects to take into consideration Vachani's specific acts with respect to the Power 100 Campaign

14  that went above and beyond his merely advisory role as CEO of the company. Second, Defendants

15  note that "there is no precedent for holding a CEO liable in this type of computer fraud and tort

16  action where the CEO is not the exclusive owner or director . . ." Defendants' Inj. Opp. at 6.

17  Vachani himself similarly argues he was never the sole owner, controlling shareholder, or

18  controlling board member of Power Ventures, which he claims had six other executive officers and

19  multiple board members who had significant influence in decision-making as well. *See* Vachani

20  Damages/Liability Brief at 5-7, 15. It is true that the cases holding corporate officers personally

21  liable for violations of CFAA, CAN-SPAM, or California Penal Code § 502 have involved factual

22  situations in which the officer was either the *sole* officer or a majority shareholder of the company

23  or some combination of both. *F.T.C. v. Sili Neutraceauticals, L.L.C.*, No. 07-C-4541, 2008 WL

24  474116, at *3 (N.D. Ill. Jan. 23, 2008) (finding that sole officer of defendant corporation who

25  formulated, directed, and controlled the acts giving rise to CAN-SPAM liability by the corporation

26  was individually liable under CAN-SPAM); *Facebook v. Fisher*, No. C 09-05842, 2011 WL

27  250395 (N.D. Cal. Jan. 26, 2011) (finding that sole officer of defendant corporation who conducted

28
                                                      20
   Case No.: 08-CV-5780-LHK
   ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
   VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
   RELIEF

1   the acts giving rise to CAN-SPAM and CFAA liability by the corporation was individually liable

2   under CAN-SPAM and CFAA); *Hanger Prosthetics &Orthotics, Inc., v. Capstone Orthopedic Inc.*,

3   556 F.Supp.2d 1122, 1134035 (E.D. Cal. 2008) (denying motion for summary judgment on CFAA

4   and California Penal Code § 502 claims against CEO where CEO owned one third of the

5   corporation and a reasonable jury could infer that he authorized and directed the unlawful acts).

6   However, Defendants fail to argue why an officer's majority shareholder status or sole officer

7   position should make any difference to the liability outcome, especially given clear Ninth Circuit

8   law in various other statutory contexts that holds corporate officers liable regardless of whether

9   they are majority shareholders or sole officers. *See, e.g., Coastal Abstract Serv. Inc. v. First*

10  *American Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999) (holding officer of insurance company

11  personally liable for violations of the Lanham Act despite the fact that he was acting as a corporate

12  agent when committing the illegal conduct, without any discussion of his shareholder status).

13  Accordingly, given the overwhelming evidence of Vachani's personal involvement in the unlawful

14  acts leading to the statutory violations in this case, Defendants have failed to show that there is a

15  genuine disputed issue of material fact concerning Vachani's personal liability, and the Court finds

16  Vachani personally liable as a matter of law for violations of CAN-SPAM, CFAA, and California

17  Penal Code § 502.

18  **V.    DAMAGES**

19          In its memorandum in support of its request for injunctive relief, Facebook expressly

20  waives its entitlement to attorneys' fees under the CFAA and its right to exemplary damages under

21  California Penal Code § 502. Facebook Inj. Brief at 2.[7]  However, Facebook seeks statutory

22  damages under CAN-SPAM, asks the Court to treble damages, and also seeks compensatory

23  damages under either CFAA or California Penal Code § 502. *Id.* at 1-13.

24  **A.    Facebook is entitled to damages under the CAN-SPAM ACT**

25

26

27  _____
    [7] Facebook had previously requested punitive damages under Penal Code § 502. Facebook's
    Damages/Liability Brief at 10.

28                                                    21
    Case No.: 08-CV-5780-LHK
    ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
    VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
    RELIEF

United States District Court
For the Northern District of California

1    Under the CAN–SPAM Act, a plaintiff may elect to recover monetary damages in an

2  amount equal to the greater of actual losses or statutory damages. 15 U.S.C. § 7706(g)(1)(B).

3  Facebook elects to recover statutory damages. It is well established that "[a] plaintiff may elect

4  statutory damages regardless of the adequacy of the evidence offered as to his actual damages and

5  the amount of the defendant's profits . . . and if statutory damages are elected, the court has wide

6  discretion in determining the amount of statutory damages to be awarded, constrained only by the

7  specified maxima and minima." *Facebook v. Wallace*, No. 09-798, 2009 WL 3617789, at *2 (N.D.

8  Cal. Oct. 29, 2009) (citation omitted) (internal quotations omitted). However, a statutory damages

9  award may violate the due process rights of a defendant "where the penalty prescribed is so severe

10  and oppressive as to be wholly disproportioned to the offense and obviously unreasonable."

11  *United States v. Citrin*, 972 F.2d 1044, 1051 (9th Cir. 1992) (citation omitted).

12    CAN–SPAM Act statutory damages are calculated as follows:

13  (3) Statutory damages.

14  (A) In general. For purposes of paragraph (1)(B)(ii), the amount determined under this paragraph is
15  the amount calculated by multiplying the number of violations (with each separately addressed
    unlawful message that is transmitted or attempted to be transmitted over the facilities of the
16  provider of Internet access service, or that is transmitted or attempted to be transmitted to an
    electronic mail address obtained from the provider of Internet access service in violation of section
17  5(b)(1)(A)(i) [15 USCS § 7704(b)(1)(A)(i) ], treated as a separate violation) by—

18
        (i) up to $ 100, in the case of a violation of section 5(a)(1) [15 USC § 7704(a)(1)]; or
19        (ii) up to $ 25, in the case of any other violation of section 5 [15 USC § 7704].

20  (B) Limitation. For any violation of section 5 [15 USCS §7704] (other than section 5(a)(1) [15
21  USC 7704(a)(1) ] ), the amount determined under subparagraph (A) may not exceed $ 1,000,000.

22  (C) Aggravated damages. The court may increase a damage award to an amount equal to not more
    than three times the amount otherwise available under this paragraph if—
23
        (i) the court determines that the defendant committed the violation willfully and knowingly;
24        or
        (ii) the defendant's unlawful activity included one or more of the aggravated violations set
25        forth in section 5(b) [15 USC § 7704(b)].
26
    15 U.S.C. § 7706(g)(3).
27
                                         22
28  Case No.: 08-CV-5780-LHK
    ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
    VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
    RELIEF

United States District Court
For the Northern District of California

1    In this case, Facebook seeks to recover statutory damages pursuant to 15 U.S.C. §

2    7706(g)(3)(A)(i), which are calculated by multiplying the number of Header violations by up to

3    $100.[8]  The Court has already determined Defendants are liable for violating 15 U.S.C. §

4    7704(a)(1) because they initiated "a minimum of 60,000 instances of spamming." ECF No. 275 at

5    9. Facebook thus argues it is entitled to the maximum statutory damages of 100 dollars for each of

6    the 60,627 spam messages Defendants sent to Facebook users.  Facebook Damages/Liability Brief

7    at 2.  In its briefing, Defendants do not appear to contest the fact that they sent 60,627 email

8    messages.  Defendants' Damages/Liability Brief at 2-4.  Facebook argues that the maximum is

9    warranted because Defendants committed "egregious" actions by "designing their spamming

10   campaign to ensure that it would continue notwithstanding any actions Facebook took to stop it"

11   and "us[ing] cash payments to induce third parties to send deceptive electronic messages." *Id.* at 2-

12   3.  Indeed, Defendants undisputedly utilized the incentive of monetary payments as a means to

13   access Facebook users' accounts. FAC ¶¶ 66-70; Answer ¶¶ 66-70 (noting how Power's "Launch

14   Promotion" offered site users 100 dollars if they successfully invited and signed up the most new

15   Power.com users").  Defendants also undisputedly designed a system that would circumvent

16   Facebook's blocking efforts. ECF No. 232-2 at 5-6 (Power Venture's Response to Interrogatories

17   answering that they "develop[ed] the technology to allow Power or Power users to continue to

18   access the Facebook website following Facebook's IP blocking").[9]  Facebook also asks the Court

---

19   [8] Under the CAN-SPAM Act, each message is considered a separate violation. 15 U.S.C.
20   § 7706(g)(3)(i).
     [9] Facebook also argues that Defendants' actions were "egregious" because they "destroyed
21   evidence necessary to establish exactly how many messages, above the 60,627, they initiated."
     Facebook Damages/Liability Brief at 2-3.  There is some evidence that Defendants did in fact
22   delete evidence relevant to this lawsuit.  Facebook's source code expert testified that a database
     called "Power_Logger" was one of two databases that should have recorded information about how
23   many emails were sent to Facebook users throughout the Power 100 campaign. ECF No. 217 at ¶
     31-34.  Defendants admitted that they deleted the Power_Logger database in April 2011. ECF No.
24   299-15 at 4-5 (Vachani admitting he made the decision to delete the database). *See also* ECF No.
     220 at 12 (engineer's declaration in support of Facebook's opposition to Defendants' motion for
25   summary judgment noting that "by deleting the Power_Logger database, Defendants effectively
     erased arguably the most relevant and useful information concerning the number of electronic mail
26   messages that Defendants initiated through execution of their PowerScript software associated with
     the 100x100x100 campaign."); ECF No. 299-36 at 3 (Email from Defendants' counsel answering
27
                                                 23
28   Case No.: 08-CV-5780-LHK
     ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
     VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
     RELIEF

United States District Court
For the Northern District of California

1    to treble the damages, contending that Defendants willfully and knowingly sent the deceptive spam

2    messages to Facebook users. *Id.* at 8-9.[10] The record supports Facebook's contention that

3    Defendants acted knowingly and willfully, *see e.g.* ECF No. 232-2 at 5-6 (Power's Response to

4    Interrogatories answering that Vachani was "responsible for developing the technology to allow

5    Power or Power users to continue to access the Facebook website following Facebook's IP

6    blocking" and for "creating the email messages sent to Facebook users asking Facebook users to

7    use the Power website to access the Facebook website").

8         In light of this evidence, the Court finds that a statutory damages award is warranted in this

9    case. While Defendants argue that the Court should not award any damages under the CAN-

10   SPAM Act because Facebook did not suffer "any specific harm" as a result of the email messages,

11   citing *Gordon v. Virtumundo Inc.*, 575 F.3d 1040 (9th Cir. 2009), *see* Defendants'

12   Damages/Liability Brief at 1-2, this argument fails for two reasons. First, this Court has already

13   determined that under *Gordon*, Facebook has shown that it was "adversely affected" by

14   Defendants' actions within the meaning of the CAN-SPAM Act. ECF No. 275 at 8-9. Second,

15   *Gordon* is inapposite here because it deals with whether a plaintiff has standing to bring a claim

16   under the CAN-SPAM Act as opposed to whether the plaintiff deserves damages once liability

17   under the Act has been determined, as in this case.[11] Nonetheless, exercising its broad discretion to

18   determine an appropriate damages award, the Court finds that the $18,000,000 award requested by

19   Facebook is unnecessary to address the deterrent and punitive purposes of a statutory damages

20   award. Without deciding whether the requested $18,000,000 award would violate Defendants' due

21   

22   Plaintiff's counsel's request to identify the "missing databases related to the number of Launch
     Promotion messages that were sent to Facebook users" and stating that the Power_Logger
23   database, which logs the activities on Power Venture's servers, has "missing tables" because
     Defendant chose not to back up those large files after it ceased operations and closed its server).
24   [10] A court may treble damages under the CAN-SPAM Act where (1) the court determines that the
     defendant committed the violation willfully and knowingly; or (2) the defendant's unlawful activity
25   included one or more of the aggravated violations in §7704(b). 15 U.S.C. § 7706(f)(3)(C).
     [11] Defendant Vachani's own arguments against damages, namely that a damages decision could
26   deter innovation and that "creating CAN-SPAM liability . . . would be unprecedented," are
     similarly unavailing. Vachani Damages/Liability Brief at 12-13. This Court has already found that
27   he is liable, *see supra*, Part IV, and more importantly, damages, not liability, are at issue here.
                                                       24
28   Case No.: 08-CV-5780-LHK
     ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
     VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
     RELIEF

1    process rights, the Court declines to award that amount and finds it sufficient to award $50 per

2    email communication that was sent. This decision is consistent with other cases where courts have

3    declined to award the maximum statutory damages of $100 per violation, instead granting awards

4    of either $50 or $25 per violation of the CAN-SPAM Act. *See Fisher*, 2011 WL 250395 (awarding

5    plaintiffs $50 per violation of the CAN-SPAM Act); *Wallace*, 2009 WL 3617789 at *2 (same);

6    *Tagged, Inc. v. Does 1 through 10*, No. C 09–01713, 2010 WL 370331 (N.D. Cal. Jan. 25. 2010)

7    (awarding plaintiffs only $25 for each of 6,079 spam emails in violation of CAN-SPAM Act in

8    case where, unlike the instant case, *see supra* n.9, there was no evidence Defendants had actively

9    deleted relevant database information to conceal the number of spam messages sent). Thus,

10   Facebook will be granted $50 per email communication that was sent. It will be awarded

11   $ 3,031,350 ($50 for each of the estimated 60,627 spam messages sent) in CAN–SPAM damages.

12        The Court also finds trebling unnecessary given the large size of the primary award amount.

13   This finding is consistent with past cases where, despite defendants' willful and knowing violation

14   of the statutes in question, courts refused to treble damages. *See Fisher*, 2011 WL 250395 (holding

15   that although defendants willfully and knowingly violated the statutes by engaging in the

16   circumvention of Facebook's security measures, the requested maximum statutory award was

17   disproportionate to the gravity of defendants' acts, and thus the court awarded plaintiffs $50 per

18   violation and declined to treble damages); *Wallace*, 2009 WL 3617789 at *2 (holding that although

19   defendant "willfully violated the statutes in question with blatant disregard for the rights of

20   Facebook and the thousands of Facebook users whose accounts were compromised by his

21   conduct," and even violated a temporary restraining order and preliminary injunction, the requested

22   maximum statutory award was not merited and the court awarded plaintiffs $50 per violation and

23   declined to treble damages); *Tagged*, 2010 WL 370331 (awarding $25 for each of 6,079 spam

24   emails for a total amount of $151,975 and declining to treble damages because although

25   defendant's violations were allegedly intentional and willful, a $2,000,000 award was not

26

27

28
                                            25
      Case No.: 08-CV-5780-LHK
      ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
      VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
      RELIEF

1    justified).[12]  Ultimately, a statutory damages award of $3,031,350 along with a permanent

2    injunction which this Court grants, *see infra* Part VI, will adequately serve the purpose of

3    punishment and deterrence in this case.

4    **B.**     **Facebook is entitled to compensatory damages under the CFAA**

5         Under the CFAA, "[a]ny person who suffers damage or loss by reason of a violation of this

6    section may maintain a civil action against the violator to obtain *compensatory* damages and

7    injunctive relief or other equitable relief." 18 U.S.C. § 1030(g) (emphasis added). This Court

8    previously held that Facebook suffered "loss" as a result of Defendants' violation of CFAA. ECF

9    No. 275 at 18. Facebook is thus entitled to recover compensatory damages under the statute.

10   Facebook has established through undisputed testimony[13] that it expended $80,543 to investigate

11   Defendants' actions and for outside legal services in connection with the Defendants' actions.

12   Accordingly, this Court grants Facebook compensatory damages in the amount of $80,543.

13   Defendants' arguments against a grant of compensatory damages are unavailing. Defendants argue

14   that Facebook "makes no effort to quantify any real harm it suffered" or "identify anything that

15   Power misappropriated from Facebook's network." Defendants' Damages/Liability Brief at 3.

16   Again, these arguments are irrelevant as they address issues on the merits that have already been

17

18   [12] Facebook cites two default judgment orders in support of its request for $18,000,000. Facebook
Damages/Liability Brief at 2-3. In *Facebook v. Guerbuez*, No. C 08–03889 (N.D. Cal. Nov. 21,

19   2008), Facebook was awarded $873 million against a defendant who sent four million spam emails
to other Facebook users. In *Myspace v. Wallace*, 2008 U.S. Dist. LEXIS 75752 (C.D. Cal. May 28,

20   2008), Myspace was awarded $223 million against a defendant who had sent nearly 400,000
messages and posted 890,000 comments from 320,000 Myspace.com user accounts which were

21   "hijacked." Here, in contrast, Defendants sent an estimated 60,627 individual emails.
Accordingly, the Court concludes that it is just to award $3,031,350. Further, even if, as Facebook

22   asserts, there are "tens of thousands of additional messages that Defendants littered through
Facebook that cannot be accounted for in the damages calculation" due to Defendants' alleged

23   destruction of the relevant database information, *see* Facebook Damages/Liability Brief at 6, the
Court finds that a $3,031,350 award is sufficient, as courts in this district have granted awards

24   proportionate to this award for similar violations. *See Tagged*, 2010 WL 370331 (awarding
plaintiff $151,975 for 6,079 emails that violated the CAN-SPAM Act where defendants' actions

25   were intentional and willful and where defendant circumvented plaintiff's security measures like in
this case).

26   [13] This Court previously recognized that "Defendants do not dispute the accuracy or veracity of
[the] evidence of [Facebook's] expenditures." ECF No. 275 at 8. Indeed, Defendants never filed a

27   rebuttal brief to Facebook's expert report regarding the monetary damages Facebook incurred.
ECF No. 299-26 (Expert Report of Richard Ostiller).

                           26

28   Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

1  decided; this Court previously found that Facebook *did* incur a "loss" under CFAA, and that Power

2  Ventures *did* obtain information from Facebook without permission. ECF No. 275 at 18.[14]

3  ## VI.  PERMANENT INJUNCTIVE RELIEF

4        Facebook moves for permanent injunctive relief to prevent future statutory violations by

5  Defendants Vachani and Power Ventures. The CAN–SPAM Act authorizes the Court to grant a

6  permanent injunction "to enjoin further violation by the defendant." 15 U.S.C. § 7706(g)(1)(A).

7  Likewise, the CFAA provides that "[a]ny person who suffers damage or loss by reason of a

8  violation of [§1030] may maintain a civil action against the violator to obtain compensatory

9  damages and injunctive relief or other equitable relief." 18 U.S.C.A. § 1030(g). California Penal

10  Code § 502 also allows a plaintiff to obtain injunctive relief. California Penal Code § 502(e)(1).

11        A party seeking a permanent injunction must make a four-part showing: (1) that it has

12  suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are

13  inadequate to compensate for that injury; (3) that, considering the balance of hardships between the

14  plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not

15  be disserved by a permanent injunction. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388,

16  390 (2006).[15] The Court has discretion to grant or deny permanent injunctive relief. *Id.* at 391.

17

18

---

19  [14] As the Court decides to grant Facebook compensatory damages under CFAA, the Court need not
20  and does not analyze Facebook's alternative argument that Facebook deserves compensatory
    damages under California Penal Code Section 502(e)(1). Facebook's Damages/Liability Brief at 9.
21  [15] Defendants cite Ninth Circuit law holding that when an injunction is sought to prevent the
    violation of a federal statute which specifically provides for injunctive relief, future violations are
22  presumed once a statutory violation is shown and the standard requirements for equitable relief
    need not be satisfied before an injunction is granted. Facebook Inj. Brief at 6 (citing *Silver Sage*
23  *Partners, LTD v. City of Desert Hot Springs*, 251 F.3d 814, 826-27 (9th Cir. 2001) (Fair Housing
    Act context). The Court notes that although some courts have granted statutory injunctions in
24  similar contexts without analyzing the traditional four factor test, *see Tagged*, 2010 WL
    370331(CFAA and California Penal Code §502); *Fisher*, 2011 WL 250395 (CAN-SPAM Act and
25  CFAA context), this Court declines to do so in light of Supreme Court authority reemphasizing the
    traditional four factor test. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-93 (2006)
26  ("According to well established principles of equity, a plaintiff seeking a permanent injunction
    must satisfy a four-factor test before a court may grant such relief" and noting that the Supreme
27  Court "has consistently rejected invitations to replace traditional equitable considerations with a
    rule that an injunction automatically follows a determination that a copyright has been infringed.")
                                                            27
28  Case No.: 08-CV-5780-LHK
    ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
    VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
    RELIEF

1    The Court will consider each of these factors in turn, and will then consider whether, on balance,

2    the principles of equity support the issuance of a permanent injunction in this case.[16]

3    **A.      Irreparable Harm**

4            Facebook has shown irreparable injury as a result of Defendants' violations of the law.

5    Judge Ware's previous order granting Facebook summary judgment cited undisputed evidence that

6    Defendants created a software program to access Facebook's website, scraped user information

7    from Facebook, repeatedly changed Power Venture's IP address in order to circumvent technical

8    barriers Facebook had installed, and used that information to cause Facebook's servers to send

9    spam emails to Facebook users with "@facebookmail.com" mailing addresses. ECF No. 275 at 9-

10   13. These activities constituted irreparable harm by harming Facebook's goodwill with its users

11   because Facebook users receiving these emails are likely to associate the spam messages with

12   Facebook. ECF No. 213 at ¶¶ 4-5. *Hotmail Corp. v. Van$ Money Pie Inc.*, 1998 U.S. Dist. LEXIS

13   10729, at *20-21 (N.D. Cal. Apr. 16, 1998) (holding that customer confusion from source of spam

14   emails, which can lead to loss of goodwill, constituted irreparable harm to plaintiff); *Meineke Car*

15   *Care Centers, Inc. v. Quinones*, 2006 WL 1549708, *3 (W.D.N.C. 2006) (finding, in preliminary

16   injunction context, that possible loss in customers resulting from defendants' deceptive suggestion

17   that they were associated with plaintiff constituted irreparable harm). While Defendants argue that

18   Facebook has not produced evidence that its reputation or goodwill with its users has been

19   damaged as a result of Defendants' activities, *see* Defendants' Inj. Opp. at 5, 9, Defendants cite no

20   case law suggesting that such specific and direct evidence is needed to prove harm to goodwill.

21   *C.f. Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F.Supp.2d 1037, 1050 (N.D. Cal. 2004)

22   (emphasis added) ("Damage to a business' goodwill is typically an irreparable injury because it is

---

23   [16] Facebook objects to Vachani's declaration submitted in support of Defendants' Opposition to
24   Injunctive Relief on the grounds that Vachani lacks personal knowledge for his various
     conclusions, including whether Facebook received any complaints about Defendants' conduct, and
25   because he is not competent to testify regarding the various legal conclusions he makes, such as
     claiming "Power did not obtain [anything] . . . of value from Facebook." ECF No. 357-1;
26   Facebook Injunction Brief at 2. For purposes of this Order only, the Court finds that Vachani's
     lack of qualifications and personal knowledge affect the weight his testimony should be accorded
27   and not its admissibility. Thus, Facebook's objection is OVERRULED.

28                                                                  28
     Case No.: 08-CV-5780-LHK
     ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
     VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
     RELIEF

United States District Court
For the Northern District of California

1   *difficult to calculate*"); *see also Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 17 (1st

2   Cir. 2004) (rejecting argument that "only *direct* evidence (with no room for inference) may

3   establish harm to goodwill" in the trademark law context).[17]  As Facebook has shown irreparable

4   harm, this factor weighs in favor of a permanent injunction.

5   **B.    Inadequacy of Money Damages**

6           Facebook has established that "remedies available at law, such as monetary damages, are

7   inadequate to compensate for [its] injury," *eBay*, 547 U.S. at 391, for three reasons.  First, money

8   damages will not ensure that Defendants will not take steps again in the future to spam Facebook

9   users, which is a possibility.  Defendants may still possess the software that enabled their illegal

10  activities, and like in other cases in this district, Defendants also "deliberately implemented other

11  tactics to circumvent plaintiff's security measures." *Tagged*, 2010 WL 370331, at *12.

12  Defendants may even still possess Facebook-user data which they misappropriated.  Because there

13  is a "reasonable likelihood of defendant's future violations," injunctive relief is warranted. *Id*;

14  *Pyro Spectaculars North Inc. v. Souza*, 861 F.Supp.2d 1079, 1092 (E.D. Cal. March 21, 2012)

15  (granting injunction in part because defendant still possessed plaintiff's data).  Second, money

16  damages will not compensate for the loss of goodwill Facebook may have suffered due to any

17  confusion created by Defendants' emails. *See Hotmail*, 1998 U.S. Dist. at *21 (holding that loss of

18  goodwill caused by confusion generated by misleading spam emails "is not easily quantified and

19  not adequately compensated with money damages.").  Last, the Ninth Circuit has held that a district

20  court has authority to issue an injunction "where the plaintiffs can establish that money damages

21  will be an inadequate remedy due to impending insolvency of the defendant . . ." *In re Estate of*

22  *Marcos*, 25 F.3d 1467 (9th Cir. 1994).  Here, Defendants' voluntary petitions for bankruptcy, *see*

---

23  [17] Defendants also argue Facebook has not shown irreparable harm because Facebook has failed to
24  submit proof of user complaints about the spam messages. Defendants' Inj. Opp. at 9.  However,
    Facebook has provided evidence that in general, deceptive spam messages detract from Facebook
25  user experiences and have been the source of complaints by Facebook users. ECF 218-8 at ¶ 5
    (Declaration of Ryan McGeehan in support of Facebook's Motion for Partial Summary Judgment
26  noting that "spam messages detract from the overall Facebook experience and are sometimes a
    source of complaints by Facebook users. For instance, in the fourth quarter of 2008,
27  Facebook received 71,256 "tickets" (*i.e.*, complaints by users) that used the word 'spam' in them.")
                                                                29
28  Case No.: 08-CV-5780-LHK
    ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
    VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
    RELIEF

1    ECF No. 323, 324, suggest they may be unable to satisfy a damages award and that non-monetary

2    relief may be necessary.

3        In rebuttal, Defendants argue they never misappropriated Facebook user data. Defendants'

4    Inj. Opp. at 8.[18]  Defendants emphasize that one of their "primary" objections to injunctive relief is

5    that "Defendants are not in possession of any Facebook data or any user data that was not expressly

6    granted to Power by the users themselves." *Id.* at 3. This argument is irrelevant to the issue at

7    hand because the Court has already ruled that Defendants did misappropriate data without

8    Facebook's permission. ECF No. 275 at 14-18. Defendants also argue that the Court should not

9    consider the fact that they may still possess the software that enabled the alleged violations because

10   Power Ventures ceased operations in 2011. Defendants' Inj. Opp. at 8. But this argument ignores

11   the fact that Defendants could easily start another company or give the data to other entities that

12   wish to engage in the illegal spamming conduct.[19] Overall, as money damages will likely be

13   inadequate, this factor weighs in favor of a permanent injunction.

14   **C.    Balance of Hardships**

15       The balance of hardships analysis also weighs in favor of granting Facebook a permanent

16   injunction. Defendants have been found liable for violating various laws, *see* ECF No. 275, and

17   while an injunction would simply serve to force their compliance with the law, *see Myspace v.*

18   *Wallace*, 498 F.Supp.2d 1293, 1306 (C.D. Cal. July 3, 2007) (holding defendant would experience

19   no hardship if enjoined from committing further violations of the CAN-SPAM Act), Facebook may

20   suffer harm if an injunction is not issued. As this Court previously concluded in its summary

21   judgment order, Facebook has already suffered harm, as it incurred expenditures to both block

22   Defendants' continued access to Facebook and to respond to the spamming emails. ECF No. 275

23

24   [18] *See also* Defendants' Inj. Opp. at 5 ("Facebook is unable to identify anything that Power
     misappropriated from Facebook's network, as Power did not take anything that belonged to
25   Facebook.")

     [19] Defendants also argue that "damages were avoidable" because Defendants allegedly cooperated
26   with Facebook through the litigation. Defendants' Inj. Opp. at 3, 10. This argument is irrelevant;
     the issue is not whether damages were "avoidable" but whether damages are sufficient to
27   compensate Facebook for its injury.

                                                      30
28   Case No.: 08-CV-5780-LHK
     ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
     VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
     RELIEF

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  at 7-10. Absent an injunction Facebook may have to deal with future violations of the law.

2  *Tagged*, 2010 WL 370331, at *12 (granting a preliminary injunction against a defendant who

3  violated CFAA and California Penal Code § 502 in part because defendant might engage in future

4  violations). Indeed, Defendants have demonstrated a willingness to do so, as they did not stop

5  even after requests from Facebook. ECF No. 299-3 at 8-9 (Vachani admitting that he sent

6  Facebook an email informing Facebook that Power Ventures would continue to try to access

7  Facebook's services despite Facebook's request that the company stop). On the other hand,

8  Defendants claim that the requested injunction impermissibly threatens Vachani's employability

9  and livelihood. Defendants' Inj. Opp. at 10-11; Vachani Damages/Liability Brief at 9. However,

10  Defendants fail to provide a persuasive reason why this is the case, and in any event, given that

11  Vachani brought this risk upon himself by violating the law, the balance would not shift in favor of

12  Defendants even if there were evidence to support this speculative claim. Accordingly, the balance

13  of hardships weighs in favor of Facebook.

14  **D.    Public Interest**

15       The public interest weighs in favor of an injunction as well, and courts in this district have

16  reached this conclusion in analogous cases. *See, e.g., Craigslist, Inc. v. Troopal Strategies, Inc.*,

17  2011 U.S. Dist. LEXIS 15625, at *11 (N.D. Cal. 2011) (holding injunction would be in the public

18  interest where defendant violated CFAA). Injunctive relief would serve the public interest by

19  preventing Defendants from impermissibly spamming Facebook users again and setting an

20  example to members of the public who may consider violating these various statutes as well. In

21  passing the CAN–SPAM Act, Congress recognized the burdens which commercial spam poses to

22  the public. 15 U.S.C. § 7701(a)(2) ("The convenience and efficiency of electronic mail are

23  threatened by the extremely rapid growth in the volume of unsolicited commercial electronic

24  mail."). Namely, the public "is forced to incur the costs of needlessly expended energy and time

25  evaluating and eventually discarding defendants' unsolicited messages[.]" *F.T.C. v. Phoenix*

26  *Avatar, LLC*, 2004 WL 1746698, *14 (N.D. Ill. July 30, 2004) (enjoining defendants for violations

27  of the CAN–SPAM Act). Because Defendants' activities fall within those activities Congress

28

31

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

1  deemed detrimental to the public, this factor weighs in favor of Facebook. Defendants' arguments

2  to the contrary are unavailing. While Defendants claim the injunction will pose "unacceptable

3  risks for innovators" and enhancements in social networking technology, Defendants' Inj. Opp. at

4  11, this argument fails to recognize that the injunction will serve to deter only conduct that violates

5  the law. The law explicitly provides for injunctive relief. Thus, to the extent that granting

6  Facebook injunctive relief for Defendants' violations of CFAA and CAN-SPAM may have

7  negative "impacts on innovation, competition, and the general 'openness' of the internet," courts

8  have held that it is up to Congress, not the courts, to decide whether to amend those statutes.

9  *Craigslist Inc. v. 3Taps*, No. CV 12–03816 CRB, 2013 WL 4447520, at *25 (N.D. Cal. Aug. 16,

10  2013) ("[I]t is for Congress to weigh the significance of those consequences and decide whether

11  amendment would be prudent.")

12  **E.  Balance of all four equitable factors**

13  The balance of all four factors weighs strongly in favor of granting an injunction in this

14  case. Thus, the Court grants Facebook its request for permanent injunctive relief against both

15  Power Ventures and Vachani in his individual capacity.[20] This decision is in line with past

16  decisions of this Court. *See Tagged*, 2010 WL 370331, at *12 (granting injunctive relief for

17  violations of CFAA and California Penal Code § 502); *Facebook v. Fisher*, 2011 U.S. Dist. LEXIS

18  9668, at *7-8 (N.D. Cal. Jan. 26. 2011) (granting injunction for violations of CAN-SPAM Act and

19  CFAA); *Microsoft Corp. v. Neoburst Net LLC*, 2004 U.S. Dist. LEXIS 18733, at *2-4 (N.D. Cal.

20

21  [20] While Defendants claim Facebook provides "no basis for enjoining the individual defendant
   from any action given that Vachani never acted independently or otherwise in a personal or
22  individual capacity while employed by Power during the period of Facebook's grievances,"
   Defendants' Inj. Opp. at 6, this argument fails for two reasons. First, as this Court finds that
23  Vachani is personally liable, he may be enjoined in his individual capacity. *FTC v. Sili*
   *Neutraceuticals LLC*, 2008 U.S. Dist. LEXIS 105683 (N.D. Ill. Jan. 23, 2008). Second, even
24  assuming this Court found Vachani was *not* personally liable, Defendants' argument ignores Ninth
   Circuit law holding that Federal Rule of Procedure 65 "establishes that an injunction may bind not
25  only parties to the action but also 'their officers, agents, servants, employees, and attorneys, and
26  [upon] those persons in active concert or participation with them.'" *Comedy Club Inc. v. Improv*
   *West Assocs.*, 553 F.3d 1277, 1287 (9th Cir. 2009) (citing FED. R. CIV. P. 65(d)). Here, Vachani
27  may be enjoined under FRCP 65 as an officer of Power Venture.

28
32

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

1   2004) (granting injunctive relief for violations of CAN-SPAM Act, CFAA, and California Penal

2   Code § 502).[21] Facebook is hereby entitled to a permanent injunction against Power Ventures and

3   Vachani as follows:

4   1. Defendants, their agents, officers, contractors, directors, shareholders, employees, subsidiary

5   companies or entities, affiliated or related companies and entities, assignees, and successors-in-

6   interest, and those in active concert or participation with them, are permanently enjoined from:

7           A. Sending, or assisting others in the sending of, or procuring the sending of unauthorized

8   or unsolicited commercial electronic text messages to users of the Facebook website,

9   www.facebook.com, or via the Facebook website or service.

10          B. Making, or assisting others in making, any false or misleading oral or written statement

11  or representation of material fact when advertising, promoting or selling any good or service,

12  including, but not limited to any false or misleading statement or representation that Defendants,

13  their representatives, or any other person is affiliated or associated with, under contract with, acting

14  in partnership with, endorsed or approved by, or otherwise connected to Facebook or to a service

15  offered by Facebook.

16          C. Accessing or using, or directing, aiding, facilitating, causing, or conspiring with others to

17  use or access the Facebook website or servers for any purpose, without Facebook's prior

18  permission.

19          D. Using any data, including without limitation Facebook-user data and data regarding

20  Facebook's website or computer networks, obtained as a result of the unlawful conduct alleged in

21  the operative complaint in this action.

22          E. Developing, using, selling, offering for sale, or distributing, or directing, aiding, or

23  conspiring with others to develop, sell, offer for sale, or distribute, any software that allows the

24  user to engage in the unlawful conduct alleged in the operative complaint in this action.

25  2. Defendants, their agents, officers, contractors, directors, shareholders, employees, subsidiary

26  companies or entities, affiliated or related companies and entities, assignees, and successors-in-

27  _____

[21] Defendants' brief fails to distinguish or otherwise discuss these relevant authorities.

28

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

Case5:08-cv-05780-LHK   Document372 *SEALED*   Filed09/25/13   Page34 of 34

1  interest, and those in active concert or participation with them shall destroy any software, script(s)

2  or code designed to access or interact with the Facebook website, Facebook users, or the Facebook

3  service. They shall also destroy Facebook data and/or information obtained from Facebook or

4  Facebook's users, or anything derived from such data and/or information.

5  3. Within three calendar days of entry of this permanent injunction and order, Defendants shall

6  notify their current and former officers, agents, servants, employees, successors, and assigns, and

7  any persons acting in concert or participation with them of this permanent injunction.

8  4. Within seven calendar days of entry of this injunction and order, Defendants shall certify in

9  writing, under penalty of perjury, that they have complied with the provision of this order.

10  5. The Court shall continue to retain jurisdiction over the parties for the purpose of enforcing this

11  injunction and order.

12  **VII.   CONCLUSION**

13          The Court finds Defendants have failed to set forth grounds pursuant to Civil L.R. 7-9(b)

14  for leave to file a motion for reconsideration of Judge Ware's February 16 order. Thus, the request

15  for leave is DENIED. The Court finds Vachani personally liable as a matter of law for violations

16  of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-

17  SPAM Act"), 15 U.S.C § 7701; the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030;

18  and California Penal Code § 502. The Court further finds Facebook is entitled to statutory

19  damages in the amount of $3,031,350, compensatory damages in the amount of $80,543, and

20  permanent injunctive relief as described above. The Clerk shall close the file.

21  **IT IS SO ORDERED.**

22

23  Dated: September 25, 2013

24

25

26

27

28

*Lucy H. Koh*

LUCY H. KOH
United States District Judge

34

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

*United States District Court*
*For the Northern District of California*

1

2                                                          **E-Filed 5/11/2009**

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                              SAN JOSE DIVISION

11

12  FACEBOOK, INC.,                    Case Number C 08-5780 JF (RS)

13                    Plaintiff,       ORDER[1] (1) DENYING MOTION TO
                                       DISMISS AND (2) GRANTING IN PART
14           v.                        AND DENYING IN PART MOTION
                                       FOR MORE DEFINITE STATEMENT
15  POWER VENTURES, INC.; STEVEN
    VACHANI; DOE 1, d/b/a POWER.COM; and  [re: doc. no. 17]
16  DOES 2-25,

17                    Defendants.

18

19

20        Plaintiff Facebook, Inc. ("Facebook") alleges that Defendants Power Ventures, Inc. and

21  Power.com (collectively "Power.com") and Steve Vachini ("Vachini") operate an Internet service

22  that collects user information from Facebook's website in violation of the Controlling the Assault

23  of Non-Solicited Pornography and Marketing ("CAN-SPAM") Act, 15 U.S.C. § 7701, *et seq*.;

24  the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq*.; and California Penal

25  Code § 502. Facebook also alleges that Defendants committed direct and indirect copyright

26  infringement when they made copies of Facebook's website during the process of extracting user

27  ───────────────────

28        [1] This disposition is not designated for publication in the official reports.

    Case No. C 08-4052 JF (RS)
    ORDER DENYING MOTION TO DISMISS ETC.
    (JFLC1)

1    information.  In addition, Facebook alleges that the means by which Power.com accessed the

2    Facebook website constituted a violation of the Digital Millennium Copyright Act ("DMCA"),

3    17 U.S.C. § 1201, *et seq.*  Facebook also asserts claims for relief based on state and federal

4    trademark law, as well as a claim for relief under California's Unfair Competition Law ("UCL"),

5    Cal. Bus. & Prof. Code § 17200, *et seq.*

6          Defendants initially moved to dismiss the First Amended Complaint ("FAC") in its

7    entirety pursuant to Fed. R. Civ. P. 12(b)(6) or in the alternative pursuant to Fed. R. Civ. P.

8    12(e), but that motion was withdrawn with respect to the CAN-SPAM, CFAA, and § 502 claims

9    in light of Facebook's opposition.  Defendants now seek dismissal of Facebook's remaining

10   claims for relief (counts 4 through 8 in the FAC).  For the reasons set forth below, the motion to

11   dismiss for failure to state a claim will be denied, and the motion for a more definite statement

12   will be granted in part and denied in part.

13                                    **I. BACKGROUND**

14         Facebook developed and operates what is now one of the most popular social networking

15   websites.  *See* FAC ¶ 2.  The Facebook website allows users to create user profiles, join networks

16   and "friend" other users, which creates online communities with shared interests and

17   connections.  *See id.*  Every Facebook user must register before using the website, and

18   registration requires the user to assent to Facebook's Terms of Use, which essentially is a user

19   agreement that sets forth the acceptable terms of use.  *See id.* Ex. A.  Users who agree to the

20   Terms of Use have a limited license to access and use Facebook's website and services.  *See id.* ¶

21   31 and Ex. A at 3 ("Any use of the Site or the Site Content other than as specifically authorized

22   herein, without the prior written permission of Company, is strictly prohibited and will terminate

23   the license granted herein.").  Registered users create and customize their own user profiles by

24   adding content such as personal information, content related to their interests, and photographs,

25   which can then be shared with other Facebook users with whom the user has a Facebook

26   connection.  *Id.* ¶ 22.  Facebook users may be contacted only by Facebook or other registered

27   Facebook users.  *Id.* ¶ 23.  Any unauthorized use of Facebook's website will result in the

28   termination of a user's license.  *See id.* ¶ 31.

                                            2

1    Facebook also grants third parties a limited license to create applications that interact

2  with Facebook's proprietary network, provided that these applications adhere to a standardized

3  set of protocols and procedures and that the third-party developers agree to Facebook's

4  Developer Terms of Service, the Terms of Use, and any other applicable policies. FAC ¶ 27. In

5  addition, Facebook permits integration with third-party websites, and even permits exchange of

6  proprietary data with third-party websites, provided that these third party websites use the

7  "Facebook Connect" service, which enables users to "connect" their Facebook identity, friends

8  and privacy to those third-party websites. *Id*. ¶ 27. Facebook does not permit third-party access

9  to Facebook user profile data unless such access is through Facebook Connect. *Id.* ¶ 28.

10    The corporate Defendants are alleged to be California entities and/or organizations that

11  do business in California. FAC ¶¶ 9-10. Defendant Vachini allegedly is the CEO of Defendant

12  Power.com, which is a website designed to integrate various social networking or email accounts

13  into a single portal *Id*. ¶¶ 5, 11, 45. A user has discretion with respect to whether to use

14  Defendants' services, and the user determines which accounts will be aggregated. *See id.* ¶ 50.

15  After a user provides his or her user names and passwords to Defendants, the Power.com service

16  takes this access information to "scrape" user data from those accounts. *Id*. ¶¶ 50-52.

17  Subsequently, the user can log on to Power.com to view the data culled from Facebook and any

18  other social networking sites or email accounts. *See id.* at ¶ 52.

19    Prior to the filing of the FAC, the parties attempted to negotiate an arrangement whereby

20  Power.com could continue to access Facebook's website provided that it did so through the

21  Facebook Connect application. FAC ¶¶ 58-61. Those discussions proved fruitless, however, and

22  in late December 2008 Defendants informed Facebook that Power.com would continue to

23  operate without using Facebook Connect. *Id.* ¶ 62. Defendants allegedly continue to scrape

24  Facebook's website, despite technological security measures to block such access. *Id*. ¶¶ 63-64.

25  Defendants also have solicited Facebook users to join Power.com through promotional emails.

26  *Id*. ¶¶ 65-66, 70.

27

28

3

Case No. C 08-5780 JF (RS)
ORDER DENYING MOTION TO DISMISS ETC.
(JFLC1)

## II. LEGAL STANDARD

When considering a motion to dismiss, the plaintiff's allegations are taken as true and the Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). For a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), "[d]ismissal is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted).

"If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading." Fed. R. Civ. P. 12(e). "Whether to grant a Rule 12(e) motion is within the discretion of the trial court." *Babb v. Bridgestone/Firestone*, 861 F. Supp. 50, 52 (M. D. Tenn., 1993). However, "[s]uch motion [is] not favored by the courts since pleadings in federal courts are only required to fairly notify the opposing party of the nature of the claim." *Resolution Trust Corp. V. Dean*, 854 F. Supp. 626, 629 (D. Ariz. 1994) (citing *A.G. Edwards & Sons, Inc. V. Smith*, 736 F. Supp. 1030, 1032 (D. Ariz. 1989)). "[The motion] should not be granted unless the defendant cannot frame a responsive pleading." *Falamore, Inc. V. Edison Bros. Stores, Inc.*, 525 F. Supp. 940 ( E.D. Cal. 1981).

## III. DISCUSSION

### A. Copyright Infringement

To state a claim for copyright infringement, a plaintiff need only allege (1) ownership of a valid copyright and (2) copying of original elements of the work. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). The FAC alleges that Defendants accessed the Facebook website and made unauthorized copies of the website or created derivative works

4

1    derived from the Facebook website. *See* FAC ¶¶ 124-27.

2         Defendants contend that Facebook's copyright allegations are deficient because it is

3    unclear which portions of the Facebook website are alleged to have been copied. Defendants

4    also argue that there are significant portions of the website that are not protected by copyright

5    because Facebook does not hold any rights to content posted by users. In response, Facebook

6    argues that Defendants make a "cache" copy of the website on each occasion of unauthorized

7    access. Facebook also argues that it need not define the exact contours of the protected material

8    because copyright claims do not require particularized allegations.

9         The facts as pled in the instant case may be analogized to those in *Ticketmaster L.L.C. v.*

10   *RMG Techs, Inc.*, 507 F. Supp. 2d 1096 (C.D. Cal. 2007), where in the context of a motion for a

11   preliminary injunction the district court found that the defendant made a copy of Ticketmaster's

12   website each time its automated program accessed the website. *See id.* at 1106. ("copies of

13   webpages stored automatically in a computer's cache or random access memory ("RAM") upon a

14   viewing of the webpage fall within the Copyright Act's definition"). *See also MAI Sys. Corp. v.*

15   *Peak Computer, Inc.*, 991 F.2d 511, 519 (9th Cir.1993) ("since we find that the copy created in

16   the RAM can be 'perceived, reproduced, or otherwise communicated,' we hold that the loading

17   of software into the RAM creates a copy under the Copyright Act."). In addition, any users that

18   accessed the Ticketmaster website were bound its terms of use, which prohibited the use of

19   automated programs to access content. *Id.* at 1107-10. Under those circumstances, the court

20   found that Ticketmaster had met its burden of showing a likelihood of success on the merits with

21   respect to its direct copyright infringement claim. *Id.* at 1110.

22        Facebook's user agreement prohibits, *inter alia*, the "harvest[ing] or collect[ion] [of]

23   email addresses or other contact information of other users from the Service or the Site by

24   electronic or other means for the purpose of sending unsolicited emails or other unsolicited

25   communications." FAC Ex. A at 4. In addition, the user agreement broadly prohibits the

26   downloading, scraping, or distributing of any content on the website, with the exception being

27   that a user may download his or her own user content. *Id.* at 3. However, not even this

28   exception allows a user to employ "data mining, robots, scraping, or similar data gathering or

                                        5

Case No. C 08-5780 JF (RS)
ORDER DENYING MOTION TO DISMISS ETC.
(JFLC1)

Case5:08-cv-05780-JF Document362, Filed05/17/06, Page49 of 269

1   extraction methods." *Id.* Such actions are explicitly deemed to constitute "unauthorized use."

2   *See id.* Accordingly, the allegations as set forth in the FAC sufficiently allege unauthorized

3   access. Access for purposes that explicitly are prohibited by the terms of use is clearly

4   unauthorized. *See Ticketmaster*, 507 F. Supp. 2d at 1108-1110.

5          In addition, Facebook need not allege the exact content that Defendants are suspected of

6   copying at this stage of the proceedings. There is no requirement that copyright claims must be

7   pled with particularity. *See Perfect 10, Inc. v. Cybernet Ventures, Inc*., 167 F. Supp. 2d 1114,

8   1120 (C.D. Cal. 2001) ("Copyright claims need not be pled with particularity…complaints

9   simply alleging present ownership by plaintiff, registration in compliance with the applicable

10  statute and infringement by defendant have been held sufficient under the rules."). Defendants'

11  argument that Facebook's website is "huge" is irrelevant. According to the FAC, Facebook owns

12  the copyright to any page within its system, including the material located on those pages besides

13  user content, such as graphics, video and sound files. *See* FAC ¶ 135 and Ex. A at 3. Defendants

14  need only access and copy one page to commit copyright infringement.

15         Defendants correctly assert that Facebook does not have a copyright on user content,

16  which ultimately is the information that Defendants' software seeks to extract. However, if

17  Defendants first have to make a copy of a user's entire Facebook profile page in order to collect

18  that user content, such action may violate Facebook's proprietary rights.[2] Accordingly, the

19  motion to dismiss the claim for direct copyright infringement will be denied.

20         The FAC also sufficiently states a claim for indirect copyright infringement. "One

21  infringes contributorily by intentionally inducing or encouraging direct infringement, and

22  infringes vicariously by profiting from direct infringement while declining to exercise a right to

23  stop or limit it." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)

24  (citations omitted). Viewing the allegations in the FAC as true, the utilization of Power.com by

25  _____

26         [2] A collection of non-copyrighted material arranged in an original way is subject to
    copyright protection. *See* 17 U.S.C. § 101; *Harper House, Inc. v. Thomas Nelson, Inc*., 889 F.2d

27  197, 204 (9th Cir. 1989). For example, in *Ticketmaster* the factual information about concerts
    and tickets was not by itself copyrightable, but Ticketmaster's arrangement of that information

28  on its website presumably was. *See id.*

6

Case No. C 08-5780 JF (RS)
ORDER DENYING MOTION TO DISMISS ETC.
(JFLC1)

1  Facebook users exceeds their access rights pursuant to the Terms of Use. *See* FAC Ex. A at 3-4.

2  Moreover, when a Facebook user directs Power.com to access the Facebook website, an

3  unauthorized copy of the user's profile page is created. *See id.* ¶ 125. The creation of that

4  unauthorized copy through the use of Defendants' software may constitute copyright

5  infringement. *See Ticketmaster*, 507 F. Supp. 2d at 1110-11 ("Designing and marketing a device

6  whose purpose is to allow unauthorized access to, and thus to infringe on, a copyrighted website

7  is sufficient to trigger contributory liability for infringement committed by the device's

8  immediate users."). The motion to dismiss the claim for indirect copyright infringement also will

9  be denied.

10        B. Violation of the DMCA

11        The elements necessary to state a claim under the DMCA are (1) ownership of a valid

12  copyright; (2) circumvention of a technological measure designed to protect the copyrighted

13  material; (3) unauthorized access by third parties; (4) infringement because of the circumvention;

14  and (5) the circumvention was achieved through software that the defendant either (i) designed or

15  produced primarily for circumvention; (ii) made available despite only limited commercial

16  significance other than circumvention; or (iii) marketed for use in circumvention of the

17  controlling technological measure. *See Chamberlain Group, Inc. v. Skylink Techs, Inc.*, 381 F.3d

18  1178, 1203 (Fed. Cir. 2004). *See also Ticketmaster*, 507 F. Supp. 2d at 1112. As with a

19  copyright infringement claim, there is no heightened pleading requirement that mandates detailed

20  allegations. *Perfect 10*, 167 F. Supp. 2d at 1120.

21        Defendants argue that Facebook's DMCA claim also is insufficient for essentially the

22  same reasons discussed previously, except that they also argue that the unauthorized use

23  requirement is not met because it is users who are controlling access (via Power.com) to their

24  own content on the Facebook website. However, this argument relies on an assumption that

25  Facebook users are authorized to use Power.com or similar services to access their user accounts.

26  The Terms of Use negate this argument. Any user is barred from using automated programs to

27  access the Facebook website. *See* FAC Ex. A at 3-4. Users may have the right to access their

28  own content, but conditions have been placed on that access. *See id.* The FAC further alleges

7

that Facebook implemented specific technical measures to block access by Power.com after

Defendants informed Facebook that they intended to continue their service without using

Facebook Connect, and that Defendants then attempted to circumvent those technological

measures.  FAC ¶¶ 63, 64.  Accordingly, the motion to dismiss the DMCA claim will be denied.

### C.  Trademark Infringement

The Lanham Act imposes liability upon any person who (1) uses an infringing mark in

interstate commerce, (2) in connection with the sale or advertising of goods or services, and (3)

such use is likely to cause confusion or mislead consumers.  15 U.S.C. § 1114(1)(a).  The

FAC states that Facebook has been the registered owner of the FACEBOOK mark since 2004.

FAC ¶¶ 38-39, 146.  The FAC further alleges that Defendants use the mark in connection with

their business.  *See id.* ¶ 70.  At no time has Facebook authorized or consented to Defendants'

use of the mark.  *Id*. ¶ 79.

Defendants again argue that the FAC does not provide sufficient detail and that Facebook

is required to provide concise information with respect to the trademark infringement allegations,

including information about "each instance of such use."  However, particularized pleading is not

required for a trademark infringement claim.  *See Perfect 10*, 167 F. Supp. 2d at 1122.  The FAC

incorporates a screenshot of an email sent by Defendants to Facebook users that not only

incorporates the protected mark but also appears to have been originated from or been endorsed

by Facebook.  *See* FAC ¶ 70.  The FAC also states that Defendants' unauthorized use of the

Facebook mark was likely to "confuse recipients and lead to the false impression that Facebook

is affiliated with, endorses, or sponsors" Defendants' services and the Power.com website.  *Id*. ¶¶

73, 76, 78.  These allegations are sufficient to state a claim for trademark infringement.  *See*

*Perfect 10*, 167 F. Supp. 2d at 1122 ("Perfect 10's allegations concerning the scope of the alleged

violations and Cybernet's alleged role, Cybernet is put on notice of the claims' nature and has

enough information to draft its pleadings.").

"To state a claim of trademark infringement under California common law, a plaintiff

need allege only 1) their prior use of the trademark and 2) the likelihood of the infringing mark

being confused with their mark."  *Wood v. Apodaca*, 375 F. Supp. 2d 942, 947-48 (N.D. Cal.

8

1    2005).  For the same reasons set forth above, the motion to dismiss the common law trademark

2    claim will be denied.

3         D.  UCL Claim

4         The Ninth Circuit "has consistently held that state common law claims of unfair

5    competition and actions pursuant to California Business and Professions Code § 17200 are

6    'substantially congruent' to claims made under the Lanham Act." *Cleary v. News Corp.*, 30 F.3d

7    1255, 1263-64 (9th Cir. 1995). *See also Jackson v. Sturkie*, 255 F. Supp. 2d 1096, 1107 (N.D.

8    Cal. 2003) (adequately pled Lanham Act claim meant that UCL claim also was pled sufficiently).

9    Facebook's UCL claim does not reference the alleged trademark violations specifically, but it

10   does incorporate all the prior allegations in the pleading by reference. *See* FAC ¶ 157.

11   Otherwise, the UCL count merely alleges that Defendants have engaged in "unlawful, unfair,

12   and/or fraudulent business acts or practices" in violation of the UCL.  Accordingly, from the face

13   of the FAC it is unclear whether Facebook's UCL claim is based on its trade dress allegations

14   alone or whether other portions of the FAC, such as the CFAA or CAN-SPAM claims, are

15   intended to form separate and independent bases for the UCL claim.  Accordingly, the Court will

16   grant Defendants' motion for a more definite statement pursuant to Rule 12(e) with respect to the

17   UCL claim.  *See Anderson v. Dist. Bd. of Trustees of Cent. Fl. Comm. Coll.*, 77 F.3d 364,

18   367(11th Cir. 1996) ("Experience teaches that, unless cases are pled clearly and precisely, issues

19   are not joined, discovery is not controlled, the trial court's docket becomes unmanageable, the

20   litigants suffer, and society loses confidence in the court's ability to administer justice.").  Within

21   thirty (30) days of the date of this order, Facebook shall file a short statement clarifying the

22   ground(s) underlying its UCL claim.

23        **IV.  ORDER**

24        Good cause therefor appearing, IT IS HEREBY ORDERED that the motion to dismiss is

25   DENIED and the motion for a more definite statement is GRANTED IN PART and DENIED IN

26   PART.  Defendants shall file an answer to the FAC within thirty (30) days of the date that Facebook

27   files its supplemental statement.

28

Case No. C 08-5780 JF (RS)
ORDER DENYING MOTION TO DISMISS ETC.
(JFLC1)

1

2 IT IS SO ORDERED.

3

4

5

DATED: May 11, 2009

6

7 _____

JEREMY FOGEL

8 United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10

Case No. C 08-5780 JF (RS)
ORDER DENYING MOTION TO DISMISS ETC.
(JFLC1)

1  This Order was served on the following persons:

2  Alan R Plutzik    aplutzik@bramsonplutzik.com

3  Daralyn Durie    ddurie@durietangri.com

4  David P. Chiappetta    dchiappetta@perkinscoie.com, docketmp@perkinscoie.com,
   docketsflit@perkinscoie.com, jcutler@perkinscoie.com, jmccullagh@perkinscoie.com,
5  kwall@perkinscoie.com, mheap@perkinscoie.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<center>11</center>

Case No. C 08-5780 JF (RS)
ORDER DENYING MOTION TO DISMISS ETC.
(JFLC1)

# EXHIBIT 25

FACEBOOK, INC.,

PLAINTIFF,

V.

POWER VENTURES, INC. DBA POWER.COM, ET AL,

DEFENDANTS

---

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CASE NO. C-08-05780-JW

EXPERT REPORT OF RICHARD J. OSTILLER

NAVIGANT CONSULTING, INC.

DECEMBER 19, 2011

RICHARD J. OSTILLER

Highly Confidential – Attorneys' Eyes Only

EXPERT REPORT OF RICHARD J. OSTILLER, DECEMBER 19, 2011

**TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................................................1

II.   CASE BACKGROUND ..........................................................................................2

III.  WORK PERFORMED ...........................................................................................3

IV.   EXECUTIVE SUMMARY .....................................................................................3

V.    OPINIONS ...............................................................................................................4

Highly Confidential – Attorneys' Eyes Only

      c.   California Comprehensive Computer Data Access and Fraud Act (California Penal Code, Section 502).[7]

9.      Power denies the vast majority of the allegations in the Complaint.[8]


## III.    WORK PERFORMED

10.    My team and I have reviewed case materials provided by counsel. These materials include court filings, deposition transcripts, and other relevant items. In addition, my team and I discussed pertinent issues with outside counsel, and conducted interviews with the following individuals:

      a.   Mr. Ryan McGeehan, Security Manager, Facebook Security Incident Response ("SIR") team (July 6, 2011, and October 18, 2011);

      b.   Sam O'Rourke, Esq., Deputy General Counsel, Facebook (September 8, 2011); and

      c.   Joseph Cutler, Esq., Perkins Coie LLP (October 10, 2011).

Craig Clark, Esq., from Facebook's legal department, also participated in several interviews.

11.    **Attachment C** summarizes the materials my team and I have considered. Based on my review and analysis of these materials, I have reached opinions related to damages in this matter.

12.    I may prepare graphical or illustrative exhibits to use at trial, based on my analysis of relevant documents and information. If additional information becomes available subsequent to the report date, I may supplement the opinions and analyses expressed in this report.


## IV.    EXECUTIVE SUMMARY

13.    Facebook is entitled to both compensatory damages for costs incurred to respond to Power's unauthorized activities during the Relevant Period, and statutory damages under

---

[7] First Amended Complaint, filed January 13, 2009, pages 15-21.
[8] Defendants' Motion for Summary Judgment, filed May 9, 2011, page 3. In preparing my damages analyses, I have assumed that Defendants are liable for the allegations in the Complaint.

3

Highly Confidential – Attorneys' Eyes Only

CAN-SPAM.[9]  The compensatory damages total $80,543, consisting of $5,000 for internal personnel costs, and $75,543 for outside legal services.  The statutory damages total $18,188,100, consisting of $6,062,700 in base statutory damages, and $12,125,400 in aggravated damages.  In my opinion, Facebook is entitled to total damages of $18,268,643 ($80,543 + $18,188,100).  (See Summary Schedule.)

## V.  OPINIONS

14.     This part includes my initial opinions in this matter and includes two subparts.  The first subpart covers Facebook's compensatory damages for costs incurred to respond to Power's unauthorized activities during the Relevant Period.  The second subpart addresses Facebook's entitlement to statutory damages under CAN-SPAM.

### A.  Compensatory Damages

15.     This subpart includes my analysis of Facebook's compensatory damages.  Facebook incurred two categories of costs in response to Power's unauthorized activities: 1) the effort of internal personnel to address Power's actions; and 2) outside legal fees.  Schedule 1 shows that Facebook's compensatory damages resulting from Power's unauthorized actions total $80,543.

#### 1.  Internal Effort

16.     Mr. Ryan McGeehan is the Security Manager on Facebook's SIR team.[10]  Mr. McGeehan participated in Facebook's initial response to Power's unauthorized activities on Facebook's website in late 2008.[11]  Mr. McGeehan notified Facebook's legal department about the issue, and after some internal deliberation, Facebook decided to block Power's IP address from accessing Facebook.[12]

17.     Over the next few weeks, Mr. McGeehan and network operations staff would block traffic from Power's IP address, only to have Power change its IP address and service provider,

---

[9] See statutory damages discussion in Facebook's Motion for Partial Summary Judgment on Count 1 (CAN-SPAM), filed November 14, 2011, pages 16-18.

[10] Declaration of Mr. Ryan McGeehan, dated November 13, 2011, page 1.

[11] Declaration of Mr. Ryan McGeehan, dated November 13, 2011, page 3.

[12] Declaration of Mr. Ryan McGeehan, dated November 13, 2011, page 4.

4

Highly Confidential – Attorneys' Eyes Only

# EXHIBIT 2

1               UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5  FACEBOOK, INC.,         )
                          )

6                      )
          Plaintiff,    )

7                      )
  vs.                )  No.  5:08-cv-05780 JW

8                      )
  POWER VENTURES, INC., a    )

9  Cayman Island          )
  corporation; STEVE       )

10  VACHANI, an individual;   )
  DOE 1, d/b/a POWER.COM,   )

11  DOES 2-25 inclusive,     )
                      )

12          Defendants.   )
                      )

13  _____)

14

15        VIDEOTAPED 30(b)(6) DEPOSITION OF

16             STEVE VACHANI

17

18     Held at the Orrick, Herrington & Sutcliffe

19      1000 Marsh Road, Menlo Park, California

20       Wednesday, March 7, 2012, 9:57 a.m.

21

22  REPORTED BY:  ELAINA BULDA-JONES, RPR, CSR #11720

23

24

25



```
 1        Q.   On Facebook's terms of service and
 2   compliance with it?
 3        A.   We had reviewed it internally.
 4        Q.   Yeah.
 5        A.   We have -- we have -- had internal
 6   counsel.
 7        Q.   All right.  Do you recall at your July
 8   deposition saying that while you had invested vetted
 9   the general process of complying with terms of
10   service, you didn't specifically do anything with
11   respect to Facebook's?
12        A.   We didn't -- we reviewed them.
13        Q.   Okay.  But you -- now -- so you do recall
14   reviewing Facebook's terms of service before they
15   sued?
16        A.   Well, I think we have -- we have
17   established that in the past.
18        Q.   Okay.
19        A.   That we have read -- we have -- someone in
20   our company has read them, you know, read the terms
21   of service.
22        Q.   All right.  All I'm trying to figure out
23   is between December 2nd, 2008, and December 30th,
24   2008, did you follow through with Mr. Herrera's
25   suggestion to get advice from a litigation lawyer?
```

101

Steve Vachani, 30(b)(6)

BARKLEY
Court Reporters

1    A.    Did I get -- I believe we had -- we had --
2    we had it, but I don't know who we talked to at that
3    time, but we did get -- I did get advice from people
4    I trusted.
5    Q.    Okay.  But you did not engage any attorney
6    formally by Power, correct?
7    A.    We did not engage any attorney formally by
8    Power.
9    Q.    And in fact, in this case you specifically
10   disavowed reliance on the advice of counsel as a
11   defense to actions, correct?
12   A.    We had -- we did have, obviously, internal
13   counsel, but you are correct, we got -- we got
14   advice on the issue and we continued to get advice.
15   Q.    All right.  And you elected, after
16   Mr. Herrera had advised to get litigation counsel,
17   to continue to make a connection to Facebook despite
18   the cease-and-desist letter, correct?
19   A.    That we -- that's correct.
20   Q.    And that --
21   A.    We continued to make -- to make -- you
22   know, we obviously continue to this day, believe
23   that we were -- you know, that we were -- you know,
24   we had a dialogue and we had -- and we -- at that --
25   at that point, in the month of -- up until December

102

Steve Vachani, 30(b)(6)



SER 54

1    25th, we did have -- you know, we were -- we were in

2    conversation -- we were in open communication with

3    Facebook.

4           And obviously it was only on December 26

5    or 27th that, based on the fact that we were not

6    able to make the updates, we advised -- we advised

7    them that we would continue until -- in good faith

8    we would continue and try until we could complete

9    the update.

10          So we were in communication with Facebook,

11   as you -- as you are fully aware of.

12     Q.   I understand you were in communication

13   with Facebook.

14     A.   And no employees -- but they understood

15   that we were going to continue operating until the

16   -- Facebook had basically acknowledged that we would

17   continue operating until the 26 of --

18     Q.   I understand, Mr. Vachani.  But my point

19   is the decision, after Mr. Herrera, on December 2nd,

20   suggested getting a litigation lawyer, to continue

21   to connect to Facebook was your decision as the --

22     A.   I was the CEO of the company, so yes, that

23   is correct.

24     Q.   Okay.  Do you see he also says, "And I

25   don't mean any commercial person at Meebo, even

                        103



1     whatever type of block.

2          Q.   Okay.  And then you say, "Please just make

3     sure they cannot block us"?

4          A.   Correct.

5          Q.   All right.  Did you take any action to

6     ensure that Facebook could not block you on or after

7     December 2nd, 2008?

8          A.   I don't believe that we did anything --

9     anything further.

10          The only thing that we had -- I don't

11    think -- I don't -- to the best of my knowledge,

12    beyond a system that -- you know, where IPs update,

13    I don't believe there was any other actions taken.

14          Q.   Do you recall Mr. Santos in any way

15    responding to your statement, "Please just make sure

16    they cannot block us"?

17          A.   I'm sure he responded.

18          Q.   All right.  Do you recall what --

19          A.   I don't recall specifically what he said,

20    but I would -- I'm sure that he would -- he

21    responded to it.

22          Q.   But you were the person making the

23    executive decision that you wanted to ensure that

24    Facebook could not block Power.com, correct?

25          A.   Well, obviously if -- it was -- we

                         141

Steve Vachani, 30(b)(6)



**SER 56**

1    would -- we did not wish for our -- for our service

2    to be blocked by -- by Facebook, obviously.

3         Q.   Okay.  But you made that decision on

4    behalf of Power, correct?

5         A.   I was the CEO of the company, so I made

6    the final decision.

7         Q.   Okay.

8              (Whereupon, Exhibit 241 was marked for

9    identification.)

10             THE WITNESS:  I don't know who made the

11   actual decision.  You know, this was when I wasn't

12   the CEO of the company.

13             (Whereupon, a brief discussion off the

14   record.)

15   BY MR. COOPER:

16        Q.   You directed Mr. Santos to ensure that

17   Power.com could not be blocked, correct?

18        A.   Yes.

19        Q.   All right.  As the CEO of the company, you

20   controlled the right to make that decision?

21        A.   That's correct, yes.

22        Q.   All right.  I put in front of you 241.

23   Exhibit 241, again, is an e-mail that you have

24   produced in the past, but with a new addition at the

25   top from the exhibit that was previously introduced.

142



1            Do you recall my showing you in July the
2    e-mail that you wrote to Joseph Cutler which begins
3    almost immediately on the first page and continues
4    for several pages?
5        A.   Correct, yes.
6        Q.   All right.  This was the e-mail that you
7    wrote on December 26th, 2008, informing Facebook
8    that you would continue to maintain access to the
9    Facebook service, correct?
10       A.   For business reasons until we could make
11   the transition properly, but that, yeah, we said
12   that we could not interrupt the service until the
13   new Facebook Connect solution was ready.
14       Q.   All right.  Do you see in this e-mail you
15   cut and pasted the e-mail you sent to Mr. Cutler and
16   then -- and sent an e-mail to Mr. Santos, saying,
17   "Please note that we will not remove anything or
18   change at this time on Facebook"?
19       A.   Correct.
20       Q.   All right.  Then you say, "I made a
21   decision and sent an e-mail to Facebook"?
22       A.   Yes.
23       Q.   Okay.  And that's because you did, in
24   fact, make the decision to continue to connect to
25   Facebook, correct?

                        143

Steve Vachani, 30(b)(6)



1    A.   Well, actually, to be clear, we were

2    connected to Facebook up until that time with

3    Facebook's full knowledge and authorization --

4    authorization for that period up until the 26th

5    because we had had a conditional agreement with

6    Facebook that we could continue operating until the

7    26th.

8         This is something I think you understand

9    that, you know, on -- after we had discussions in

10   the beginning of December.

11        And after the 26th, that's when we had --

12   we had said unfortunately, the damage -- you know,

13   for business reasons, we cannot -- you know, we

14   need -- we need to keep this up for a few more

15   weeks.

16        And then obviously Facebook responded

17   accordingly.

18    Q.   My question was simple.  You wrote, "I

19   made a decision and sent an e-mail to Facebook,"

20   because you did, in fact, make the decision?

21    A.   I made the final decision, yeah.

22    Q.   And you controlled the right to make that

23   final decision, correct?

24    A.   I was the CEO of the company.

25    Q.   Right.  And as of December 26, 2008, you

144

1    block Power?

2        A.   Yes, as I said in the past, we had -- we

3    had -- blocks were common with those companies.  We

4    engaged and we -- and we resolved them in the case

5    of Orkut.

6             In the case of hi5, we met with them,

7    we -- you know, we explained to them our -- you

8    know, our position on it.  They -- we met with the

9    CEO and the people, and resolved them like -- you

10   know, resolved the solution together.

11            (Whereupon, Exhibit 242 was marked for

12   identification.)

13            (Whereupon, a brief discussion off the

14   record.)

15   BY MR. COOPER:

16       Q.   Mr. Vachani, I have put in front of you

17   one of the e-mails that was produced January 25th.

18   This is from Eric Santos to Elmo Cruz, Danilo

19   Delgado, cc'ing Julian Conceicao?

20       A.   Okay.

21       Q.   Have you seen this e-mail before today?

22       A.   This e-mail, I don't believe I have seen.

23       Q.   All right.

24            (Whereupon, a brief discussion off the

25   record.)

Steve Vachani, 30(b)(6)

**BARKLEY**
Court Reporters

1   BY MR. COOPER:

2       Q.   Can you read to me how you would translate

3   the first sentence?

4       A.   Probably in the next few weeks, we will --

5   there will be blocks from -- attempted blocks from

6   Facebook, Hi5, or MySpace.

7            We need to have a structure -- yeah, to

8   have our structure in place to -- you know, to

9   prevent these blocks if -- if they -- if they -- if

10  they -- if they will happen.  And so just asking

11  what is the state of our current structure.

12      Q.   All right.  Then what does he ask Elmo in

13  the next sentence?

14      A.   Elmo, can you please configure Power to

15  use other servers and proxies, only for other Power

16  sites.  For example, Orkut using proxy local,

17  Facebook using Squid, and Amazon and MySpace using

18  Power proxy distribution.  We need to prioritize

19  this activity.

20      Q.   Okay.  Doesn't that reflect that

21  Mr. Santos, after December 2nd, actually had to take

22  additional activity to ensure that you would not be

23  blocked by Facebook?

24      A.   He's basically saying we have a structure

25  and it's possible -- anything is possible, so we --

                        147



1    we need to keep updating our system that we have,

2    our IP rotation system.

3        Q.   You are sure it's the IP rotation system

4    he's referring to?

5        A.   Either the IP rotation or updating IPs.

6    He is referring to different -- to different IPs

7    here, I believe.

8        Q.   Do you know?

9        A.   Let's see.  Well, he is referring to other

10   servers, other proxy servers, but -- other proxy

11   servers.

12       Q.   Do you know if this e-mail was written in

13   response to your instruction to Mr. Santos to be

14   prepared for blocks by Facebook?

15       A.   Probably, yes.

16       Q.   Okay.

17            (Whereupon, Exhibit 243 was marked for

18   identification.)

19   BY MR. COOPER:

20       Q.   Mr. Vachani, putting in front of you a

21   document dated January 7th, 2009, from Eric Santos

22   to you, cc'ing Felipe Herrera, Cornelius Conboy, and

23   Bruno Carvalho?

24       A.   Uh-huh.

25       Q.   Do you see the title, "Hi5 blockeo de

                              148

Steve Vachani, 30(b)(6)



1    was -- it was one -- it was one -- I don't know.

2    The word "outdated" means an old IP address.  They

3    were probably blocking one of our -- one of our IP

4    addresses.

5        Q.   Was that -- and the address they were

6    blocking was a current IP address used by Power to

7    connect to Facebook?

8        A.   That was a current address.

9        Q.   All right.

10        (Whereupon, Exhibit 245 was marked for

11    identification.)

12        (Whereupon, a brief discussion off the

13    record.)

14    BY MR. COOPER:

15        Q.   Mr. Vachani, I put in front of you an

16    exhibit, 245, which is one of the e-mails that was

17    produced on January 25th for the first time.  And

18    it's an e-mail chain, which, if you go to the second

19    page, begins on December 23rd.  Do you see that?

20        A.   Okay.  Yes.

21        Q.   It begins with an e-mail that's subject

22    matter is "Blockeo di Facebook."  Do you see that?

23        A.   Yes.

24        Q.   All right.  And it's from Julian Conceicao

25    to you, Eric Santos, Cornelius Conboy, Patrick

<center>153</center>

```
 1   Amorim, cc'ing Andre Fernandes and Elmo Cruz?

 2        A.   Correct.

 3        Q.   All right.  First is a practical question.

 4   Do you know or have any understanding why this

 5   e-mail was not produced prior to January 25th in any

 6   of your other e-mail productions from your Yahoo

 7   account or anything?

 8        A.   I do not know.

 9        Q.   All right.  Do you see we have produced,

10   because of the high importance of this particular

11   file, a certified translation already, as of today,

12   on an expedited basis?

13        A.   Correct.  Yes.

14        Q.   All right.  Please go to the second page

15   of the certified translation.

16             Do you see that the translator has

17   interpreted that first e-mail to read, in the body

18   of the e-mail, "Dear all, Power site Facebook is

19   disabled at the moment because Facebook has blocked

20   our access through web servers."

21        A.   Correct.

22        Q.   And then it says, "Andre is running a

23   configuration to use new IPs (Workaround Solution

24   1)."

25        A.   Yes.
```

<center>154</center>

Steve Vachani, 30(b)(6)



<center>SER 64</center>

```
 1      Q.   All right.  Do you understand whether or
 2  not this was the first or most -- or second or
 3  any -- do you have any understanding whether
 4  Facebook had blocked Power before December 23rd?
 5      A.   I believe there would have been one --
 6  there would have been one instance before and then
 7  after the 26th, I guess, a second instance.
 8      Q.   This was three days before you made the
 9  executive decision to continue to connect to
10  Facebook, correct?
11      A.   To leave our connection, correct.
12      Q.   All right.  Now, do you see Andre
13  Fernandes, three hours or close to four hours after
14  Julian Conceicao sent her e-mail, said -- wrote,
15  "Facebook is working in Power.com again"?
16      A.   Yes.
17      Q.   And then he said, "We are using a proxy
18  solution that allows access to Facebook through
19  different IPs from our web servers"?
20      A.   Correct.
21      Q.   Was the proxy solution the workaround that
22  is referred to in Julian Conceicao's e-mail that you
23  were copied on?
24      A.   I am assuming that they -- they were
25  activating our solution to -- that was -- where the
```

155



```
 1    IP was updated from our -- from our many IPs that we

 2    have -- that we already had.

 3         Q.   Okay.  On December 28th, the next e-mail

 4    in the chain, Andre Fernandes informs all of you all

 5    over again, "We have been blocked by Facebook yet

 6    again," correct?

 7         A.   That's correct.

 8         Q.   All right.  And he then says, "I have

 9    configured a server at Amazon to serve as proxy, and

10    Facebook is logging in normally at the moment"?

11         A.   Yes.

12         Q.   So Mr. Fernandes actually had to make a

13    change to your system of IP blocks -- or of rotating

14    IPs by switching it to Amazon, correct?

15         A.    Well, there was already some -- there was

16    already a system with Amazon, but he must -- he made

17    some updates.

18         Q.   He says, "I have configured a server at

19    Amazon," correct?

20         A.    I guess he configured.  I don't know what

21    he -- we had -- we already had a relationship with

22    Amazon but I don't know what he specifically did.

23         Q.   He had to --

24         A.    He made some kind of adjustment.

25         Q.   All right.  Then do you see Mr. Santos, in
```

156

Steve Vachani, 30(b)(6)



**SER 66**

1    response to that comment, informs everybody,

2    yourself included, "We need to develop a solution to

3    create proxy servers every six hours automatically

4    or something similar"?

5         A.    That's correct.

6         Q.    All right.  "I'm sure they will continue

7    blocking our services," is what he then adds,

8    correct?

9         A.    Yes.

10        Q.    All right.  So Mr. Santos recognized that

11   you needed to develop a new system to deal with the

12   fact that you wanted to continue accessing Facebook

13   despite their continued blocking of your site,

14   correct?

15        A.    I think what he is saying is it needs to

16   be more frequent or updated -- to be adjusted -- the

17   frequency needs to be adjusted.

18        Q.    Okay.  And that's because that

19   functionality didn't exist already?

20        A.    No, he's saying that the frequency -- he

21   says that the frequency needs to be adjusted.

22        Q.    He uses the word "solution," correct?

23        A.    Yeah, solution.  I mean, he is

24   basically -- the solution to change our IPs, update

25   and rotate already existed.  He basically is

157



1   referring to how often it gets updated, and it's

2   pool IP addresses.

3       Q.   Mr. Vachani, I'm going to again ask

4   something.

5       A.   Sure.

6       Q.   There have now been four e-mails I have

7   showed you that you have been cc'd on.

8       A.   Yeah.

9       Q.   Do you have an understanding why not one

10   of them was produced to us prior to January 25 in

11   any of your productions over the past three years?

12       A.   I do not.

13       Q.   All right.  Do you recall telling me at

14   the July 11th -- July 2011 depo that you searched

15   actively your e-mail accounts to find any that

16   referred to the events of December 2008?

17       A.   Yes.

18       Q.   Would you agree that these are referring

19   specifically to some of the biggest events in this

20   litigation, namely, the events involving Facebook's

21   attempt to block Power?

22       A.   Yes.

23       Q.   Would you agree these are amongst the type

24   of e-mails you assured me you would try to search

25   for?

<center>158</center>



<center>**SER 68**</center>

1    A.   Yes.

2    Q.   All right.  And do you have any

3 understanding why they were not located, a single

4 one of them, in any of your prior searches?

5    A.   I don't know why they were not located.

6    Q.   All right.  Does that reflect that you

7 yourself may have from time to time deleted e-mails

8 after January -- or after January 1st, 2009, even if

9 they related to the issues in this case?

10   A.   I don't -- I don't believe so.  I don't --

11 I don't know where these -- I don't know why these

12 were not produced.

13   Q.   All right.  I will represent to you these

14 were only produced because we found them in Mr. --

15 in the backup server from the Micro Exchange server.

16   A.   Uh-huh.

17   Q.   But my question is if you have any idea

18 why you, as you testified, kept all your e-mails,

19 why they weren't actually produced through your

20 forward production, if you know?

21   A.   I don't know the answer to that.

22   Q.   Okay.  Do you see on December 29th, 2008,

23 Andre Fernandes sent an e-mail to Elmo Cruz, Julian

24 Conceicao, and Lucas Araujo?

25   A.   Yes.

<center>159</center>

Steve Vachani, 30(b)(6)



**SER 69**

```
1        Q.   All right.  And he asks Elmo, "Could you
2    please ask someone in your team to run a diagnostic
3    exclusively with Facebook?"
4        A.   Yes.
5        Q.   All right.  "This way we could receive a
6    notification via e-mail when log in is not possible
7    and we would know when Facebook was blocked again"?
8        A.   Correct.
9        Q.   All right.  "Tyaga could do this, but
10   since he's not here we need to find someone else,"
11   correct?
12       A.   Correct.
13       Q.   And then he says, "I'm checking a way to
14   always change the proxy server in a more optimized
15   manner"?
16       A.   Correct.
17       Q.   All right.  So again, this was a further
18   adjustment to your dynamic rotation system, in
19   addition to sending it to Amazon, that was necessary
20   to continue your access of the -- of the Facebook
21   blocks and to continue service, correct?
22       A.   Yes.
23       Q.   Did you have the ultimate authority to
24   instruct all of these individuals to make these
25   adjustments?
```

<center>160</center>

<center>Steve Vachani, 30(b)(6)</center>



<center>SER 70</center>

```
 1        A.   I had the authority, but -- I think that
 2   they were -- they were taking natural steps to -- to
 3   make adjustments.
 4        Q.   All right.  But were you copied on --
 5        A.   Correct.
 6        Q.   -- every one of these e-mails?
 7        A.   Yes.
 8        Q.   And you approved of these steps, correct?
 9        A.   Yes.
10        Q.   And you had the right to control these
11   steps, correct?
12        A.   Yes.
13        Q.   All right.  Monday, December 29th, 2008,
14   is the day before Facebook sued you in this case, is
15   it not?
16        A.   Yes.
17        Q.   All right.  And it's two days after you
18   made the executive decision -- that you wrote to the
19   team that you had made a decision to continue
20   accessing Facebook?
21        A.   That's correct, yes.
22        Q.   In light of Exhibit 245, do you believe
23   your statement in Paragraph 11 of Exhibit 244 is
24   accurate to the extent you said, "Power did not
25   undertake any effort to circumvent that block"?
```

161

Steve Vachani, 30(b)(6)



SER 71

```
 1      A.   I think that statement should be updated
 2  to more accurately reflect it, based on this
 3  information.
 4           MR. COOPER:  I am optimistic I'm going to
 5  finish earlier than I thought.
 6           But I would like to take a break right now
 7  so I can try and siphon out some of the exhibits
 8  that I was -- that I brought and not have to siphon
 9  through them.  So you want to take 15 minutes?
10           THE WITNESS:  Sure.
11           THE VIDEOGRAPHER:  We are going off the
12  record.  The time is 1:36 p.m.
13           (Whereupon, a brief recess was taken.)
14           THE VIDEOGRAPHER:  This begins Videotape
15  No. 3 in the continuing deposition of Power
16  Ventures, Inc.  The time is 1:51 p.m. on March 7th,
17  2012, and we're back on the record.
18  BY MR. COOPER:
19      Q.   Mr. Vachani, before the break, I showed
20  you Exhibit 244, Paragraph 11, the sentence, "Power
21  did not undertake any effort to circumvent that
22  block and did not provide users with any tools
23  designed to circumvent it"?
24      A.   Yes.
25      Q.   And you said you did agree it should be
```

Steve Vachani, 30(b)(6)

BARKLEY
Court Reporters

1    system, we made -- we made adjustments, obviously I

2    think that's what -- how to phrase that.  I need to

3    get the proper -- look at that carefully.

4         Q.   All right.  And these adjustments were

5    made over multiple days?

6         A.   They were made over different -- there

7    were adjustments made, but again, adjustment whether

8    they pulled from pooled IP addresses or whether they

9    probably did them -- I mean, I think I would have to

10   look at this carefully just to see, but I think that

11   there could definitely be an update on that.

12        Q.   Okay.  To the extent that that exact same

13   sentence appears in other declarations you have

14   filed in this case, would it need to be -- those

15   declarations need also to be updated?

16        A.   I think we should -- we should look at

17   them.

18        Q.   All right.

19        A.   And potentially update them.

20        Q.   All right.  When you say "potentially

21   update them," I'm just asking you, before today, do

22   you recall ever seeing any of the e-mails in Exhibit

23   245?

24        A.   Most of these e-mails -- like a lot of the

25   stuff were internal operations on those issues.  I

                         164



1   don't remember -- I don't remember seeing.

2        Q.   All right.  But you agree you are cc'd on

3   four of the five e-mails in this chain?

4        A.   Yeah.  I agree, yeah.

5        Q.   Who -- and who is Cornelius Conboy?

6        A.   He was another manager at the time over --

7   administrative manager.

8        Q.   When did he leave Power?

9        A.   Around that same time.

10       Q.   Okay.  Was it with -- over disagreements

11  with you on the Facebook case in any way?

12       A.   No, we had no money for him.  We -- he was

13  actually -- we just -- he was too expensive to

14  maintain under all of our cuts.

15       Q.   Okay.  Who is Patrick Amorim?

16       A.   He was another executive at that time.

17       Q.   What was his role?

18       A.   He was a project manager, I guess you can

19  say.

20       Q.   Project manager?

21       A.   Project manager.  I mean, he was like a --

22  I would say a -- probably the best is like a product

23  marketing manager or a product -- you know, he

24  did -- he managed both business-side -- business --

25  you know, client relationships and also project.

165



```
 1        Q.   All right.

 2             (Whereupon, Exhibit 248 was marked for

 3   identification.)

 4             (Whereupon, a brief discussion off the

 5   record.)

 6   BY MR. COOPER:

 7        Q.   Mr. Vachani, this is an e-mail chain, part

 8   of which was in an earlier exhibit, marked Exhibit

 9   248, beginning on the 15th of December from Eric

10   Santos to Elmo Cruz, Danilo Delgado, and Julian

11   Conceicao.

12             Do you see where Mr. Santos titles it,

13   "Please Prepare For Blocks of IPs"?

14        A.   Yes.

15        Q.   All right.  And that's because he is

16   setting up a system for the -- his engineering team

17   to take steps to prepare for blocks by what he

18   anticipated were forthcoming from Facebook, hi5, and

19   MySpace, correct?

20        A.   Yes.

21        Q.   All right.  And this is at the same time

22   he was also, in Exhibit 247, asking for information

23   about the number of new users signing up from

24   Facebook since the launch of the campaign, correct?

25        A.   This was a completely different
```

178

Steve Vachani, 30(b)(6)



1      Q.   Okay.  But they also -- as Mr. Santos
2  understood, they were complaining and threatening to
3  block your site?
4      A.   Not that they were complaining, I think
5  there was -- there were IPs that were not working.
6      Q.   Do you disagree that Mr. Santos'
7  December 15th e-mail specifically refers to
8  preparing for blocks by Facebook, hi5, and MySpace?
9      A.   He is saying that's something that we
10  always do.  Blocks were possible.
11      Q.   But he is also, in the title of the
12  e-mail, saying, we need to prepare for blocks of
13  IPs, correct?
14      A.   Well, blocks -- we have always, since our
15  thing, said that blocks are possible.
16          We have -- you know, they happen for
17  different reasons and this was a general, just kind
18  of saying we need to continue making our system for
19  IP rotation and dealing with blocks, upgrading that
20  system.
21          (Whereupon, Exhibit 249 was marked for
22  identification.)
23          (Whereupon, a brief discussion off the
24  record.)
25

180



1    Q.   Okay.  By "them," are you referring to

2  Mr. --

3    A.   Mr. Cutler, yeah.  I believe we had a

4  conversation with him almost immediately.  So we had

5  an immediate response like the same day or the next

6  day.

7    Q.   Okay.

8    A.   And that's when our dialogue all kind of

9  began.

10   Q.   And throughout the period that you were

11 having the dialogue with Facebook's counsel, as CEO,

12 you were controlling and directing the company's

13 activities, correct?

14   A.   I was.

15   Q.   Okay.  You were controlling and directing

16 their activities as it related to Facebook?

17   A.   Yes.

18   Q.   And that included controlling and

19 directing the activities related to the use of the

20 Power 100 campaign in conjunction with Facebook

21 users?

22   A.   Yes.

23   Q.   And that included the use -- the control

24 and direction of Facebook activities -- or, I mean,

25 Power's activities related to responses to blocks of

229

Steve Vachani, 30(b)(6)



SER 77

1    your IP addresses by Facebook?

2        A.    I'm sorry.  Repeat that?

3        Q.    Let me -- it was horribly said.  You

4    controlled the activities --

5        A.    I was the CEO of the company, so I made

6    the final -- I made the final -- all the final

7    decisions of the company at that time.

8        Q.    And that -- all I'm asking that would, in

9    the instance that we saw the e-mails earlier,

10   include your authorizing the changes that -- the

11   activities that were designed to ensure that even if

12   Facebook blocked Power, that Power would continue to

13   have access to Facebook?

14       A.    Well, as I said, I didn't necessarily

15   authorize some of the things because I delegated --

16   you know, because like, as you saw, there were

17   e-mails that were not -- were not copied to me, that

18   Eric was handling and were not bothering me with.

19            So, I mean, it was a standard company.  It

20   had a chain of command and obviously in the end I

21   was the CEO.  But I delegated things that I didn't

22   make directly, I -- you know, Eric reported to me.

23       Q.    Yeah, but you instructed Eric to ensure to

24   prepare for blocks by Facebook, correct?

25       A.    I have -- on some issues, I mean, that we

                              230



1    have -- that we have seen, I have --

2         Q.   You --

3         A.   -- I have instructed him to, you know,

4    to -- you know, to address the situation.

5         Q.   All right.  To the extent Mr. Santos took

6    activities to ensure that Power continued to have

7    access to Facebook, he did so at your control and

8    direction, though, correct?

9         A.   I mean, to things that he asked me.  As I

10   said, there were things that he did that I was not

11   copied on, but, I mean, he was -- he was -- it was

12   his -- he felt in his opinion that he was able to

13   take care of those.

14        Q.   Okay.  But to the extent you were copied

15   on them, if you had disagreed with them, you would

16   have advised him, correct?

17        A.   If I -- yeah, if I disagreed.  And there

18   may have been e-mails, also, that I didn't see.  I

19   mean, e-mails sometimes -- but for the most part, I

20   saw most e-mails.

21        Q.   Okay.

22             MR. COOPER:  This is already marked, I'm

23   sorry.

24             (Whereupon, Exhibit 205, being previously

25   marked, was entered into the record.)

                        231



1   of the testimony given by the witness.  (Fed. R. Civ. P.

2   30(f)(1)).

3           Before completion of the deposition, review of

4   the transcript [XX] was [  ] was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9   Dated: MARCH 8, 2012

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        264

              Steve Vachani, 30(b)(6)

# EXHIBIT 4

| | |
|---|---|
| **From:** | steve@stevevachani.com |
| **To:** | Eric.santos |
| **Subject:** | Re: biggest problem about power.com in the usa is that is doesn't really work yetbiggest problem about power.com in the usa is that is doesn't really work yet |
| **Date:** | Tuesday, December 02, 2008 5:03:15 AM |

</table
correct. if they can't block us, this will give us a lot of power... we can then create lots of media attention at the right time.

please just make sure they cannot block us

--- On **Tue, 12/2/08, Eric Santos <*eric.santos@powerinc.net*>** wrote:

From: Eric Santos <eric.santos@powerinc.net>
Subject: Re: biggest problem about power.com in the usa is that is doesn't really work yet
To: steve@stevevachani.com
Date: Tuesday, December 2, 2008, 1:52 AM

Realmente eles n�o podem fazer nada judicialmente contra a gente.
Vou me preparar j� para um poss�vel bloqueio por parte do Facebook.

Atc,

Eric


EXHIBIT
240
Vachani

From: "steve@stevevachani.com" <steve@stevevachani.com>
To: Eric Santos <eric.santos@powerinc.net>
Sent: Tuesday, December 2, 2008 12:24:17 AM
Subject: biggest problem about power.com in the usa is that is doesn't really work yet

Eric,

my biggest problem with Power.com is that it still has some major problems. The aggregation still has some bugs. People don't really see their messages aggregated by date for all sites. They don't really see their feeds aggregated by date or birthdays. it is not really working. A lot of times, it still doesn't come up. We really need to solve this quickly.

Second, we really need to add Facebook private mail and Myspace private mail, and Hi5 private mail, Twitter, and Linkedin.

We need to get these bugsour and make it quicker.

USA users really won't find a need until we have private mail. And after we add Linkedin and Twitter, this will really be good. After we add Yahoo, will be even better.

# EXHIBIT 5

| From: | Andre Fernandes |
|---|---|
| To: | Elmo Cruz; Juliane Conceicao |
| Cc: | Lucas Araujo |
| Subject: | FW: Bloqueio do Facebook |
| Date: | Monday, December 29, 2008 9:59:42 AM |

Elmo,

Poderia ver com alguém da sua equipe para fazer um Diagnostic só com o Facebook? Dessa forma receberíamos por e-mail quando não conseguisse logar e saberíamos que o Facebook bloqueou novamente. Quem poderia fazer isso era Tyago, mas como ele não está aqui, temos que ver um outra pessoa. Estou vendo uma forma de estarmos sempre mudando o servidor de Proxy de forma mais otimizada.

Att.:

André Fernandes



**From:** Eric Santos [mailto:eric.santos@corp.power.com]
**Sent:** domingo, 28 de dezembro de 2008 15:05
**To:** Juliane Conceicao; SteveVachani; Steve Vachani; Patrick Amorim; Andre Fernandes
**Cc:** Elmo Cruz; operacao; Tyago Valenca; Danilo Delgado; Leandro Mascarenhas
**Subject:** RE: Bloqueio do Facebook

Oi Elmo e André,

Precisamos já desenvolvermos uma solução para ficar criando servidores de proxy automaticamente a cada 6 horas, algo do tipo. Tenho certeza que eles continuarão bloquear o nosso serviço.

Atc,

Eric

--- On **Sun, 12/28/08, Andre Fernandes *<andre.fernandes@corp.power.com>*** wrote:

> From: Andre Fernandes <andre.fernandes@corp.power.com>
> Subject: RE: Bloqueio do Facebook
> To: "Juliane Conceicao" <juliane.conceicao@corp.power.com>, "SteveVachani"
> <steve@stevevachani.com>, "Steve Vachani" <steve@corp.power.com>, "Eric
> Santos" <eric.santos@corp.power.com>, "Patrick Amorim"
> <patrick.amorim@corp.power.com>
> Cc: "Elmo Cruz" <elmo.cruz@corp.power.com>, "operacao"
> <operacao@corp.power.com>, "Tyago Valenca" <tyago.valenca@corp.power.com>,
> "Danilo Delgado" <danilo.delgado@corp.power.com>, "Leandro Mascarenhas"

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
FBPOWER00846

<leandro.mascarenhas@corp.power.com>
Date: Sunday, December 28, 2008, 10:10 AM

Mais uma vez fomos bloqueados pelo Facebook. Configurei um servidor na Amazon para servir como Proxy e no momento o Facebook está logando normalmente.

Att.:

André Fernandes

---

**From:** Andre Fernandes
**Sent:** terça-feira, 23 de dezembro de 2008 19:52
**To:** Juliane Conceicao; SteveVachani; Steve Vachani; Eric Santos; Cornelius Conboy; Patrick Amorim
**Cc:** Elmo Cruz
**Subject:** RE: Bloqueio do Facebook

O Facebook está funcionando novamente na Power.com. Estamos utilizando uma solução de proxy que permite acessar o Facebook através de IPs diferentes dos nossos servidores web.

Att.:

André Fernandes

---

**From:** Juliane Conceicao
**Sent:** Tuesday, December 23, 2008 4:03 PM
**To:** SteveVachani; Steve Vachani; Eric Santos; Cornelius Conboy; Patrick Amorim
**Cc:** Andre Fernandes; Elmo Cruz
**Subject:** Bloqueio do Facebook

Caros,

Nesse momento o PowerSite Facebook está desabilitado porque o Facebook bloqueou o acesso pelos nossos servidores WEB. André está realizando uma configuração para utilização de novos IP (solução de contorno 1).

Att.
Juliane
Internal Virus Database is out of date. Checked by AVG - http://www.avg.com Version: 8.0.138 / Virus Database: 270.6.6/1624 - Release Date: 20/8/2008 19:11

Internal Virus Database is out of date.
Checked by AVG - http://www.avg.com
Version: 8.0.138 / Virus Database: 270.6.6/1624 - Release Date: 20/8/2008 19:11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
FBPOWER00847

From: Andre Fernandes [IMCEAEX-ANDRE+2EFERNANDES@orrick.com]
Sent: Mon 12/29/2008 1:01 PM
To: Elmo Cruz; Juliane Conceicao
Cc: Lucas Araujo
Subject: FW: Facebook Blockage

Elmo,

Could you please ask someone in your team to run a Diagnostic exclusively with Facebook? This way we would receive a notification via e-mail when login is not possible, and would know when Facebook was blocked again. Tyago could do this, but since he is not here, we have to find someone else. I'm checking a way to always change the Proxy server in a more optimized manner.

Regards,

André Fernandes

From: Eric Santos [mailto:eric.santos@corp.power.com]
Sent: Sunday, December 28, 2008 3:05 PM
To: Juliane Conceicao; SteveVachani; Steve Vachani; Patrick Amorim; Andre Fernandes
Cc: Elmo Cruz; operacao; Tyago Valenca; Danilo Delgado; Leandro Mascarenhas
Subject: RE: Facebook Blockage

Hi Elmo and André,

We need to develop a solution to create proxy servers every six hours automatically or something similar. I am sure they will continue blocking our service.

Sincerely yours,

Eric

— On Sun, 12/28/2008, Andre Fernandes <_andre.fernandes@corp.power.com_> wrote:

From: Andre Fernandes <andre.fernandes@corp.power.com>
Subject: RE: Facebook Blockage
To: "Juliane Conceicao" <juliane.conceicao@corp.power.com>, "SteveVachani"
<steve@stevevachani.com>, "Steve Vachani" <steve@corp.power.com>, "Eric Santos"
<eric.santos@corp.power.com>, "Patrick Amorim" <patrick.amorim@corp.power.com>
Cc: "Elmo Cruz" <elmo.cruz@corp.power.com>, "operacao" <operacao@corp.power.com>, "Tyago
Valenca" <tyago.valenca@corp.power.com>, "Danilo Delgado" <danilo.delgado@corp.power.com>,
"Leandro Mascarenhas" <leandro.mascarenhas@corp.power.com>
Date: Sunday, December 28, 2008, 10:10 AM
We have been blocked by Facebook yet again. I have configured a server at Amazon to serve as Proxy and Facebook is logging in normally at the moment.

Regards,

André Fernandes

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
FBPOWER00848

**From:** Andre Fernandes
**Sent:** Tuesday, December 23, 2008 7:52 PM
**To:** Juliane Conceicao; SteveVachani; Steve Vachani; Eric Santos; Cornelius Conboy; Patrick Amorim
**Cc:** Elmo Cruz
**Subject:** RE: Facebook Blockage

Facebook is working in Power.com again. We are using a proxy solution that allows access to Facebook through different IPs from our web servers.

Regards,

André Fernandes

---

**From:** Juliane Conceicao
**Sent:** Tuesday, December 23, 2008 4:03 PM
**To:** SteveVachani; Steve Vachani; Eric Santos; Cornelius Conboy; Patrick Amorim
**Cc:** Andre Fernandes; Elmo Cruz
**Subject:** Facebook Blockage
Dear All,

PowerSite Facebook is disabled at the moment because Facebook has blocked our access through our WEB servers. André is running a configuration to use new IPs (workaround solution 1).

Regards,
Juliane
Internal Virus Database is out of date. Checked by AVG – http://www.avg.com Version: 8.0.138 / Virus
        Database: 270.6.6/1624 - Release Date: 20/8/2008 19:11
Internal Virus Database is out of date.
Checked by AVG – http://www.avg.com
Version: 8.0.138 / Virus Database: 270.6.6/1624 - Release Date: 20/8/2008 19:11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
FBPOWER00849



**TRANSPERFECT**

CERTIFICATION OF TRANSLATION

I, Matthew Orr, hereby certify that the attached Portuguese to English translation has been translated by a qualified translator competent in both languages, and verified to be an accurate and complete rendering of the content of the original document to the best of our ability. The following document is included in this certification:

"FW Bloqueio do Facebook"

Matthew Orr

Sworn to before me this

March 7, 2012

Signature, Notary Public
**CASEY WARNER**
**NOTARY PUBLIC-STATE OF NEW YORK**
**No. 01WA6255670**
**Qualified in New York County**
**My Commission Expires February 06, 2016**
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
THREE PARK AVENUE, 39TH FLOOR, NY, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 75 CITIES WORLDWIDE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
FBPOWER00850

# EXHIBIT 8



Power.com

# Power.com Introduces Social Inter-networking to the World

## Stealth Brazilian company quietly registers over 5,000,000 for site that lets users bring together their own presence on major social networks and messaging services

**Media Inquiries:**

Ed Niehaus
Power.com
m) 650-255-9976
edniehaus@gmail.com

Myles Weissleder
Mylermedia
m) 415-990-0970
myles@mylermedia.com

### FOR IMMEDIATE RELEASE

**San Francisco, CA --Dec 1, 2008** -- Today Power.com ushers in the era of Social Inter-networking with its global launch. Now, for the first time, social network users don't have to jump from site to site to synchronize their logins, content, messages and friends across Facebook, Hi5, LinkedIn, MSN, MySpace and Google's Orkut.

"Today many people have multiple social network, email and IM accounts," said Steve Vachani, CEO of Power.com. "Power synchronizes their friends, messages, photos, updates, and everything they care about. We're taking down the boundaries between social sites, so users can keep in touch, and even synchronize friends and photos automatically. We call this Social Inter-networking."

"Social is about people, not about place," Vachani continued, "So we're making the virtual 'where' irrelevant. Social Inter-networking is the basis for our vision of the future of the Internet."

**Stealth roll-outs: five million registered users and counting**
Power.com, based in Rio de Janeiro, Brazil, held "stealth roll-outs" in Latin America and India in the past year. The company quietly let over 5 million people register themselves -- about the population of Sweden. These users arrived organically after seeing their friends using Power.com; no one either blogged about the company or wrote about it in the press, no websites linked to Power.com, and the company sent out no invitations, yet 5 million people joined.

**No Vested Interests: unlike Facebook, Google or Microsoft**
"Power.com works because it doesn't require the big websites to get together and break down their walls," Vachani stated. "Instead, millions of Power users are breaking down these walls on their own, and experiencing the benefits of Social Inter-networking without waiting for Yahoo, Microsoft, Google, Facebook, and MySpace to all agree. This independence contrasts with all previous efforts to bring social networks together, including Facebook Connect, Google Friend Connect, Microsoft Passport, OpenID and OpenSocial.

"There is currently an industry wide trend among all sites and consumers to break up and atomize the web with widgets, applications, feeds, and mashup tools," Vachani explained. "Although Power is significantly accelerating this imminent evolution toward a borderless







Power.com

internet, we are preserving the essence of these sites' terms of use by giving users rightful control of their own content and friends. We are focused on delivering applications which increase user's usage of and add new value to their existing sites. Soon, we will provide tools for sites themselves to add the most popular Social Inter-networking applications directly into their entire sites.

"These previous efforts assume the problem to be 'interoperability,' a technology issue," Vachani continued. "We are the first to address Social Inter-networking as a consumer proposition. Power.com is well-positioned to deliver our vision of an ecosystem in which individuals, websites and even large social networks can create new ways to satisfy customers and build businesses in a socially inter-networked world."

**Media Inquiries:**

Ed Niehaus
Power.com
m) 650-255-9976
edniehaus@gmail.com

Myles Weissleder
Mylermedia
m) 415-990-0970
myles@mylermedia.com

**How Power.com works**

*Users join by registering their social networks at Power.com. Their Power start page shows them all of their friends, messages, and content -- from all their social networks, instant messengers, and email accounts -- in one place. Updates, pictures of friends, messages that they'd see on Facebook show up next to ones they have on MySpace, LinkedIn, etc. Communities, birthdays, any social network features they choose, are all arranged by people -- not by website -- on their Power.com start page.*

Once users log on to Power.com, they are automatically logged on everywhere that matters to them. They go from Power.com to their page on any one of their social networks with one click. Another click brings them to their page on another social network. One click also brings them back to Power.com, where they can simultaneously update the content of all their social pages. For example, they can browse for their latest photos or videos, pick the ones they want, and -- click -- make the pictures appear on any or all of their personal pages at the same time.

Messaging is especially nimble with Power.com: all their friends and messages from all sites show up in one place. Users can write one message and just choose recipients, without regard to what social network or messaging provider actually reaches each friend. Power sorts it out and sends the message off to each friend via the appropriate system. If any one friend has multiple ways to exchange messages, Power lets the user choose which one to use.

Today, Power.com now supports users on Facebook, MySpace, Hi5, MSN Messenger, Orkut, and YouTube. In the near future, Power will support them on LinkedIn, Twitter, Flickr, Hotmail, Yahoo, Gmail, AOL, Skype and other email and communication accounts.

**Virality -- how Power got 5 million registered users so quickly**

Messaging is a prime driver of Power.com's virality. Users communicate with all their friends on all of their sites, email, and instant messengers, using Power Messaging. The historic analogy is Hotmail, which grew to be the world's largest Internet service with over 500 million users by promoting itself at the bottom of each email its users sent. Power users are sending millions of inter-networked messages every day, across all social networks, email, and instant messengers. Like Hotmail, each Power Messenger message promotes Power.com.



Furthermore, millions of Power users have already added Power widgets, links, and watermarks to their social network profile pages, photos, and messages, so when friends visit these enhanced pages, they click to learn more about Power.com. Power also encourages users to invite their friends. At Power's current growth rates, the company expects to have over 30 million registered users by the end of 2009.

**The Brazilian advantage**

"To me the important issue is that users are driving Power themselves," said **Esther Dyson**, one of the technology industry's preeminent global trend spotters and a seed investor in Power.com. "And it excites me that these users are not just in the US. Nor are the software's creators: Latin America has impressive software design and engineering talent. Silicon Valley is not the only place to find great talent to build a world-class company."

Vachani, a self-proclaimed "global adventurer" arrived in Brazil 5 years ago to take a break from the Silicon Valley. A UC Berkeley graduate, and serial entrepreneur, Vachani, who lives in Rio de Janeiro, said, "I came to Brazil with a smile, a backpack and a passion for Brazilian dance and music. I just wanted to get my mind off of technology, and I thought I would go back to the US and start a new project after a year or so. Little did I know…"

Vachani soon recognized Latin America's hidden treasure: undiscovered great minds. Vachani stated, "I quickly realized that Latin America was like India 30 years ago, before Silicon Valley discovered it. Back then, most of India's brilliant minds were trapped in academia or working as bureaucrats in the government, with no entrepreneurial opportunities. Today, thousands of brilliant minds in Latin America are likewise underutilized and undervalued, with their biggest dreams being jobs as government bureaucrats and academics. Little capital and few role models are available to young entrepreneurs. If I could create a project that truly pushed the limits of innovation, and that had capital, I knew I would be able to attract hundreds of Brazil's and Latin America's brightest minds. Together we have built Latin America's first global technology company built upon the Silicon Valley adage to first bring the brilliant minds together and then they will create a brilliant product and company."

Vachani did just that. As founder and CEO of Power.com, he attracted the world renowned Silicon Valley venture capital firm Draper Fisher Jurvetson, famous for investing in Skype, Baidu, and Hotmail, to invest $6 million in Power and complete DFJ's first ever investment in Latin America. A group of private investors -- including Esther Dyson -- added another $2 million. Power has attracted over 70 of Brazil's brightest minds, including self-made entrepreneurs, professors, PhD's and top graduates from Brazil's most prestigious universities.

Igor Barenboim, Power's Director of Business Development, PhD graduate from Harvard University and former Global Economist for Latin America's largest hedge fund, stated, "I joined Power when it was just an idea on paper because I truly believed that Steve's vision would help jumpstart Latin America's transformation into an economy which truly values its intellectual capital. As a Brazilian with great dreams for the future of Latin America, I knew I needed to join this adventure"

**Media Inquiries:**

Ed Niehaus
Power.com
m) 650-255-9976
edniehaus@gmail.com

Myles Weissleder
Mylermedia
m) 415-990-0970
myles@mylermedia.com



**Vision -- People, not websites, at core of Power's Social Inter-networking platform**
Eric Santos, a Brazilian native and the company's Chief Technology Officer, stated, "We visualize a social world that centers around people, not websites. People have grown to love sharing their lives. They love to stay in touch, share their pictures, their relationships and everything they care about. The boundaries between different websites and different providers are irrelevant to these relationships. Power removes these boundaries, creating a much more natural and open social experience. We are creating a borderless Internet."

Power.com is now building an open platform for developers to create thousands of new Social Inter-networking applications. Today, thousands of developers are creating Facebook and Google applications. Soon these developers, and anyone creating social applications, will be able to add Social Inter-networking functionality on top of their existing Facebook and Google applications and dream up new Social Inter-networking applications which will help Power.com realize its vision of a borderless internet powered by the users, not corporations.

**About Power**
Power.com is the world's leading Social Inter-networking company, with 5 million registered users. Headquartered in Rio de Janeiro Brazil, Power.com is a privately held company with 70 people. This month, Power.com is opening new offices in San Francisco, California and Hyderabad, India. The company received an $8 million Series A investment led by Draper Fisher Jurvetson of Menlo Park, California and notable investors including Esther Dyson. For more information visit www.Power.com.

Contact:  Myles Weissleder, o 415-332-3205, m 415-990-0970 mw@mylermedia.com
Ed Niehaus, Power.com,  m 650-255-9976, edniehaus@gmail.com
Steve Vachani, Power.com, m 646-554-7773, Steve@power.com

**Media Inquiries:**

Ed Niehaus
Power.com
m) 650-255-9976
edniehaus@gmail.com

Myles Weissleder
Mylermedia
m) 415-990-0970
myles@mylermedia.com

#30#



Power.com

# Power.com Product Overview

## Ten Key Social Inter-networking Features

1. Enjoy all your friends from your Facebook, Myspace, Google, MSN, and other sites, brought together in Power.com

2. Read and respond to your messages from all your sites in one place at Power.com

3. Enter and browse all your social network, email, and IM accounts simultaneously with one login at Power.com

4. Use MSN Messenger inside your Facebook, Myspace, Hi5, and Orkut at Power.com (Yahoo Messenger, Gtalk, and AOL Buddy coming soon)

5. Send messages, photos, and videos to multiple friends simultaneously on all your sites, email, and IM from Power.com

6. Access Facebook, Orkut, Hi5, or Myspace from blocked computers at work or school through Power.com

7. Interact with with users from all social networks around the world in Power.com Chat rooms

8. Use Hotmail, Gmail, Yahoo Mail, Facebook Mail, and work email together in one place at Power.com (coming soon)

9. Synchronize and manage all your photos, music, applications, blogs, and videos on all sites at Power.com (coming soon)

10. Add LinkedIn, Twitter, Flickr, Yahoo, Hotmail, Gmail, AOL, Blogger, and Skype to your Power.com start page (coming soon)

**Media Inquiries:**

Ed Niehaus
Power.com
m) 650-255-9976
edniehaus@gmail.com

Myles Weissleder
Mylermedia
m) 415-990-0970
myles@mylermedia.com



## Power.com Executive Team

**Steve Vachani, CEO** - Experienced startup CEO, serial entrepreneur, board member, viral/ loyalty/user experience marketing innovator. From age 16 to 20, started 3 small businesses generating over $4 million in combined revenues while simultaneously completing multiple degrees at UC Berkeley. Founded pioneering e-commerce site in 1994 putting campus food delivery business online. During the past 13 years, launched 5 major Internet sites through grass roots and viral marketing campaigns that generated over 70 million combined registered users. CEO of leading loyalty and Internet marketing company Qool Media for 8 years. Oversaw creation of over 50 online marketing and loyalty building campaigns for fortune 500 and leading internet startups. Undergraduate degrees in Political Science and Business from UC Berkeley

**Eric Santos, Director of Product and Engineering** - Product Manager overseeing an elite team of framework engineers and specialists at Latin America and Brazil's largest technology services firm – CPM International/Braxis/Unitech. As an entrepreneur, Eric managed from concept to launch the creation of approximately 20 outside client's projects. With no outside resources in his spare, he individually incubated, executed, and obtained more than 500k registered members marketing a set of social network, viral marketing, and user generated media tools. Masters in Engineering from prestigious Federal University – Salvador, Brazil.

**Igor Barenboim, Director of Global Business Development** – Global economist, lead analyst, and founding team member of Gavea Investimentos, Latin America's largest hedge fund. PhD in Economics from Harvard University.

**Michael Ross, Director of Business Development – North America** – President of New York-based investment bank, Joseph Capital LLC. Served in the Investment Banking Division of Salomon Smith Barney and as Vice President at Bank of America and at Lehman Brothers. Served as lead analyst to hedge fund, Vision Capital, and as buy-side analyst at Sanford C. Bernstein. PhD in Finance from UC Berkeley.

**Cornelius Conboy, Director of Administration** – Senior operational and engineering executive on founding management team of Ifilm (sold to Viacom). Was with Ifilm.com from startup to maturity. Previously, he served as VP technology for industry leading news portal. MBA at Pepperdine University where he emphasized entrepreneurship and marketing. Launched the Brazilian offices for another US global technology company gaining significant startup and operations experience in Brazil.

**Ed Niehaus, Director of Marketing & Global Communications** – Experienced entrepreneur, venture capitalist, global marketing professional, and CEO. Cofounder & CEO of the Internet's top public relations agency in the 1990's, helping drive the market entry of 45 leading Internet companies. Launched Yahoo's market entry when they had 3 employees, no CEO and no VP Marketing; oversaw Yahoo's public relations for the following five years as Niehaus Ryan helped

**Media Inquiries:**

Ed Niehaus
Power.com
m) 650-255-9976
edniehaus@gmail.com

Myles Weissleder
Mylermedia
m) 415-990-0970
myles@mylermedia.com



Yahoo build one of the largest global brands ever built with PR. Drove Apple's turn around PR efforts from Steve Job's return, through the development of the Think Different campaign, the launch of the iMac and beyond. Former General Partner in VC firm Cypress Ventures. Currently Chairman of Collaborative Drug Discovery which raised investment from top VC firms, Founders Fund and Omidyar Network. B.S.E. in Mechanical Engineering from Duke University.

**Felipe Herrera, Director of Legal and Corporate Affairs** – Worked for top Brazilian law firm, Levy & Salomão Advogados as a legal consultant, dealing with Mergers and Acquisitions, Antitrust Law, Banking, Corporate and International Commerce. International Law experience working with Administrative Tribunal for the Organization of American States (OEA) in Washington, D.C. Analyst at the Bear Stearns Investment Bank in New York. Bachelors International Relations from USA and Law School at prestigious State University of Rio De Janeiro.

***Cleomar Rocha, Product Marketing Manager*** – Professor in Design and Communications at prestigious University of Salvador, Brazil. Nationally respected product marketing & product management consultant. Post Doctorate from prestigious PUC University specializing in Visual Communications and Technology Product Communications. Masters and PhD degrees in Digital Communications from prestigious Federal University of Bahia.

**Media Inquiries:**

Ed Niehaus
Power.com
m) 650-255-9976
edniehaus@gmail.com

Myles Weissleder
Mylermedia
m) 415-990-0970
myles@mylermedia.com

# EXHIBIT 9

| From: | Eric Santos |
|---|---|
| To: | Bruno Carvalho |
| Cc: | Danilo Assis; Danilo Delgado; Carolina Fialho; Juliana Kalid; Elmo Cruz; Steve Vachani |
| Subject: | Campanha 100x100x100 |
| Date: | Wednesday, November 26, 2008 9:22:21 PM |

Oi Bruno,

Steve está solicitando TODOS os textos para a campanha 100x100x100. Ele deseja os textos dos EMAILS, FACEBOOK MAIL, MENSAGENS PRIVADAS, SCRAP / FACEBOOK WALL e TEXTOS DE SPLASHS. Envia também junto a versão HTML ou COM FORMATAÇÃO DE CADA TEXTO. Ele precisa ver a versão tanto INGLÊS ou PORTUGUÊS.

No último material sobre a campanha 100x100x100, faltou ter as interfaces traduzidas e os textos em inglês, naquele material não constava de textos para SCRAPS / WALL, MENSAGEM PRIVADA e FACEBOOK MAIL. Precisamos também ter tanto a versão em HTML quanto a versão TEXTO PLANO dos convites em EMAIL. Quais são as variações de TÍTULOS e TEXTOS DOS CONVITES?

É importante garantirmos que a campanha tenha nela o máximo de exposição possível, por isso se faz necessário que seja enviado através dela também RECADOS PRIVADOS PARA TODOS AMIGOS. Se pudermos, vamos ativar um EVENTO para que o usuário modifique o STATUS de todas as redes convidando os amigos a entrarem na POWER através do link personalizado. Existe algum outro elemento viral nessa campanha que não foi abordado nesse email? Tem alguma nova sugestão para adicionarmos nela.

Aproveite também para me enviar qual é o conteúdo e o layout dos BANNERS (widgets) da campanha.

Atc,

Eric

No virus found in this outgoing message. Checked by AVG. Version: 7.5.549 / Virus Database: 270.9.10/1812 - Release Date: 25/11/2008 19:53



| | |
|---|---|
| **From:** | Eric Santos |
| **To:** | Bruno Carvalho |
| **Cc:** | Danilo Assis; Danilo Delgado; Carolina Fialho; Juliana Kalid; Elmo Cruz; Steve Vachani |
| **Subject:** | 100x100x100 Campaign |
| **Date:** | Wednesday, November 26, 2008 9:22:21 PM |

Hi Bruno,

Steve is asking for ALL the texts for the 100x100x100 campaign. He wants the texts from the E-MAILS, FACEBOOK MAIL, PRIVATE MESSAGES, SCRAP / FACEBOOK WALL and SPLASH TEXTS. Also send the HTML version or versions WITH THE FORMATTING OF EACH TEXT. He needs to see both the ENGLISH or PORTUGUESE versions.

In the last material for the 100x100x100 campaign the translated interfaces and texts in English were missing, the material did not include texts for SCRAPS / WALL, PRIVATE MESSAGES and FACEBOOK MAIL. We also need to have both the version in HTML and the PLAIN TEXT version of the E-MAIL invitations. What are the various INVITATION HEADERS and TEXTS?

It is important that we ensure the campaign achieves the maximum exposure possible and therefore PRIVATE MESSAGES TO ALL FRIENDS must also be sent as part of it.
If we can, let's activate an EVENT so that users modify the STATUS of all networks inviting friends to join POWER via the personalized link. Is there any other viral element in this campaign that was not mentioned in this e-mail? Are there any new suggestions to add to this.

Also can you also send me the content and layout of the BANNERS (widgets) of the campaign, please.

Regards,

Eric

No virus found in this outgoing message. Checked by AVG. Version: 7.5.549 / Virus Database: 270.9.10/1812 - Release Date: 25/11/2008 19:53

SER 100



**TRANSPERFECT**

CERTIFICATION OF TRANSLATION

I, Matthew Orr, hereby certify that the attached Portuguese (Brazil) to English translation has been translated by a qualified translator competent in both languages, and verified to be an accurate and complete rendering of the content of the original document to the best of our ability. The following document is included in this certification:

"Campanha 100x100x100"

Signature

Sworn to before me this
January 6, 2012

Signature, Notary Public

KEVIN M KELLEY JR
Notary Public - State of New York
No. 01-KE-6229268
Qualified in Queens County
Commission Expires October 4 2014

Stamp, Notary Public

THREE PARK AVENUE, NEW YORK, NY 10016   T 212.689.5555   F 212.689.1059   WWW.TRANSPERFECT.COM

# EXHIBIT 12

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN JOSE DIVISION

 4

 5  FACEBOOK, INC.            :

 6            Plaintiff,      :

 7                            :

 8        v.                  :

 9                    :

10  POWER VENTURES, INC. d/b/a:

11  POWER.COM, a California   :

12  corporation; POWER        :        Case No.

13  VENTURES, INC. a Cayman   :     5:08-CV-05780

14  Island Corporation, STEVE :        JW (HRL)

15  VACHANI, an individual;   :

16  DOE 1, d/b/a POWER.COM, an:

17  individual and/or business:

18  entity of unknown nature; :

19  DOES 2 through 25,        :

20  inclusive, individuals    :

21  and/or business entities  :

22  of unknown nature,        :

23            Defendants.     :

24  _____

25        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
```

<div align="center">1</div>

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

**BARKLEY**
Court Reporters

```
 1          Videotaped Deposition of STEVEN VACHANI

 2    taken on behalf of the Plaintiff at the offices of

 3    BURSOR & FISHER, P.A., 369 Lexington Avenue, New

 4    York, New York, on Wednesday, July 20, 2011,

 5    commencing at 9:47 in the forenoon before PATRICIA

 6    MULLIGAN CARRUTHERS, a Certified Court Reporter and

 7    Notary Public of the State of New Jersey and Notary

 8    Public of the State of New York.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



| | | |
|---|---|---|
| 10:04 | 1 | A. Legally, no. As I mentioned at |
| 10:04 | 2 | the moment, any new activities that I'm pursuing, |
| 10:04 | 3 | I'm pursuing under this entity, so I'm currently |
| 10:04 | 4 | engaged in conversations with -- with people. |
| 10:04 | 5 | Q. And when did you join Power? |
| 10:04 | 6 | A. Power was founded in -- It was |
| 10:04 | 7 | 2006 is when our -- our primary activities started. |
| 10:04 | 8 | We incorporated Power, I believe it was, if I'm not |
| 10:04 | 9 | mistaken, late 2006 and -- but the activities |
| 10:05 | 10 | started previously as a start-up, we started |
| 10:05 | 11 | working on it. |
| 10:05 | 12 | Q. Were you one of the creators of |
| 10:05 | 13 | Power? |
| 10:05 | 14 | A. I was the founder of the company. |
| 10:05 | 15 | Q. Now, when you say it was |
| 10:05 | 16 | incorporated in 2006 but started before then, was |
| 10:05 | 17 | it started under the Web site title www.power.com? |
| 10:05 | 18 | A. No. It was originally -- When we |
| 10:05 | 19 | originally started it, there was no Web site. It |
| 10:05 | 20 | was a -- Like many startups we were -- we were |
| 10:05 | 21 | working on a core, you know, product idea, and |
| 10:05 | 22 | later the name power.com came about in 2007. I |
| 10:05 | 23 | believe we acquired the domain in 2007. |
| 10:05 | 24 | Q. Who helped -- Besides yourself, |
| 10:05 | 25 | who helped create Power.com. You used the -- |

21

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

**BARKLEY**
Court Reporters

02:33  1          Q.      Do you know if there were

02:33  2  documents reflecting Power's ideas being bantered

02:33  3  about describing how they could get new members?

02:33  4          A.      Yes.  I believe we provided those

02:33  5  to you.

02:33  6          Q.      Do you know -- How many documents

02:33  7  do you believe you provided to Facebook

02:34  8  approximately?

02:34  9          A.      I think it was -- not -- less -- I

02:34 10  don't know.  It was less than ten, I believe.

02:34 11          Q.      The -- And how often were

02:34 12  marketing schemes discussed internally at Power, if

02:34 13  you know?

02:34 14          A.      How often?  They would be in

02:34 15  conversations, like, we'd have -- we -- meetings.

02:34 16  There would be conversations if anything became

02:34 17  relevant or useful.  There would be -- Most of them

02:34 18  were e-mail discussions, so e-mail discussions

02:34 19  would be where most of conversations took place,

02:34 20  but obviously they were also verbal conversations.

02:34 21          Q.      Do you know if any particular

02:34 22  discussions ever occurred relating to soliciting

02:34 23  members from Facebook?

02:34 24          A.      Soliciting members from Facebook?

02:34 25  What do you mean?

                              181

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

```
02:34   1          Q.       To join -- To join Power.
02:34   2          A.       We didn't have access to -- The
02:35   3   users could invite their friends.  So that was a
02:35   4   feature that -- One of our promotions in our
02:35   5   features was that you could invite your friends to
02:35   6   join, invite your friends on Facebook to join, and
02:35   7   so people could -- they could make promotions so
02:35   8   they could create events around -- around a power
02:35   9   creativity around Power.  So we gave our user -- We
02:35  10   encourage our users, in fact, to bring their
02:35  11   friends in the same way that Facebook encourages
02:35  12   its users to bring their friends from other sites.
02:35  13   But we employed same tactics that are used by --
02:35  14   similar tactics where you invite your friends, so
02:35  15   we did use invite friends features and promotions.
02:35  16          Q.       If you go back to Exhibit 103, you
02:35  17   see various -- "Displayed a Launch Promotion" in
02:35  18   the upper left-hand corner?
02:35  19          A.       Yup.
02:35  20          Q.       It says, "First 100 people who
02:35  21   bring 100 new friends to power.com earn $100?
02:36  22          A.       Yes.
02:36  23          Q.       Is that an example of a pop-up
02:36  24   that was made available on the site that was
02:36  25   designed to encourage new users to the site?
```

                              182

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



SER 107

| | | |
|---|---|---|
| 02:36 | 1 | A.        I don't know if this was a pop-up. |
| 02:36 | 2 | You can see it was prominently displayed on the |
| 02:36 | 3 | front page.  That's not more than that, it's not a |
| 02:36 | 4 | pop-up.  I think the terminology is not pop-up it's |
| 02:36 | 5 | an ad -- In fact, it's a prime-placed ad on the |
| 02:36 | 6 | home page. |
| 02:36 | 7 | Q.        Do you know whose idea it was for |
| 02:36 | 8 | this particular promotion? |
| 02:36 | 9 | A.        That was mine. |
| 02:36 | 10 | Q.        Do you know when you came up with |
| 02:36 | 11 | it? |
| 02:36 | 12 | A.        While I was sleeping.  I just |
| 02:36 | 13 | thought a hundred, hundred, hundred was a good |
| 02:36 | 14 | idea. |
| 02:36 | 15 | Q.        All right.  And when you clicked |
| 02:36 | 16 | on the Number 100, what would happen? |
| 02:36 | 17 | A.        It gave you a chance to -- to |
| 02:36 | 18 | select which friends you wanted to -- to, I guess, |
| 02:36 | 19 | invite to -- to join -- to join Power. |
| 02:36 | 20 | Q.        All right.  And was that -- Would |
| 02:36 | 21 | you agree that, as reflected on Exhibit 103, that |
| 02:37 | 22 | particular promotion was made available at the time |
| 02:37 | 23 | that you were connected to Facebook? |
| 02:37 | 24 | A.        Yes.  It was. |
| 02:37 | 25 | Q.        And if you clicked on 100 people, |

<div align="center">183</div>

**BARKLEY**
Court Reporters

<div align="center">SER 108</div>

02:37 1  you would be invited to ask your friends to join

02:37 2  power.com?

02:37 3         A.      No.  You would have the option to

02:37 4  invite your friends to join just like you have the

02:37 5  option on Facebook to invite your friends to join

02:37 6  Facebook and every other site on the Internet, and

02:37 7  if they did, if they reach a hundred friends that

02:37 8  joined, they would earn $100.

02:37 9         Q.      And if you accepted the feature

02:37 10  that came up saying would you -- it said something

02:37 11  like, "Would you like to invite your friends to

02:37 12  Power"?

02:37 13         A.      Yes.

02:37 14         Q.      If you hit "yes" or "I agree" --

02:37 15         A.      Yes.

02:37 16         Q.        -- how -- what -- what

02:37 17  automation would occur at that point?

02:37 18         A.      So first of all, you have to

02:38 19  remember that 99 percent of our users were not --

02:38 20  were not using -- were not using Facebook.  They

02:38 21  were users on other sites, so we actually -- I

02:38 22  guess you could say we were actually a big source

02:38 23  of providing users to Facebook in Brazil.  In fact,

02:38 24  as -- I guess you could say it was a gift, but we

02:38 25  -- we brought a large amount of Orkut users to

184

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

**BARKLEY**
Court Reporters

02:38  1    Facebook, so that's where a lot of our promotions

02:38  2    were -- Because our users already, as you know,

02:38  3    have -- Prior to having Facebook, we had millions

02:38  4    of users who have hundreds of friends already in

02:38  5    the system, and that represented 99 percent of our

02:38  6    contacts in our system.  Facebook was a very small

02:38  7    part of this world.  At that time, obviously it's a

02:38  8    much larger site today but in our world, in our

02:38  9    growth it was -- it was introduced later.  So we

02:38 10    were encouraging our friends -- our users to go and

02:38 11    register at Facebook and become Facebook users.

02:38 12    Because in our -- in our view, the more social

02:39 13    networks that users were using, the more value it

02:39 14    would be to, you know, to aggregate different

02:39 15    sites.  So we encouraged users to sign up for

02:39 16    Facebook.  In fact, we're giving free marketing to

02:39 17    Facebook.  So to answer your question, a lot of

02:39 18    these users -- You could see all your friends from

02:39 19    all your sites and say, "Hey.  Join Facebook when

02:39 20    you're at Facebook."  That was a big part of our

02:39 21    promotions.  That was the largest part of our

02:39 22    promotions.  And then, of course, if they have

02:39 23    friends that are already using Facebook -- Facebook

02:39 24    and they wanted to invite their friends to come use

02:39 25    Power, that's the smaller part.  But the biggest

185

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



02:39 1    one were obviously the friends that the user had

02:39 2    already put in the system.

02:39 3         Q.       The promotion itself had to have

02:39 4    an attribute created for it in the MSQL database.

02:39 5    Correct?

02:39 6         A.       Yes.  That's correct.

02:39 7         Q.       And that attribute would then be

02:40 8    assigned to anybody who clicked on the promotion.

02:40 9    Correct?

02:40 10         A.       What do you mean "the attribute"?

02:40 11         Q.       Well, if someone clicked on the

02:40 12    promotion, their user name would then be assigned

02:40 13    to the attribute associated with the promotion.

02:40 14    Correct?

02:40 15         A.       If they selected to invite a

02:40 16    friend, they could send an invitation to that

02:40 17    friend.

02:40 18         Q.       That's not what I'm talking about.

02:40 19    The minute that -- Let's say I'm Ms. Almeirda who's

02:40 20    being shown on the screen shot.

21         A.       Okay.

02:40 22         Q.       If Ms. Almeirda clicks on the

02:40 23    launch promotion --

02:40 24         A.       Yes.

02:40 25         Q.        -- she would have received a --

186

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

02:43 1    can tell you that every single user of our site had

02:43 2    the ability to invite friends.  And if -- if some

02:43 3    of them reached a hundred, which was obviously not

02:43 4    an easy task to reach, they would -- they would win

02:43 5    this award, so I think only 30 something people

02:43 6    reached it, if I -- if I remember correctly.

      7            Q.        All right.

02:44 8            A.        So I don't know if that answers

02:44 9    your question correctly.

02:44 10           Q.        What data was -- Whether it was

02:44 11   automatedly or manually viewed, what data was

02:44 12   viewed in order to determine who had invited 100

02:44 13   friends to join Facebook?

02:44 14           A.        Well, it's -- In the same -- When

02:44 15   any site creates an import or invitation, when a

02:44 16   friend registers because of your invitation, you

02:44 17   know this is -- This is a feature that was in our

02:44 18   site, always in our site.  We know how many friends

02:44 19   were invited.  We know how many friends were

02:44 20   converted.  Just as Facebook publicly displays it

02:44 21   on their site and every other site does that.  So

02:44 22   we just looked and saw the people that were above

02:44 23   the hundred on that date, and we -- and we -- and

02:44 24   we gave them a hundred dollar check.

02:44 25           Q.        And when you say you looked, you

                                  190

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



02:44 1    looked in the database.  Correct?

02:44 2         A.      We looked in our database,

02:44 3    correct.  And we provided the numbers, I believe,

02:44 4    on that promotion to you guys.

02:45 5         Q.      When somebody clicked on the

02:45 6    launch promotion and they were given, like you to

02:45 7    invite your friend" --

02:45 8         A.      That's correct.

02:45 9         Q.      -- and they hit yes, at that

02:45 10    point the importer, as we've been calling it, would

02:45 11    automatically contact all friends on Facebook to

02:45 12    invite them to --

02:45 13         A.      Let's be clear.  We don't have

02:45 14    access to any friends' e-mail addresses, so there

02:45 15    was not a single E mail sent by Face -- by Power

02:45 16    for -- We have e-mail addresses for friends on

02:45 17    other sites, but on -- so we -- If they wanted to

02:45 18    invite, as I said 99 -- well over 90 percent of our

02:45 19    users were Orkut users and Orkut friends and had

02:45 20    friends from other sites where they -- on sites

02:45 21    that allowed their E mails, but Facebook didn't --

02:45 22    didn't allow E mails, otherwise, we would have been

02:45 23    happy to send an invitation to those friends to

02:45 24    invite them; so that was not available for us for

02:46 25    Facebook.

<div align="center">191</div>

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



02:46 1        Q.        At this point, I haven't even

02:46 2   talked about E mail.  All I meant is at the point

02:46 3   at which someone said yes they'd like to invite

02:46 4   their friends, the database would then recognize,

02:46 5   using its importer function and the idea of the

02:46 6   registered user Power, who the friends were.

02:46 7   Correct?

02:46 8        A.        It would show you a list of all

02:46 9   your friends, yes, from your friends list.

02:46 10        Q.        And the invitation to join was

02:46 11   then automatically forwarded to those friends

02:46 12   whether through E mail if you're on Orkut or some

02:46 13   other way on Facebook.  Correct?

02:46 14        A.        A user had to say, "I want to

02:46 15   invite this friend," so it's -- An authorized user

02:46 16   said, "Yes, these are my friends, and these are the

02:46 17   friends I want to invite to this site."  That is

02:46 18   correct.

02:46 19        Q.        All right.  And at that point, an

02:46 20   automated script would contact whatever friends

02:46 21   were identified.  Correct?

02:46 22        A.        Depends on -- So if the friend was

02:46 23   a non-- Facebook did not provide E mails.  If the

02:47 24   friend was, like, on another site and they had the

02:47 25   E mail, they could -- they could send on E mail

192

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

SER 114

02:51 1  copy their friends and say, "Sign up with this

02:51 2  link." They were unlimited ways that people can

02:51 3  communicate with their friends.

02:51 4          Q.      All right. But the link was

02:51 5  provided in the communication by Power. Correct?

02:51 6          A.      The link was given -- Power

02:51 7  provided a link to our users to encourage them to

02:51 8  invite their friends.

02:51 9          Q.      And did Power also prepare the

02:51 10  script that was included with that invitation?

02:51 11          A.      I think, yeah, we provided them --

02:51 12  we provided them a script, yeah. As every single

02:51 13  -- As Facebook does and everybody else does.

02:51 14          Q.      Now, in the case of Facebook, you

02:51 15  say that Facebook didn't permit you to contact

02:51 16  through E mails?

02:51 17          A.      What do you mean "Facebook doesn't

02:51 18  permit"? Facebook did -- It has nothing to do with

02:51 19  permitting it. We wanted -- If we wanted to -- We

02:51 20  just didn't have access to the E mails because

02:52 21  Facebook -- If we wanted to, we could have -- We

02:52 22  didn't get to that, but we would be happy to build

02:52 23  a feature that imported your E mail contacts, but

02:52 24  we didn't -- we didn't do that. We never got to

02:52 25  that point.

<div align="center">197</div>

<div align="center">STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO</div>



<div align="center">SER 115</div>

02:53 1    that you could determine how many Facebook

02:53 2    registered users were contacted as part of this

02:53 3    promotion?

02:53 4         A.        Facebook registered users?

02:53 5    Meaning if they were contacted -- In what manner?

02:53 6    If they happened -- If they were contacted at Orkut

02:53 7    and they happened to have an account on Facebook

02:53 8    but were not contacted through -- through the help

02:53 9    of Facebook?

02:53 10        Q.        No.  I'm talking about were there

02:53 11   individuals at Facebook contacted on the Facebook

02:53 12   -- through the Facebook system --

02:53 13        A.        Yes.

02:53 14        Q.        -- as a result of this promotion?

02:53 15        A.        Yes.  Of course.

02:53 16        Q.        Is there a way to determine how

02:53 17   many were contacted?

02:54 18        A.        Well, we could do -- If you take a

02:54 19   few minutes, we can probably figure out -- It's

02:54 20   obviously very small, but -- Because the Facebook

02:54 21   users were so small, but let's think about -- So

02:54 22   people created events on Facebook, so promoting it,

02:54 23   because our users were -- You know, some of them

02:54 24   created events saying, "Come on Facebook," about

02:54 25   come and joining, they created messages.  They

                          199

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



| | | |
|---|---|---|
| 02:57 | 1 | at that time, but I know it's usually standard, you |
| 02:58 | 2 | know, more common to have a default to invite all |
| 02:58 | 3 | your friends.  I think Facebook does that, in fact. |
| 02:58 | 4 | Q.        Setting aside what the default |
| 02:58 | 5 | was, as part of the invitation, would list the |
| 02:58 | 6 | friends that could be contacted? |
| 02:58 | 7 | A.        That's correct. |
| 02:58 | 8 | Q.        And that would list the friends |
| 02:58 | 9 | who were available as friends on Facebook. |
| 02:58 | 10 | Correct? |
| 02:58 | 11 | A.        I believe so, yes. |
| 02:58 | 12 | Q.        And for the friends who were |
| 02:58 | 13 | contacted on Facebook, an invitation to join Power |
| 02:58 | 14 | would then be set if the person had that person |
| 02:58 | 15 | selected as, "Yes.  I would like them to be |
| 02:58 | 16 | invited"? |
| 02:58 | 17 | A.        Yeah.  If they could communicate |
| 02:58 | 18 | to invite them, they would be invited. |
| 02:58 | 19 | Q.        And earlier you said that however |
| 02:58 | 20 | the mechanism was, whether it was events or E mails |
| 02:58 | 21 | for other Web sites or whatever -- setting aside |
| 02:58 | 22 | the telephone call, if it was in a text-based |
| 02:58 | 23 | communication -- |
| 02:58 | 24 | A.        Yes. |
| 02:58 | 25 | Q.        -- Power would provide the text |

<center>203</center>

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



<center>SER 117</center>

02:58  1    and the URL link to Power as part of that

02:58  2    communication so --

02:58  3            A.        Yes.

02:59  4            Q.              -- so the friends would know

02:59  5    where to go to be invited.  Correct?

02:59  6            A.        We would provide them text that

02:59  7    they could use.  Correct.  Of course.

02:59  8            Q.        And the list of friends was

02:59  9    recovered from the database and the variables that

02:59 10    were associated with friends with that user ID?

02:59 11            A.        Every -- I think -- Every user --

02:59 12    One of our core features is you can access all your

02:59 13    friends and create a friends list.  So, yes, I

02:59 14    mean, you have a friends list and you can select

02:59 15    from your aggregated friends list who you want to

02:59 16    invite.

02:59 17            Q.        Now, earlier you said while most

02:59 18    people contacted their Web site dynamically inside

02:59 19    the browser, the functionality existed to have the

02:59 20    automation available on through the PowerScript

02:59 21    also contact the Web sites.  Correct?

02:59 22            A.        What do you mean?

02:59 23            Q.        In other words, you -- In order to

02:59 24    obtain -- user content, for instance, from Web

02:59 25    sites, you could use the automated script available

                                    204

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



02:59 1    through PowerScript to download --

02:59 2         A.       That's what any importer does.

03:00 3    When you use an importer, you're -- you're

03:00 4    basically authorizing a script to go to another

03:00 5    site and access certain data.  So, like, when

03:00 6    Facebook -- as your Facebook import you authorize a

03:00 7    script written by Facebook to go to another site,

03:00 8    take that data, bring it back, and then Facebook

03:00 9    sends an invitation on behalf of the user.  That's

03:00 10   the same process that we go through.  That is

03:00 11   correct.

03:00 12        Q.       And in the invitation that was

03:00 13   then sent as part of the launch promotion to a

03:00 14   Facebook user, how would the Power site know what

03:00 15   function or what feature on Facebook to populate

03:00 16   the invitation to?  In other words, how would it

03:00 17   know to send it to an event or say an instant

03:00 18   message or whatever medium of communication?

03:00 19        A.       Well, Facebook doesn't have

03:00 20   instant message.  You know, a user can go and -- If

03:00 21   a user wanted to manually click on a friend and

03:01 22   say, "Hey," I don't believe even they had Facebook

03:01 23   chat at that time, so there wasn't even -- I don't

03:01 24   think it was a feature, so we didn't even interact

03:01 25   with that.  They could write a message to their

                              205

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



03:01 1  friend.  They could create an event or they could

03:01 2  go and, I guess, take that link up and paste it and

03:01 3  write an E mail to their friend.

03:01 4          Q.      Was one of the ways that Power was

03:01 5  able to make the invitation available to Facebook

03:01 6  users is that the PowerScript would set up an event

03:01 7  on Facebook on behalf of the user who had clicked

03:01 8  on --

03:01 9          A.      If the user authorized for the

03:01 10 creation of the event, yes.

03:01 11         Q.      And if the -- How did the -- How

03:01 12 did Power know it was to set up an event as opposed

03:01 13 to any other way of communicating --

03:01 14         A.      Because the user said, "Create an

03:01 15 event for me," so user authorized the creation of

03:01 16 an event.

03:01 17         Q.      Was that made available on the

03:01 18 promotion -- on the pop-up that made -- would come

03:02 19 up --

03:02 20         A.      That was -- As I said, if you

03:02 21 clicked that, that was one of the options that the

03:02 22 user had an option to create an event.

03:02 23         Q.      What other options did the user

03:02 24 have?  We can take a break here.

03:02 25                 THE VIDEOGRAPHER:  It's 3:01.  Off

                                206

| | | |
|---|---|---|
| 03:02 | 1 | the record, Tape 4. |
| 03:02 | 2 | (Whereupon, a recess is taken.) |
| 03:14 | 3 | THE VIDEOGRAPHER: 3:13, on the |
| 03:14 | 4 | record. Beginning of Tape 5. |
| 03:14 | 5 | Q. Mr. Vachani, just before the break |
| 03:14 | 6 | you indicated that in the instance of Facebook |
| 03:14 | 7 | being contacted by Power -- |
| 03:14 | 8 | MR. COOPER: Strike that. |
| 03:14 | 9 | Q. That in the instance in which a |
| 03:14 | 10 | friend of somebody who had indicated their interest |
| 03:14 | 11 | in participating in the launch promotion, the |
| 03:14 | 12 | friend was on Facebook, that one option that was |
| 03:14 | 13 | available to contact that friend was events. Do |
| 03:14 | 14 | you recall that before the break saying? |
| 03:15 | 15 | A. I believe creating a event. |
| 03:15 | 16 | Q. Do you recall what the other |
| 03:15 | 17 | options were? |
| 03:15 | 18 | A. I don't offhand, but I think they |
| 03:15 | 19 | provided a link where they could -- So everyone was |
| 03:15 | 20 | given a unique link so they could go do whatever |
| 03:15 | 21 | they want with that link, write E mails to friends, |
| 03:15 | 22 | call on the phone, whatever so that was -- When |
| 03:15 | 23 | they clicked, they were made available a link, and |
| 03:15 | 24 | I think that maybe send in a message so Facebook -- |
| 03:15 | 25 | While they can't send an E mail, they can send a |

207

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



03:15  1    message to friends on Facebook, so they could

03:15  2    message their friend.  So if the user said, "I want

03:15  3    to send a message, private message," they could

03:15  4    send a private message to their friend, if I'm not

03:15  5    mistaken.

03:15  6          Q.       Let me -- Any other options?

03:15  7          A.       I don't remember offhand, but

03:15  8    those are the -- I think the primary ones, but

03:15  9    obviously they had -- they had a link that they

03:15  10   could use whatever way they wanted to.  They could

03:15  11   create an event -- create an event, send a message.

03:16  12   Those are the ones I could think of off hand, but I

03:16  13   believe whatever details on this were also provided

03:16  14   in the past in the previous declarations.

03:16  15         Q.       In the case of providing a link,

03:16  16   in what way was the link displayed on Facebook?

03:16  17         A.       When the user is provided a link

03:16  18   on Power, and they can copy and paste and do

03:16  19   whatever they want to -- to go promote that link.

03:16  20         Q.       I see.

03:16  21         A.       So just as any invitation process

03:16  22   on sites.  You give a unique link which has your

03:17  23   unique identifier in it, so if someone signs up

03:17  24   from that link you -- you get credit for it.

03:17  25         Q.       And that link would be the URL to

                                    208

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



03:20  1    that was sent to Facebook --

03:20  2              A.       Usually --

03:20  3                       MR. BURSOR:  Objection.  Vague and

03:20  4    ambiguous.

03:20  5              Q.       Do you know who created the text

03:20  6    that was prepared through the automated script that

03:20  7    was sent by Power to Facebook users?

03:20  8                       MR. BURSOR:  Objection.  Vague and

03:20  9    ambiguous.  Assumes facts not in evidence.  Lacks

03:20 10    foundation.  You can answer.

03:20 11              A.       I'm repeating what he said.

03:20 12    Objecting.  It's vague and ambiguous.

03:21 13                       MR. BURSOR:  I objected.  If you

03:21 14    can understand it, you can answer it.

03:21 15              Q.       Mr. Vachani, as I said at the

03:21 16    beginning, your attorney has the right to interject

03:21 17    actions unless he instructs you not to answer --

03:21 18              A.       Okay.

03:21 19              Q.       Let me -- One of the ways that you

03:21 20    said that Facebook users would be contacted for

03:21 21    this promotion was the Power user could say they

03:21 22    wanted to participate and contact friends to create

03:21 23    an event?

03:21 24              A.       Correct.

03:21 25              Q.       And you said the automatic script

                                 212

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



```
03:21  1    -- the automated script created by Power would, in
03:21  2    fact, create an event on Facebook?
03:21  3            A.      If the user authorized it and
03:21  4    indicated they wanted to do that.  That's correct.
03:21  5            Q.      As part of the creation of that
03:21  6    event, was text included as part of event set up --
03:21  7            A.      They were shown texts just like
03:21  8    standard practice.  They were shown it and
03:21  9    authorized it.
03:21 10            Q.      And that text included the same
03:22 11    link to the URL to Power?
03:22 12            A.      I would assume it has the link in
03:22 13    it, yes.
03:22 14            Q.      The E mails that you said were
03:22 15    sent to users of, like, Orkut that had e-mail
03:22 16    addresses available on your site --
03:22 17            A.      Correct.
03:22 18            Q.      To the best of your knowledge --
03:22 19    And you said the link itself was one way that you
03:22 20    would be allowed to contact users.  Correct?
03:22 21            A.      Well, you could take the link and
03:22 22    pass the link.  It's -- You provide them a unique
03:22 23    link and they can go to messenger and copy that
03:22 24    link and say, "Hey, go sign up for -- for Power."
03:22 25            Q.      Do you know if that URL had an ID
```

213

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

SER 124

04:14 1    create an event as part of $100 promotion use the

04:14 2    language, "Bring 100 friends and 100 bucks"?

04:14 3                   MR. BURSOR:  Hold on a second.

04:14 4    Objection.  Vague, ambiguous.  Assumes facts not in

04:14 5    evidence.  Lacks foundation.  If you could clarify

04:14 6    whether you're referring to PowerScript or Facebook

04:14 7    script, that might help clear up some of the --

04:14 8                   MR. COOPER:  I asked specific -- I

04:14 9    will say it again.  Was the language, "Bring 100

04:14 10   friends and win 100 bucks," language that was used

04:14 11   in the Power automated script when it set up the

04:14 12   event on Facebook?

04:14 13                  MR. BURSOR:  Objection.  Vague,

04:14 14   ambiguous.  Assumes facts not in evidence.  Lacks

04:15 15   foundation.  Listen to the question carefully, and

04:15 16   if you can understand it, you can answer it.

04:15 17        A.        Bring 100 friends and 100 bucks

04:15 18   was our -- our tag line, so -- but I don't --

04:15 19   whether the user entered that in on their own or

04:15 20   whether they -- they put this.  I cannot say from

04:15 21   this -- from looking at this, but that was the

04:15 22   language that we suggested to users to use.  But

04:15 23   many users changed the language, too, and put other

04:15 24   language in those events, so I can't -- This is one

04:15 25   example of a user creating an event.  I cannot say

256



```
04:15   1    what -- you know, how this was specifically created
04:15   2    because they -- they had -- they could have created
04:15   3    this event and the language was -- That was the tag
04:15   4    line we were promoting, but I do not know if this
04:15   5    was specifically -- this specific E mail or if they
04:16   6    copied and pasted it if they did whatever.  But
04:16   7    what I do know is, this was an event where the user
04:16   8    specifically authorized us and said -- either
04:16   9    created this event manual or specifically
04:16  10    authorized us to create this event.
04:16  11                   MR. COOPER:  We've got to go off
04:16  12    the record.
04:16  13                   THE VIDEOGRAPHER:  It's 4:15.  Off
04:16  14    the record.  End of Tape 5.
04:16  15                   (Whereupon, a recess is taken.)
04:23  16                   THE VIDEOGRAPHER:  4:22, on the
04:23  17    record.  Beginning of Tape 6.
04:23  18         Q.       Before the break you indicated
04:23  19    that, "Bring 100 friends and win 100 bucks" was the
04:23  20    tag line but you couldn't say for sure how the --
04:23  21                   MR. COOPER:  Strike that.
04:23  22         Q.       Before the break, you indicated
04:23  23    that "Bring 100 friends and win 100 bucks" was the
04:23  24    tag line employed by Power.  Correct?
04:23  25         A.       That was the tag line of the
```

257

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

**BARKLEY**
Court Reporters

04:24   1   information exist today?

04:24   2           A.      I don't know if it exists today

04:24   3   because the site's been down for a long time.

04:24   4           Q.      Would it exist in the source code

04:24   5   for the automated script?

04:24   6           A.      No.  That wouldn't -- that -- The

04:24   7   images and everything, it wouldn't -- that's not --

04:24   8   I'm confusing the term "source code," so you're

04:25   9   talking about the PowerScript not the source code

04:25  10   of Power because it's two different things.

04:25  11           Q.      Would it exist in the PowerScript?

04:25  12           A.      I don't -- PowerScript's were

04:25  13   dynamic and changed regularly.  They were kind of

04:25  14   like HTML on a site, it's unlike source code.  They

04:25  15   were dynamically changed, so I don't know the

04:25  16   answer, you know.  It could have been updated on a

04:25  17   weekly basis so the -- PowerScript is like an HTML,

04:25  18   so it's not documented formally like source code,

04:25  19   but -- sorry.

04:25  20           Q.      Did the language ever exist in

04:25  21   PowerScript?

04:25  22           A.      I can verify that that is the

04:25  23   language that we used.  Whether -- You know, I

04:25  24   think that's what you want to know.  That's the tag

04:25  25   line that we used for this promotion so that would

                                259

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

04:27 1    Q.    Okay.  Do you know if the text
04:27 2 that was suggested for private messages by the
04:27 3 automated script from Power exists as part of
04:27 4 PowerScript?
04:27 5    A.    I don't know if that exists today
04:27 6 because it was three or four years ago.
04:27 7    Q.    Do you know how the PowerScript
04:27 8 applications were stored by Power while it was
04:27 9 operational?
04:27 10    A.    How they were stored?
04:27 11    Q.    Yes.
04:27 12    A.    I believe that it's similar to --
04:27 13 to an -- I think a lot of this was done in XML.
04:28 14 HTML, XML references or -- where it pulled the
04:28 15 text, so I don't know how that was done.  I don't
04:28 16 know the source of where those offhand.
04:28 17    Q.    Do you know how many versions of
04:28 18 PowerScript you have available to you in stored
04:28 19 form to this day?
04:28 20    A.    I don't know offhand, but I'm sure
04:28 21 we have quite a lot of PowerScripts that are
04:28 22 available.
04:28 23    Q.    Do you know where, if at all, I
04:28 24 would be able to find out who was responsible for
04:28 25 creating the language that was used in the

261

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

**BARKLEY**
Court Reporters

SER 128

```
04:28   1   application PowerScript application?
04:28   2          A.        The actual language?
04:28   3          Q.        Yes.
04:28   4          A.        Was -- That was -- That phrase
04:28   5   "Bring 100 friends, 100 bucks" was created by me.
04:28   6          Q.        Do you know if the remainder of
04:28   7   any text that was employed in suggested text in
04:28   8   private messages that were used on Facebook as a
04:29   9   result of automated script were prepared by you?
04:29  10                    MR. BURSOR:  Could you read that
04:29  11   back, please?
04:29  12                    (Whereupon, the last question is
04:29  13   read back by the reporter.)
04:29  14                    MR. BURSOR:  Objection.  Vague,
04:29  15   ambiguous.  Assumes facts not in evidence.  Lacks
04:29  16   foundation.  You can answer.
04:29  17          A.        Repeat the question one more time.
04:29  18          Q.        You earlier indicated private
04:29  19   messages were one of the ways that the automated
04:29  20   script would permit somebody using this campaign to
04:29  21   contact friends on Facebook.
04:29  22          A.        Okay.  So to be clear --
04:29  23          Q.        Yes or no.
04:29  24          A.        I want to clarify.  Earlier I said
04:29  25   that could be one of the ways that someone could
```

<div align="center">262</div>

<div align="center">STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO</div>



04:29  1   send it.  I honestly don't know if we actually ever

04:29  2   used private messages.  It was a long time ago.  To

04:29  3   my recollection, I don't -- I don't remember us

04:29  4   sending private messages, but it was definitely

04:30  5   something we -- we discussed, but I don't know if

04:30  6   we actually ever got to employing that method.

04:30  7   It's been a long time since that happened.  It's

04:30  8   possible that users took suggested text and wrote

04:30  9   messages to friends and if -- I don't remember if

04:30  10  we actually employed that technique, but it's

04:30  11  something we obviously would have been happy to do

04:30  12  because if the user authorized us to do it, I just

04:30  13  don't remember if we actually did it.

04:30  14          Q.       Looking at Exhibit 103, the launch

04:30  15  promotion --

04:30  16          A.       Yup.

04:30  17          Q.        -- who prepared the PowerScript

04:30  18  that is reflected in that launch promotion?

04:30  19          A.       It could have been Carlos or

04:30  20  Danilo.

04:30  21          Q.       What documentation shows how that

04:30  22  launch promotion was implemented on power.com?

04:30  23          A.       It was either -- It was either a

04:30  24  verbal, "Hey, use this text," in a meeting, said,

04:31  25  "Hey, this is the text you should use," and they

                              263


BARKLEY
Court Reporters

04:31 1    took it or there was an E mail.  I don't know.

04:31 2         Q.        But you see the box, "Launch

04:31 3    Promotion."  Correct?

04:31 4         A.        Yes.

04:31 5         Q.        That is a feature that is made

04:31 6    available to the power.com user through the

04:31 7    power.com Web site.  Right?

04:31 8         A.        Yes.

04:31 9         Q.        None of the aggregated social

04:31 10   networks prepared the contents shown in that

04:31 11   promotional box.  Correct?

04:31 12        A.        Right.

04:31 13        Q.        Where would I find documentation

04:31 14   showing me how that launch promotion was

04:31 15   implemented on power.com?

04:31 16        A.        So it either was in a meeting that

04:31 17   we had where I said, "Hey, this is the text you

04:31 18   want to use for this promotion," and they would

04:31 19   have noted it down, or it would have been an E mail

04:31 20   that was sent saying, "Use this text."  One of

04:31 21   those two.  I don't know which one it was because

04:31 22   we had weekly meetings where we discussed ideas and

04:31 23   this was -- this was an idea that I had come up

04:32 24   with.  So many times I would share my idea.  I

04:32 25   would say, "Eric, use this text.  This is a

                              264

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

SER 131

04:33 1    -- just a standard HTML, XML -- HTML, Java script

04:33 2    page written by our team, so there's -- Because

04:33 3    this is actually -- They're on the front page right

04:33 4    now on this promotion.  This is someone's -- just

04:33 5    logged into power.com.  This is the first page they

04:33 6    come to.

04:33 7         Q.      And the PowerScript that would be

04:33 8    implemented when somebody pressed on the 100 in URL

04:34 9    that's embedded in this block, where does that

04:34 10   exist today, if at all?

04:34 11        A.      If it exists it would be on -- Let

04:34 12   me be clear.  This -- This -- This promotion, this

04:34 13   image, and this text that has nothing to do with

04:34 14   PowerScript.  This is just a HTML.  When they click

04:34 15   it and they arrive on the page, that's just

04:34 16   standard HTML.  If they, at that point, copy and

04:34 17   send a message, that's a user taking that and going

04:34 18   and sending a message.  So the only -- If -- If

04:34 19   they said go -- I authorize you to create an event

04:34 20   for me, that would be a PowerScript that would do

04:34 21   that.

04:34 22        Q.      And where would that PowerScript,

04:34 23   where would I find how that PowerScript was

04:34 24   functionally implemented today?

04:34 25        A.      That's a dynamic -- That's a

                            266

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO


BARKLEY
Court Reporters

```
04:39   1    on the top of Exhibit Number 106?
04:39   2           A.        Yes.
04:39   3           Q.        Do you see it's January 13, 2009?
04:39   4           A.        Yes.
04:39   5           Q.        As of January 13, 2009, did Power
04:39   6    still have the ability to locate a script that was
04:39   7    used in conjunction with the launch promotion?
04:39   8           A.        If it existed, yes.
04:39   9           Q.        Do you know if at any time Power
04:39  10    had in place what is known as a litigation hold
04:39  11    instructing employees not to destroy documents
04:39  12    after this case was filed?
04:39  13           A.        We never -- We didn't destroy any
04:39  14    documents after that -- anything -- destroy
04:39  15    anything after this case started.
04:39  16           Q.        Then does that mean the
04:39  17    PowerScript should still exist?
04:39  18           A.        What I know is PowerScripts are
04:39  19    dynamic script's that are constantly updated, so I
04:40  20    don't know what exists for this.
04:40  21           Q.        If you go back to Exhibit 106 --
04:40  22    First of all, was any instruction ever given to
04:40  23    employees not to destroy any documentation relating
04:40  24    to the Facebook program?
04:40  25           A.        Not to -- We don't -- It's not our
```

<div align="center">271</div>



<div align="center">SER 133</div>

```
04:40  1    standard practice to destroy anything, so there's
04:40  2    not -- Since we don't actively destroy something,
04:40  3    there's no need to tell them not to destroy it.  We
04:40  4    don't have any policy for destroying -- destroying
04:40  5    our documents.
04:40  6              Q.      And that includes your
04:40  7    PowerScripts?
04:40  8              A.      Well, PowerScripts, I believe, are
04:40  9    dynamic things.  There was no policy saying change
04:40 10    -- preserve an earlier version of that.  I don't
04:40 11    know how the -- The PowerScripts are like HTML
04:40 12    changes.  They're very similar to making an HTML
04:40 13    change.
04:40 14              Q.      Do you know when the promotion
04:40 15    shown on Exhibit 103 exist -- when it lasted from?
04:41 16              A.      That lasted from December of 2008
04:41 17    -- Was that eight?  Yes.  December of 2008 until
04:41 18    2000 -- I guess -- like the -- January -- Well,
04:41 19    Facebook -- It lasted well beyond Facebook, so it
04:41 20    probably lasted until about March or April, but
04:41 21    Facebook was only alive for four weeks, five weeks.
04:41 22              Q.      I'm sorry.  At that time in that
04:41 23    timeframe is when Power was sued by Facebook.
04:41 24    Correct?
04:41 25              A.      That's correct.
```

<center>272</center>

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



04:41 1          Q.          And it was sued, in part, because

04:41 2     of Facebook's allegations relating to how this

04:41 3     launch promotion was employed.  Correct?

04:41 4          A.          I don't know what Facebook made

04:41 5     allegations to is right there.

04:41 6          Q.          Earlier you said that Facebook is

04:41 7     responsible for sending the E mail notification

04:41 8     about the invite.

04:41 9          A.          Yeah.  That was sent by Facebook

04:42 10    servers.

04:42 11         Q.          But Facebook's E mail servers

04:42 12    would not send the invite, but for the initiation

04:42 13    of the event.  Correct?

04:42 14         A.          A user has to authorize -- A user

04:42 15    has to create an event for Facebook to do that and

04:42 16    a user has to log in with their user name and

04:42 17    password and do this, so Facebook authorizes its

04:42 18    users to create events as part of their -- That's

04:42 19    the relationship Facebook has with its users.

04:42 20         Q.          You indicated some of the events

04:42 21    are set up through the automated scripted?

04:42 22         A.          No.  What I indicated is that

04:42 23    users -- users created these events.  Whether the

04:42 24    user authorized -- whether they authorized an agent

04:42 25    to go do it for them or they did it, it's the same

                              273

04:42 1    thing.  It's initiated by the user, that's what we

04:42 2    know.

04:42 3          Q.       The automated script, though, is

04:42 4    operated by power.com?

04:42 5          A.       It's a -- An automated script for

04:42 6    PowerScript, are initiated by users and executed by

04:42 7    power.com in the same way that an exporter is

04:43 8    initiated by user and managed by the site that's

04:43 9    doing it on behalf of the user.  Did you get that?

04:43 10   Yes.

04:43 11                 (Whereupon, Exhibit 107 is marked

04:43 12   for identification by the reporter.)

04:43 13         Q.       Mr. Vachani, Exhibit 107 is

04:43 14   Exhibit A to the first amended complaint that was

04:43 15   106.  Have you seen this document before today?

04:43 16         A.       What is this document I'm looking

04:43 17   at?

04:43 18         Q.       Exhibit A to the first amended

04:43 19   complaint.

04:43 20         A.       Is this the Facebook Terms and

04:43 21   Conditions?

04:43 22         Q.       Yes.

04:44 23         A.       I have -- Vaguely -- I've seen

04:44 24   this before, yes.  I don't know if I've seen this

04:44 25   specific version.  I've read the Facebook Terms and

                              274



06:24  1          Q.       Do you know if that PowerPoint was

06:24  2    ever created?

06:24  3          A.       I don't know if it was ever

06:24  4    created, but we obviously created the site and we

06:24  5    did launch with Facebook Connect, so they --

06:24  6    somehow or other they figured out what they were

06:24  7    going to do and it was launched.  We did launch

06:24  8    Facebook Connect.

06:24  9          Q.       Number 3 he's talking about the

06:24 10    prediction of changes of power.com to support the

06:24 11    new infrastructure.  Correct?

06:24 12          A.       Exactly.  So what would be needed

06:24 13    to support this new infrastructure.  Correct.

06:24 14                   (Whereupon, Exhibit 116 is marked

06:25 15    for identification by the reporter.)

06:25 16          Q.       Mr. Vachani, I put in front of you

06:25 17    in the e-mail chain that on the front page includes

06:25 18    a December 26, 2008, E mail from you to Mr. Herrera

06:25 19    and Mr. Cutler.  Do you see that?

06:25 20          A.       Yes.  I do.

06:25 21          Q.       Was this the E mail you prepared

06:25 22    in response to the information you received

06:25 23    following Mr. Santos' communications, a number of

06:25 24    users, Facebook?

06:25 25          A.       After I got a full analysis, which

                                353

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

06:25  1    is what -- what resources would be necessary to do

06:25  2    this, what it would take, when it would happen, you

06:25  3    know, the amount of users and the growth and all

06:25  4    the different questions, you know.  I basically had

06:25  5    to make a final decision and this E mail reflects

06:26  6    the -- you know, our best efforts to address the

06:26  7    issue that, you know -- Our business could not

06:26  8    handle an interruption in the service and,

06:26  9    therefore, we were -- we were requesting them to be

06:26  10   as you put in here to be, to give us until January

06:26  11   30th to do a proper integration and letting them

06:26  12   know that we -- while we may expect it, now, that

06:26  13   we've done our full analysis, this is what it's

06:26  14   realistically going to take.

06:26  15         Q.       And did you prepare this E mail on

06:26  16   your own or did you have help?

06:26  17         A.       I prepared it on my own.

06:26  18                  (Whereupon, Exhibit 117 is marked

06:26  19   for identification by the reporter.)

06:26  20         A.       Obviously, I got a lot of feedback

06:26  21   from a lot on their opinions and thoughts.

06:27  22         Q.       With respect to Exhibit 116, when

06:27  23   you say you got feedback from a lot of people, did

06:27  24   you solicit their thoughts on precise language you

06:27  25   were going to send to Mr. Cutler?

354

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



| 06:27 | 1 | A. No. I wrote that. I got their |
| 06:27 | 2 | opinions on irrelevant stuff, as you can see, with |
| 06:27 | 3 | Eric. I -- I asked -- I wanted to understand |
| 06:27 | 4 | what's possible, what's feasible, can we create |
| 06:27 | 5 | something useful and valuable to the user which is |
| 06:27 | 6 | obviously our most important priority as for what |
| 06:27 | 7 | we were building. And based on -- on all the |
| 06:27 | 8 | feedback I got from Eric and his feedback that he |
| 06:27 | 9 | got accordingly, that was -- this was -- this was |
| 06:27 | 10 | the culmination of that. The conclusion that I |
| 06:27 | 11 | made. |
| 06:27 | 12 | Q. Before we go to 117 very quickly |
| 06:27 | 13 | the first -- At the bottom of the first paper of |
| 06:27 | 14 | your December 26, 2008, E mail there's a reference |
| 06:27 | 15 | to, "Furthermore, we are about to launch a new |
| 06:27 | 16 | solution which will pass Facebook ads inside of all |
| 06:27 | 17 | Facebook content which is displayed outside of |
| 06:27 | 18 | Facebook." |
| 06:28 | 19 | A. Yup. |
| 06:28 | 20 | Q. Did that ever -- Did that solution |
| 06:28 | 21 | ever get developed? |
| 06:28 | 22 | A. Well, we didn't even -- we didn't |
| 06:28 | 23 | -- we never continued with Facebook, since we were |
| 06:28 | 24 | -- we -- we had already -- What our goal was in -- |
| 06:28 | 25 | part of our cooperation with Facebook was we were |

<div align="center">355</div>

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

<div align="center">SER 139</div>

```
           CERTIFICATION

    I, PATRICIA MULLIGAN CARRUTHERS, a
Certified Shorthand Reporter and Notary Public of
the State of New Jersey and a Notary Public of the
State of New York, do hereby certify that prior to
the commencement of the examination the witness was
sworn by me to testify as to the truth, the whole
truth, and nothing but the truth.

    I do further certify that the foregoing is
a true and accurate transcript of the testimony as
taken stenographically by and before me at the
time, place, and on the date hereinbefore set
forth.

    I do further certify that I am neither of
counsel nor attorney for any party in this action
and that I am not interested in the event nor
outcome of this litigation.
```

Patricia Mulligan Carruthers, CSR
Certificate No. XI00780
Notary Public of the State of New York
Notary Public of the State of New Jersey

Dated: JULY 27, 2011

My commission expires October 28, 2015    (N.J.)
My commission expires December 21, 2013    (N.Y.)

361

EXHIBIT 100

SER 140

# EXHIBIT 14

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4


 5
    FACEBOOK, INC.,                 )
 6                                  )
            Plaintiff,              )
 7                                  ) Case No.
    vs.                             ) 5:08-cv-05780 JW (JCS)
 8                                  )
    POWER VENTURES, INC., a         )
 9  Cayman Island Corporation;      )
    STEVE VACHANI, an individual;   )
10  DOE 1, d/b/a POWER.COM,         )
    DOES 2-25, inclusive,           )
11                                  )
            Defendants.             )
12  _____)

13

14

15                  CONFIDENTIAL

16

17         VIDEOTAPED DEPOSITION of POWER VENTURES,

18  INC.'S 30(b)(6) Designee STEVEN VACHANI taken on behalf

19  of Plaintiff, at Orrick, Herrington & Sutcliffe LLP, 405

20  Howard Street, 10th Floor, San Francisco, California

21  beginning at 9:13 a.m., Monday, January 9, 2012, before

22  CHERREE P. PETERSON, RPR, CRR, Certified Shorthand

23  Reporter No. 11108.

24

25


                        2
```



SER 142

1    -- he's not available.  So I haven't talked to him.

2    He's not -- we have no intention right now to try to,

3    you know, locate him to be in at trial.

4             MR. CHATTERJEE:  What number are we on, 193?

10:56  5         THE REPORTER:  193.

6             (Plaintiff's Exhibit No. 193 marked for

7              identification.)

8    Q.    BY MR. CHATTERJEE:  Unlike some of the other

9    ones, we have a certified translation.

10:56  10   A.    Yeah, this is the e-mail I was just referring

11   to.

12   Q.    Okay.  So let me just ask you so the record's

13   clear.  Document number 193, what is this?

14   A.    So this -- on April 24th, 2011, as you know,

10:57  15   that was -- that was the month when we were -- we had

16   made the decision to remove Power.com, you know, off --

17   take it offline.  And at that -- you know, it was a

18   cost-cutting measure.  And we also had -- were not in a

19   position to make payments on our servers and we were --

10:57  20   we didn't know how many days -- it was already past the

21   date to be removed so -- to be shut off.  And so we had

22   went to a -- we were going through a process of trying

23   -- of backing up everything on another server.  And the

24   way -- the only way to back it up was had to be

10:57  25   transferred so -- through the internet.  So it was a

79

```
 1    -- it was inside of -- it was an Orkut app.  So it had

 2    nothing to do -- it was completely unrelated.  It was

 3    launched about a year earlier I think or six months.

 4        Q.    But there was a functionality that Power

11:01 5  Ventures had that worked not only on Orkut but was used

 6    to work on other web sites as well?

 7        A.    Yeah.  Well, worked on many sites.  Orkut was

 8    our largest -- user base was on Orkut.  So that's why we

 9    refer to -- a lot of our biggest innovations were on

11:01 10 Orkut just because that's where our largest user base

11    was.

12        Q.    Right.  So here it says is the basis of the

13    Orkut app PowerFriends.

14        A.    Correct.

11:01 15       Q.    Is it your testimony that that Orkut app was

16    only used on Orkut?

17        A.    Yes.  That -- that app was only used on Orkut

18    and it was a much earlier time than even -- we're not

19    even involved in Facebook.  So the -- the PowerFriends

11:01 20 app is completely irrelevant to any discussions

21    whatsoever, you know, I think, relating to Facebook.

22    It's a --

23        Q.    As of April 17th, 2011, the logger database

24    existed?

11:02 25       A.    It existed on the -- yeah, on the server.  It
```

                                   83

1    was available and accessed in whatever -- if anything,

2    it was referenced in any questions.  If -- I don't know

3    if that was specifically where -- but it was -- it was

4    -- it existed until that date, that's correct.

11:02  5       Q.    Okay.  And then following that you made the

6    decision to delete that database?

7        A.    Yeah.  As you can see, the dialogue there we

8    didn't have the time with -- to transfer it before our

9    servers would be shut off.  So they -- the decision was

11:02  10   transfer all the most valuable stuff and if we have time

11    and they're not shut off, do these two last.

12        Q.    Other than what's stated in this e-mail, do

13    you know specifically what was in the logger database?

14        A.    I do not know specifically.  This was why I

11:02  15   asked that question right there.

16        Q.    But other than what's stated here?

17        A.    I -- I do not know.

18        Q.    So as you sit here today, you don't know, for

19    example, if the logger database would track event

11:03  20   invitations sent through links to -- to Facebook users?

21           MR. FISHER:  Objection.  Vague.  Assumes facts

22    be in evidence.

23           THE WITNESS:  What I do --

24           MR. FISHER:  Lacks foundation.  Incomplete

11:03  25   hypothetical.

<div align="center">84</div>

**BARKLEY**
Court Reporters

```
          1   always believed that and we were exploring in those ways
          2   what would -- what we do if a user wants to get their
          3   data.  And -- and this was a -- an exploration.
          4       Q.    Let me establish some foundation around this,
12:07     5   Mr. Vachani.  You said in this instant message "we also
          6   need to do some planning to make sure that we do it in a
          7   way where we are not really detected," correct?
          8       A.    That's correct.
          9       Q.    And the reason that you said that was because
12:07    10   you didn't want web sites like Orkut to detect what you
         11   were doing, right?
         12       A.    Not to detect.  If -- if they attempted to
         13   block, block the -- the sites, we wanted to understand
         14   what are the issues.
12:07    15       Q.    And you wanted to be able to interfere with
         16   their ability to block you, right?
         17            MR. FISHER:  Objection.  Vague.
         18   Argumentative.
         19            THE WITNESS:  To interfere with their ability
12:07    20   to block, no.  I'm saying -- we -- this -- exactly what
         21   it says here.  We had a -- we had a hypothetical
         22   conversation about -- about the issues relating to data
         23   extraction where users wanted to access their own data.
         24       Q.    BY MR. CHATTERJEE:  And you knew that the web
12:07    25   sites that were housing that data wouldn't like what you
```

<div align="center">121</div>

1    were doing.

2      A.    We didn't know --

3            MR. FISHER:  Objection.  Calls for speculation

4    --

5            THE WITNESS:  We didn't know if they would

6    like --

7            THE REPORTER:  Okay.  Whoa.  I'm sorry.

8    Please restate your --

9            THE WITNESS:  We didn't know if they would

10   like it or not --

11           THE REPORTER:  I'm sorry.  Hold on.  Please.

12           MR. FISHER:  Vague.  Assumes facts not in

13   evidence.  Lacks foundation.  Incomplete hypothetical.

14   Argumentative.

12:08 15         THE WITNESS:  Okay.  We didn't -- we have no

16   idea what they were -- this is 2005.  But we know that

17   if -- if a user is -- obviously some sites and it turns

18   out Facebook that, you know, in the future was -- was

19   not Orkut.  It was -- you know, Facebook does not -- did

12:08 20  not want users to export their own data.  And while --

21   and we have always stated very publicly and clearly that

22   we believe that users, you know, do have rights to

23   access their data.  So we were exploring and

24   understanding what are the potential reactions that

12:08 25  sites could have.  This was a -- this was a hypothetical

                        122

12:11   1   something that while it's a right and something that's

     2   been established that users have the right to do, not

     3   every site -- not every site wants users to -- to be

     4   able to get their own -- access their data.  Obviously

12:11   5   Facebook being one of the greatest, you know, companies

     6   that have traditionally been against -- been against

     7   this publicly.  You know, users trying to access their

     8   own data.  This is -- this is something that we -- we

     9   always understood that, you know, just because it's --

12:11 10   it's correct and it's okay for users to access their own

   11   data doesn't mean that every site will -- will allow

   12   users to access their own data.

   13      Q.    So you knew that the web sites may not like

   14   having users access and export data?

12:11 15      A.    Historically importing data has never been --

   16   has never -- many sites have always objected to it and

   17   it -- and despite that fact, it has been going on for

   18   ten years and been a commonly-accepted practice.

   19      Q.    I understand that.  But you -- you understand

12:12 20   that even at the time you wrote this instant -- or the

   21   portions of this instant message chat log that web sites

   22   were often against exporting data from their web site to

   23   another place?

   24      MR. FISHER:  Objection.  Vague.  Calls for

12:12 25   speculation.

<div align="center">125</div>



<div align="center">SER 148</div>

```
 1              THE WITNESS:  I understood that.  And I also

 2    understood that -- that's correct.

 3         Q.   BY MR. CHATTERJEE:  Okay.  That's correct.

 4    And so one of the things that you wanted to do was to

 5    have multiple IP addresses to allow for the extraction

 6    of data without the ability of those web sites to block

 7    you; isn't that fair?

 8         A.   If a user authorized that -- that, correct.

 9    That's something we've -- we've always said.

10         Q.   Okay.  And -- and you said in -- in this chat

11    log "since we will only have one chance to do it."

12              What did you mean by "we will only have one

13    chance to do it"?

14         A.   I believe that we were -- we were just sharing

15    -- conversation that -- that accessing -- importing

16    data, you know, we wanted -- we wanted to do it right.

17    You know, we wanted to make sure that if a user wanted

18    to access their own data that they would be able to do

19    it.  That's basically that -- we understood that import

20    -- importing data is a sensitive -- is a sensitive

21    subject, despite the fact that we strongly believe its

22    the user's right.  And that's basically what this

23    discuss -- discussion was about.

24         Q.   Okay.  Farther down you say "lets" "plan on

25    getting the data grab done as soon as possible."
```

<div align="center">126</div>

```
  1    not necessary as we....
  2       Q.    So when this lawsuit was filed, did you e-mail
  3    the various power.com members and ask them to preserve
  4    documents?
13:54 5       A.    Did I e-mail?  I mean, you have my e-mails,
  6    so.  I mean, I don't -- I don't think there was a --
  7    there was no law -- there was no law -- there was a -- I
  8    mean, I -- I don't know what -- what -- what we said to
  9    them, but it would be -- it would be my -- everything is
13:54 10   in my e-mail.
  11      Q.    Do you recall ever instructing the power.com
  12   employees not to -- not to destroy documents?
  13      A.    It's our standard policy no one -- not to
  14   destroy documents.  No one's -- as far as I know, no
13:55 15   one's -- no one's taken any direct effort to destroy
  16   documents.
  17      Q.    Did -- but my question's really precise.  When
  18   the litigation was filed did you send out a reminder or
  19   tell anyone not to destroy documents?
13:55 20      A.    Which?  You mean the Facebook litigation?
  21      Q.    Yeah.
  22      A.    No, I didn't.
  23      Q.    Okay.  And was there any particular reason why
  24   you didn't do that?
13:55 25      A.    There was no -- it was just a standard --
```

<div align="center">168</div>

```
 1     Q.    I'm going to ask you the question one more
 2   time.
 3     A.    But I --
 4     Q.    No.  Mr. Vachani, you can either answer it or
15:27 5   you can't.  If you can't answer it, tell me you can't
 6   answer it.
 7         You knew that the Facebook terms of service
 8   did not allow Power users to access the Facebook web
 9   site in the way Power wanted to do it; isn't that right?
15:28 10        MR. FISHER:  Objection.  Assumes facts not in
11   evidence.  Lacks foundation.  Argumentative.  Vague.
12         THE WITNESS:  And I would like to -- once
13   again, I would like to ask you the previous question,
14   can you repeat my answer?  I -- I'm not answering your
15:28 15   question yet.  I'm asking her to repeat the answer I
16   made to your previous question which was similar.
17         MR. CHATTERJEE:  Okay.  Let's take a break.
18   Tim, we're doing our meet and confer right now.
19         THE VIDEOGRAPHER:  We are going off the
15:28 20   record.  The time is 3:28 p.m.
21         (Whereupon a break was taken from 3:28 to
22          3:37.)
23         THE VIDEOGRAPHER:  We are back on the record.
24   The time is 3:37 p.m.
15:37 25        THE WITNESS:  So I previously wanted -- I
```

236

BARKLEY
Court Reporters

```
 1   similar process where almost -- where -- where almost,
 2   for example, Google has a clause that states in their
 3   things that users cannot do it, but Facebook has
 4   continued to do it.  And -- and I'll ignore these
 5   things.
 6         And I said about five minutes ago -- let me
 7   finish, please.
 8     Q.   BY MR. CHATTERJEE:  Finish.
 9     A.    I said five minutes ago that terms and
10   conditions are created by -- by a site.  And the
11   decision -- the decision on -- on interpreting those
12   terms and conditions and how companies choose to respond
13   to their users have been and continue to be very
14   subjective.  Facebook has been very subjective, Power
15   has been very subjective, and there is no legal
16   precedent.  So we can have a discussion all day on this
17   issue.  But I've answered the question to you that I --
18   we are very familiar and have read Facebook terms and
19   conditions.
20     Q.    Okay.  Let's step back.  You said you've read
21   Facebook's terms and conditions.  That was prior to
22   accessing the Facebook web site as pursuant to the
23   December 2008 launch, correct?
24     A.    Yes.
25     Q.    Did you believe under your reading of the
```

15:40 — lines 5, 10, 15
15:41 — lines 20, 25

<center>239</center>

1    looked at the industry as a whole, and we saw no -- no

2    precedent for -- you know, on these issues and therefore

3    felt that if it was an issue, this is something that

4    would be determined -- and it has been determined by the

15:42  5    courts.  Finally, I -- I believe --

6        Q.    BY MR. CHATTERJEE:  Okay.  There -- there

7    might be some confusion in my question.

8        A.    Okay.

9        Q.    I'm not asking about anything other than the

15:42  10    terms of service.  Just that standing alone.

11        A.    Okay.

12        Q.    Was there any concern in your mind when you

13    read that terms of service that the way Power wanted to

14    access the Facebook web site would be a violation of

15:43  15    Facebook's terms of service?

16            MR. FISHER:  Objection.  Vague.  Calls for a

17    legal conclusion.

18            THE WITNESS:  I would agree calls -- you're

19    asking for a legal conclusion that I'm not able to --

15:43  20        Q.    BY MR. CHATTERJEE:  I'm just asking you for

21    whether there was any concern in your mind, not whether

22    there's a legal violation.

23        A.    Concern is irrelevant.  You know, this is --

24    you're asking me --

15:43  25        Q.    Mr. Vachani, it is not a matter of you to

                              241



1    determine relevance or not.

2           Was there a concern in your mind or not?

3    A.    Was there a concern?

4           MR. FISHER:  Same objections.  Argumentative.

15:43  5        THE WITNESS:  I think our company's actions

6    speak for themselves.  Because, you know, I'm -- I was

7    the CEO of the company.  And the company -- the company

8    made a -- made a -- made a decision which I've already

9    articulated, testified, and -- and I've also -- we've

15:43 10   also had years -- we've had years of discussions on this

11   issue, we've had court rulings on this issue, and you

12   continue to ask the same question which I think we're --

13   we're -- you know --

14   Q.    BY MR. CHATTERJEE:  It's because you're not

15:43 15  listening to my question.  I'm going to move on.

16   A.    I am listening to my question.

17   Q.    You aren't.  We're going -- Mr. Vachani --

18          MR. FISHER:  There's no point to arguing about

19   this.  Go to the next question.

15:43 20  Q.    BY MR. CHATTERJEE:  -- we're going to go to

21   court over this.  We're going to have these questions

22   answered.

23   A.    Do you mind asking the question one more time?

24   Q.    You're not answering them now.  No.  I'm --

15:44 25  I'm done.  I've asked it ten times.  You don't want to

242

Designee Steven Vachani, 30 (b) (6) - Confidential

**BARKLEY**
Court Reporters

SER 154

1    not mistaken.  I don't even know the issue.  But the

2    main thing is we -- we -- we didn't know what -- we

3    didn't really know what Facebook's reaction would be.

4         Q.    All right.  So if I understand you correctly,

16:23 5  by this point in time you had reviewed Facebook's terms

6    of service and you may have received a cease and desist

7    letter from Facebook?

8         A.    I think it was either this day or the day

9    after.  I'm not a hundred percent sure what day it was.

16:23 10      Q.    And around that time frame Mr. Santos stated

11   he'll prepare for a possible block by Facebook?

12        A.    Oh, he was -- he was trying to evaluate the

13   systems if -- if our -- if our system is unable to

14   access Facebook.

16:23 15      Q.    Was there any doubt in your mind when he said

16   that that Facebook was considering or may block Power

17   from accessing the Facebook web site in the way that it

18   did?

19             MR. FISHER:  Objection.  Vague.

16:24 20            THE WITNESS:  Obviously -- obviously they --

21   they had sent a -- a legal -- a legal threat.  They had

22   sent a legal threat.  So, I mean, there -- there --

23   there were definitely, you know, possibilities.

24        Q.    BY MR. CHATTERJEE:  So you knew that they

16:24 25  didn't feel that Power was authorized to be accessing

279



1    Facebook in the way that Power was doing?

2    A.    We knew that Facebook had -- Facebook had

3    expressed, you know, their opinion that they -- that's

4    correct.

16:24  5    MR. CHATTERJEE:  We're getting to an easier

6    part for a little while.  218.

7    (Plaintiff's Exhibit No. 218 marked for

8    identification.)

9    THE WITNESS:  Okay.

16:25 10    Q.    BY MR. CHATTERJEE:  Okay.  The document I've

11   given you as Exhibit 218, what -- what is this document,

12   Mr. Vachani?

13   A.    What is this document?  This is a -- looks

14   like -- this looks like an e-mail from Facebook.

16:25 15   Q.    This is an e-mail that you received?

16   A.    This e-mail that I received.  I don't know if

17   this was a test e-mail or if this was from -- you know,

18   from Facebook.  I don't know that.  But it looks like it

19   was from Facebook.

16:25 20   Q.    And it was to you?

21   A.    Yep.

22   Q.    And then the subject line has "Ghostday

23   Leandro Abreu," A-b-r-e-u.

24   A.    Yeah.  This is an e-mail from Facebook.

16:26 25   Q.    And Leandro Abreu was -- we -- we talked about

280

```
 1   30(f)(1)).

 2          Before completion of the deposition, review of

 3   the transcript (XX) was (  ) was not requested.  If

 4   requested, any changes made by the deponent (and

 5   provided to the reporter) during the period allowed, are

 6   appended hereto.  (Fed. R. Civ. P. 30(e)).

 7

 8   Dated: JANUARY 13, 2012

 9

10

11                   Cherree R. Peterson

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

360

BARKLEY
Court Reporters

SER 157

# EXHIBIT 20

| From: | Felipe Herrera |
|---|---|
| To: | SteveVachaniMail |
| Cc: | Eric.santos |
| Subject: | STEVE, PLEASE READ UNTIL THE END AND RESPOND QUICKLY |
| Date: | Thursday, December 04, 2008 11:52:05 AM |
| Importance: | High |

CEASE AND DESIST LETTER FROM FACEBOOK

Steve,

The letter from Facebook's lawyers claims the following:

1) We are scraping content from their website;

2) We are directly violating their TOS, which prohibits the following:

    - Soliciting of Facebook's user login information;
    - Using a person's Facebook account without Facebook's authorization;
    - Using automated scripts to collect information from their site;
    - Sending spam;
    - Using Facebook's site for commercial purposes;
    - Incorporating Facebook's site in another database



3) According to the letter, we are in violation of at least 5 Federal laws, in addition to state laws prohibiting "interference with Facebook's business expectations and interests.";

4) We are using Facebook's logo without their authorization, which may cause users to believe we are somehow affiliated with Facebook;

5) We are violating users' privacy;

6) Facebook has an open platform that allows third parties to develop applications that integrate with Facebook, subject to their TOS. They have "Facebook Connect", which allows Facebook users to connect their Facebook identity, friends and privacy to any site. They say we can use these resourses to integrate with Facebook in an authorized manner;

They had given us a deadline of Wednesday, December 3rd, 2008, to answer. I did not have time to look at this until today, so we would have missed the deadline by a day. However, they sent us a direct email today saying we have until Friday, December 5th, 2008, to respond given they had previously notified Leigh instead of us.

In our written response, they want us to:

a) Cease and desist in soliciting Facebook user login information;

b) Cease adn desist om sending unsolicited commercial messages to Facebook users;

c) Remove the compatibility with Facebook from our site;

d) Remove references to Facebook from our site and other promotional material;

e) Cease using or displaying Facebook's trademark on our website;

f) Promise that in the future we will strictly comply with Facebook's TOS.

SER 159

In light of the above, please see my comments below:

1) I agree that what we are doing may be considered web scraping according to the definition below:

**"Web scraping** (sometimes called **harvesting**) generically describes any of various means to extract content from a website over HTTP for the purpose of transforming that content into another format suitable for use in another context."

If it is indeed considered to be web scraping, we can be liable for **"trespass to chattels"**. In order to success in this claim, they must demonstrate that we intentionally and without authorization interfered with their possessory interest in the computer system and that the <u>our unauthorized use caused damage to the plaintiff</u>.

Their main challenge would be proving the damage to their site, but I can think of a few ways they can try to prove this. The main problem here I believe is the loss of traffic and consequent loss of revenues on their site. They could also lose positions in alexa.com.

I remember in the past we did not use to change these site's advertising, but I took a quick look at our site and compared with Facebook's site and saw that we are in fact showing only our ads and not theirs. Can we stop doing this and at least show both their and our ads??

2) They seem to be correct in relation to the following prohibited activities:

   - Using a person's Facebook account without Facebook's authorization;
   - Using automated scripts to collect information from their site;
   - Incorporating Facebook's site in another database.
   - Using Facebook's site for commercial purposes;

However, we can probably contend that we do not perform any of the following activites:

   - Soliciting of Facebook's user login information [since it is the user's choice to give us their information];
   - Sending spam [since we only send emails to people's friends and we comply with email regulations, providing an unsubscribe button, etc.];

3) As I said, we would need the legal advice from a U.S. attorney on the matter given that these are U.S. statutes. I suggest contacting Cooley Godward LLP since they are one of the top firms in the U.S. for Internet related matters. Simon Olson highly recommended them and I believe he used to work for them in San Francisco.

From my quick research, I believe we may also be accused of violating the safe harbor provisions of the DMCA in addition of all of the laws mentioned in their letter (including the CA Penal Code).

4) We should DEFINITELY remove other websites' trademarks or request their authorization to use them. I remember when we had the problem with Google's watchdog (RCA RYotta) last year we inserted text on the start page of powerscrap.com saying explicitly that we are not affiliated to any of those sites. I am not sure why this was not done for power.com, but we should definitely put this disclaimer back up and make it very visible to avoid problems;

5) We can probably dismiss the claim of violating user's privacy (or at least defend ourselves) by saying they agreed to our TOS and were informed of everything;

6) We should definitely have someone (maybe Bruno) take a look at this "Facebook Connect" and other platforms they talk about in the letter and see if there is a way to keep doing what we are doing in an authorized manner. If there is a way of complying with their rules without compromising our Power Login or virality too much (without including additional pages), we should do it!

Guys, it is extremely important that we answer them quickly, so I need your imput ASAP. Please let me know if you agree with my comments above or if you have any additional ideas or suggestions on how to respond to this. If we do not respond quickly they can sue us and this can turn into something much more serious. Perhaps we can avoid it.

Thanks,
Felipe.

# EXHIBIT 22

1   BURSOR & FISHER, P.A.
    L. Timothy Fisher (State Bar No. 191626)
2   Sarah N. Westcot (State Bar No. 264916)
    1990 North California Blvd., Suite 940
3   Walnut Creek, CA 94596
    Telephone: (925) 300-4455
4   Facsimile: (925) 407-2700
    E-Mail: ltfisher@bursor.com
5            swestcot@bursor.com

6   BURSOR & FISHER, P.A.
    Scott A. Bursor (State Bar No. 276006)
7   369 Lexington Avenue, 10th Floor
    New York, NY 10017
8   Telephone: (212) 989-9113
    Facsimile: (212) 989-9163
9   E-Mail: scott@bursor.com

10  BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
    Alan R. Plutzik (State Bar No. 077785)
11  Michael S. Strimling (State Bar No. 96135)
    2125 Oak Grove Road, Suite 120
12  Walnut Creek, CA 94598
    Telephone: (925) 945-0200
13  Facsimile: (925) 945-8792
    E-Mails: aplutzik@bramsonplutzik.com
14           mstrimling@bramsonplutzik.com

15  Attorneys for Defendants Power
    Ventures, Inc. and Steve Vachani
16
                    UNITED STATES DISTRICT COURT
17
                    NORTHERN DISTRICT OF CALIFORNIA
18

19  FACEBOOK, INC.,                          Case No. 5:08-CV-05780 JW

20                           Plaintiff,      **DEFENDANT POWER VENTURES,**
                                             **INC.'S SUPPLEMENTAL**
21  -against-                                **RESPONSES TO FACEBOOK,**
                                             **INC.'S INTERROGATORIES NOS.**
22                                           **1, 2, 3, 7, 13, 14, 15, 19, 20 AND 21**
    POWER VENTURES, INC. d/b/a POWER.COM, a
23  California corporation; POWER VENTURES, INC.
    a Cayman Island Corporation, STEVE VACHANI,
24  an individual; DOE 1, d/b/a POWER.COM, an
    individual and/or business entity of unknown nature;
25  DOES 2 through 25, inclusive, individuals and/or
    business entities of unknown nature,
26
27                           Defendants.
28

DEFENDANT POWER VENTURES, INC.'S SUPPLEMENTAL RESPONSES TO FACEBOOK, INC.'S
INTERROGATORIES NOS. 1, 2, 3, 7, 13, 14, 15, 19, 20 AND 21
CASE NO. 5:08-CV-05780 JW

1  presentations, sample source code, internal developer manuals, and plans for future development.

2  Some, but not necessarily all, of these documents can be found at "power.com / Power.Com.Core /

3  Engines / Facebook," "design / Produtos / Power.com / facebook," "docs / Documentação

4  Produtos," "produtos / Produtos," "apresentacoes / produtos," and "apresentacoes / 20090120 -

5  Intersite Connect."

6  **INTERROGATORY NO. 2:**

7       Describe in detail AND IDENTIFY the process by which POWER provides OR provided

8  POWER USERS with access to the FACEBOOK WEBSITE.

9  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

10       See supplementary response to Interrogatory No. 1.

11  **INTEROGATORY NO. 3:**

12       Describe in detail AND IDENTIFY ANY AND ALL software, i.e., computer code,

13  programs, tools, scripts OR automated devices, YOU use OR used to access OR provide POWER

14  USERS with the means to access, the FACEBOOK WEBSITE to copy, download, extract, OR

15  retrieve information from the FACEBOOK WEBSITE, including but not limited to, the processes

16  OR procedures by which that software was developed, including how it was tested and on what

17  code its functionality was tested.

18  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

19       See supplementary response to Interrogatory No. 1.

20  **INTERROGATORY NO. 7:**

21       Describe in detail and IDENTIFY the process by which YOU continued to access, OR

22  provide POWER USERS' with the means to access, the FACEBOOK WEBSITE following

23  FACEBOOK's IP blocking, including, but not limited to the POWER employee(s) OR director(s)

24  responsible for that process OR decision.

25  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

26       Power hereby incorporates the General Objections above as if fully stated herein.  Power

27  objects that this interrogatory is vague and ambiguous, overly broad, unduly burdensome, and

28

seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, pursuant to Fed. R. Civ. P. 33(d), Power refers to its source code, produced on 8/23/11 and 9/14/11. The source code is the primary source material, as it contains the exact functions and technical mechanisms through which Power accessed the Facebook Website. Additionally, Power refers to documentation stored in Power's subversion repository ("SVN"), produced on 10/24/11. The SVN is a secondary source, as it contains supporting documents about Power's software, including screenshots, PowerPoint presentations, sample source code, internal developer manuals, and plans for future development. Some, but not necessarily all, of these documents can be found at "power.com / Power.Com.Core / Engines / Facebook," "design / Produtos / Power.com / facebook," "docs / Documentação Produtos," "produtos / Produtos," "apresentacoes / produtos," and "apresentacoes / 20090120 - Intersite Connect."

Aside from this information, Power did not implement any additional processes, procedures, or technical measures to bypass Facebook's IP block. The person responsible for Power's conduct in this regard was its Chief Executive Officer, Steve Vachani.

**INTERROGATORY NO. 13:**

Explain in detail what actions, if any, YOU took to integrate the POWER WEBSITE with FACEBOOK Connect.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:**

See supplemental response to Interrogatory No. 1.

**INTERROGATORY NO. 14:**

Describe in detail YOUR "detailed product plan" regarding the "reintegration of Facebook with Facebook connect," referenced in YOUR December 17, 2008 e-mail to FACEBOOK's legal counsel. Dkt. No. 56 at Ex. A.

DEFENDANT POWER VENTURES, INC.'S SUPPLEMENTAL RESPONSES TO FACEBOOK, INC.'S                4
INTERROGATORIES NOS. 1, 2, 3, 7, 13, 14, 15, 19, 20 AND 21
CASE NO. 5:08-CV-05780 JW

1  seeks information that is irrelevant and not reasonably calculated to lead to the discovery of

2  admissible evidence.

3      As a matter of business practice, Power does not delete or destroy any documents related to

4  any aspect of its business. See Vachani Dep. at 271:9-272:5, 296:9-298:16. Power ceased its daily

5  operations on April 2011. Nonetheless, Power preserved its files by transferring them to an online

6  backup. This online backup contains Power's databases and subversion repository, which includes

7  a large organizational chart of Power's divisions and employees, presentations given at board

8  meetings, several dozen PowerPoint presentations for investment funds and advertisers, banner ads

9  and commercials, information on Power's business model, a PowerPoint presentation for each

10 major component of Power's software (PowerFriends, PowerMessenger, Orkut connectivity,

11 MySpace connectivity), internal documentation for each component of Power's software,

12 information on stock option programs, brainstorming for new software development, plans for

13 growth and expansion, "break even" revenue requirements, marketing materials, hardware and

14 software specifications for Power's servers, network diagrams, and segments of source code.

15     Nearly every file was transferred to the online backup. However, one database file,

16 Power_Logger, was too large to feasibly be transferred. This file was over 100 GB, and it did not

17 contain critical user data, such as profiles, personal information settings, or passwords. Instead, it

18 logged the activities of Power's servers. For this reason, Power necessarily omitted Power_Logger

19 from the backup.

20 Dated: November 18, 2011     BURSOR & FISHER, P.A.

22 By:_____

    L. Timothy Fisher

24 L. Timothy Fisher (State Bar No. 191626)
Sarah N. Westcot (State Bar No. 264916)
25 1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
26 Telephone: (925) 300-4455
Facsimile: (925) 407-2700
27 E-Mail: ltfisher@bursor.com
    swestcot@bursor.com

DEFENDANT POWER VENTURES, INC.'S SUPPLEMENTAL RESPONSES TO FACEBOOK, INC.'S
INTERROGATORIES NOS. 1, 2, 3, 7, 13, 14, 15, 19, 20 AND 21
CASE NO. 5:08-CV-05780 JW

8

SER 166

1   BURSOR & FISHER, P.A.
    Scott A. Bursor (State Bar No. 276006)
2   369 Lexington Avenue, 10th Floor
    New York, NY 10017
3   Telephone: (212) 989-9113
    Facsimile: (212) 989-9163
4   E-Mail: scott@bursor.com

5   BRAMSON, PLUTZIK, MAHLER &
    BIRKHAEUSER, LLP
6   Alan R. Plutzik (State Bar No. 77785)
    Michael S. Strimling (State Bar No. 96135)
7   2125 Oak Grove Road, Suite 120
    Walnut Creek, CA 94598
8   Telephone: (925) 945-0200
    Facsimile: (925) 945-8792
9   E-Mail: aplutzik@bramsonplutzik.com
            mstrimling@bramsonplutzik.com
10
    Attorneys for Defendants Power
11  Ventures, Inc. and Steve Vachani

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>VERIFICATION</u>**

I, Steve Vachani, declare that:

I am a defendant in the above-captioned action.  I have read DEFENDANT POWER

VENTURES, INC.'S SUPPLEMENTAL RESPONSES TO FACEBOOK, INC.'S

INTERROGATORIES NOS. 1, 2, 3, 7, 13, 14, 15, 19, 20 AND 21, and know the contents thereof.

The responses are true of my own knowledge except as to the matters therein stated on information

and belief and as to those matters I believe them to be true.

I declare under penalty of perjury under the law of the United States of America that the

foregoing is true and correct.

Executed in San Francisco, CA on November 18th, 2011.

_____

Steve Vachani

VERIFICATION
CASE NO. 5:08-CV-05780 JW

SER 168

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Bursor & Fisher, P.A., 1990 North California Blvd., Suite 940, Walnut Creek, CA  94596.  On November 18, 2011, I served the within document:

**DEFENDANT POWER VENTURES, INC.'S SUPPLEMENTAL RESPONSES TO FACEBOOK, INC.'S INTERROGATORIES NOS. 1, 2, 3, 7, 13, 14, 15, 19, 20 AND 21**

☒      by placing a copy of the document(s) listed above for collection and mailing following the firm's ordinary business practice in a sealed envelope with postage thereon fully prepaid for deposit in the United States mail at Walnut Creek, California addressed as set forth below.

☐      by depositing a true copy of the same enclosed in a sealed envelope with delivery fees provided for a Overnight/Federal Express pick up box or office designated for overnight delivery, and addressed as set forth below.

☐      By causing a personal delivery of a copy of the document(s) listed above to the person(s) at the address(es) set forth below.

☐      by facsimile transmission on that date.  This document was transmitted by using a Brother MFC-9970CDW facsimile machine that complies with California Rules of Court Rule 2003(3), telephone number (925) 407-2700.  The transmission was reported as complete and without error.

☐      by e-mail transmission on that date.  These documents were transmitted via e-mail to the following e-mail addresses as set forth below.

I. Neel Chatterjee
Theresa A. Sutton
Morvarid Metanat
Orrick, Herrington & Sutcliffe, LLP
1000 Marsh Road
Menlo Park, CA  94025
Telephone:   650-614-7400
Facsimile:   650-614-7401

I am readily familiar with the firm's practice of collecting and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on the same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

PROOF OF SERVICE      1
CASE NO. 5:08-CV-05780 JW

I declare under penalty of perjury under the laws of the State of California that the above is true and correct, executed November 18, 2011, at Walnut Creek, California.

_Debbie Schroeder_

_____

Debbie Schroeder

PROOF OF SERVICE
CASE NO. 5:08-CV-05780 JW

2

# EXHIBIT 34

| From: | steve@stevevachani.com |
|---|---|
| To: | eric@power.com; Eric.santos |
| Subject: | Facebook update and letter I sent to them |
| Date: | Friday, December 26, 2008 9:50:34 PM |

</table
Please note that we will not remove anything or change at this time on Facebook. I made a decision and sent an email to Facebook.

We must work very quickly to implement a solution and also implement our new standard to create the best possible experience.

EXHIBIT
241
Vachani

Dear Joseph,

I am writing to follow up to our discussions regarding Power.com�s integration of Facebook connect, your requests for us to take down our current Power browser compatability with Facebook, and your complaints regarding our users storing their Facebook login information inside the Power Browser. I hope you will pass this letter on to Sam and other appropriate parties inside of Facebook to communicate our sincere desire to diplomatically resolve our current disagreement and help you reduce these disagreements with well intentioned companies like Power.

Power.com is very committed to working with Facebook and we sincerely hope that this message of diplomacy and good intention is very clear in this letter. We would like to reiterate that we have made the decision to make every diplomatic effort possible to cooperate with Facebook to integrate your Facebook Connect solution on our login page. We had originally expected that it would take us 2 weeks to complete this integration, but with the holidays and the amount of work necessary to complete this integration, we realistically don�t expect have this new solution fully integrated until January 30th. After careful consideration and after previously thinking that it would better to take Facebook comptability down while we implemented this new solution, we have made the business decision to not prevent the interruption of service to our millions of users while working closely to make these changes to address Facebook's concerns. We sincerely hope that while this is not your desired action, you will respect our reasons for doing this and keep the door open and approve Power.com inside of Facebook connect when we go live in one month. Furthermore, we would like to work with Facebook to offer our complete browser tools to users with Facebook�s consent and input into the user experience.

The Power.com browser provides our users value added features across their Internet experience.  Like most browsers, we have little interest to cause harm to Facebook or reduce Facebook�s revenues. On the contrary, we are taking proactive steps to pass all Facebook ads through to the user inside our browser. Similar to Firefox, Internet Explorer, Flock, and other browsers and browser add-ons, we provide our users a browser to

navigate and continue to use their existing sites and do not in any way attempt to obstruct users from using the sites they are accustomed to using every day. Like most browsers, we do offer our users the option to either start their experience on our home page or start on their default social network.

Furthermore, we are about to launch a new solution which will pass Facebook ads inside of all Facebook content which is displayed outside of Facebook. This is something we can have ready by the end of January and which we can also enable for you to offer to other develpment partners whose only desire is to create positive applications for Facebook users. We are committed to working with the entire industry to responsibly create a borderless web where all parties interests are respected when widgets, apps, messages, and other content are distributed outside of Facebook or outside the host site of any other web publisher.

Power strives for complete transparency with our users by providing them explicit statements on our front page in two different places about the nature of our application, the fact that we are a value added browser with no endorsement by other sites, and we also require a user before using our service to read through and proactively accept our terms and conditions where we for the third time clarify the users consent and understanding that we are in no way affiliated with or endorsed by Facebook.

We completely understand Facebook's position to not begin any business discussions with Power.com until we have become compliant with Facebook requests. We request that you please reconsider this decision and enable us to meet with Facebook as early as possible to diplomatically resolve this issue in a way that will allow us to keep creating new applications for Facebook and also help Facebook better accommodate other innovators and application developers like Power.com who only want to enrich your user�s experiences. We are working to implement this complete solution with Facebook�s cooperation by January 30th and sincerely hope that you will not misinterpret this delay and our decision to not interrupt the user experience of our mutual users as our lack of desire to work together with Facebook.

If you maintain that you cannot faciliate a direct meeting, we will happily use our own contacts to start these discussions with Facebook, but it is difficult to start these discussions until after the holidays are over. We have no problem using our own contacts to get to the appropriate people at Facebook engaged in discussions in January to resolve this, but naturally prefer your assistance to speed things up.

We believe that it would be a serious strategic mistake to disrupt the experience of the millions of Power.com users while we are actively working to complete the integration of Facebook connect. We believe that this would create unnecessary attention and disruption among users, the media, and the industry around what we believe is a discussion that can be handled maturely and quietly between our companies.

I believe that Facebook understands the current challenges as Meebo and soon thousands of other sites that will connect to Facebook using open source technology solutions and other user driven solutions that are not endorsed by Facebook. We respect Facebook�s objectives to create an open Internet which respects and protects users and enables developers to create new innovations to serve Facebook users. We think that it is important that we all diplomatically work together to achieve these goals for the best interests of users. The borderless web is inevitable and we all need to work together to define the best practices for this new and exciting Internet which Facebook has already played such a pivotal role in helping create over the past years.

Power.com is very interested in sitting down with Facebook to discuss together the future of the borderless internet and work to address all of Facebook�s concerns. I am willing to fly to San Francisco as early as possible to proactively present our solutions or we are happy to wait until after January 30th when we complete our integration of Facebook connect on our initial login page.

We believe that that your number one concern of protecting a users username and password will be resolved by our implemention of Facebook connect or by Facebook using an extension to Facebook connect that we would like to present to you which would allow Power and other outside developers maximum flexibility to innovate on top of Facebook while keeping the users username and password locked securely and safely outside the reach of Power.com or any other developer. We are currently supporting and helping introduce a new industry wide solution that will ensure that sites like Power.com, Meebo, eBuddy, and thousands of others will never have access or store Facebook usernames and passwords, but still have the maximum flexibility to innovate new applications on top of Facebook and all other sites on the Internet. We all share similar investors and partners and we are all striving for the same objectives.

We believe that Facebook�s second concern is the potential loss of revenues when Facebook content is accessed outside of Facebook. This coming month, Power.com will be introducing a solution which will pass all Facebook advertising through with your content that is displayed outside of Facebook. We are proceeding with this without being asked in order to further demonstrate our desire to diplomatically and responsibly address the issues of distributed content inside of mashed up websites. Power.com has no interest to interfere or to prevent Facebook from receiving revenue from all its content and will go out of its way to showcase to the industry how to responsibly solve this problem. We would welcome the opportunity to work with you to define these standards together with the leading sites on the web and introduce these standards together to the industry and inside of Facebook connect.

Finally, as a browser, most of our users experience is actually inside of Facebook and other destination sites  and we do not in any way prevent users from viewing the entire

Facebook experience with all ads and revenues streams intact.

While we understand your current requests to take down the current Facebook compatibility with the Power Browser today, we strongly believe that it is a mistake to disrupt the user experience of our millions of users and create attention around our private discussions.

Unlike some other sites that you are dealing with that may truly be causing harm to Facebook, Power.com�s only goal is to enable new applications which enhance Facebook�s users experience inside your site.

Therefore, we diplomatically request that you please grant us an extension until January 30th to work to achieve compliance with Facebook's request and to have time to diplomatically sit down with Facebook to present solutions that will assist you in dealing with these core issues not only with Power.com, but with the hundreds of other well intentioned developers who are only looking to create new innovations for Facebook, but who do not yet have the flexibility from Facebook to support their innovations. The floodgates are about to open and we would love to work proactively to solve these challenges together.

We sincerely hope you respect our decision on this and look forward to building a healthy and diplomatic dialogue with Facebook to address your true concerns of protecting your users. And we apologize for the lack of clarity on our position until today and for any confusion we may have created from this lack of clarity. Facebook�s initial strong reaction did catch us off guard and after careful consideration, we have crafted this letter to make clear our position and desire and commitment to work together.


Best Regards,

Steve Vachani

CEO, Power.com



--- On **Fri, 12/26/08, Eric Santos <*eric.santos@corp.power.com*>** wrote:

From: Eric Santos <eric.santos@corp.power.com>
Subject: RE: please call me so we can discuss what to do with Facebook
To: "SteveVachani" <steve@stevevachani.com>, "Eric Santos" <eric@power.com>
Date: Friday, December 26, 2008, 6:31 PM

Steve,

N�o quero discutir mais nada. Por favor tome sua decis�o e eu estarei
cuidando para que a mesma aconte�a.

Gostaria mesmo era tirar f�rias, e poder estar curtindo o reveillon com a Jade
sem estar preocupado em como pagar as contas.

Atc,

Eric


From: steve@stevevachani.com [mailto:steve@stevevachani.com]
Sent: sexta-feira, 26 de dezembro de 2008 23:00
To: Eric Santos
Subject: please call me so we can discuss what to do with Facebook

and make a final decision

thanks,
Steve

# EXHIBIT 35

**Dalton, Amy**

| | |
|---|---|
| **From:** | L. Timothy Fisher [ltfisher@bursor.com] |
| **Sent:** | Wednesday, November 09, 2011 6:08 PM |
| **To:** | Metanat, Morvarid |
| **Cc:** | Scott A. Bursor; Cooper, Monte; Sutton, Theresa A.; Dalton, Amy; Neal Deckant |
| **Subject:** | Re: Facebook v. Power-- Supplemental Production |

Dear Counsel:
As agreed at the 11/4 hearing, we are providing instructions regarding how you may access the contents of Steve Vachani's Yahoo! email account and Power's AsaDrive online backup for inspection. As I indicated at the hearing, we are not waiving any privilege and request that you make a good-faith effort to avoid opening or reading any communications between Steve Vachani and his counsel. The instructions are below.

## STEVE VACHANI'S YAHOO! MAIL

As a preliminary note, these emails are subject to the protective order and are hereby designated as "Confidential - Attorneys' Eyes Only." In addition, we request that you keep a log of your search activities. At a minimum, please keep a record of (i) the name of the party conducting the search, (ii) the search terms being used, and (iii) a copy and description of any emails you review or save.

Instructions:
(1) Go to http://www.yahoo.com/ on a web browser.
(2) Click on "Mail."
(3) The username is "vachani@yahoo.com" and the password is "zucked123"

## POWER'S ASADRIVE ONLINE BACKUP

As a preliminary note, these documents are also subject to the protective order and should be designated as "Confidential - Attorneys' Eyes Only."

Instructions:
(1) Go to http://www.asadrive.com/downloads.php. Download "AsaDrive for Windows." You do not want "AsaDrive Restore," because it cannot handle files over 2 GB.
(2) Install the software.
(3) You will probably need to set up port forwarding to connect to the server. AsaDrive does not publish the ports they use. Your IT staff should be able to do this. Either your IT staff can detect the ports the software is attempting to use, or they can simply enable all ports for the duration of the discovery process.
(4) When you load the software, it asks for a username and password. Use "vachani@yahoo.com" and "mike123" without quotes.
(5) Go into the settings. Open the "Services" tab. Make sure the boxes on AsaDrive Online Backup and AsaDrive Online Drive are both checked.
(6) Open the "Bandwidth" tab. You probably want to set it to max, as the default is rather low.
(7) At the top of the "Options" menu, there is text that will either say "AsaDrive is running (click here for status)" or "AsaDrive is not running (click here to start)." Either way, click it. It will open a panel showing the files that are available to download.

## "MISSING" DATABASES

On November 3 and November 4, you sent us a series of emails regarding two database files that appear to have missing information. Specifically, you noted that the database "Async" does not contain any event logs after 11/23/08. You stated that the database "specifically omit[s]" the month of December 2008. In addition, you

1

noted that the database "Power_Logger" has missing tables. You then asked us to provide these files immediately.

We have, in fact, produced every substantive database in our possession. We have investigated the cause of this apparent deficiency. We will summarize our findings below.

*"Async" does not contain event logs after 11/23/08*

The database "Async" contains event logs. To be clear, this database was not used to store critical user data (profiles, personal information, settings, passwords, etc.). Instead, the database stored logs that recorded and memorialized the activities of Power's servers. In this sense, these logs were not critical to the functioning of Power's website and core business model. Creating and maintaining these logs was costly and resource-intensive.

In November 2008, Power implemented several cost-cutting plans. One of these plans was to migrate the servers to a cheaper hosting service, iWeb. During this migration, Power made a business decision to cease its logging procedures on the new server. This decision was rooted in the high cost of such logging activities.

*Power_Logger has missing tables*

The database "Power_Logger" has missing tables. Similar to "Async," this is a log file. Accordingly, it does not contain critical information, but it does log the activities of Power's servers.

Power ceased its daily operations on April 2011. During this time, Power closed its server on iWeb. It then transferred its files onto a separate online backup. Nearly every file was transferred to the online backup. However, Power_Logger was approximately 110 GB, which was too large to transfer to the backup. For this reason, Power omitted Power_Logger from the backup. This decision was rooted on the infeasibility of backing it up with the rest of the files, as well as the minimal benefit of keeping this information. We have attempted to obtain this file from iWeb but were told it was removed from their servers.

Please let us know if you have any other questions.

Tim
--
L. Timothy Fisher
Bursor & Fisher, P.A.
1990 North California Blvd., Suite 940
Walnut Creek, California 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

On Wed, Nov 9, 2011 at 4:37 PM, Metanat, Morvarid <mmetanat@orrick.com> wrote:

Tim,

Could you please confirm that sometime today you will be providing us with the means to access Defendants' ASA drive, Mr. Vachani's email accounts and any other sources of relevant information? Please advise as to what time and in what format we may expect to receive this information.

2

Also, I believe Mr. Vachani indicated that he would get back to us today regarding the missing databases related to the number of Launch Promotion messages that were sent to Facebook users.  Please confirm that we will be receiving this information today as well.


Thank you.


Morvarid




**ORRICK**

**MORVARID METANAT**
*Associate*

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
SILICON VALLEY

*tel* (650) 614-7344
mmetanat@orrick.com

www.orrick.com

============================================================
IRS Circular 230 disclosure: To ensure compliance with requirements
imposed by the IRS, we inform you that any tax advice contained in this
communication, unless expressly stated otherwise, was not intended or
written to be used, and cannot be used, for the purpose of (i) avoiding
tax-related penalties under the Internal Revenue Code or (ii) promoting,
marketing or recommending to another party any tax-related matter(s)
addressed herein.
============================================================
NOTICE TO RECIPIENT: THIS E-MAIL IS MEANT FOR ONLY
THE INTENDED RECIPIENT OF THE TRANSMISSION, AND
MAY BE A COMMUNICATION PRIVILEGED BY LAW. IF YOU
RECEIVED THIS E- MAIL IN ERROR, ANY REVIEW, USE,
DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS
E-MAIL IS STRICTLY PROHIBITED. PLEASE NOTIFY US
IMMEDIATELY OF THE ERROR BY RETURN E-MAIL AND
PLEASE DELETE THIS MESSAGE FROM YOUR SYSTEM.
THANK YOU IN ADVANCE FOR YOUR COOPERATION.
For more information about Orrick, please visit http://www.orrick.com/
============================================================

3

4

Case: 3:08-cv-05780-JW Document: 229 Filed: 02/23/12 Page: 191 of 269

Pages 1 - 16

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE

```
FACEBOOK, INC.,                     )
                                    )
              Plaintiff,            )
                                    )
   VS.                              ) NO. C 08-5780 JW (JCS)
                                    )
POWER VENTURES, INC.,               )
                                    )San Francisco, California
              Defendant.            )  Friday
                                    )  February 24, 2012
_____    )  9:30 a.m.
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff**:          Orrick, Herrington & Sutcliffe
                            1000 Marsh Road
                            Menlo Park, California  94025
                    BY:  **MORVARID METANAT, ESQ.**
                         **MONTE COOPER ESQ.**


**For Defendant**:          Bursor & Fisher, P.A.
                            1900 North California Boulevard
                            Suite 940
                            Walnut Creek, California 94596
                    BY:  **LAWRENCE TIMOTHY FISHER, ESQ.**
                         - appeared telephonically


*Reported By:  Debra L. Pas, CSR 11916, CRR, RMR, RPR*
              *Official Reporter - US District Court*
              *Computerized Transcription By Eclipse*

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 182

```
 1                    P R O C E E D I N G S
 2   FEBRUARY 24, 2012                              1:36 p.m.
 3
 4              THE CLERK:  Case C08-5780, Facebook versus Power
 5   Ventures.
 6              And, Mr. Fisher, since you're appearing by phone, I
 7   do have a court reporter who is here.  Her name is Debbie Pas.
 8   So just make sure you speak up so she can get whatever your
 9   conversation is accurately on the transcript, okay?
10              MR. FISHER:  I will do that.
11              THE COURT:  Thank you.
12              Counsel, appearances, please?
13              MS. METANAT:  Good morning, your Honor.
14              MR. FISHER:  Good morning, your Honor.  Timothy
15   Fisher for defendants Power Ventures and Steven Vachani.
16              MS. METANAT:  Morvarid Metanat and my co-counsel
17   Monte Cooper for Facebook.
18              THE COURT:  Thank you, everyone.
19              So I want to go through these one by one.  As to the
20   motion to preclude witnesses at trial, that one seems to me to
21   be moot, isn't it?
22              MS. METANAT:  Your Honor, while the issue of Power's
23   liability has been decided on summary judgment, there are still
24   the issues of damages and the issue of Mr. Vachani's personal
25   liability pending before the Court.  We ask then that the
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 183

 1 | witnesses be precluded from testifying to those matters given
 2 | that we haven't had the ability to depose them.
 3 |        **THE COURT:** I see. So, I guess the question really
 4 | was for the defendants as well.
 5 |        You're not intending to call -- and I think you've
 6 | said as much. There's three witnesses identified, right?
 7 | Santos, Herrera -- and who is the other one?
 8 |        **MR. FISHER:** Carvalho.
 9 |        **MS. METANAT:** Carvalho.
10 |        **THE COURT:** Carvalho. You're not intending to call
11 | them or submit declarations on their behalfs in this litigation
12 | period, right?
13 |        **MR. FISHER:** No, your Honor.
14 |        **THE COURT:** And so do you have any objection to the
15 | Court entering an order saying you can't do that?
16 |        **MR. FISHER:** No, your Honor.
17 |        **THE COURT:** Okay. So the first part is a stipulated
18 | order that the defendant shall -- agrees shall not call as
19 | witnesses or provide a declaration from Santos, Herrera and
20 | Carvalho.
21 |        Okay. The second issue is the motion to compel
22 | emails that were responsive, but purportedly not produced
23 | because they weren't copied to Vachani. Though -- and to
24 | provide a 30(b)6 -- continued 30(b)6 deposition with regard to
25 | those additional emails.

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 184

1          Obviously, I have two or three tentative thoughts on
2    that.  My first is that there is no excuse for not producing
3    those emails.  They are responsive.  They are relevant.
4    It's -- it is not sufficient that Mr. Vachani thinks that all
5    the important emails were copied to him.
6          Number two.  They should have been produced before
7    the 30(b)6 deposition was taken.  They were called for.  There
8    is no reasonable excuse for them not being produced before the
9    30(b)6.  They now, I guess, to the extent they exist have been
10   produced.
11        **MS. METANAT:**  Your Honor, we have received a drive
12   containing emails from Power employees.  However, there are
13   still emails that appear to be missing from this production.
14   We're still -- you know, we have just now been able to process
15   them and we're still trying to figure out what happened with
16   those emails, but it appears that there are some that are still
17   missing.
18        **THE COURT:**  I don't have a record on that.  All I've
19   got is a record of you've got some of these emails, and I think
20   in light of that you're entitled now to get a renewed 30(b)6 of
21   Power to testify regarding these emails and have the defendants
22   pay for the cost, including attorney's fees, of that renewed
23   deposition because it's the defendant's fault that it has to
24   occur.  That's my tentative thought on this.
25        So I guess, do you want to say anything about that as

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

**SER 185**

1    counsel for the defendants?

2         **MR. FISHER:**  Your Honor, we intended to produce those

3    documents after the Court entered its earlier ruling.  We

4    thought they had been produced and it was an inadvertent error

5    that led to their production.

6         We do not disagree with the Court's ruling.  We think

7    it's unnecessary in light of Judge Ware's order granting

8    summary judgment for the deposition to be taken of the subjects

9    that were listed in the 30(b)6 notice have virtually all been

10   determined by the Court in Facebook's favor, and so we think

11   there is really no need for the deposition.  The issues have

12   been resolved and resolved in Facebook's favor.

13        **THE COURT:**  Well, there are -- there are issues

14   regarding Mr. Vachani's participation and his personal

15   liability.

16        And then, of course, the damages issue is not simple.

17   I mean, in order to figure out the damages issue, you have to

18   figure out exactly how this program operated and what happened

19   so that you can figure out and give a reasonable estimate of

20   how many times, so that's sort of thing.  Not to mention issues

21   relating to -- that might go to intentionality, which might

22   have a bearing on damages.

23        So I'm not sure why you think it's moot at this point

24   in terms of the deposition.  You know, there may be some issues

25   which, you know, I'm sure having won on them the defendants --

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 186

```
1   the plaintiffs won't voice the time that I would give them to

2   go into, but for the most part there still substantial issues

3   to be resolved; isn't that right?

4           MR. FISHER:  I think the issues are very narrow at

5   this point and are outside the scope of the subjects listed in

6   the 30(b)6 notice.

7           THE COURT:  I'm sorry.  They didn't want -- I mean, I

8   read the deposition.  They were trying to figure out how the

9   program operated, how many times it invaded Facebook's space

10  and that sort of thing.  And the knowledge of Mr. Vachani's on

11  that subject and others on that subject, those things all seem

12  relevant to damages to me.  Aren't they?

13          MR. FISHER:  And I think he's already testified about

14  those subjects and I think the Court has already determined the

15  number of times that emails were sent.

16          THE COURT:  Number of times?  The Court made a

17  finding on number of times?

18          MR. FISHER:  That was submitted by Mr. Mehling,

19  Facebook's expert, who determined there were 60,000 emails that

20  were sent and defendants have not disputed that.

21          THE COURT:  Well, that's -- that's different.  I

22  mean, they want to say it's many more than that.  That's what

23  they know from what they got.  Now they want to do an

24  investigation that they thought they should have been able to

25  do before and say, well, that -- that's the minimum number that
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 187

1  we have been able to account for, but, at least as I understand

2  the argument, there will be -- there are many more.

3        Although, I don't know.  It's hard to know where this

4  is going.  When you multiply 60,000 times statutory damages,

5  you get such a humongous number that nobody is ever going to be

6  able to pay for it, but that's not my -- certainly not my

7  bailiwick.

8        Well, you know, I mean, I certainly would restrict

9  the deposition to the issues that are remaining in the case to

10 be resolved, but I would not like to see -- and we'll set the

11 parameters for this deposition when we get to the next letter

12 or letter after that.  But I would not like to see some big

13 fight about whether or not any particular question was within

14 the scope of that restriction, because it's a difficult

15 restriction to apply given that damages in these cases and the

16 personal liability of Mr. Vachani, you know, overlap a lot of

17 the issues that -- you know, the facts regarding those issues

18 overlaps the facts of the issues on which the Court has reached

19 conclusions.  So I'm not -- I don't think it's worth getting

20 into a big fight about when we get to the deposition.

21       So I'll order the defendant -- obviously, to the

22 extent that they haven't -- to produce forthwith the responsive

23 emails that were not copied to Vachani.

24       I will order the defendant to sit for a 30(b)6 --

25 renewed 30(b)6 depo regarding the newly-produced emails limited

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 188

1  to the subjects, to the issues that were still unresolved by
2  the Court's summary judgment order.
3        And I'll order the defendant to pay the cost, the
4  reasonable cost, including attorney's fees, for the renewed
5  30(b)6 depo.  And I'll just expect that to be worked out
6  between counsel.  If it's not, you can submit a letter to me on
7  what your reasonable costs were, et cetera, and I'll get it
8  resolved that way.
9        MS. METANAT:  Your Honor, if I may just for a moment?
10 We also requested that the deposition be supervised.
11       THE COURT:  We'll get to that.  That's the next
12 question.
13       MS. METANAT:  Oh.
14       THE COURT:  So you want to do the whole 30(b)6
15 deposition over and have court supervision, and that's the next
16 letter.  I want to set some parameters for how we do this, but
17 let me give you my thoughts on that motion.
18       I think it's clear from the deposition that the
19 witness did not accurately prepare for the deposition.
20 Contrary to the way counsel described it, it is not sufficient
21 that you just got somebody who you thought knew every aspect of
22 the business, because it was clear in the questioning that
23 there were aspects of the business on which and for which and
24 with respect to which the deposition was noticed that the
25 witness did not have knowledge and would have had to have asked

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

**SER 189**

1 somebody, but didn't.

2          There is an obligation in the law, the way that the
3 30(b)6 jurisprudence has developed over the last 15 years, to
4 speak with including employees and former employees and provide
5 all the information that is reasonably available.  It's clear
6 that Mr. Vachani has been in contact with one or more former
7 employees and, in fact, made statements during the deposition
8 about various subjects on which he would have to make inquiry.
9 So he was not properly prepared for the deposition.  Spending
10 an hour and just showing up just doesn't do it.  This is not
11 just a fact witness.  It's a 30(b)6 witness.  Number one.

12          Number two is, the conduct by the witness was
13 inexcusable.  He thought it was a game.  He was argumentative
14 and he was evasive.  He refused to give straightforward answers
15 to straightforward questions that were put to him.  He
16 improperly just read answers out of his declaration, and that
17 certainly was an obstruction of the deposition process.

18          So I would allow the 30(b)6 motion, the deposition to
19 be on any topic that is remaining in the case to be renewed; a
20 renewed deposition on any topic remaining in the case that's in
21 the list of topics on which the 30(b)6 was noticed, and that
22 the witness is ordered to -- of course, if there are questions
23 that you've already asked on which you've gotten a clear
24 answer, you can't ask them again.  So no repeating questions on
25 which you've got a clear answer.

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 190

```
 1              Hang on a second.

 2              (Brief pause.)

 3              And in terms of supervision, I'm not quite prepared

 4    on this record.  For one thing, I don't -- I don't want the

 5    parties to have to hire a special master.  Because, you know,

 6    I'm entering these orders about attorney's fees, I don't have

 7    any illusions about them actually ever getting paid.  So if we

 8    had -- if we hired a special master, that would be -- Facebook

 9    would be paying for a special master and hoping some day to

10    recover the cost.  I'm not sure I'm really interested in doing

11    that.  I don't know that I would do it now. I'm certainly not

12    interested in sitting there myself.  Not because it wouldn't be

13    a delight, but it's because -- I don't think this has gotten to

14    the point where you need that if there is sufficient

15    instruction from the Court in advance on how you want it to go

16    -- how I want it to go.

17              So let me tell you how I want it to go.  The witness

18    shall answer all the questions put to him and there shall be no

19    instructions not to answer, other than on attorney-client

20    privilege and attorney work product.

21              The witness may not read from his declaration as an

22    answer.  That's not an adequate answer.

23              The witness may not argue with the lawyer.

24              The witness shall take all reasonable steps,

25    including contacting former employees, to be prepared on all
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 191

1   the topics that we're allowing.  Just to be clear, what we're

2   allowing is all of the topics that are listed in the Notice of

3   Deposition that was previously served so long as they are still

4   at issue.

5        Now, I'm going to put a time limit, which I think

6   should take care of scope questions.  So in other words, I

7   don't actually -- you know, I'm happy to have you object that

8   it's beyond the scope of the deposition that I'm permitting on

9   the record, but no instructions not to answer on that basis;

10  but I'm going to put a time limit and that will, hopefully,

11  encourage the plaintiffs to use their time wisely and only

12  stick to topics that are still subject to being briefed in

13  front of the Court or tried.

14       And -- okay.  And I will order -- and I think I

15  previously said that the defendants will pay the reasonable

16  costs, including attorney's fees, for the renewed 30(b)6

17  deposition.

18       So, and then we've got to figure out the when.  Did

19  you want to make any comments on those, on behalf of the

20  defendants?

21       **MR. FISHER:**  No, your Honor.  Other than, did you

22  specify a time limit?  I didn't hear that.

23       **THE COURT:**  Oh, yeah.  I think seven hours.  Seven

24  hour limit.  Yeah.

25       So now the tricky question is when.  Not that these

```
 1   other questions weren't tricky, but when?  We are sort of in a
 2   box here, n that you're briefing, I guess, is due March 1st.
 3              MS. METANAT:  March 2nd.
 4              THE COURT:  March 2nd.  Friday.  So a week from
 5   today?
 6              MS. METANAT:  Yes, your Honor.
 7              THE COURT:  Well, you know, I don't know -- it sort
 8   of depends on what you want to accomplish by this deposition
 9   because if you -- if I say okay, we'll have a deposition next
10   Tuesday.  All right?  You will get whatever there is that he
11   can accomplish between now and next Tuesday.  He'll have to do
12   reasonable preparation by then, but, you know, that's not like
13   a month of preparation.  That's three days or four days of
14   preparation, two of which are on weekends and basically what
15   you want to do is call the other employees and say, you know,
16   how exactly did this promise work and where is the evidence on
17   how many times it would have inquired into a Facebook data base
18   or whatever it does.  I don't know.
19              On the other hand, if what you're really after is we
20   have gone through the 75 gigabytes.  We have got 15 emails and
21   we really want to talk about those, well, that you probably can
22   do next week by Tuesday or Wednesday.  So if you want me to set
23   it next week, I will, in time for your briefing, but it has
24   consequences.
25              MS. METANAT:  Your Honor, I think we would like to
```

```
 1  schedule it for next week, if possible.

 2           MR. FISHER:  Your Honor, this is Mr. Fisher.

 3           The other issue is that Mr. Vachani lives in Brazil,

 4  and just the travel time alone would take up a lot of the time

 5  required for him to talk to other employees.

 6           MS. METANAT:  I think we're aware of his --

 7           THE COURT:  You know, that's just something that --

 8  you know, he will have a limited period of time to do the

 9  preparation.  You know, maybe he'll have a day to do the

10  preparation and that will leave whatever it yields, but I would

11  expect him to devote the day for preparation.  We shouldn't be

12  in this situation.  It's his fault that we are.

13           So today is the 24th.  If I set the deposition --

14  when did you want me to set it?  It's your brief.

15           MS. METANAT:  I think next Tuesday works for us.

16           THE COURT:  Tuesday, the 28th of February?

17           MS. METANAT:  Yes.

18           THE COURT:  Is counsel for Mr. Vachani available on

19  Tuesday, the 28th?

20           MR. FISHER:  I'm actually supposed to be in a seminar

21  that day, your Honor.  Is it possible if we could do it on

22  Wednesday and then that would give Mr. Vachani an extra day to

23  travel?

24           MS. METANAT:  We're okay with that.

25           THE COURT:  Fine.  We will do it on Wednesday the
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 194

```
 1  29th, 2011 -- 2012 -- excuse me, I'm having a tough time
 2  adjusting to that -- at the Orrick Menlo Park offices?  Is that
 3  where you want it?
 4          MS. METANAT:  Yes, please.
 5          THE COURT:  What time of day?  What time do you
 6  usually start?
 7          MS. METANAT:  I think 10:00 o'clock works for both
 8  parties.
 9          THE COURT:  All right.  10:00 a.m.?
10          MS. METANAT:  Yes, please.
11          THE COURT:  And since, you know, you all work 24
12  hours a day, you can go over the transcript that evening, put
13  it in a brief the next day.  When I say "you," I mean --
14          MS. METANAT:  Yes, I understand.
15          Okay.  Am I -- in terms of other issues about general
16  spoliation, I don't feel comfortable on this record making any
17  decisions about that.
18          MS. METANAT:  Your Honor, we understand that and we
19  were hoping that we could submit further briefing on that issue
20  on defendant's discovery misconduct throughout the course of
21  discovery.
22          THE COURT:  Well, maybe or maybe not.  The judge is
23  about to decide what to do with the case.  There may or may
24  not -- I mean, to the extent there is a motion to -- for some
25  broad -- I don't think it's teed up here.  I don't think you've
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 195

```
 1  asked for anything, so I don't think I'm denying anything
 2  actually.
 3          And I won't preclude you from filing such a motion.
 4  I think that if you really want to do a motion for any serious
 5  discovery sanctions, like default -- I mean, in this case it's
 6  all about default, right?  It's got to be that -- you've got to
 7  assume that the number of incidents of infringement of our
 8  rights is "X" or something like that.  It's not -- it's not a
 9  precluding evidence issue, I don't think.  That wouldn't do you
10  any good.
11          So I'm not sure -- so what you're asking really is
12  for a default.  And so I'll -- I'll leave it open.  If you want
13  to do that, you can do it.  You've got to do it by a regular
14  motion.  We don't do it by letter briefing.
15          You may want to talk about -- it may be more
16  appropriate since its -- I don't know whether it's more
17  appropriate to do it in front of me or Judge Ware.  That would
18  be up to you and he, and it depends on what he does in response
19  to your briefing next week; but I'll leave  it open.
20  Certainly, I won't forbid it.
21          I will say that you don't have to do joint letter
22  briefs on it because I would not expect the defendants to agree
23  to it.  If they agree to it, then the case is over anyways, but
24  you can file any motion you want.
25          MS. METANAT:  Thank you, your Honor.
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 196

16

1          THE COURT:  Okay?  Anything else I should be taking

2  care of?

3          MS. METANAT:  I think we are okay.

4          THE COURT:  Okay.  Thank you.

5          MS. METANAT:  Thank you.

6          MR. FISHER:  Thank you, your Honor.

7          (Whereupon, further proceedings in the

8           above matter were adjourned.)

9

10                          --oo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 197

**CERTIFICATE OF REPORTER**


        I, DEBRA L. PAS, Official Reporter for the United
States Court, Northern District of California, hereby certify
that the foregoing proceedings in C 08-5780 JW (JCS), FACEBOOK,
INC. vs POWER VENTURES, INC. were reported by me, a certified
shorthand reporter, and were thereafter transcribed under my
direction into typewriting; that the foregoing is a full,
complete and true record of said proceedings as bound by me at
the time of filing.

        The validity of the reporter's certification of said
transcript may be void upon disassembly and/or removal
from the court file.




                    /s/ Debra L. Pas
         Debra L. Pas, CSR 11916, CRR, RMR, RPR
              Monday, February 27, 2012




*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 198



ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CALIFORNIA 94025

*tel* +1-650-614-7400
*fax* +1-650-614-7401
WWW.ORRICK.COM

Morvarid Metanat
(650) 614-7344
mmetanat@orrick.com

January 26, 2012

*VIA ELECTRONIC FILING*

Hon. Joseph C. Spero
United States Magistrate Judge
United States District Court
Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

Re:  Facebook, Inc. v. Power Ventures, Inc., et al., Case No. 5:08-cv-05780 (JW)

Dear Magistrate Judge Spero:

Plaintiff Facebook, Inc. ("Facebook") hereby moves this Court for an Order compelling Defendants to produce all company emails of Defendant Power Ventures, Inc. ("Power") which were not copied to Defendant Steve Vachani ("Vachani"). Facebook also requests that Power be made available for a further deposition regarding these emails at Defendants' expense. Defendants oppose Facebook's request.

Discovery in this case closed on January 20, 2011. However, pursuant to the Court's Standing Order on Discovery Issues, the parties met and conferred prior to the close of discovery in an effort to resolve this dispute. The parties failed to reach a complete resolution and now request that the Court issue an Order resolving the present discovery issue. Facebook and Defendants attach hereto Declarations from Monte Cooper ("Cooper Decl.") and Timothy Fisher ("Fisher Decl.") in support of their respective positions.

**I.  Facebook's Position on the Discovery Dispute Regarding Missing Emails from Power Employees.**

This case involves allegations that Defendants violated the CAN-SPAM Act, the Computer Fraud and Abuse Act ("CFAA"), and California Penal Code Section 502. Facebook's claims arise from Defendants' actions in December of 2008 in surreptitiously scraping, downloading, and storing Facebook user data, and then using that data as part of a "Power 100 Launch Promotion" to spam



ORRICK

Hon. Joseph C. Spero
January 26, 2012
Page 2

thousands of Facebook users with electronic mail messages inviting them to join Defendants' own competitive website.[1]

Facebook has repeatedly been forced to seek relief from the Court by requesting the Court to compel Defendants to abide by their discovery obligations. *See* Dkt. Nos. 127 & 166. At the time Facebook filed suit, Power had 100 employees, most of whom resided in Brazil. Cooper Decl. Ex. 1 at 25:17-25; 27:4-11; 134:22-25; 232:22-25.[2] Remarkably, though, Defendants elected not to put in place any kind of litigation hold requiring that these Power employees preserve their relevant documents, including their email communications concerning the Power 100 campaign. *Id.* at 271:9-272:5; Ex. 2 at 168:17-22. It is that failure which lies at the root of Facebook's repeated need to seek the Court's intervention, including with respect to the present motion.

A.  **Relevant Intra-Company Emails by Former Power Employees Should Have Been Preserved.**

Discovery in this case began in the fall of 2010, when Facebook served Defendants with a First Set of Requests for Production. *See* Cooper Decl. Ex. 3. Among Facebook's requests were several that covered communications between Power employees related to how the company accessed the Facebook website, and what was discussed concerning the Power 100 Launch Promotion. *See, e.g., id.* Request Nos. 1-2, 6-8, 12-14, 18-25, 27-29, 31, 42, and 44-49. However, initially Defendants responded by producing only 13 documents and virtually no source code. Defendants' intransigence with respect to discovery thereafter precipitated months of motion practice. *See, e.g.* Dkt. Nos. 124, 129 & 139. In each instance, Facebook prevailed and received relief. Dkt. Nos. 127 & 166.

Most recently, Facebook on November 4, 2011 successfully compelled Vachani to produce relevant emails from his personal Yahoo! email account, and an ASA hard drive. Dkt. No. 166. At the time, Defendants swore to the Court that no other locations existed where responsive documents were stored. Cooper Decl. Ex. 4, at 7:8-8:22. At the same time, however Defendants also testified that all emails from Power employees should have been backed up by the company's servers hosted by iWeb.com and amazon.com, rather than deleted. Ex. 1 at 61:25-63:2. In particular, in July of 2011 Vachani testified as follows:

---

[1] Facebook and the Defendants have cross-moved for summary judgment on each of these claims. Chief Judge Ware held a hearing on the pending motions on January 23, 2012, and took the matter under advisement. *See* Dkt. No. 253.

[2] Facebook has filed a separate Joint Letter addressing the problems arising from the fact that these employees all were subsequently laid off by Power, and cannot now under Brazilian law be compelled by a United States Court to produce documents or testify at trial or depositions.



ORRICK

Hon. Joseph C. Spero
January 26, 2012
Page 3

        Q.    Were the E mails sent intra-- intra, I-N-T-R-A company so that they only went to other employees in the company?

        A.    They would go to -- It was not -- It would go to whoever was copied on the E mail.

        Q.    Were those E mails backed up anywhere?

        A.    I believe they were backed up on our servers.

        Q.    Okay.  And those are the servers that were hosted by IWEB and Amazon.com?

        A.    That's correct.

        Q.    And is that backup information still available to you through your site that you're currently hosting on a monthly basis?

        A.    Everything was instructed to be copied there, and so I'm assuming that it's all there.  I haven't looked at it individually personally, but I made a backup of everything.

*Id.* at 62:13-63:6. Facebook subsequently learned that despite this representation, Defendants did not as promised produce all emails in their custody and control and stored on the backup server.[3]

    **B.**    <u>**No Power Emails from Anyone Other than Vachani Were Searched or Produced.**</u>

---

[3] Indeed, at the very last second, Defendants have produced what they describe as a "Microsoft Exchange File that may be a backup of Power's email server."  Cooper Decl., Ex. 5.  Defendants did not previously produce this source of evidence.  Facebook received this Exchange File on January 26, 2012 and has not yet been able to confirm its contents.  However, Facebook has determined that the Microsoft Exchange File contains 76,457 files, 5,752 folders, and 74.6 Gigabytes of data.  Facebook anticipates that much of this material will be in Portuguese and will require translation.  When asked about the contents of the recent production, Defendants' counsel indicated he was unable to open the file and could not verify its contents.  *See* Cooper Decl., Exs. 6 & 7.  The gravity of Defendants' failure to timely produce this source of evidence likely warrants further sanctions than the relief requested herein.



ORRICK

Hon. Joseph C. Spero
January 26, 2012
Page 4

A review of Vachani's emails from his Yahoo! account reflects that he only produced his own personal emails, not the emails from other employees that he previously testified were backed up by the iWeb and amazon.com servers. This fact was brought to his attention during a Rule 30(b)(6) deposition of Power held on January 9, 2012, in which Vachani was Power's designee for all topics. At that time, Vachani for the very first time acknowledged that emails between Power employees other than those which he had forwarded to his personal Yahoo! email account had been not been searched or produced, despite his prior representations that all emails had been backed up by Power's servers and that the only sources for such materials were his own email account and the ASA Drive. Cooper Decl. Ex. 2 at 165:9-166:15; 170:24-171:21. According to Vachani, while emails between company employees were backed up and were the property of Power, everyone had different ways of accessing the emails through Power and therefore there was no way to know where any of the actual documents resided. *Id.* at 171:15-174:8.

Defendants' position as stated at their recent Rule 30(b)(6) deposition is nonsensical. For one thing, Power has produced an architectural diagram for the Power.com system that ███████ ████████████████████████████████████████████████████████████████████ *See* Cooper Decl. Ex. 8, Figure 2. More to the point, though, Defendants' position that they know the emails were backed up somewhere conflicts with Vachani's representations to the Court on November 4 that the ASA Drive and his own email account were the only remaining sources for Power documentation. Cooper Decl. Ex. 4, at 7:8-8:22. The missing emails also clearly exist, as Vachani recently confirmed, and should be produced.

## C. Power Should be Compelled to Produce Emails from Former Power Employees on Which Vachani was not Copied

Even though discovery closed on January 20, 2012, Defendants should be compelled to produce the numerous missing emails from former Power employees which were not copied to Vachani. It was only after Facebook rapidly reviewed the more than 300,000 emails Vachani produced from his personal Yahoo! account, and then took Power's Rule 30(b)(6) deposition on January 9, 2012, that Facebook confirmed Power made no effort to locate or produce any of these missing emails from other company employees.

With 100 employees, it is obvious that Vachani, Power's CEO, was not the only individual who sent or received relevant communications concerning such subjects as the Power 100 Campaign.[4] Yet, Facebook did not know for certain until January 9, 2012 that Defendants made no

---

[4] Facebook has identified through various sources a handful of such emails on which Vachani was not copied, and they underscore that these emails are highly relevant. For instance, a December 26, 2008 email from a Power employee named Elmo Cruz to various Power engineers is the only email



ORRICK

Hon. Joseph C. Spero
January 26, 2012
Page 5

effort whatsoever to locate or produce any documents from these other individuals. "Rules 26 and 34, Fed. R. Civ. P., require [ ] defendants and their counsel to conduct a thorough search of the [ ] defendants' records; to locate all responsive documents in their possession, custody, and control, and to either produce those documents or identify them on an appropriate privilege log." *Wollam v. Wright Medical Group, Inc.*, No. 10-cv-03104-DME-BNB, 2011 U.S. Dist. LEXIS 56649, at *13-*15 (D. Colo., May 18, 2011). Such a thorough search requires, "at a minimum, a reasonable procedure to distribute discovery requests to all employees and agents of the defendant potentially possessing responsive information, and to account for the collection and subsequent production of the information to plaintiffs." *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 556 (N.D. Cal. 1987).

When a party's search methodology is questioned, "the party selecting the methodology must be prepared to explain the rationale for the method chosen to the court, demonstrate that it is appropriate for the task, and show that it was properly implemented." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 262 (D.Md. 2008). Now that Facebook is challenging Defendants' lack of production of emails they contend were saved by the Power's email server, Defendants bear the "burden of explaining what they had done and why it was sufficient." *Id.* As of right now, Defendants have offered no explanation for the omission of these emails.

**D.    Defendants Should Bear The Costs Of A Further Deposition.**

Insofar as Defendants produce former employees' emails not previously produced, Power should be required to appear for a further deposition regarding these emails at its own expense. Facebook will suffer significant prejudice if it is not afforded the opportunity to question Power regarding these emails that may contain critical evidence in support of Facebook's claims. *Kim v. Interdent Inc.*, No. C08-5565SI, 2010 U.S. Dist. LEXIS 56121, at *2 (N.D. Cal. May 18, 2010) (granting defendants' motion to compel further deposition of plaintiff where plaintiff's delayed production proceeded defendants' deposition of plaintiff); *see also The Sunrider Corp. v. Bountiful Biotech Corp.*, No. SACV 08-1339 DOC (AJWx), 2010 U.S. Dist. LEXIS 117346, at *22 (C.D. Cal. Oct. 8, 2010) (finding that plaintiffs were prejudiced by being forced to conduct deposition without key documents when defendant failed to produce documents until all discovery deadlines had passed). Moreover, given Power's late production of these documents, Power should bear the costs associated with a further deposition. *See Keithley v. Homestore.com, Inc.*, No. C-03-04447 SI (EDL), 2009 U.S. Dist. LEXIS 2720, at *20-21 & 28 (N.D. Cal. Jan. 7, 2009) (defendants entitled to costs associated with the re-deposition of witnesses due to plaintiff's late production of documents).

---

produced to date reflecting the number of logins to the Power website by Facebook users during the month of December 2008. *See* Ex. 9.



ORRICK

Hon. Joseph C. Spero
January 26, 2012
Page 6

Accordingly, to the extent the missing emails were preserved and can be produced from Power's backup email server, or from the former employees themselves, the missing emails should be produced. To the extent that Power produces these emails, Facebook should be entitled to take a further deposition of Power regarding these untimely produced emails at Defendants' expense. If the emails were not preserved, Defendants should acknowledge as much and explain why they were deleted.

**II.      Position of Defendants Power Ventures, Inc. and Steve Vachani**

Facebook seeks the production of Power's internal emails between its employees that did not include its CEO Steve Vachani. To date, Defendants have produced more than 300,000 of Mr. Vachani's emails, and Facebook has obtained hundreds of emails from Rob Pollock, Ed Niehaus, and Zak Mandhro, three other Power executives.

Following the 30(b)(6) deposition of Steve Vachani on January 9, 2012 Facebook's counsel inquired about Power's email server and whether its contents had been produced. During defendants' subsequent investigation, a file labeled "backup_exchange.rar" was located. The contents of this file is unknown, but based on the name of the file, defendants believe it may be a backup of Power's Microsoft Exchange email server. This file had previously been stored on Power's online backup known as the AsaDrive.[5] In late October 2011, Power was preparing to produce the contents of the AsaDrive to Facebook.[6] During this process, five files, including

---

[5]      Defendant Power ceased operations in April, 2011. At that time, it transferred its files to AsaDrive, an online backup service.

[6]      The production of the documents on AsaDrive was part of the massive production defendants have made in this case. Power produced its source code for inspection on August 25, 2011. On September 14, 2011, Power also produced more than 1,700 printed pages of the source code to Facebook and its expert. Dkt. No. 149 at 2.
         Power also produced the contents of its AsaDrive, on October 24 and November 9, 2011. In total, the backup server contains 120 gigabytes of data and 69 large database files. *Id.* It also contains subversion repository ("SVN") files, which contain additional source code and a number of additional documents including a large org chart of Power's divisions and employees, approximately 50 PowerPoint presentations for investment funds and advertisers, banner ads and commercials, copious information on Power's business model, comparisons to competitors (like Google), a PowerPoint presentation for most major component of Power's software (PowerFriends, PowerMessenger, Orkut connectivity, MySpace connectivity), internal documentation for each major component of Power's software, information on stock option programs, working drafts and brainstorming on new software development, plans for growth and



ORRICK

Hon. Joseph C. Spero
January 26, 2012
Page 7

"backup_exchange.rar," could not be opened. These files were removed from the AsaDrive for
further analysis to determine if their contents could be verified. Upon discovering that these files
had not been included in the November 2011 production, defendants immediately copied the
"backup_exchange.rar" file and the other four files to a portable drive and sent it via Federal
Express to Facebook's counsel on January 25. The omission of the "backup_exchange.rar" file in
Power's previous production was unintentional and inadvertent.

     Assuming that backup_exchange.rar contains a backup of Power's employee emails,
defendants propose that Facebook review the file and determine if they need an additional
deposition. If Facebook believes such a deposition is necessary after reviewing the file, defendants
will coordinate with Facebook to schedule that deposition.

     Power believes that such a deposition is probably unnecessary as Mr. Vachani was copied on
virtually all important communications and 300,000 of Mr. Vachani's emails were produced on
November 9. Mr. Vachani is Power's founder and CEO and has been personally involved in all of
Power's operations including the Facebook integration that occurred in December, 2008 that gave
rise to this litigation. Mr. Vachani has repeatedly testified that Power employees copied him on
important email communications. 7/20/11 Vachani Dep., Exh. A to the Fisher Decl., at 296:14-15
("Any document that was sent electronically is still in my E mailbox"); *id.* at 297:16-21 ("I
personally, whenever somebody wanted me to review something, I would get it in my E mailbox
because I just preferred that, so I would always request that to be sent to my E mail. So if, there was
anything related to Facebook or these other issues, it would have been in my E mailbox."); *id.* at
298:6-8 ("Every document that I've ever reviewed that I can -- To the best of my knowledge, was
usually E mailed to me . . ."); Dkt. No. 136 at 4-5 ("Mr. Vachani clearly indicated on several
occasions that his Yahoo account contained the vast majority (if not all) of his work-related emails . .
. . Emails were the preferred method of office communication, and Mr. Vachani knew he was copied
on important matters.").

Respectfully submitted,

   /s/ *Morvarid Metanat*                       /s/ *L. Timothy Fisher*

      Morvarid Metanat                             L. Timothy Fisher

---

expansion, "break even" revenue requirements, and marketing materials (lists of prominent blogs
and outreach programs).



**ORRICK**

Hon. Joseph C. Spero
January 26, 2012
Page 8


    **Filer's Attestation:**  Pursuant to General Order No. 45, §X(B), I attest under penalty of perjury that concurrence in the filing of the document has been obtained from its signatory.

Dated: January 26, 2012                Respectfully submitted,

                                      */s/ Morvarid Metanat*
                                      Morvarid Metanat

Pages 1 - 40

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES WARE

```
FACEBOOK, INC.,                    )
                                   )
            Plaintiff,             )
                                   )
  VS.                              )  No. C 08-5780 JW
                                   )
POWER VENTURES, INC. a Cayman      )
Island Corporation; STEVE VACHANI, )
an individual; DOE 1, d/b/a        )
POWER.COM, DOES 2-25, inclusive,   )
                                   )  San Francisco, California
            Defendants.            )  Monday
_____)  January 23, 2012
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:          ORRICK, HERRINGTON & SUTCLIFFE
                        1020 Marsh Road
                        Menlo Park, California  94025
                   BY:  **I. NEEL CHATTERJEE, ESQUIRE**
                        **MONTE M.F. COOPER, ESQUIRE**
                        **MORVARID METANAT, ESQUIRE**


For Defendants          BURSOR & FISHER, P.A.
Power Ventures          1990 North California Blvd., Suite 940
Steve Vachani:          Walnut Creek, California 94596
                   BY:  **LAWRENCE TIMOTHY FISHER, ESQUIRE**
                        **SARAH NICOLE WESTCOT, ESQUIRE**




Reported By:    *Katherine Powell Sullivan, CSR #5812*
                *Official Reporter - U.S. District Court*

```
 1              P R O C E E D I N G S

 2   JANUARY 23, 2012                           9:25 A.M.

 3

 4           THE CLERK:  Calling case C 08-5780, Facebook versus

 5   Power Ventures.

 6           Counsel, please approach and state your name for the

 7   record.

 8           MR. FISHER:  Good morning, Your Honor.  Timothy

 9   Fisher for Defendants Power Ventures and Steve Vachani.

10           MR. CHATTERJEE:  Good morning, Your Honor.  Neel

11   Chatterjee for Facebook.  With me is Monte Cooper and Morvarid

12   Metanat.

13           THE COURT:  Good morning, all.

14           So these are cross motions.  I didn't look to see who

15   started the fight, but who wants to go first?

16           MR. FISHER:  I will, Your Honor.

17           THE COURT:  Very well.

18           MR. FISHER:  I started it.

19           Your Honor, I'd like to begin by focusing on the

20   e-mails that are at the center of the litigation.  Facebook

21   claims that my client sent 60,000 e-mails as part of the e-mail

22   invitation system that Facebook has.

23           And I'd really like to draw the Court's attention to

24   the e-mail and look at the e-mail.  They only put one e-mail

25   into the record -- a little unusual in a CAN-SPAM Act case, but
```

1    they put one e-mail in excerpted into their brief.  And I'd

2    like to draw the Court's attention to several parts of that

3    e-mail, which I think really go to the heart of the matter.

4         First, if the Court looks -- and I have a copy of the

5    e-mail if Your Honor would like to have it in front of you.

6         **THE COURT:**  I'd like to have the one you're referring

7    to, because I thought that I also had a facsimile or an actual

8    one in the pleadings.

9         **MR. FISHER:**  If Your Honor looks at the "from" line

10   of the e-mail, it says the e-mail is from Facebook.  Then the

11   e-mail address that follows says "eventmaster," and then

12   there's a series of numbers and letters.  And then the e-mail

13   there is Facebookmail.com.

14        Then at the bottom of the e-mail, it says, "Thanks,

15   the Facebook team."  And then below that, "Want to control

16   which e-mails you receive from Facebook?"  And there's a link.

17   And those are all aspects of the e-mail that are controlled by

18   Facebook.

19        Neither Power nor any of the users could change any

20   aspect of this e-mail.  Those are things that they could not

21   have adjusted in any way had they wanted to.

22        And I think it's very difficult to find liability

23   under the CAN-SPAM Act for having false and misleading headers

24   and subject lines when you can't even change them in any way.

25        **THE COURT:**  I'm sorry?  Why does that follow?

```
 1          MR. FISHER:  The CAN-SPAM Act requires that Facebook
 2   prove that there were false and misleading headers and other
 3   information in the e-mail.
 4          THE COURT:  Right.  Is your argument that if the
 5   e-mail is initiated from someone other than Facebook, the fact
 6   that Facebook's name appears in the header cannot serve as a
 7   basis for liability even if Facebook did not initiate the
 8   e-mail?
 9          MR. FISHER:  It seems to me, Your Honor, there
10   shouldn't be liability under the CAN-SPAM Act for including
11   false and misleading headers and information if you don't have
12   any control over that information itself.
13          THE COURT:  What do you mean by "control"?
14          MR. FISHER:  That I couldn't put what supposedly
15   would be the correct information into that e-mail.  How can I
16   possibly comply with the law if I have no control over what
17   goes into the e-mail?
18          THE COURT:  You have control over whether the e-mail
19   is sent.
20          MR. FISHER:  Actually not.  Facebook designed its
21   system so that the e-mails were sent no matter what.  Power nor
22   its users could not stop those e-mails from being sent when
23   they created an event on a Facebook website.
24          THE COURT:  So I'm now coming closer to
25   understanding.  In other words, Power did not create this
```

1  Facebook event, it only did something other than that.  And so
2  by Facebook appearing here, it is appearing based upon no
3  conduct by Power.
4          MR. FISHER:  That is exactly my argument, Your Honor.
5          THE COURT:  So who initiated the e-mail?
6          MR. FISHER:  Facebook initiated the e-mail, Your
7  Honor.
8          THE COURT:  I see.  So Facebook was sending this out?
9          MR. FISHER:  Yes, it came from Facebook's server.
10          THE COURT:  No, Facebook, the company.  Not the
11  server.  The server doesn't do anything unless it's instructed
12  to.  So some individual at Facebook initiated this, is your
13  argument?
14          MR. FISHER:  Well, I don't think there's somebody --
15  I mean, I think hundreds of millions of these kinds of e-mails
16  go out.  Every time somebody creates an event on Facebook,
17  these e-mails go out.  It is an automated --
18          THE COURT:  I understand.  So the someone who created
19  the event was a Facebook employee.
20          MR. FISHER:  The person who created the event was a
21  user of the Facebook system.
22          THE COURT:  So it wasn't a Facebook -- Facebook
23  didn't initiate it, some user initiated.
24          MR. FISHER:  A user would initiate the e-mail.  The
25  e-mail would not go without the user initiating an event.

```
 1              THE COURT:  And Power was not the user.

 2              MR. FISHER:  No, no, Power is not a user.

 3              THE COURT:  Power didn't initiate this event?

 4              MR. FISHER:  That's right.

 5              THE COURT:  All right.  Let me -- to me, that would

 6    be the end of the argument, because the statute requires

 7    initiation.  And your argument is there's no initiation.

 8              MR. FISHER:  That's right.  That's the heart of our

 9    argument.

10              THE COURT:  All right.  So let me interrupt your

11    argument and go to your opponent to respond to that.

12              MR. FISHER:  Sure, Your Honor.

13              MR. CHATTERJEE:  Your Honor, if I may address your

14    questions, I think there's a little bit of confusion in my

15    opposing counsel's argument.

16              You'll notice in page 7, which he gave you as a

17    demonstrative exhibit, the first complete sentence says,

18    "Defendant's PowerScript's software also initiated and sent an

19    additional electronic message to the Facebook user's friends."

20              And they want to and have consistently focused on the

21    e-mail that is sent as a consequence of posting an event on the

22    Facebook system.

23              But on page 6 of our brief, we actually talk in

24    detail about the fact that the PowerScript software, that was

25    created by Power.com, actually created the event and the text
```

1    for the event that was posted on the Facebook system and sent

2    to other Facebook users was actually drafted by Power.

3          And we actually give the direct quote of what is

4    posted on the Facebook event.  It's like a calendar invite on

5    the Facebook system.  That was the first message.  The e-mail

6    message was the consequence of posting that event message.

7          Now, what my opposing counsel wants to do is they

8    want to redefine what "initiate" means under the CAN-SPAM Act.

9    "Initiate," as defined by the statute, includes procurement of

10   messages.  And what Power did was they paid their users -- and

11   we submitted evidence on this from the 30(b)(6) testimony of

12   Mr. Vachani on behalf of Power Friday evening.  We had just

13   recently deposed him so we couldn't submit it earlier.

14         They paid their users in order to gain access to

15   those users' accounts and send Power's commercial e-mail

16   messages to try and recruit people to the Power website.

17         **THE COURT:**  Did you miss a step?  Because, as I

18   understood your opponent's argument, they might have paid the

19   users, but what they paid the users to do was to have the users

20   initiate.

21         So what I heard from you just now was they paid the

22   users for access and Power initiated.  Which is it?

23         **MR. CHATTERJEE:**  It is Power that initiated it, Your

24   Honor.  The declaration --

25         **THE COURT:**  No, no.  I gave you two choices.  So one

1  would be to pay the users to initiate.  The other would be

2  to -- I'm not sure how the pay gets involved in that, but for

3  Power to initiate.  So I was trying to understand which you

4  were arguing.

5       **MR. CHATTERJEE:**  Correct.  Yes, Your Honor.  So I am

6  arguing that Power initiated the message under the statutory

7  definition of the term "initiate."

8       When Power says to their users, we will pay you -- in

9  other words, we will procure your services to send our e-mail

10  message or our commercial message, like a Facebook

11  invitation --

12       **THE COURT:**  So it is the first?  In other words, they

13  procure the services of the user; namely, they pay the users to

14  send -- to create the event and use the Facebook software to

15  send the invite?

16       **MR. CHATTERJEE:**  It's a little more complicated than

17  that, Your Honor.  Power wrote software.  That software would

18  log in to Facebook through a user account.  That software would

19  then send an event invitation.  And this was all done by Power.

20       All Power did with respect to the Facebook user is

21  they said, Can we use your user account to do that?  And we

22  will pay you to send these event invitations.

23       And this is all detailed in the declaration of the

24  Larry Melling, who analyzed the source code, the only evidence

25  in this case about how that software works.

```
1              But Power is the entity that caused the event
2    invitations to be sent through Facebook user accounts.  And
3    they paid their users for the right to send those event
4    invitations.
5              THE COURT:  Now, let me pause.
6              Is there anything that Mr. Chatterjee just said to
7    which you would say that's incorrect?
8              MR. FISHER:  Yes, I would say --
9              THE COURT:  What exactly?
10             MR. FISHER:  -- the procurement theory, Your Honor,
11   is a complete red herring.
12             THE COURT:  No, no.  What did he say that's
13   incorrect?
14             MR. FISHER:  I'm sorry, I couldn't -- I was focused
15   on his argument about procuring the --
16             THE COURT:  What did he say that was incorrect?  What
17   fact did he say that was -- I'm trying to get to how --
18             MR. FISHER:  That Power initiated these e-mails is
19   certainly --
20             THE COURT:  That was his conclusion.  What fact -- I
21   was told that Power wrote the software.  That was a fact.
22   That's something --
23             MR. FISHER:  Power created a browser through which
24   one could access the Facebook website.
25             THE COURT:  Did it write software, yes or no?
```

```
 1              MR. FISHER:  Absolutely.
 2              THE COURT:  All right.  And did the software allow
 3    them to log in through the user account?
 4              MR. FISHER:  Through a Facebook user account, yes.
 5    It allowed users to access the Facebook website.
 6              THE COURT:  All right.  And then using that software,
 7    did Power send an event --
 8              MR. FISHER:  No.
 9              THE COURT:  -- invitation?  All right.
10              So what about that is incorrect?
11              MR. FISHER:  Power would send -- Power users would
12    send the event invitation.
13              THE COURT:  So what does that mean factually, that
14    the Power users would send?
15              In other words, individual users would log on to
16    their computer and create the event, or was there some
17    automated process by which the software that was created would
18    mimic the user doing it and it would be sent?
19              Was this a series of people doing it or something
20    that was set up through the computer?
21              MR. FISHER:  Each individual user had to authorize
22    the creation of an event.  And there was code in the software
23    that allowed the user to click some buttons and to create an
24    event.
25              THE COURT:  All right.
```

1    **MR. FISHER:**  But it was all done with the permission

2  of the user.

3         **THE COURT:**  Let me go back over here.  So do you

4  disagree with that, that the way it operate factually is that

5  Power created the software, but each individual user had to go

6  into the system to create individual events?

7         **MR. CHATTERJEE:**  No, that's not true, Your Honor.

8         **THE COURT:**  Okay.

9         **MR. CHATTERJEE:**  And there's no evidence, absolutely

10  none, that they submitted that said that.

11         **THE COURT:**  All right.  So how do I decide a motion

12  for summary judgment?  I thought these were cross motions to

13  which there was no disagreement over the facts.  So I'm trying

14  to figure out how it operates.

15         **MR. FISHER:**  Your Honor --

16         **MR. CHATTERJEE:**  Your Honor, it's very simple.  In

17  the evidence we submitted Friday, Mr. Vachani, in the 30(b)(6)

18  deposition, said the software is the best evidence of how the

19  system work.

20         Larry Melling, who is our expert, came in and put

21  forward affirmative evidence describing how that software

22  worked, going line by line through the sub routines on that

23  code that described how Power did it in the exact way I

24  described it to you.  The evidence is unrefuted, so there is no

25  issue of fact.

```
 1          They can come in here now and say they disagree with
 2   that, but there is no evidence, none, that says the software
 3   operated any differently than the way Mr. Melling articulated.
 4          THE COURT:  All right.  Let me pause.  So what would
 5   be the fact that would contradict that?
 6          MR. FISHER:  The fact -- there is not a fact that
 7   contradicts that.  I think we're in agreement about how it
 8   works.  There's no dispute that there was a process by which
 9   Power users could create these events.  But they were done with
10   the explicit permission of the Power users.  It could not be
11   done without the Power users authorizing.
12          Your Honor, we included in our brief screen shots
13   that showed exactly how the system worked.  And I think if the
14   Court looks at those, it's very basic and very simple --
15          THE COURT:  Why doesn't Power show up at all in the
16   event e-mail?
17          MR. FISHER:  I think Power does, Your Honor.
18          THE COURT:  Where?
19          MR. FISHER:  It says the host is Power.
20          THE COURT:  Where?
21          MR. FISHER:  Right in the middle of the e-mail, it
22   says, Host:  Power.
23          THE COURT:  Oh.  So that is supposed to be Power.com?
24          MR. FISHER:  Yes, I believe so, Your Honor.
25          THE COURT:  That's the only reference to Power in
```

1    this?

2         **MR. FISHER:**  Yes.  I believe if you click on the --

3         **THE COURT:**  So they are hosting the reunion, they're

4    not hosting the e-mail.

5         **MR. FISHER:**  I don't know if they -- yes.  I mean, I

6    think, Your Honor, if a user was to click on the link down

7    below the information about the event, that would lead you to

8    more information about Power.  I don't know.  And that's not in

9    evidence, Your Honor, but that's my speculation.

10        **THE COURT:**  So why does it -- why is Facebook on this

11   at all?

12        **MR. FISHER:**  I have no earthly idea, is the answer to

13   that, Your Honor.

14        **THE COURT:**  Say again?

15        **MR. FISHER:**  I have no earthly idea why Facebook

16   cares about this.

17        **THE COURT:**  No, no, no, I didn't ask you why they

18   care about it.  Why does Facebook appear in the event?

19        Why isn't this a Power event where Power is

20   soliciting its users?  Because you said these are Power users.

21   So these are Power users, also who are Facebook users, sending

22   out an event that is to the benefit of Power, correct?

23        **MR. FISHER:**  That's correct, Your Honor.

24        **THE COURT:**  All right.  So why does Facebook appear

25   in it at all?

1    **MR. FISHER:**  The answer to that is because that's how

2    Facebook designed the system.  Facebook created this system by

3    which e-mails go out, and they designed it down to the -- every

4    aspect of that was created by Facebook, not Power.

5         **THE COURT:**  The alternative would be for Power to

6    create its own e-mail list and send it directly, correct?

7         **MR. FISHER:**  They could have done that.

8         **THE COURT:**  All right.  So what it chooses to do is

9    to use the Facebook system for its benefit.  Power chooses to

10   use the Facebook system for its benefit.

11        **MR. FISHER:**  There was no way for Power to create its

12   own e-mail invitations within the Facebook --

13        **THE COURT:**  Why not?  You had the users, and the

14   users had the e-mail addresses of their friends.  Why couldn't

15   they simply list those?

16        **MR. FISHER:**  Because Facebook is a closed system that

17   doesn't allow its users to use its system in that manner.

18        **THE COURT:**  I didn't say use its system.  You want to

19   get to the e-mail address of the friends.  The users know their

20   friends.  They know their e-mail address.  Why can't they

21   simply give them to Power?

22        **MR. FISHER:**  They could have done that.  They didn't

23   do that, Your Honor.

24        **THE COURT:**  No --

25        **MR. FISHER:**  Facebook has a system that is created

```
 1   for creating events, and it's a very simple process by which
 2   one, with a few clicks on a keyboard, could send out these
 3   kinds of invitations.  It's very common.  And hundreds of
 4   millions of these are sent every day, whether it's somebody
 5   who's having a party or somebody who has a business function
 6   that is at issue.
 7              Facebook is obviously so ubiquitous --
 8         THE COURT:  All right.  Let me have you go back to
 9   your argument.  I appreciate that I know almost enough about
10   the facts.  I did not hear you say that I could not rely on
11   this expert declaration as an explanation of how the system
12   operates.
13              And the question that it sounds like you need to
14   argue to the Court is, if it operates like that, does it
15   violate the statutes that are at issue here.
16         MR. FISHER:  Sure, and I'm happy to address that,
17   Your Honor.
18         MR. CHATTERJEE:  And, Your Honor, just to make sure
19   I've pointed you in the right direction, the Melling
20   declaration, paragraphs 3 and 17 to 35, describe in detail how
21   the event invitations work.
22         THE COURT:  All right.  So let's assume that -- and I
23   presume you are familiar with that declaration.  And so in
24   order to make this a purposeful argument under the standard for
25   summary judgment, I need to now go to statutory interpretation,
```

1    which is a matter of law.

2         And assuming that you agree with paragraphs 3 and 17

3    to 35, why doesn't that violate the federal and state laws that

4    are at issue here?

5         **MR. FISHER:**  Because, first of all, Power didn't do

6    anything.  It was Power users who did something and authorized

7    the e-mails to be sent.  And really -- really, there are two

8    steps here, Your Honor.

9         First, there's the creation of an event.  And I don't

10   think the creation of an event even falls with the CAN-SPAM

11   Act.  The e-mail is a separate part, and that's done completely

12   by Facebook.

13        And they have no control whatsoever what goes into

14   many aspects of this e-mail.  The return address, the name on

15   it, the signature line, the opt-out information at the bottom

16   of the e-mail; they have no control over it that.

17        And I don't think under CAN-SPAM -- they haven't

18   cited a single case under similar facts where a defendant has

19   been found liable under the CAN-SPAM Act.

20        Furthermore, Your Honor, there has been no showing

21   that anyone who got these e-mails was deceived or misled or

22   complained or was in any way harmed by receiving these e-mails.

23   They haven't put into evidence anything that shows that

24   somebody said, hey, Facebook, stop sending me these e-mails.

25        **THE COURT:**  Well, I don't know that the statute

1    requires that.  In other words, you would argue that the

2    statute, by the language of the statute, requires actual belief

3    or some mental state on the part of the people who receive it.

4    I don't see that.

5         **MR. FISHER:**  No, but I think, Your Honor, that goes

6    to the point that it's telling that -- the fact that nobody

7    complained shows that people get these things all the time and

8    they know they're coming from Facebook and they're part of the

9    Facebook system.

10        **THE COURT:**  I invited you to focus on the statute.

11   If you tell me, Your Honor, the statute is important, that the

12   CAN-SPAM Act doesn't apply if it's a ubiquitous thing.  I don't

13   see that language, so that's why I'm inviting you to go to --

14   in other words, I see "initiate."

15        I see something where there's something called header

16   information as the source, destination, routing information.

17        Tell me that the source, destination and routing

18   information is not inaccurate in any way.  That's what I want

19   to hear.  I want to hear you argue to the language of the

20   statute and based upon the facts as set forth in the

21   declaration.

22        **MR. FISHER:**  I don't think there's a disagreement

23   about what the statute says, Your Honor.  I think the

24   disagreement here is on a couple things.  I don't think there's

25   any inaccuracy in these -- in the header information.  And

1    there's nothing wrong with what is in the header information,

2    and there's no violation therefore.

3              THE COURT:  What's the source?

4              MR. FISHER:  The source?

5              THE COURT:  What does that mean, the source?

6              MR. FISHER:  The source of the e-mail?

7              THE COURT:  The source as identified in the header

8    information.

9              MR. FISHER:  The source is the Facebook server.  The

10   source is Facebook.

11             THE COURT:  And so if anyone were to send something

12   through the Facebook server, the Facebook server becomes the

13   source as opposed to the person who initiates it.  The source

14   is always defined as the Internet service provider, the server,

15   the Internet service provider.  That's what I should say as a

16   matter of law.

17             MR. FISHER:  It's common sense, I think, Your Honor.

18             THE COURT:  No.  Just say yes, if that's what your

19   argument is.

20             MR. FISHER:  Yes.

21             THE COURT:  Because I'm going to tie you to arguments

22   of proposition.  Because if this is a motion for summary

23   judgment, the people who grade my papers are going to be

24   looking to see that I'm basing it on no dispute about facts but

25   only questions of law.

```
 1              And if you tell me that, under the statute, the
 2    source means the server, that's what I'll write down.  That's
 3    as your position.
 4              MR. FISHER:  That's my position, Your Honor.
 5              THE COURT:  All right.  And...
 6              MR. FISHER:  Or, more generally, the source is
 7    Facebook.
 8              THE COURT:  And then the Act further provides that
 9    the header information shall be considered materially
10    misleading if it fails to identify accurately a protected
11    computer used to initiate the message.
12              MR. FISHER:  And that really goes to the argument I
13    made earlier, Your Honor, that nobody was misled.  How can it
14    be materially misleading if nobody complained, nobody said,
15    Hey, Facebook, stop sending me this.  There's no evidence of
16    that.
17              THE COURT:  Well, it says "fails to identify the
18    protected computer used to initiate the message."
19              What protected computer was correctly identified as
20    used to initiate the message?
21              MR. FISHER:  Facebook's computer sent a message,
22    Facebook's server.
23              THE COURT:  Used to initiate the message.
24              MR. FISHER:  Yes.
25              THE COURT:  All right.  And so, again, the language
```

1    "used to initiate the message" always means the server of the

2    Internet service provider.

3            **MR. FISHER:**  Yes.

4            **THE COURT:**  All right.

5            **MR. FISHER:**  The other thing the statute requires,

6    Your Honor, is harm.  And there is no evidence whatsoever of

7    any harm to Facebook under either the CAN-SPAM Act or the two

8    other statutes, the Computer Fraud and Abuse Act or Penal Code

9    Section 502, that they also assert in their complaint.

10           The only evidence that Facebook has put in of harm is

11   two declarations.

12           **THE COURT:**  So you've gone to harm.  I'm still on the

13   definition of "initiate."

14           So then the other part is, under the statute, "would

15   impair the ability of an Internet service provider or a

16   recipient to identify, locate or respond to a person who

17   initiated the message."

18           So respond to the person who initiated, who would

19   that be under your argument?

20           **MR. FISHER:**  Doesn't the last line of the e-mail,

21   "Want to control which e-mails you receive from Facebook?" go

22   directly to that, Your Honor?

23           **THE COURT:**  I don't want to answer the questions.  I

24   want you to answer my question.

25           Who would you argue is the individual that is

```
 1    referred to as "respond to a person who initiated the

 2    electronic mail"?  Who is that referring to under the statutory

 3    language?

 4              MR. FISHER:  You would respond to Facebook.

 5              THE COURT:  Well, I need a more general -- all other

 6    cases Facebook might not be in it.  I'm trying to ask you a

 7    statutory interpretation question.

 8              Is that again to the server?

 9              MR. FISHER:  Yes.

10              THE COURT:  Of the Internet service provider?

11              MR. FISHER:  Yes.

12              THE COURT:  All right.

13              MR. FISHER:  Is it all right if I move on to harm,

14    Your Honor?

15              THE COURT:  Well, I was going to go to the California

16    Penal Code, also involved here.

17              MR. FISHER:  My arguments on harm tie into both the

18    other statutes as well.

19              THE COURT:  And what's your position with respect to

20    California Penal Code Section 502?

21              MR. FISHER:  502 and the Computer Fraud and Abuse Act

22    are similar in terms of their scope and what they cover.  They

23    both require some showing that there was some sort of taking of

24    information from an unauthorized access.

25              We've already talked at some length that there was no
```

1 unauthorized access here.  Any access was done with the

2 permission of Power users who expressly provided their log-in

3 credentials.

4          In addition, there's no evidence of any sort of

5 taking at all.  The only information that Power ever took from

6 Facebook was information that did not belong to Facebook.  It

7 was Power users' personal information, their pictures, their

8 music, their contacts, things like that that users said they

9 could take.  There's no evidence whatsoever of anything having

10 been taken from Facebook.  No software --

11          **THE COURT:**  Well, the software that was created, why

12 was it necessary?

13          **MR. FISHER:**  Why was the software that was created

14 necessary?

15          **THE COURT:**  Why was the Power software necessary?

16          **MR. FISHER:**  The Power software was designed to allow

17 users who have multiple social networking accounts to look at

18 them all in one place.

19          So if a user had an account with Orchid, which is

20 Google's social networking system, as well as a Facebook

21 account and a Twitter account and all these other ones, they

22 could go to Power and they could access those accounts all in

23 one place and then share information between the various sites

24 all in one place.  That was what --

25          **THE COURT:**  All right.  But was there any feature of

*Katherine Powell Sullivan, CSR, RPR, CRR*
*Official Reporter - U.S. District Court*
*(415) 794-6659*

SER 228

```
 1   the software that was necessary to circumvent protections that

 2   Facebook built against that?

 3           MR. FISHER:  Was there -- I'm sorry, Your Honor.

 4   Would you rephrase that for me?  I didn't understand.

 5           THE COURT:  Was there any aspect of the Power

 6   software that was created to circumvent protections built into

 7   the Facebook system to avoid that very process?

 8           MR. FISHER:  Power's software had built into it the

 9   capacity to switch from one IP address to another one if an IP

10   address were --

11           THE COURT:  My question called for a yes or no

12   answer.  Was there any aspect of the Power software that was

13   designed to circumvent Facebook's software or its system to

14   avoid this process that you're describing that Power created,

15   yes or no?

16           MR. FISHER:  No, Your Honor.

17           THE COURT:  No.  So there was no -- there was no

18   aspect of this that was circumventing technical or barriers

19   that were built into the code by Facebook, yes?

20           MR. FISHER:  It had the -- yes, Your Honor.  It had

21   the ability to switch from one IP address to another, but that

22   is not -- there's not evidence that that is -- that the purpose

23   was to --

24           THE COURT:  I didn't ask the purpose.  I asked

25   whether it circumvented.
```

```
 1        MR. FISHER:  No, it was not designed to circumvent.

 2        THE COURT:  Did it circumvent?

 3        MR. FISHER:  As defined by this Court, I don't

 4   believe so, no.

 5        THE COURT:  So I've got to take your belief?

 6        MR. FISHER:  No, Your Honor.

 7        THE COURT:  So how do I learn whether or not --

 8   what's the test for whether it circumvented?

 9        MR. FISHER:  Your Honor looked at this issue at some

10   length in 2010, in connection with earlier motions that were

11   brought by the parties.

12        THE COURT:  So I can use that same process.

13        MR. FISHER:  Yes, I think you would use exactly the

14   same process.  And I think when Your Honor talked about

15   circumventing in the -- I believe it was July 2010 order, Your

16   Honor talked about circumventing in, okay, Facebook, if you

17   attempted to block Power and then they did something to get

18   around your block, okay, that can be a violation of the CFAA or

19   502.  I think that's what Your Honor intended by that.

20        THE COURT:  I wanted more information at that point.

21        MR. FISHER:  Yeah.  And at that time Facebook's

22   argument was that we're going to show you, Your Honor, that we

23   put up an IP block and then Power did something to get around

24   that.

25             They've now abandoned that theory, and now their
```

```
 1  theory is, well, when Power was designing its software,
 2  whenever that was -- 2006, 2007 -- that at that time they built
 3  into their software something that could get around some sort
 4  of hypothetical IP blocking that came up at some future time,
 5  some technical barrier that they had not even yet encountered.
 6  That's their argument now.
 7           THE COURT:  Maybe you're being adversarial in this.
 8  I understood that there were built into this Power software
 9  some switching of the IP address so that any attempt that could
10  be made to stop massive kinds of e-mails coming through
11  Facebook would be circumvented.
12           Maybe I'm not accurately describing it, but that's
13  what I'm trying to get you to speak to.
14           MR. FISHER:  It's -- the software had that ability to
15  switch IP addresses.
16           THE COURT:  Isn't that designed to circumvent?
17           MR. FISHER:  That is not a design to -- I don't think
18  there's any evidence that that was designed to circumvent.
19           THE COURT:  Does it circumvent?
20           MR. FISHER:  Just as we -- you know, your Honor, I
21  think that's a very common feature of software, so that if you
22  go to a website and it doesn't connect, the website is able to
23  switch over to another IP so that you're still able to connect.
24  I think that's something we all encounter every day when we use
25  software.
```

```
 1            THE COURT:  How about if you're trying to block?

 2            MR. FISHER:  How could Power have known in advance

 3   that Facebook was going to attempt to block it and what

 4   mechanism they would use?

 5            THE COURT:  Maybe these are rhetorical questions, but

 6   I don't intend to answer that.

 7            I'm trying to get your position as to whether or not

 8   that formed circumvention if you switched IP addresses in order

 9   to avoid blocking a particular one.

10            MR. FISHER:  It certainly had the effect of getting

11   around the block, but the block was very weak.

12            And I don't think Your Honor wants to create a system

13   where someone who's writing a piece of software and then five

14   years later somebody tries to block the use of that software

15   and suddenly that becomes criminal liability under the Computer

16   Fraud and Abuse Act.

17            In the amicus brief submitted by the Electronic

18   Frontier Foundation, they talked about that sort of creating a

19   thought crime, that they talked about it as a way in which

20   somebody who's, you know, in their office right now writing a

21   piece of software has to anticipate what blocks are going to be

22   used and then worry about whether or not they're going to

23   someday be held liable under this statute even though they have

24   no idea how that software is going to be used or what kind of

25   blocks a company could use.  There is no way a person could
```

1  know that.  And to impose liability for that just seems

2  inconsistent with the Act.

3       And the Electronic Frontier Foundation has very

4  persuasive arguments on that point, and I'd ask Your Honor to

5  look at those.

6       On the harm issue, Your Honor, the evidence of harm

7  that's been put in by Facebook consists of two declarations.

8  One by somebody on the Facebook security team named Ryan

9  McGeehan.  And he talks about that what Power and its users did

10 created security vulnerabilities in the Facebook system, and he

11 talks about that their actions harmed -- potentially harmed

12 Facebook's goodwill.  I think that's all very vague and

13 unquantifiable and not very specific.

14      And the extent of what Mr. McGeehan says that he and

15 his team did was they had some meetings.  And I don't think

16 those harms are sufficient for a finding of liability or a

17 recovery of any sort of damages under the CAN-SPAM Act, under

18 the CFAA, or under Penal Code Section 502.  And certainly not

19 the $18 million that Facebook seeks under the CAN-SPAM Act.

20      The other harm identified by Facebook is it seeks to

21 recover its lawyer fees.  Its lawyer, Joseph Cutler, wrote a

22 cease-and-desist letter to Power and then initiated this

23 lawsuit.  And they now seek to recover those fees as part of

24 this lawsuit.

25      And, again, I think that's inconsistent with the

```
 1  language of the CAN-SPAM Act and the case law that's
 2  interpreted the Act, which talks about the ability to recover
 3  under the Act for operational and technical costs that were
 4  incurred as a result of the violation of the statute.
 5          They haven't cited a case under the CAN-SPAM Act
 6  where there is any sort of recovery of attorneys' fees for a
 7  violation of the Act.
 8          The CFAA and 502 are broader in their language about
 9  what can be recovered -- I see I have a red light.  May I
10  continue, Your Honor?
11          THE COURT:  Finish your statement there.
12          MR. FISHER:  Sure.  The CFAA and 502 are broader in
13  their language regarding the costs that can be recovered, but
14  if you look at the legislative history -- and, again, the
15  Electronic Frontier Foundation's brief looked at it carefully
16  and showed, really, again, the purpose of those statutes is to
17  recover for things like repair costs, restoring data,
18  reprogramming a computer, lost computer time, those sorts of
19  things.  There's not really any sort of mechanism for
20  recovering attorneys' fees under that statute.
21          And it also allows a plaintiff to sort of manufacture
22  standing under the statute because it's very easy to run up
23  $5,000 in attorney time and a plaintiff who didn't like
24  somebody's access could simply hire a lawyer and in a few hours
25  they would have standing to assert a claim under the statute.
```

```
 1            Thank you, Your Honor.
 2       THE COURT:  Thank you, Counsel.
 3            So although we have an earlier colloquy, I give to
 4  you the same responsibility.  Assuming that what is described
 5  in the declaration you refer to, I can take that as undisputed
 6  facts.  What brings that conduct within the various statutes?
 7       MR. CHATTERJEE:  Well, Your Honor, Mr. Melling's
 8  declaration does actually say that it was Power that initiated
 9  these commercial messages.
10       THE COURT:  Those are his conclusions.  The facts are
11  not his conclusion.  The facts are what actually happened.  And
12  so I'll have to separate out the conclusion from the factual
13  description of what took place.
14       MR. CHATTERJEE:  Understood, Your Honor.
15            So, Your Honor, you asked some very pointed questions
16  on the CAN-SPAM Act about who is the initiator.  And the way I
17  like to think about the "who is the initiator" question is if I
18  wanted to ask someone to stop sending me this particular form
19  of commercial message, could I do that?
20            In this case, Power was paying users to send
21  commercial messages.  Just as Your Honor asked, they were not
22  doing it on their own behalf.  Instead, they were hiding behind
23  the users to send these messages.
24            When another user received those messages, there was
25  no way for them to know -- and Your Honor actually asked
```

specific questions about those e-mail messages.  And you can
also look at the event invitations.  There was no way to know
that it originated with Power.

So if a user said, look, I don't want to see anymore
Power messages, they would have no way to know who to contact
to say, please, stop doing that.

**THE COURT:**  Well, you're using "user" in both ways.
So if a recipient wanted to --

**MR. CHATTERJEE:**  Let's use "sender" and "recipient."
That's a better way to refer to it, Your Honor.

So if a recipient of a message that was originated
from the Power website, using the Power technology, wanted to
tell Power to stop, they could not do that.

**THE COURT:**  Who is the statute designed to protect?

**MR. CHATTERJEE:**  The statute is defined to protect
both Internet services that could be misused in the way Power
misused the Facebook website as well as the recipient of the
e-mail messages.

But the standing that's conferred is specifically on
the ISPs to incentivize them to protect themselves, because it
requires that adversely affected language for the ISPs.  But it
is designed to prevent misuse of systems such as Facebook in
the way that Power did it.

**THE COURT:**  So if the ISP is the intended beneficiary
of the statute -- I understand that senders and recipients will

1    be affected, but the only standing here is given to the ISP.

2            **MR. CHATTERJEE:**  Correct, Your Honor.

3            **THE COURT:**  All right.  So if the ISP creates a

4    system of hosting events and allows users to use the system to

5    host those events, what is to prevent a user from being paid to

6    host an event?

7            **MR. CHATTERJEE:**  Your Honor, it's because the

8    statute, the CAN-SPAM statute -- there's two creatures.  One is

9    the terms of service which governs the relationship between a

10   website and its users.  But there's also the statute itself

11   under CAN-SPAM.  And if I may, I'll read you the definition of

12   "initiate."

13           **THE COURT:**  All right.

14           **MR. CHATTERJEE:**  So what the definition of "initiate"

15   says is, the term "initiate," when used with respect to

16   commercial electronic mail message, means to originate or

17   transmit such message, or to procure the origination or

18   transmission of such message.  That's the definition.

19           And what -- what Power did here is they paid their

20   users.  They procured the origination of the message from their

21   users.

22           **THE COURT:**  So it's really the latter part that I

23   should focus on.  In other words, my question was:  What is to

24   prevent a user from being paid to initiate these invites?  And

25   you believe that language does that?

1    **MR. CHATTERJEE:**  That language requires that if
2  you're going to pay the users to send a commercial e-mail
3  message for you, you have to identify that you're the actual
4  sender of the message.  So with respect to the event --
5    **THE COURT:**  Not the actual sender, you're the
6  procurer.  I guess it mixes both things.  In other words, if
7  there are two standards, sending and procuring someone else to
8  send, what does the statute say if you're using the latter
9  portion?
10    **MR. CHATTERJEE:**  That's right, Your Honor.  So under
11 the statute both the sender and the procurer are the initiators
12 of a commercial message.
13    **THE COURT:**  I thought it was "or."
14    **MR. CHATTERJEE:**  It is.  It is "or."
15    **THE COURT:**  So if you're in an "or" situation where
16 you've got just the person who's procuring someone else to send
17 it, what does the statute provide with respect to
18 identification?
19    **MR. CHATTERJEE:**  So what the statute provides is that
20 the -- the message that is sent has to identify who is the
21 procurer.  So in this case, if an event invitation --
22    **THE COURT:**  That literal language isn't there.
23 That's something you'd ask me to interpret from the statute.
24    **MR. CHATTERJEE:**  It is the way that the FTC has
25 interpreted the statute.  It is the way that the courts have

SER 238

1   interpreted the statute.  And my reading of the statute, that's

2   what's required, Your Honor.

3           **THE COURT:**  All right.

4           **MR. CHATTERJEE:**  Because, otherwise, the statute

5   would have no teeth.  If a noncommercial entity could be bought

6   off to send a message, you would never be able to go to the

7   source of the problem and stop the message.

8           The whole point here is to be able to go to the

9   source of the commercial e-mail messages and get them to stop,

10  either from the ISP side, or if a user received an unsolicited

11  message, they need to be able to contact the originator.

12          **THE COURT:**  Well, your opponent points to the word

13  "Power" under host as the way you would know who was doing

14  this.  Why isn't that sufficient?

15          **MR. CHATTERJEE:**  Because it doesn't even identify a

16  website in the e-mail.  It just says Power.  If I received an

17  e-mail invitation and all it said was Power, I'd have no idea

18  who that was, where it was, whether that was the source or not.

19  It has no indication as to what that is.  It just uses the

20  naked word "Power."  It doesn't even say Power.com.

21          The key issue when you're talking about these

22  commercial e-mail messages is to be able to know who the source

23  of the message is, the person that's actually causing it to be

24  sent, and that includes the person procuring the message, and

25  to tell them to stop.

1       This e-mail message, as well as the event invitation

2 that's posted on the Facebook system, gave no indication as to

3 who the source of the message was, Power.com.

4     **THE COURT:** So here's the -- here's the other aspect

5 of this that concerns the Court, and that is, this is not

6 unconnected to the users. This is an attempt by one commercial

7 company to compete with another by inviting the users to use

8 the resources of their many websites, their many social

9 networking sites, to its advantage.

10     And it, therefore, is very different from Power

11 somehow sending directly to various users of Facebook and

12 MySpace or others -- I don't know quite the number that would

13 be involved here -- because, using the intermediary of a user,

14 you at least then don't have a uncontrollable audience that

15 you're sending it to.

16     You're actually only sending it to people who the

17 user decides, I would like to have my friends receive the

18 benefit of this because I'm receiving a benefit, a hundred

19 bucks if I can win the time and number of contests. But that

20 removes it from other circumstances where it's totally

21 unconnected with the user. Address that concern.

22     **MR. CHATTERJEE:** Your Honor, actually that specific

23 type of issue has been addressed in case law as well. And it's

24 actually considered a worse issue because it falsely puts a

25 stamp of approval that it's the user sending it, not Power.

1    It creates a misleading impression on the part of

2 users because it doesn't say that the user is being paid to

3 send these.  Instead, it kind of creates a degree of

4 association that otherwise wouldn't exist.

5    **THE COURT:**  Well, are they being paid or are they in

6 a contest?

7    **MR. CHATTERJEE:**  They are being paid.  If they -- if

8 they get a hundred users --

9    **THE COURT:**  That makes it a contest, doesn't it?

10   **MR. CHATTERJEE:**  Your Honor, if you look at the FTC

11 analysis of the CAN-SPAM Act, it's not a contest in the sense

12 that if people bring a hundred users, they get a hundred

13 dollars.

14   Even Mr. Vachani, in his 30(b)(6) deposition, which

15 we submitted on Friday, he said they were paying users to get

16 access to their user account and send these invitations.  You

17 cannot say that that is anything other than procurement.

18   They are procuring the users by -- they're procuring

19 new members on Power by paying existing Power users to get

20 access to the Facebook account.  That is -- that is exactly

21 what the statute says.  That's how -- that's how it has been

22 interpreted by the FTC.  That is how the case laws interpret

23 it.

24   And it gets aggravated by the fact that they created

25 a false degree of association by using the users.  It is true

1    that there are other CAN-SPAM cases that you just have a

2    general, broadcast-based e-mail to everyone in the world.  But

3    that does not change the nature of what the statute requires

4    and what creates a cause of action under the statute.

5            **THE COURT:**  How about the harm?

6            **MR. CHATTERJEE:**  Your Honor, as to the harm, they

7    admitted a number of things in their answer, including -- and

8    Your Honor found on our previous motion that we had put forward

9    the requisite amount of harm just by nature of their

10   admissions.

11           But we did put in additional evidence from Ryan

12   McGeehan that shows that we were adversely affected, as well as

13   the deposition of Joe Cutler, who is one of the lawyers that

14   was originally investigating Power's activities.

15           **THE COURT:**  It adversely affected the measure of

16   harm?

17           **MR. CHATTERJEE:**  So it's different, Your Honor, for

18   the CAN-SPAM Act than it is for 502C and 1030.  Fundamentally,

19   I think the underlying facts are the same, but the way the

20   statutes read are slightly different.

21           Adversely affected -- and the *Gordon vs. Ruchu Mundo*

22   case, goes in detail about what that means under the CAN-SPAM

23   Act, but, basically, if we are engaging in substantial efforts

24   to combat spam, or unsolicited commercial messages, we have to

25   engage in investigatory efforts to stop this sort of activity.

1    That is enough to constitute adversely affected.

2            I think that the facts underlying that and harm, for

3    502C and CFAA are fundamentally the same.  The statutes are

4    not -- are worded slightly differently, but the underlying

5    analysis doesn't change a whole lot.

6            **THE COURT:**  All right.  A final question for you.  I

7    see your time is coming to an end.  And I'll actually ask your

8    opponent the same question.

9            This feels to me as though, even if I were to be

10   persuaded to find on liability, I cannot find by way of summary

11   adjudication damages.

12           So if I were to find in your favor, what would be

13   undisputed evidence about whether I can come to a determination

14   of damages?

15           **MR. CHATTERJEE:**  So, Your Honor, on the damages

16   question under the CAN-SPAM Act, we have put in unrefuted

17   evidence as to the number of event invitations that were sent

18   through the Facebook system.  It was 60,000, a certain several

19   hundred beyond that.

20           The declaration of Larry Melling once again -- and

21   I'll keep pointing you back to that because they haven't

22   refuted it -- pointed to specific sub routines and databases

23   where -- the logging data of how many event invitations were

24   sent through the Power system.

25           During this litigation, the other side has destroyed

1   the database that would connect that information.  And so the

2   evidence we have right now is 60,100-something.  I forget the

3   exact number of hundreds.

4           What we ask Your Honor to do is, under the CAN-SPAM

5   Act, to just apply the statutory maximum and the aggravating

6   numbers because that is the only evidence there is.  They

7   destroyed the rest.  And so we know that there's more.  We

8   believe there's more.  But they destroyed that evidence.

9           As to the damages under the -- under the 502C and

10  1030 causes of action, Your Honor, if you're going to make a

11  finding of liability, that may or may not be necessary for

12  damages, because, quite honestly, if we get $18 million under

13  the CAN-SPAM Act, my guess is we may never try the issue of

14  damages on the -- on the 502C and 1030 claims.  The damage

15  numbers there are considerably smaller.

16          **THE COURT:**  All right.

17          **MR. CHATTERJEE:**  If I can just add one final thing --

18          **THE COURT:**  Yes.

19          **MR. CHATTERJEE:**  -- to address going back to the

20  Larry Melling declaration, you had a colloquy about the

21  circumvention measures.  There is an exhibit, Exhibit 3 to my

22  declaration, where Mr. Vachani is asked specifically about the

23  blocking measures and their efforts to circumvent.

24          And he was asked, Did you actually circumvent

25  Facebook blocks?  Generally.

```
 1              Here's what he said:
 2              "It means that it is very difficult to block
 3              up.  Facebook took what should have been a
 4              standard measure, but we were able to easily
 5              adjust and could have continued."
 6              He admitted that he circumvented in reaction to the
 7    Facebook measures, but we also know that he made a premeditated
 8    act.  The documents that we submitted show the reason that this
 9    proxy-rotating technology was developed was to evade detection
10    and to avoid blocks.
11              And Mr. Melling's declaration describes in detail how
12    the system was engineered from the very beginning to do that,
13    because they knew that Facebook and other websites wouldn't
14    want to give them access.  They knew that the terms of service
15    forbade it.  And they knew after Facebook sent a
16    cease-and-desist letter that Facebook was going to block them.
17    And so they preengineered a proxy rotation strategy.
18              Mr. Fisher can come in here and say, well, in the
19    abstract, you know, people might pre-engineer something and it
20    might have some pernicious consequences.  That is not what the
21    facts show here, Your Honor.
22              THE COURT:  Very well.  I have that in mind.  Thank
23    you very much, Mr. Chatterjee.
24              MR. CHATTERJEE:  Thank you, Your Honor.
25              THE COURT:  So the question I put at the end there
```

```
 1   that I would have you respond to is whether I shouldn't treat
 2   these as cross motions for summary judgment on liability only.
 3           Even if I find liability one way or the other here,
 4   don't I need a trial on damages?
 5           MR. FISHER:  No, Your Honor, because I think we put
 6   the evidence in, there's no harm.  Facebook hasn't been harmed
 7   in any way.  And the Court doesn't -- the Court can decide
 8   this.
 9           THE COURT:  Okay.
10           MR. FISHER:  There's no harm.
11           THE COURT:  Well, sounds like both sides are saying I
12   don't need a trial on damages, so I'll take your word for it.
13           Thank you very much.  The matter is submitted.
14           MR. FISHER:  Thank you, Your Honor.
15           MR. CHATTERJEE:  Thank you.
16           (At 10:16 a.m. the proceedings were adjourned.)
17                      -  -  -  -
18           **CERTIFICATE OF REPORTER**
19       I certify that the foregoing is a correct transcript
20   from the record of proceedings in the above-entitled matter.
21   DATE:   Friday, January 27, 2012
22               s/b Katherine Powell Sullivan
23       _____
24       Katherine Powell Sullivan, CSR #5812, RPR, CRR
              U.S. Court Reporter
25
```

*Katherine Powell Sullivan, CSR, RPR, CRR*
*Official Reporter - U.S. District Court*
*(415) 794-6659*

# EXHIBIT 2

| From: | Steven Vachani |
|---|---|
| To: | Steven Vachani |
| Subject: | discussion with abi |
| Date: | Monday, July 18, 2005 4:30:16 PM |

Abi says:
Hi
Steve says:
good day
Abi says:
Hwo are you doing
Steve says:
great. so we are ready to go
Abi says:
Yah
Abi says:
i read all your 19 pages chat
Abi says:
deeply
Steve says:
great. Is there any questions. Do you feel pretty
comfortable with things on the project.
Abi says:
I agree with greg
Abi says:
that queries on every page is very imp that only will
let 25000
Abi says:
per sec let it be happen
Abi says:
So we will use more of views
Abi says:
and store procedures ..
Abi says:
and about storing data what we extract from orkut
Abi says:
in XML but in diffrebt formats
Abi says:
all user who we extract and ther eprofile start with A
will be on one XML file
Abi says:
and who start B will be saven in diffrent file and so
on
Abi says:
this way processing time will reduce
Abi says:
when we need to featch things
Abi says:
and it wil featch from samller file then one large
file
Steve says:
ok
Abi says:
what do u say ?
Steve says:
Do you feel confident in this strategy
Abi says:
yes ,

Steve says:
can you explain your understand of this strategy with
page view. Second, we had discussed creating a list of
all the different types of queries to better
understand where the roadblocks will take place in the
launch
Steve says:
i think we had discussed that there are about 65
different database queries
Abi says:
ididnt get you what you said in last
Steve says:
in the 19 page conversation. it was discussed that we
need to understand all the different database queries
Abi says:
oh yes
Steve says:
possibly create a list of all the database queries. it
was said that there are about 65
Steve says:
so that we can more clearly map out the potnetial
problems and also create compromises and possible
queries that can be removed permanently or temporarily
during the launch period
Abi says:
wiat
Abi says:
Sorry
Abi says:
i was on phone
Abi says:
ye swe are clear with quries part
Abi says:
let me show you software
Abi says:
what you can estimate server and site performace if
liek traffic hit to website in same time
Steve says:
ok
Abi says:
empirix.com
Abi says:
go here and see teh demo of flash pls
Abi says:
as i told you even We will have most of storeprocedure

Steve says:
so is our team all set to go... lets make it happen
Abi says:
yah but you hav e to tale license for thsi software
Abi says:
for testing
Steve says:
okay... when will we need to start testing
Abi says:
did you see task sheet
Steve says:
yes, what part of the task sheet are you referring to
Steve says:
you mean to see the task sheet of when we will start

testing
Steve says:
ok
Abi says:
Yes ..
Abi says:
i have define dates for testing in it
Steve says:
so should I assume that work has essentially started
and our team is in action
Abi says:
it will be start from tomm morning
Steve says:
okay great
Abi says:
we will start an algo
Abi says:
but terms we have to decide yet
Steve says:
terms?
Abi says:
I mena are we okay
Abi says:
with funds and payent terms
Abi says:
what we talked
Steve says:
so I will be sending $833 (1/3 payment). That is
correct
Abi says:
yes
Steve says:
do you have a bank account routing number and bank
account number
Abi says:
Yes i will mail you
Abi says:
that and you can post me on it
Steve says:
ok
Abi says:
when we will be going to startfeatching profiles
Abi says:
we will doing from dedicated server what is very High
end
Steve says:
yes, tell me what we will need to do it as efficiently
and quick as possible
Steve says:
we also need to do some planning to make sure that we
do it in a way where we are not really detected
Steve says:
possible rotating IP's or something. don't really
understand this too well. Greg may also have some
ideas
Abi says:
yah
Abi says:
rotating IP if we can set then its very good
Abi says:

as when orkut will see so much bandsidth use by
perticular IP
Steve says:
we need to plan this very carefully
Abi says:
then they will block that perticulat IP
Steve says:
since we will only have one chance to do it
Steve says:
we might need to rotate with over 200 IP's or even
more to do it perfectly
Abi says:
yah server you have to see .. as if they block us we
will be wast e..
Abi says:
either open proxies
Abi says:
can do tricks or Ip switching
Steve says:
ok great. so lets make this happen
Steve says:
lets try to plan on getting the data grab done as soon
as possible
Steve says:
and we need to spend some specific time to discussion
later then registration process
Steve says:
this was discussed in the 19 page chat
Steve says:
but we really need to plan out the specifics of the
launch and the invitation to make sure we can get the
flow correctly
Abi says:
Okay
Steve says:
you understand the basic flow. A user will a  receive
a standard invitation from a friend
Steve says:
when they click on the invitation, they arrive on a
page with a short description and prompting them to
enter their Orkut username and password
Steve says:
when they enter it, we grab their entire Orkut contact
database of names and emails
Steve says:
we will automatically send out an email invitation to
all members from these emails who are not yet
registered.
Abi says:
yes
Steve says:
Those who are registered will not receive another
invitation
Abi says:
yah i know
Steve says:
this will prevent users from receiving 100 invitation
emails in the first week and dramatically reduce the
amount of emails our server sends out
Abi says:

they will get mail telling ther efriend have joined
teh network
Abi says:
oh then no mail will go
Abi says:
i thought it will be good telling them which all
frineds of his/her joined
Steve says:
yes
Steve says:
we can possibly do a daily email
Steve says:
which tell thems which friends joined that day
Abi says:
okay
Steve says:
also, we need to make sure that all friends who are
from Orkut are automatically added as friends
Steve says:
they do not need to accept them
Steve says:
this is important
Steve says:
since we will move all their friends automatically
Steve says:
we will just let them know who joined
Steve says:
in a daily email, but nobody will need to accept
friends
Steve says:
this will dramatically reduce traffic also
Steve says:
and emails going out requiring people to accept
Steve says:
the first time they joined, they will already see all
their friends in their friends network
Steve says:
and all their friends emails will be in their network
list of friends
Abi says:
yes
Abi says:
when we extract profile and save we are saving his
friend list in same node
Abi says:
in XML
Steve says:
same node? can you explain that
Abi says:
lets assume you are user on orkut name as steve
Abi says:
i am user name abi
Abi says:
in our XML we will have one node name as abi and one
as steve
Abi says:
all your info is been sore under your node
Abi says:
that mena profile ., text pic , friend list and all
Abi says:

and under my node i will have all mine
Abi says:
di du get it
Steve says:
get what
Abi says:
i mena did u understood what i mean by node
Steve says:
no, can you explain
Abi says:
do u know how XML look like
Abi says:
liek DB have rows
Abi says:
and tables
Abi says:
XML have nodes
Abi says:
go here
Abi says:
http://www.getafreelancer.com/rss.xml
Abi says:
here channel is one parent node
Steve says:
ok
Abi says:
this is how we will keep one person profile wit us
Steve says:
so assuming we first grab the first 8 million of so
profile. they will all be int he database and be
considered inactive users, but their profiles and
everything are viewable
Abi says:
No
Steve says:
we will insert 8 million profiles in the database. is
that correct?
Abi says:
no
Abi says:
all profiles
Abi says:
will ne in XML
Steve says:
ok
Steve says:
but when a person joins
Steve says:
will all their friends and friends of friends be
viewable immediately
Abi says:
as soon as one person give his user name password and
we featch rest if his info we will move that to DB
Abi says:
Yes
Abi says:
all will be viewable right away
Abi says:
from XMl
Abi says:

as storing in XML and featching values from XML will
be faster
Abi says:
then making queries and running it from DB
Abi says:
as each profile is Node so all we need to do is point
that node
Abi says:
and all his value swill be shown in browser
Steve says:
great
Steve says:
right now, this module of grabbing all the data is
extremely important. and very soon, we need to be able
to demonstrate this feature working
Steve says:
this should be one of our key first milestones
Abi says:
yes this is what i am going to start first
Steve says:
working with the invitatations system and all.
Abi says:
ok
Steve says:
the other key feature will be the grabbing all
contacts from Yahoo, Hotmail, AOl, and maybe Gmail
Steve says:
but just grabbing
Abi says:
hmm

# EXHIBIT 7

| From: | Felipe Herrera |
|---|---|
| To: | SteveVachani |
| Subject: | RE: response to your December 26th e-mail |
| Date: | Saturday, January 03, 2009 4:47:38 AM |

Jesus Christ, man...I had no idea we were sending these messages and signing "The Facebook Team" (llok at paragraph 63 of the records)....wow...this shows the absolute lack of communication between the product and legal teams. Since the beginning of the company the product team has been putting things online without any type of consultation with the legal department. Since we do not participate in the homologation process of products and services before they go online, we have no way of knowing this.

Granted that signing someone else's name in a commercial email is just obvious to any layman that it is fraud. People don't need to be lawyers to know that it is wrong, so I don't understand why we did this...

The few times that Bruno and Patrick came to us before something went online helped us avoid legal problems, but that does not happen normally.

This is very frustrating. It looks like we have no legal advice or that we are knowingly and purposedly doing things that are illegal and acting in baad faith. It looks terrible on the legal department.

Let's please adjust the standard procedures so that new products and services go through Legal before being put online.

Thanks,
Felipe.

_____
From: steve@stevevachani.com [steve@stevevachani.com]
Sent: Friday, January 02, 2009 11:52 PM
To: Felipe Herrera; McCullagh, James R. (Perkins Coie)
Cc: Mark Howitson; Sam O'Rourke; Cutler, Joseph P. (Perkins Coie)
Subject: RE: response to your December 26th e-mail

Ok. Please let us know any additional steps we will need to take to fully address your requests from your complaint. We await this so we can take these additional steps to bring this to resolution.

Thanks,
Steve

--- On Fri, 1/2/09, McCullagh, James R. (Perkins Coie) <JMcCullagh@perkinscoie.com> wrote:
From: McCullagh, James R. (Perkins Coie) <JMcCullagh@perkinscoie.com>
Subject: RE: response to your December 26th e-mail
To: steve@stevevachani.com, felipe.herrera@powerinc.net
Cc: "Mark Howitson" <mhowitson@facebook.com>, "Sam O'Rourke" <samo@facebook.com>, "Cutler, Joseph P. (Perkins Coie)" <JCutler@perkinscoie.com>
Date: Friday, January 2, 2009, 5:33 PM

Mr. Vachani,

Facebook is continuing to evaluate Power.com's compliance with Facebook's demands. Facebook does not consider that Power.com's recent actions have resolved all of the issues raised by the lawsuit. We hope to be able to provide you with more information next week.

Regards,

Jim
Jim McCullagh | Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
PHONE: 206.359.6329<LiveCall:206.359.6329>
FAX: 206.359.7329<LiveCall:206.359.7329>
CELL: 206.434.6678<LiveCall:206.434.6678>
E-MAIL: jmccullagh@perkinscoie.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

_____

From: steve@stevevachani.com [mailto:steve@stevevachani.com]
Sent: Friday, January 02, 2009 5:10 PM
To: filipe.herrera@powerinc.net; McCullagh, James R. (Perkins Coie)
Cc: Mark Howitson; Sam O'Rourke; Cutler, Joseph P. (Perkins Coie)
Subject: RE: response to your December 26th e-mail

We are moving forward to sharing with the media and those who ask how we intend to use Facebook connect as they are asking. We would really like to communicate with interested parties that we have resolved this issue with Facebook and complied with all of Facebook's demands.

Because of the amount of media attention, we would really love to communicate this sooner.

James or Joseph, do you have a moment to speak very quickly on how we can confirm resolution on this

--- On Wed, 12/31/08, McCullagh, James R. (Perkins Coie) <JMcCullagh@perkinscoie.com> wrote:
From: McCullagh, James R. (Perkins Coie) <JMcCullagh@perkinscoie.com>
Subject: RE: response to your December 26th e-mail
To: steve@stevevachani.com, filipe.herrera@powerinc.net
Cc: "Mark Howitson" <mhowitson@facebook.com>, "Sam O'Rourke" <samo@facebook.com>, "Cutler, Joseph P. (Perkins Coie)" <JCutler@perkinscoie.com>
Date: Wednesday, December 31, 2008, 4:32 PM

Mr. Vachani,

This email acknowledges receipt of your email below. We are confirming your representations of compliance with Facebook's requests and will respond more fully in due course.

Regards,

Jim

Jim McCullagh | Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
PHONE: 206.359.6329<LiveCall:206.359.6329>
FAX: 206.359.7329<LiveCall:206.359.7329>
CELL: 206.434.6678<LiveCall:206.434.6678>
E-MAIL: jmccullagh@perkinscoie.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

From: steve@stevevachani.com [mailto:steve@stevevachani.com]
Sent: Wednesday, December 31, 2008 4:13 PM
To: filipe.herrera@powerinc.net; McCullagh, James R. (Perkins Coie)
Cc: Mark Howitson; Sam O'Rourke; Bates, Leota (Perkins Coie); Cutler, Joseph P. (Perkins Coie)
Subject: RE: response to your December 26th e-mail

In order for us to faciliate a healthy beginning in our discussions and in our communications with interested parties and media who may ask about our relationship with Facebook, we would request that Facebook acknowledge our compliance and remove the filed lawsuit from public records as soon as possible.

We think it is in both company's best interests to transform our relationship into a positive one and look forward to offering feedback and advice to the Facebook Connect team on ways to expand Facebook connect's functionality to encourage more industry wide innovation between developers and Facebook.

We had only requested that we have more time to prevent a disruption among users, but per your request, we complied and are looking forward to completing our new version with Facebook connect compliance.


--- On Wed, 12/31/08, McCullagh, James R. (Perkins Coie) <JMcCullagh@perkinscoie.com> wrote:
From: McCullagh, James R. (Perkins Coie) <JMcCullagh@perkinscoie.com>
Subject: RE: response to your December 26th e-mail
To: steve@stevevachani.com, filipe.herrera@powerinc.net
Cc: "Mark Howitson" <mhowitson@facebook.com>, "Sam O'Rourke" <samo@facebook.com>, "Bates, Leota (Perkins Coie)" <LBates@perkinscoie.com>, "Cutler, Joseph P. (Perkins Coie)" <JCutler@perkinscoie.com>
Date: Wednesday, December 31, 2008, 8:28 AM

Dear Mr. Vachani,

We appreciate your prompt response, but your proposed removal of Facebook in 5-6 days is NOT acceptable. Your solicitation and storage of Facebook usernames and passwords, and your promotional activities that spam to Facebook users must stop immediately. Facebook has been very clear in its demands and patient in allowing Power time to make the necessary changes. That patience expired when you forced Facebook to file a lawsuit against you. You have provided no reason why you cannot bring your service into compliance other than your own convenience. Your willful violation of Facebook's rights continues to exacerbate the damage to Facebook and is affecting any desire that Facebook may have to conduct business with you.

As stated in Mr. Cutler's email to you yesterday, we await your confirmation by the end of business today that you will immediately comply with Facebook's demand.

Regards,

Jim
Jim McCullagh | Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
PHONE: 206.359.6329<LiveCall:206.359.6329>
FAX: 206.359.7329<LiveCall:206.359.7329>
CELL: 206.434.6678<LiveCall:206.434.6678>
E-MAIL: jmccullagh@perkinscoie.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

From: steve@stevevachani.com [mailto:steve@stevevachani.com]
Sent: Wednesday, December 31, 2008 2:59 AM
To: Cutler, Joseph P. (Perkins Coie)
Cc: filipe.herrera@powerinc.net; McCullagh, James R. (Perkins Coie); Mark Howitson; Sam O'Rourke;
Bates, Leota (Perkins Coie); Demetrescu, Nicole (Perkins Coie); Mrazik, Ryan T. (Perkins Coie)
Subject: Re: response to your December 26th e-mail

I have instructed our guys to complete the take down of Facebook from Power.com

While we would like to have avoided the disruption in service to our users until we have completed the Facebook connect integration, we understand your position and after further discussions have decided that we will proceed with take down of the service. I sent an email to our team today to initiate take down of the current version of Facebook inside of Power. I will send you an email confirmation by this Monday formally responding to your letter and confirming our compliance with your requests.

There is nobody in our offices today, tomorrow, and Friday, but Facebook should be removed completely from Power.com by Monday.

We are working to complete the Facebook connect integration as soon as possible and after the take down has been completed, we will hope to share our ideas on how improve Facebook connect to faciliate greater functionality from companies like Power.

As stated in our previous email, we are already working to integrate Facebook connect. We look forward to more productive conversations on a business side in the future on ways to expand the functionality of Facebook connect and address issues of how to expand the distribution of Facebook content in ways that are mutually beneficial and agreeable to Facebook.

Thanks,
Steve

--- On Tue, 12/30/08, Cutler, Joseph P. (Perkins Coie) <JCutler@perkinscoie.com> wrote:
From: Cutler, Joseph P. (Perkins Coie) <JCutler@perkinscoie.com>
Subject: response to your December 26th e-mail
To: steve@stevevachani.com
Cc: filipe.herrera@powerinc.net, "McCullagh, James R. (Perkins Coie)" <JMcCullagh@perkinscoie.com>,
"Mark Howitson" <mhowitson@facebook.com>, "Sam O'Rourke" <samo@facebook.com>, "Bates, Leota
(Perkins Coie)" <LBates@perkinscoie.com>, "Demetrescu, Nicole (Perkins Coie)"
<NDemetrescu@perkinscoie.com>, "Mrazik, Ryan T. (Perkins Coie)" <RMrazik@perkinscoie.com>
Date: Tuesday, December 30, 2008, 5:28 PM


Dear Mr. Vachani:

Your response of late Friday, December 26, 2008, that Power.com has made the unilateral decision to continue to violate Facebook's rights is unacceptable. Earlier today, Facebook filed a lawsuit against Power.com. I have attached a copy of the lawsuit for your convenience.

This matter is of extreme importance to Facebook and Power.com's blatant and knowing violation of Facebook's rights must immediately stop. Power.com must

  *   Cease soliciting Facebook usernames and passwords;
  *   Cease all integration of Facebook in Power.com;
  *   Remove all Facebook usernames, passwords, friend lists, and other information gathered from Facebook from active servers and preserve all such information off line;
  *   Remove all references to Facebook;
  *   Remove all Facebook Trademarks;
  *   Cease using Power.com to send messages to Facebook users;
  *   Cease circumventing Facebook security measures; and
  *   Comply with any and all Facebook Terms of Use

In addition, you must preserve and not destroy all information that may be relevant to the causes of action described in the attached Complaint, including but not limited to all electronically stored information related in any way to Power.com's interaction with Facebook, Facebook's website, and/or Facebook users.

If Power.com does not comply with these demands by the CLOSE OF BUSINESS, TOMORROW, DECEMBER 31, 2008, Facebook will seek a Temporary Restraining Order against Power.com.   Please have your attorneys contact me immediately.

Very truly yours,

Joseph P. Cutler

Joseph P. Cutler | Perkins Coie LLP

Attorney at Law
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
jcutler@perkinscoie.com< mailto:jcutler@perkinscoie.com >

206.359.6104<LiveCall:206.359.6104> (office) | 206.359.7104<LiveCall:206.359.7104> (fax)

Professional Biography< http://www.perkinscoie.com/professionals/professionals_detail.aspx? professional=139 >

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

IMPORTANT TAX INFORMATION: This communication is not intended or written by Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code of 1986, as amended.