Nos. 13-17102, 13-17154

**IN THE**

# United States Court of Appeals
# For The Ninth Circuit

———————————————————

FACEBOOK, INC.,
*Plaintiff-Appellee*,

v.

POWER VENTURES, INC.

&

STEVEN SURAJ VACHANI,
*Defendants-Appellants*.

———————————————————

Appeal from the United States District Court
for the Northern District of California
Case No. 5:08-cv-05780-LHK, The Honorable Lucy Koh

———————————————————

**SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME II OF II**

———————————————————

Eric A. Shumsky
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005
(202) 339-8400

I. Neel Chatterjee
Monte Cooper
Brian P. Goldman
Robert L. Uriarte
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
(650) 614-7400

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

## VOLUME I OF II

**Record Entry**[*]                                                    **SER**

### District Court Orders

Order Denying Leave to File Motion for Reconsideration, Finding
      Defendant Steven Vachani Liable as a Matter of Law, and
      Granting Damages and Permanent Injunctive Relief,
      Dkt. No. 372 (Filed September 25, 2013)................................................ 1

Order Denying Motion to Dismiss and Granting in Part and Denying
      in Part Motion for Definite Statement,
      Dkt. No. 38 (Filed May 11, 2009)........................................................ 35

### Other Record Materials

Excerpts from the Expert Report of Richard J. Ostiller,
      Exhibit 25 to the Declaration of Monte Cooper in Support of
      Facebook Inc.'s Supplemental Brief Regarding Damages
      and Liability of Defendant Steve Vachani,
      Dkt. No. 300-1 (Filed Apr. 17, 2012)................................................... 46

---

[*] None of the documents in the Supplemental Excerpts of Record is confidential, although some are so marked. Some of the documents were stamped confidential but never sealed (Dkt. Nos. 236-2, 236-6, 248-2, 248-7). Other documents were filed under seal, but were later unsealed by the district court. *See* Dkt. No. 298 (unsealing Dkt. Nos. 299-3, 299-6, 299-9, 299-10, 299-15, 299-21, 299-35); Dkt. No. 395 (unsealing Dkt. Nos. 213-2, 213-4, 217, 300-1, 372, 396).

Excerpts from the March 7, 2012 deposition transcript of Steve
Vachani,
Exhibit 2 to the Declaration of Monte Cooper in Support of
Facebook Inc.'s Supplemental Brief Regarding Damages
and Liability of Defendant Steve Vachani,
Dkt. No. 299-3 (Filed Apr. 17, 2012).................................................... 52

December 2, 2008, Email Chain between Steve Vachani and Eric
Santos,
Exhibit 4 to the Declaration of Monte Cooper in Support of
Facebook Inc.'s Supplemental Brief Regarding Damages
and Liability of Defendant Steve Vachani,
Dkt. No. 299-5 (Filed Apr. 17, 2012).................................................... 81

December 29, 2008, Email Chain among Power employees,
Exhibit 5 to the Declaration of Monte Cooper in Support of
Facebook Inc.'s Supplemental Brief Regarding Damages
and Liability of Defendant Steve Vachani,
Dkt. No. 299-6 (Filed Apr. 17, 2012).................................................... 84

December 1, 2008, Press Release for Power.com,
Exhibit 8 to Declaration of Monte Cooper in Support of
Facebook Inc.'s Supplemental Brief Regarding Damages
and Liability of Defendant Steve Vachani,
Dkt. No. 299-9 (Filed Apr. 17, 2012).................................................... 90

November 26, 2008, Email from Eric Santos to Bruno Carvalho,
Exhibit 9 to the Declaration of Monte Cooper in Support of
Facebook Inc.'s Supplemental Brief Regarding Damages and
Liability of Defendant Steve Vachani,
Dkt. No. 299-10 (Filed Apr. 17, 2012) ................................................. 98

Excerpts from the July 20, 2011, Deposition Transcript of Steve
        Vachani,
        Exhibit 12 to the Declaration of Monte Cooper in Support of
        Facebook Inc.'s Supplemental Brief Regarding Damages and
        Liability of Defendant Steve Vachani,
        Dkt. No. 299-13 (Filed Apr. 17, 2012) ............................................... 102


Excerpts from the January 9, 2012, Deposition Transcript of Steven
        Vachani (as Power Ventures, Inc.'s 30(b)(6) designee),
        Exhibit 14 to the Declaration of Monte Cooper in Support of
        Facebook Inc.'s Supplemental Brief Regarding Damages
        and Liability of Defendant Steve Vachani,
        Dkt. No. 299-15 (Filed Apr. 17, 2012) ............................................... 141


December 4, 2008, Email from Felipe Herrera to Steve Vachani,
        Exhibit 20 to the Declaration of Monte Cooper in Support of
        Facebook Inc.'s Supplemental Brief Regarding Damages
        and Liability of Defendant Steve Vachani,
        Dkt. No. 299-21 (Filed Apr. 17, 2012) ............................................... 158


Power Ventures Inc.'s Supplemental Responses to Facebook's
        Interrogatories,
        Exhibit 22 to the Declaration of Monte Cooper in Support of
        Facebook Inc.'s Supplemental Brief Regarding Damages
        and Liability of Defendant Steve Vachani,
        Dkt. No. 299-23 (Filed Apr. 17, 2012) ............................................... 162


December 26, 2008, Email from Steve Vachani to Eric Santos,
        Exhibit 34 to the Declaration of Monte Cooper in Support of
        Facebook Inc.'s Supplemental Brief Regarding Damages
        and Liability of Defendant Steve Vachani,
        Dkt. No. 299-35 (Filed Apr. 17, 2012) ............................................... 171

November 9, 2011, Email from Timothy Fisher to Facebook's
        Counsel,
        Exhibit 35 to the Declaration of Monte Cooper in Support of
        Facebook Inc.'s Supplemental Brief Regarding Damages
        and Liability of Defendant Steve Vachani,
        Dkt. No. 299-36 (Filed Apr. 17, 2012) ................................................ 177

Transcript of Proceedings Held on Feb. 24, 2012, before Magistrate
        Judge Joseph C. Spero,
        Dkt. No. 280 (Filed Feb. 27, 2012) ...................................................... 182

January 26, 2012, Joint Discovery Letter re: Compelling Production
        of Emails,
        Dkt. No. 269 (Filed Feb. 10, 2012) ...................................................... 199

Transcript of Proceedings Held on Jan. 23, 2012, before Chief Judge
        James Ware,
        Dkt. No. 257 (Filed Jan. 27, 2012)....................................................... 207

Transcript of July 18, 2005, Chat between Steve Vachani and "abi",
        Exhibit 2 to the Declaration of I. Neel Chatterjee in Support
        of Facebook Reply Memorandum in Support of Facebook's
        Motions for Partial Summary Judgment,
        Dkt. No. 248-2 (Filed Jan. 20, 2012) ................................................... 247

January 3, 2009, Email from Felipe Herrera to Steve Vachani,
        Exhibit 7 to the Declaration of I. Neel Chatterjee in Support
        of Facebook Reply Memorandum in Support of Facebook's
        Motions for Partial Summary Judgment,
        Dkt. No. 248-7 (Filed Jan. 20, 2012) ................................................... 255

# VOLUME II OF II

**Record Entry**                                                 **SER**

*Other Record Materials (con't)*

Excerpts from Defendants' Memorandum of Points and Authorities in
Opposition to Facebook's Motion for Partial Summary
Judgment Under California Penal Code § 502 and the
Computer Fraud and Abuse Act, 18 U.S.C. § 1030,
Dkt. No. 242 (Filed Jan. 19, 2012)..................................................... 261

Excerpts from the July 20, 2011, Deposition Transcript of Defendant
Steve Vachani,
Exhibit 2 to the Declaration of Morvarid Metanat in Support
of Facebook's Motion for Partial Summary Judgment Under
California Penal Code § 502 and CFAA,
Dkt. No. 236-2 (Filed Jan. 19, 2012) ................................................. 265

Excerpts from Power Ventures, Inc.'s Responses to Facebook, Inc's
First Set of Interrogatories,
Exhibit 4 to the Declaration of Morvarid Metanat in Support
of Facebook's Motion for Partial Summary Judgment Under
California Penal Code § 502 and CFAA,
Dkt. No. 236-4 (Filed Jan. 19, 2012) ................................................. 276

December 1, 2008, Email from Steve Vachani to Felipe Herrera and
Eric Santos,
Exhibit 6 to the Declaration of Morvarid Metanat in Support
of Facebook's Motion for Partial Summary Judgment Under
California Penal Code § 502 and CFAA,
Dkt. No. 236-6 (Filed Jan. 19, 2012) ................................................. 284

December 17-18, 2008, Emails among Power Employees,
  Exhibit 7 to the Declaration of Morvarid Metanat in Support
  of Facebook's Motion for Partial Summary Judgment Under
  California Penal Code § 502 and CFAA,
  Dkt. No. 236-7 (Filed Jan. 19, 2012) ................................................. 287

December 1, 2008, Cease and Desist Letter,
  Exhibit A to the Declaration of Joseph Cutler in Support of
  Facebook, Inc.'s Motion for Partial Summary Judgment For
  Liability Under The CAN-SPAM Act,
  Dkt. 233 (Filed Jan. 19, 2012)............................................................ 297

December 12-26, 2008, Email Chain between Steve Vachani and
  Facebook Counsel Joseph Cutler,
  Exhibit B to the Declaration of Joseph Cutler in Support of
  Facebook, Inc.'s Motion for Partial Summary Judgment For
  Liability Under The CAN-SPAM Act,
  Dkt. 233-1 (Filed Jan. 19, 2012) ........................................................ 301

Excerpts from Power Ventures, Inc.'s Responses to Facebook, Inc.'s
  First Set of Interrogatories,
  Exhibit 5 to the Declaration of Monte M.F. Cooper in
  Support of Facebook, Inc.'s Motion for Partial Summary
  Judgment on Count I under the CAN-SPAM Act,
  Dkt. No. 232-2 (Filed Jan. 19, 2012) ................................................. 310

Excerpts from Power Ventures, Inc.'s Responses to Facebook, Inc.'s
  First Set of Requests for Admissions,
  Exhibit 6 to the Declaration of Monte M.F. Cooper in
  Support of Facebook, Inc.'s Motion for Partial Summary
  Judgment on Count I under the CAN-SPAM Act,
  Dkt. No. 232-3 (Filed Jan. 19, 2012) ................................................. 320

Excerpts from the July 20, 2011, Deposition Transcript of Steven
        Vachani,
        Exhibit 2 to the Declaration of Monte M.F. Cooper in
        Support of Facebook Inc.'s Motion for Partial Summary
        Judgment on Count I under the CAN-SPAM Act
        Dkt. No. 229 (Filed Jan. 19, 2012).....................................................333

Declaration of Lawrence Melling in Support of Facebook, Inc.'s
        Motion for Partial Summary Judgment On Count I under the
        CAN-SPAM Act,
        Dkt. No. 217 (Filed Jan. 19, 2012).....................................................375

Declaration of Joseph Cutler in Support of Facebook, Inc.'s Motion
        for Partial Summary Judgment For Liability under the CAN-
        SPAM Act,
        Dkt. No. 213-2 (Filed Jan. 19, 2012) .................................................389

Declaration of Ryan McGeehan in Support of Facebook's Motion for
        Partial Summary Judgment on Count I under the CAN-
        SPAM Act,
        Dkt. No. 213-4 (Filed Jan. 19, 2012) .................................................393

Transcript of Proceedings Held on Nov. 4, 2011, before Magistrate
        Judge Joseph C. Spero,
        Dkt. No. 176 (Filed Nov. 21, 2011) ...................................................401

Amended Answer and Counterclaims of Defendants Power Ventures,
        Inc. and Steve Vachani,
        Dkt. No. 54 (Filed Nov. 23, 2009) .....................................................412

### *District Court Orders Regarding Sealed Documents*

Order Permitting the Public Filing of Portions of Facebook Inc.'s
        Supplemental Brief Regarding Damages and Liability of
        Defendant Steve Vachani,
        Dkt. No. 298 (Filed Apr. 17, 2012).....................................................439

Order Sealing Certain Portions of Facebook, Inc's Motions for Partial
Summary Judgment and Facebook's Opposition to
Defendants' Motion for Summary Judgment,
Dkt. No. 203 (Filed Dec. 19, 2011)...................................................... 441

Order Granting Facebook Inc.'s Motion for Administrative Relief to
File Under Seal Pursuant to Civil Local Rule 79-5(B),
Dkt. No. 183 (Filed Nov. 28, 2011) ...................................................... 444

Order Granting Facebook Inc.'s Motion for Administrative Relief to
File Under Seal the Declarations of Ryan McGeehan and
Joseph Cutler and Portions of Facebook's Motion for Partial
Summary Judgment Pursuant to Civil Local Rule 79-5(B),
Dkt. No. 182 (Filed Nov. 28, 2011) ...................................................... 446

Stipulated Protective Order for Standard Litigation,
Dkt. No. 95, (Filed Feb. 4, 2011) ........................................................ 448

***Material Filed Following Limited Remand to Expand the Record, per 9th Cir.
Dkt. No. 35***

Expert Report of Bob Zeidman and Lawrence Melling,
Dkt. No. 396 (Filed May 29, 2014)...................................................... 467

Stipulation and Order Pursuant to Civil Local Rule 7-12, to File
Previously Lodged Material and Unseal Previously Sealed
Materials,
Dkt. No. 395 (Filed May 29, 2014)...................................................... 506

1    BURSOR & FISHER, P.A.
     L. Timothy Fisher (State Bar No. 191626)
2    Sarah N. Westcot (State Bar No. 264916)
     1990 North California Blvd., Suite 940
3    Walnut Creek, CA 94596
     Telephone: (925) 300-4455
4    Facsimile: (925) 407-2700
     E-Mail: ltfisher@bursor.com
5            swestcot@bursor.com

6    BURSOR & FISHER, P.A.
     Scott A. Bursor (State Bar No. 276006)
7    369 Lexington Avenue, 10th Floor
     New York, NY 10017
8    Telephone: (212) 989-9113
     Facsimile: (212) 989-9163
9    E-Mail: scott@bursor.com

10   BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
     Alan R. Plutzik (State Bar No. 077785)
11   2125 Oak Grove Road, Suite 120
     Walnut Creek, CA 94598
12   Telephone: (925) 945-0200
     Facsimile: (925) 945-8792
13   E-Mails: aplutzik@bramsonplutzik.com

14   Attorneys for Defendants Power
     Ventures, Inc. and Steve Vachani
15
                    UNITED STATES DISTRICT COURT
16
                   NORTHERN DISTRICT OF CALIFORNIA
17

18   FACEBOOK, INC.,                              Case No. 5:08-CV-05780 JW

19                              Plaintiff,        **DEFENDANTS' MEMORANDUM
                                                  OF POINTS AND AUTHORITIES IN
20   -against-                                    OPPOSITION TO FACEBOOK'S
                                                  MOTION FOR PARTIAL
21   POWER VENTURES, INC. d/b/a POWER.COM, a      SUMMARY JUDGMENT UNDER
     California corporation; POWER VENTURES, INC. CALIFORNIA PENAL CODE § 502
22   a Cayman Island Corporation, STEVE VACHANI,  AND THE COMPUTER FRAUD
     an individual; DOE 1, d/b/a POWER.COM, an    AND ABUSE ACT, 18 U.S.C. § 1030**
23   individual and/or business entity of unknown nature;
     DOES 2 through 25, inclusive, individuals and/or  Date: January 23, 2012
24   business entities of unknown nature,         Time: 9:00 a.m.
                                                  Courtroom 9 – 19th Floor
25                              Defendants.        Chief Judge James Ware
26
27
28

---

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW

SER 261

**III.    THE CFAA AND CALIFORNIA PENAL CODE § 502**

The CFAA is primarily a criminal statute, criminalizing and penalizing unauthorized access to computers.  *P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC*, 428 F.3d 504, 510 (3d Cir. 2007).  The majority of CFAA cases involve "classic" hacking activities. *Id.*; *see also LVRC Holding LLC v. Brekka*, 581 F.3d 1127, 1130 (9th 2009) ("The act was originally designed to target hackers who accessed computers to steal information or to disrupt or destroy computer functionality as well as criminals who possessed the capacity to 'access and control high technology processes vital to our everyday lives.'").

Facebook claims that defendants violated two provisions of the CFAA.  First, Facebook relies on 18 U.S.C. § 1030(a)(2)(C), which prohibits a party from intentionally accessing a computer "without authorization" and thereby obtaining "information from any protected computer."  Facebook also cites 18 U.S.C. § 1030(a)(4), which prohibits a party from accessing a "protected computer" "without authorization" with "intent to defraud" and "by means of such conduct furthers the intended fraud and obtains anything of value."  *See also P.C. Yonkers, Inc.*, 428 F.3d at 508 ("A claim under CFAA § 1030(a)(4) has four elements: (1) defendant has accessed a 'protected computer;' (2) has done so without authorization or by exceeding such authorization as was granted; (3) has done so 'knowingly' and with 'intent to defraud;' and (4) as a result has 'further[ed] the intended fraud and obtain[ed] anything of value.'").

Penal Code § 502 is California's corollary to the CFAA.  *Multiven, Inc. v. Cisco Systems, Inc.*, 725 F.Supp.2d 887, 895 (N.D. Cal. 2010).  It was enacted to expand the degree of protection to individuals, businesses and government agencies from "tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems."  Penal Code § 502(a).  As the Court held in its July 20, 2010 order, each of the subsections of Penal Code § 502 that potentially apply in this case require that defendants' actions be taken "without permission."  7/20/10 Order at 9.  Individuals may only be subjected to liability for acting "without permission" under the statute if they "access[] or us[e] a computer, computer network, or website in a manner that overcomes technical or code-based barriers.  *Id.* at 18.  Facebook also bears the burden to prove that it suffered "damage or loss" because of defendants' actions.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW

3

SER 262

## V. THE COURT SHOULD DENY FACEBOOK'S MOTION FOR SUMMARY JUDGMENT ON ITS PENAL CODE § 502 CLAIM

Facebook also moves for summary judgment as to its claim under Penal Code § 502 on the same grounds as its claim under the CFAA. As with its CFAA claim, Facebook has failed to show that Power accessed Facebook's website "without permission." *See supra* Section IV.B. Facebook has also failed to establish any harm to its network or data from any of Power's activities. And Facebook has failed to establish that Power intended to defraud Facebook. The Court should deny Facebook's motion for summary judgment on its Section 502 claim.

## VI. CONCLUSION

Facebook has failed to satisfy its burden to establish every factual element of its claims under the CFAA or Penal Code § 502. In fact, Facebook is unable to demonstrate that defendants have caused any harm to it in any way. The Court should deny Facebook's motion for summary judgment on its claims under the CFAA and Penal Code § 502.

Dated:  December 2, 2011                    BURSOR & FISHER, P.A.


By: _____/s/_____
                L. Timothy Fisher

BURSOR & FISHER, P.A.
L. Timothy Fisher (State Bar No. 191626)
Sarah N. Westcot (State Bar No. 264916)
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail:  ltfisher@bursor.com
                swestcot@bursor.com

BURSOR & FISHER, P.A.
Scott A. Bursor (State Bar No. 276006)
369 Lexington Avenue, 10th Floor
New York, NY  10017
Telephone:  (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail:  scott@bursor.com

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION FOR PARTIAL       12
SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW

SER 263

BRAMSON, PLUTZIK, MAHLER &
BIRKHAEUSER, LLP
Alan R. Plutzik (State Bar No. 77785)
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0200
Facsimile: (925) 945-8792
E-Mail: aplutzik@bramsonplutzik.com

Attorneys for Defendants Power
Ventures, Inc. and Steve Vachani

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FACEBOOK'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW

13

Case 5:08-cv-05780-LHK Document 352 Filed 11/19/13, Page 1 of 11

# EXHIBIT 2

```
 1            UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                 SAN JOSE DIVISION

 4

 5  FACEBOOK, INC.            :

 6            Plaintiff,      :

 7                            :

 8        v.                  :

 9                    :

10  POWER VENTURES, INC. d/b/a:

11  POWER.COM, a California   :

12  corporation; POWER        :       Case No.

13  VENTURES, INC. a Cayman   :     5:08-CV-05780

14  Island Corporation, STEVE :       JW (HRL)

15  VACHANI, an individual;   :

16  DOE 1, d/b/a POWER.COM, an:

17  individual and/or business:

18  entity of unknown nature; :

19  DOES 2 through 25,        :

20  inclusive, individuals    :

21  and/or business entities  :

22  of unknown nature,        :

23            Defendants.     :

24  _____

25        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
```

1

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



04:42  1    thing.  It's initiated by the user, that's what we

04:42  2    know.

04:42  3           Q.      The automated script, though, is

04:42  4    operated by power.com?

04:42  5           A.      It's a -- An automated script for

04:42  6    PowerScript, are initiated by users and executed by

04:42  7    power.com in the same way that an exporter is

04:43  8    initiated by user and managed by the site that's

04:43  9    doing it on behalf of the user.  Did you get that?

04:43 10    Yes.

04:43 11                   (Whereupon, Exhibit 107 is marked

04:43 12    for identification by the reporter.)

04:43 13           Q.      Mr. Vachani, Exhibit 107 is

04:43 14    Exhibit A to the first amended complaint that was

04:43 15    106.  Have you seen this document before today?

04:43 16           A.      What is this document I'm looking

04:43 17    at?

04:43 18           Q.      Exhibit A to the first amended

04:43 19    complaint.

04:43 20           A.      Is this the Facebook Terms and

04:43 21    Conditions?

04:43 22           Q.      Yes.

04:44 23           A.      I have -- Vaguely -- I've seen

04:44 24    this before, yes.  I don't know if I've seen this

04:44 25    specific version.  I've read the Facebook Terms and

                               274

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



04:44 1    Conditions previously.

04:44 2            Q.      As of December 1st, 2008, had you

04:44 3    read the Terms and Conditions that were available

04:44 4    on the Facebook Web site?

04:44 5            A.      I didn't read it all a hundred

04:44 6    percent, but we had read -- people in our company

04:44 7    had read it.

04:44 8            Q.      So who in your company had read it

04:44 9    -- if anybody?

04:44 10           A.      It would have been myself -- I

04:44 11   believe -- I do remember reading it.  Filipe would

04:44 12   have also read it.

04:44 13           Q.      Mr. Herrera?

04:44 14           A.      Yes.  I would have asked was there

04:44 15   anything relevant in the terms.  He would have been

04:44 16   the person I talked to.

04:44 17           Q.      Could you turn to Page 4?

04:44 18           A.      Sure.

04:44 19                   MR. BURSOR:  Are you using the

04:44 20   page numbers at the top?

04:44 21                   MR. COOPER:  Yes.  I'm sorry if

04:44 22   that wasn't clear.

04:44 23           Q.      Mr. Vachani, your counsel made a

04:45 24   good point.  I'm referring to the page numbers in

04:45 25   the upper right-hand corner.  You see the one that

275

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



SER 268

04:45  1     says Page 415?

04:45  2              A.        Yes.

04:45  3              Q.        Can you read the first bullet

04:45  4     point to yourself and tell me when you've finished?

04:45  5              A.        The first bullet point?  Yes.

04:45  6                        Okay.

04:45  7              Q.        As of December 1st, 2008, do you

04:45  8     know one way or another whether anybody at Power

04:45  9     had read that particular provision in the Facebook

04:45 10     Terms of Service?

04:45 11              A.        Yes.

04:45 12              Q.        Had you read it?

04:45 13              A.        Yes.

04:45 14              Q.        All right.  Did you have an

04:46 15     understanding whether power.com enabled users to

04:46 16     registered users to violate the Terms of Service?

04:46 17              A.        I don't understand how a message

04:46 18     that a user wants to send to another friend --

04:46 19     First of all, it's an unsolicited message; and

04:46 20     second, I don't understand what this Terms and

04:46 21     Conditions has anything to do with -- with -- I

04:46 22     don't understand how the relevance to the

04:46 23     questions.

04:46 24              Q.        Did you have an understanding

04:46 25     whether or not power.com to enabled its registered

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



04:49 1   2008, have an understanding whether it was

04:49 2   permitting registered users of Facebook to violate

04:49 3   the Terms of Service of Facebook?

04:49 4          A.       I don't know -- I'm not at liberty

04:49 5   to say what -- what's a violation of Facebook's

04:49 6   terms and we -- As I already stated, we did not

04:49 7   participate in sending any kind of unsolicited

04:49 8   users and our users were sending messages to their

04:49 9   own friends, so I don't understand if a user sends

04:49 10  a message to their friend how that's unsolicited

04:49 11  and how that has anything to do with this

04:49 12  terminology.

04:49 13         Q.       Would you look at the third bullet

04:49 14  point?

04:49 15         A.       Yeah.

04:49 16         Q.       You see where it says -- if you

04:49 17  read the -- It starts with, "In addition, you agree

04:49 18  not to use the service or site to," and then the

04:49 19  third bullet point is, "use automated scripts to

04:49 20  collect information from or otherwise interact with

04:50 21  the service or the site."

04:50 22              THE WITNESS:  Scott, is this even

04:50 23  relevant to the conversation?  I don't -- I don't

04:50 24  understand.

04:50 25              MR. BURSOR:  Why don't we just get

                              279

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

**BARKLEY**
Court Reporters

04:50  1    the question read back and then just answer the

04:50  2    question.

04:50  3             A.        So what's the question?

04:50  4                       (Whereupon, the last question is

04:50  5    read back by the reporter.)

04:50  6                       MR. BURSOR:  Is the question:

04:50  7    Does he see that in the agreement?

       8                       MR. COOPER:  Yeah, that's all I

       9    asked.

      10                       MR. BURSOR:  Yeah, so do you see

04:50 11    that -- do you see that --

04:50 12             A.        I see that in the agreement.

04:50 13                       MR. BURSOR:  Yeah, so then you've

04:50 14    answered the question.

      15             A.        Okay.  Yeah, I see that in your

04:50 16    agreement.

04:50 17             Q.        Have you read that language as of

04:50 18    December 1st, 2008?

04:50 19             A.        Yes.  I had read it many times.

04:50 20             Q.        Had anybody else at power.com read

04:50 21    that language as of December 1st, 2008?

04:50 22             A.        I don't know if they read it.  It

04:51 23    was my job to read it and I think Filipe probably

04:51 24    read it.  Those are the two people that I know.

04:51 25             Q.        As of December 1st, 2008, had you

                                   280

```
05:38   1    remember any substantial conversation.
05:38   2         Q.        All right.  Do you know -- The
05:38   3    second sentence of Exhibit 109 says, "Eric we need
05:38   4    to be prepare for Facebook to try and to block us
05:38   5    and the turn this into a national battle that gets
05:39   6    us huge attention"?
05:39   7         A.        Yes.
05:39   8         Q.        Why did you think Facebook was
05:39   9    going to block you?
05:39  10         A.        Obviously, they sent this letter
05:39  11    to us saying very clearly it was -- I thought it
05:39  12    was absurd, but that -- nonetheless that they were
05:39  13    trying to do this, but it was clear that that's
05:39  14    what they would do.
05:39  15         Q.        By what the way, do you remember
05:39  16    the name of the Facebook individual that Nevo
05:39  17    suggested you talk to?
05:39  18         A.        I do not recall it right mow.
05:39  19         Q.        Do you know if it was the same Sam
05:39  20    O'Rourke?
05:39  21         A.        That name sounds familiar, but I
05:39  22    don't -- I know I've heard that name.
05:39  23         Q.        Why did you -- The third sentence
05:39  24    says, "We need to address the scraping argument and
05:39  25    the soliciting log in credentials"?
```

313

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

05:50  1          A.        Yes.  We were -- We were live all
05:50  2   the way until we voluntarily took it down once --
05:50  3   once the communications once it broke down we made
05:50  4   a decision that we'll voluntarily take it down and
05:50  5   we'll implement Facebook Connect anyway, even
05:50  6   though Facebook was being very, you know, difficult
05:50  7   to work with we said -- we made the decision that
05:50  8   we'll go ahead and implement Facebook Connect.  It
05:50  9   was not going to happen -- it was not a simple --
05:50 10   We realized that it was not going to happen in a
05:50 11   simple way, but we did take it down and we launched
05:50 12   Facebook Connect which you're probably aware of
05:50 13   that we did turn on Facebook Connect.
05:50 14          Q.        Did fate Facebook block access to
05:51 15   its site?
05:51 16          A.        To what?
05:51 17          Q.        At any point, did you become aware
05:51 18   that Facebook was attempting to block access from
05:51 19   Power to the site?
05:51 20          A.        I don't know if they were --
05:51 21   Obviously, we expected that they would but he we
05:51 22   also know that our system doesn't get blocked
05:51 23   because there's nothing -- there's nothing it's
05:51 24   technically doing.  It's just users accessing the
05:51 25   site so that it can't really be blocked.  The

                              323

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

05:51 1    system can't be -- you can't -- Unless you want to

05:51 2    block your users from entering your site, Power's

05:51 3    technology is just implementing -- just emulating

05:51 4    what users are wanting to do, so there was no

05:51 5    really conversation about whether they were going

05:51 6    to be blocked.  We know that they would try, but we

05:51 7    also know that it was built to -- it would not be

05:51 8    blockable.

05:51 9         Q.      You see in the final page there's

05:51 10   a reference, second page, "We did study Digsby and

05:51 11   others and saw the changes they made to their UI to

05:52 12   implement Facebook Connect"?

05:52 13        A.      Yes.

05:52 14        Q.      Do you know what Digsby is?

05:52 15        A.      Digsby was a company that Facebook

05:52 16   was aggressively threatening legally that was

05:52 17   aggregating accounts.

05:52 18        Q.      Do you know if -- When you say "we

05:52 19   did study Digsby" what study was made of Digsby?

05:52 20        A.      We evaluated what they -- what

05:52 21   they originally did and then how they implemented

05:52 22   Facebook Connect and just to -- because we knew at

05:52 23   that time it was a -- one of the many, many, sites

05:52 24   that Facebook was threatening.

05:52 25        Q.      Is there any document reflecting

                              324

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

SER 274

CERTIFICATION

    I, PATRICIA MULLIGAN CARRUTHERS, a

Certified Shorthand Reporter and Notary Public of

the State of New Jersey and a Notary Public of the

State of New York, do hereby certify that prior to

the commencement of the examination the witness was

sworn by me to testify as to the truth, the whole

truth, and nothing but the truth.

    I do further certify that the foregoing is

a true and accurate transcript of the testimony as

taken stenographically by and before me at the

time, place, and on the date hereinbefore set

forth.

    I do further certify that I am neither of

counsel nor attorney for any party in this action

and that I am not interested in the event nor

outcome of this litigation.

Patricia Mulligan Carruthers, CSR
Certificate No. XI00780
Notary Public of the State of New York
Notary Public of the State of New Jersey

Dated: JULY 27, 2011

My commission expires October 28, 2015    (N.J.)
My commission expires December 21, 2013    (N.Y.)

361

EXHIBIT 100

# EXHIBIT 4

1  LAW OFFICES OF SCOTT A. BURSOR
   Scott A. Bursor (*pro hac vice*)
2  369 Lexington Avenue, 10th Floor
   New York, NY 10017
3  Telephone: (212) 989-9113
   Facsimile: (212) 989-9163
4
   BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
5  Alan R. Plutzik (State Bar No. 077785)
   L. Timothy Fisher (State Bar No. 191626)
6  2125 Oak Grove Road, Suite 120
   Walnut Creek, CA 94598
7  Telephone: (925) 945-0200
   Facsimile: (925) 945-8792
8
   Attorneys for Defendants Power
9  Ventures, Inc. and Steve Vachani

10                 UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12

13

14  FACEBOOK, INC.,

15                      Plaintiff,          Case No. 5:08-cv-05780 JF (RS)

16  -against-                               **DEFENDANT POWER VENTURES,
                                            INC.'S RESPONSES TO
17  POWER VENTURES, INC. d/b/a POWER.COM, a  FACEBOOK, INC.'S FIRST SET OF
    California corporation; POWER VENTURES, INC.  REQUESTS FOR ADMISSIONS**
18  a Cayman Island Corporation, STEVE VACHANI,
    an individual; DOE 1, d/b/a POWER.COM, an
19  individual and/or business entity of unknown nature;
    DOES 2 through 25, inclusive, individuals and/or
20  business entities of unknown nature,

21                      Defendants.

22

23

24

25

26

27

28

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR
ADMISSIONS
CASE NO. 5:08-CV-05780 JF (RS)

**REQUEST FOR ADMISSION NO. 13:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU provided POWER USERS with the means to access the FACEBOOK WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

Admitted.

**REQUEST FOR ADMISSION NO. 14:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU solicited FACEBOOK USER login information, including, but not limited to, user login names, e-mail addresses OR passwords.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

Objection vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 15:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU stored FACEBOOK USER login information, including, but not limited to, user login names, e-mail addresses OR passwords.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

Admitted.

**REQUEST FOR ADMISSION NO. 16:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU used the FACEBOOK WEBSITE for commercial purposes.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

Denied.

/      /      /

/      /      /

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

6

SER 278

**REQUEST FOR ADMISSION NO. 17:**

Admit that YOU have never entered into a formal advertising agreement with FACEBOOK.

**RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

Objection vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 18:**

Admit that YOU developed OR created programming scripts OR language that would provide POWER with an automated mechanism to extract data from the FACEBOOK WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

Admitted.

**REQUEST FOR ADMISSION NO. 19:**

Admit that YOU copied OR made use of at least some part, excerpt, OR portion of FACEBOOK's source code to develop, test implement, use OR provide POWER's aggregating services.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

Objection compound, vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 20:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU incorporated FACEBOOK WEBSITE content, DATA, or information into the POWER WEBSIT OR that services located thereon.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

Objection compound, vague and ambiguous. Subject to and without waiving these objections, denied.

/      /      /

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO. 5:08-CV-05780 JF (RS)

7

**REQUEST FOR ADMISSION NO. 21:**

Admit that in or about December 2008, YOU agreed to access the FACEBOOK WEBSITE OR cause others to access the FACEBOOK WEBSITE through means permitted by FACEBOOK.

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

Admitted.

**REQUEST FOR ADMISSION NO. 22:**

Admit that after receiving notice that YOUR use of or access to FACEBOOK was not permitted by FACEBOOK, YOU took, copied, OR made use of DATA from the FACEBOOK WEBSITE without FACEBOOK'S permission to do so.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

Admitted.

**REQUEST FOR ADMISSION NO. 23:**

Admit that FACEBOOK implemented technical measures to block YOU from accessing the FACEBOOK WEBSITE through the POWER WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

Admitted.

**REQUEST FOR ADMISSION NO. 24:**

Admit that, in or about December 2008, FACEBOOK blocked YOUR IP address(es) from accessing the FACEBOOK WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

Objection compound, vague and ambiguous. Subject to and without waiving these objections, denied.

/ / /

/ / /

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO. 5:08-CV-05780 JF (RS)                    8

SER 280

**REQUEST FOR ADMISSION NO. 36:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU used or attempted to another person's FACEBOOK WEBSITE account information without authorization from FACEBOOK.

**RESPONSE TO REQUEST FOR ADMISSION NO. 36:**

Objection compound, vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 37:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU used automated scripts or COMPUTER CODE to collect information from, or otherwise interact with, the FACEBOOK WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 37:**

Admitted.

**REQUEST FOR ADMISSION NO. 38:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU uploaded, posted, OR made available promotional materials OR solicitations on the FACEBOOK WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 38:**

Objection compound, vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 39:**

Admit that on December 26, 2008, Steve Vachani sent an e-mail to Facebook stating YOUR "business decision" to continue accessing or using the FACEBOOK WEBSITE without implementing the Facebook Connect platform.

**RESPONSE TO REQUEST FOR ADMISSION NO. 39:**

Objection vague and ambiguous.  Subject to and without waiving these objections, Power admits that Mr. Vachani sent an email to Facebook's counsel on December 26, 2008 stating:

> Dear Joseph,
> I am writing to follow up to our discussions regarding Power.com's
> integration of Facebook connect, your requests for us to take down

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO. 5:08-CV-05780 JF (RS)

12

1  **REQUEST FOR ADMISSION NO. 54:**

2      Admit that, between December 1, 2008 and February 1, 2008, YOU did not delete the

3  "Facebook friend information" in YOUR possession.

4  **RESPONSE TO REQUEST FOR ADMISSION NO. 54:**

5      Admitted.

6  **REQUEST FOR ADMISSION NO. 55:**

7      Admit that, to present date, you have not deleted, purged or destroyed all data that YOU

8  obtained from the FACEBOOK network.

9  **RESPONSE TO REQUEST FOR ADMISSION NO. 55:**

10     Admitted.

11 **REQUEST FOR ADMISSION NO. 56:**

12     Admit that, to present date, you have not deleted, purged or destroyed all FACEBOOK

13 login information obtained from POWER users, including, but not limited to, FACEBOOK user

14 names and/or passwords.

15 **RESPONSE TO REQUEST FOR ADMISSION NO. 56:**

16     Admitted.

17 Dated:  December 15, 2010        BRAMSON, PLUTZIK, MAHLER &
18                          BIRKHAEUSER, LLP

20 By        /s/
            L. Timothy Fisher

21 Alan R. Plutzik (State Bar No. 77785)
22 L. Timothy Fisher (State Bar No. 191626)
   2125 Oak Grove Road, Suite 120
23 Walnut Creek, CA  94598
   Telephone:  (925) 945-0200
24 Facsimile:  (925) 945-8792

25 LAW OFFICES OF SCOTT A. BURSOR
   Scott A. Bursor (*pro hac vice*)
26 369 Lexington Avenue, 10th Floor
   New York, NY  10017-6531
27 Telephone:  (212) 989-9113
   Facsimile:   (212) 989-9163

28

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)    20

SER 282

1

2          Attorneys for Defendants Power
           Ventures, Inc. and Steve Vachani

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

21

SER 283

# EXHIBIT 6

**SAB**

Scott A. Bursor <scott@bursor.com>

# Fwd: Cease and Desist Soliciting Login Credentials and Scraping Facebook Content

1 message

---

**steve@stevevachani.com <steve@stevevachani.com>**                              Mon, Feb 9, 2009 at 12:12 PM
Reply-To: steve@stevevachani.com
To: scott@bursor.com
Cc: felipe.herrera@corp.power.com

--- On **Mon, 12/1/08**, **steve@stevevachani.com** <**steve@stevevachani.com**> wrote:

> From: steve@stevevachani.com <steve@stevevachani.com>
> Subject: Fwd: Cease and Desist Soliciting Login Credentials and Scraping Facebook Content
> To: "'Felipe Herrera'" <felipe.herrera@powerinc.net>, "'Eric Santos'" <eric.santos@powerinc.net>
> Date: Monday, December 1, 2008, 8:01 PM
>
> We need to prepare and think carefully how to transform this into an opportunity for Power. I will talk to my friends at Meebo and also see the best response.
>
> Eric, we need to be prepared for Facebook to try to block us and the turn this into a national battle that gets us huge attention. But before we do that, we need to be prepared to address their arguments.
>
> We need to address the scraping argument and the soliciting login credentials. Soliciting login credentials should be something with A LOT of precedent. Everybody has been soliciting login credentials for years. Scraping is also something we should be able to address.
>
> Let's discuss this. This is exciting. :)
>
> Keep this letter confidential.
>
> Thanks.
> Steve
>
> --- On **Mon, 12/1/08**, **hostmaster1@poweremail.org** <**hostmaster1@poweremail.org**> wrote:
>
> > From: hostmaster1@poweremail.org <hostmaster1@poweremail.org>
> > Subject: Fwd: Cease and Desist Soliciting Login Credentials and Scraping Facebook Content
> > To: "Steven Vachani" <steve@stevevachani.com>
> > Cc: "Felipe Herrera" <felipe.herrera@powerinc.net>
> > Date: Monday, December 1, 2008, 7:54 PM

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

POWER 2011.02.03.0000089

Steve,

This looks serious.  They want a response by Wednesday in writing.
If I can help, let me know.

Leigh Power

--
Power Assist, Inc.
Coupeville, WA  98239
--

----- Forwarded message from JCutler@perkinscoie.com -----
   Date: Mon, 1 Dec 2008 19:30:08 -0800
   From: "Cutler, Joseph P. (Perkins Coie)"
<JCutler@perkinscoie.com>
Reply-To: "Cutler, Joseph P. (Perkins Coie)"
<JCutler@perkinscoie.com>
 Subject: Cease and Desist Soliciting Login Credentials and Scraping Facebook
Content
     To: hostmaster1@poweremail.org

I misspelled your email address when I sent this earlier this evening.  Please
see below.

Sincerely,

Joe

Joseph P. Cutler
Attorney at Law
Perkins Coie, LLP
206. 359. 6104 (Office)
206. 359. 7104 (Fax)
jcutler@perkinscoie.com

-----Original Message-----
From: Cutler, Joseph P. (Perkins Coie)
To: 'hostmaster1@poeremail.org' <hostmaster1@poeremail.org>
CC: McCullagh, James R. (Perkins Coie); Demetrescu, Nicole  (Perkins Coie)
Sent: Mon Dec 01 18:51:00 2008
Subject: Cease and Desist Soliciting Login Credentials and Scraping Facebook
Content

  <<C&D power.com.pdf>>
Please open, review and respond to the attached correspondence as directed
therein.



Sincerely,



Joe



Joseph P. Cutler | Perkins Coie LLP

Attorney at Law
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
jcutler@perkinscoie.com <mailto:jcutler@perkinscoie.com>

206.359.6104 (office) | 206.359.7104 (fax)

Professional Biography
<http://www.perkinscoie.com/professionals/professionals_detail.aspx?professional=139>

NOTICE: This communication may contain privileged or other confidential
information. If you have received it in error, please advise the sender by reply
email and immediately delete the message and any attachments without copying or
disclosing the contents. Thank you.

IMPORTANT TAX INFORMATION: This communication is not intended or written by
Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose
of avoiding penalties that may be imposed on the taxpayer under the Internal
Revenue Code of 1986, as amended.



----- End forwarded message -----

---

**3 attachments**

 **ATT142348.txt**
2K

 **ATT142351.htm**
3K

 **C&D power.com.pdf**
173K

---

HIGHLY CONFIDENTIAL                    POWER 2011.02.03.0000090
ATTORNEYS' EYES ONLY

# EXHIBIT 7

| From: | Eric Santos <eric.santos@corp.power.com> |
|---|---|
| Sent time: | Thursday, December 18, 2008 2:30:29 AM |
| To: | SteveVachani <steve@stevevachani.com> |
| Subject: | RES: RES: RES: Integrating new changes regarding Facebook, Facebook Connect - URGENT |

Ok.

Lembrando que a prioridade número 1 é a correção de bugs e melhorias na infra-estrutura (inclusive ficar pronto para bloqueios). A número 2 é a melhoria na campanha e comunicação para maximizar a ação. A 3ª prioridade está em desenvolver a solução do Facebook Connect e a solução de Integração de Redes (evitar que a gente fique com o usuário e senha).

Abraço

Eric

---

**De:** steve@stevevachani.com [mailto:steve@stevevachani.com]
**Enviada em:** quinta-feira, 18 de dezembro de 2008 05:22
**Para:** Eric Santos
**Assunto:** Re: RES: RES: Integrating new changes regarding Facebook, Facebook Connect - URGENT

Ok. Hopefully Facebook will give us an extension to keep Facebook working while we work on this new solution. I will need to present a presentation to Facebook with our product plan and progress on this. Hopefully we will be able to keep the site working while we do this and keep improving Facebook.

Also, during this time, we can make sure that our Amazon solution is working to distribute IP's through Amazon and other places.

Thanks,

Steve

--- On **Wed, 12/17/08, Eric Santos <eric.santos@corp.power.com>** wrote:

> From: Eric Santos <eric.santos@corp.power.com>
> Subject: RES: RES: Integrating new changes regarding Facebook, Facebook Connect - URGENT
> To: "SteveVachani" <steve@stevevachani.com>
> Date: Wednesday, December 17, 2008, 11:09 PM
>
> Bruno não está envolvido nessa atividade, somente a Carol. Para que se comece a especificação vou precisar que o Carlos Bacelar termine o estudo. Como te falei vamos ter que tirar o facebook e manter o site por enquanto sem facebook ... já vou solicitar que eles trabalharem para que a Power.com fique pronta para estar sem o Facebook e aguardarei a sua confirmação.
>
> Atc,
>
> Eric

---

**De:** steve@stevevachani.com [mailto:steve@stevevachani.com]
**Enviada em:** quinta-feira, 18 de dezembro de 2008 04:31
**Para:** Eric Santos; Felipe Herrera; Bruno Carvalho; Eric Santos
**Cc:** Cornelius Conboy
**Assunto:** Re: RES: Integrating new changes regarding Facebook, Facebook Connect - URGENT

Eric, after Carole and Bruno finish the initial specifications and designs, please provide me a Power point showing visually how everything will work with this new version. I will take this to Facebook to show them our progress and work for them to provide additional time.

Please keep me updated.

Thanks,
Steve

--- On **Wed, 12/17/08, steve@stevevachani.com <steve@stevevachani.com>** wrote:

From: steve@stevevachani.com

Subject: Re: RES: Integrating new changes regarding Facebook, Facebook Connect - URGENT

To: "Eric Santos" <eric@power.com>, "Felipe Herrera" <felipe.herrera@corp.power.com>, "Bruno Carvalho" <bruno.carvalho@corp.power.com>, "Eric Santos" <eric.santos@corp.power.com>

Cc: "Cornelius Conboy" <cornelius.conboy@corp.power.com>

Date: Wednesday, December 17, 2008, 10:22 PM

Eric, if we make a lot of progress on the presentation and other parts of the implementation, I will return to Facebook and make a presentation with our product plan and implementation and ask them if they can give us an extra week. Do not REMOVE it without talking to me. Please be ready to remove it if necessary.

Please let me know after Carol and Bruno finish the full product presentation of how it will work.

Thanks,
Steve

--- On **Wed, 12/17/08, Eric Santos <eric.santos@corp.power.com>** wrote:

From: Eric Santos <eric.santos@corp.power.com>

Subject: RES: Integrating new changes regarding Facebook, Facebook Connect - URGENT

To: "SteveVachani" <steve@stevevachani.com>, "Eric Santos" <eric@power.com>, "Felipe Herrera" <felipe.herrera@corp.power.com>, "Bruno Carvalho" <bruno.carvalho@corp.power.com>

Cc: "Cornelius Conboy" <cornelius.conboy@corp.power.com>

Date: Wednesday, December 17, 2008, 8:07 AM

Steve,

Realisticamente NÃO conseguiremos implantar a Facebook Connect na Power.com até o dia 24. Só posso garantir até essa data a retirada do PowerSite Facebook da Power.com.  Além disso, não temos equipe com esse conhecimento específico. Estou colocando dedicado 100% do tempo nessa atividade o Carlos Bacelar, mesmo assim não vai ser suficiente para que a gente tenha alguma solução pronta antes do ano que vem.

Temos os seguintes etapas que devemos passar para fazer algo com Facebook Connect:

1-    Estudar o Facebook Connect e realizar um estudo comparativo com a nossa tecnologia. Verificar o que poderemos fazer e o que não poderemos.  [Carlos Bacelar]

2-    Desenvolver projeto do novo powersite do Facebook com Facebook Connect na Power.com. [Carolina Fialho]

3-    Desenvolver infra-estrutura para acessar o Facebook Connect. [Carlos Bacelar]

4-    Desenvolver a integração do powersite do Facebook Connect na Power.com. [Elmo – Tyago e Leandro]

   *Ainda temos o esforço de retirada da atual solução.

Ou seja, se contente se essa solução estiver no ar antes do dia 15 de janeiro. Infelizmente não acho indicado parar as atividades de correção de bug e melhoria de perfomance.

Posso tentar te confirmar a retirada do facebook da Power.com no dia 24. Perderemos aproximadamente 30k usuários. Ok?

Atc,

Eric

---

**De:** steve@stevevachani.com [mailto:steve@stevevachani.com]

**Envida em:** quarta-feira, 17 de dezembro de 2008 09:28

**Para:** Eric Santos; Felipe Herrera; Bruno Carvalho

**Cc:** Cornelius Conboy

**Assunto:** Integrating new changes regarding Facebook, Facebook Connect - URGENT

Eric,

As we discussed, we will proceed to make changes as implemented addressed below for the final login and the start page.

Please see www.joost.com, www.digsby.com, and some other sites that have integrated Facebook connect.

On the first page, we will put a Login Using Facebook approved logo. Please see the approved logos. When a person clicks that, it will popup the Facebook connect login.

We can customize the text and graphics. Please see how Joost implemented this.

After the person logs in, We can use their Facebook photo with the Facebook logo inside (see Joost). We can also access the Facebook IM inside our Facebook messenger.

Please confirm if we can access updates, Facebook mail, birthdays, and other information on the start page.

Facebook allows the option for a user to remain logged in to a site with their Facebook account.

So if a Power Facebook user returns, we can go automatically to their logged in start page. We can also let Facebook users automatically have a Power account and we can store all their other accounts inside of Power.

We might need to create a separate window for Facebook inside of the Power Start page, but lets see if we can integrate the information more naturally inside.

In the short term, lets be Facebook's most INNOVATIVE partner and then when we are ready, I will request for them to give us more flexibility and allow us to create extensions to Facebook connect.

I don't like to do this, but I think in the short term, we should try. We are not strong enough right now.

Also, if a user enters Facebook, for now, we should just keep a Power Frame open and then past them into Facebook. The user will need to login. If they have a Facebook cookie, they will not need to login. Let's try to keep the Power Frame.

Maybe we can still use the Power Proxy also if Facebook allows us to stay logged in. Let's try to to see if we can use the proxy.

I realize that this is a big change, but it is important that we try our best. Diplomatically, this will allow us to have more flexibiliy to try new things with Facebook,

Facebook has given us a deadline to have EVERYTHING installed and working by next week. We need to complete everything by December 24th.

Let me be clear. THIS IS VERY URGENT.

Let's determine the best possible user experience.

We will not let users login right now directly.

In the short term, we will integrate Facebook Connect inside our Power Login API also.

We will need to follow Facebook connects policies regarding displaying their logo on our site. They have approved logos and other stuff at this link

1. That Power.com has ceased displaying Facebook's trademarks on its website, except as expressly permitted by Facebook's Terms of Use, Developer Terms of Service, and/or Facebook's Connect Policies (see http://wiki.developers.facebook.com/index.php/Facebook_Connect_Policies).
2. That Power.com has implemented Facebook Connect in strict adherence to Facebook's Terms of Use, Developer Terms of Service, and/or Connect Policies.

Eric, please study Facebook connect carefully and please look at Joost, Digsby, and other Facebook connect partners to see how they have implemented. More importantly, lets' try to be Facebook's most innovative partner so they will then work with us on new ideas.

No virus found in this incoming message.
Checked by AVG.
Version: 7.5.552 / Virus Database: 270.9.19/1853 - Release Date: 17/12/2008 08:31

No virus found in this outgoing message. Checked by AVG. Version: 7.5.552 / Virus Database: 270.9.19/1853 - Release Date: 17/12/2008 08:31

No virus found in this incoming message.
Checked by AVG.
Version: 7.5.552 / Virus Database: 270.9.19/1854 - Release Date: 17/12/2008 19:21

No virus found in this outgoing message. Checked by AVG. Version: 7.5.552 / Virus Database: 270.9.19/1854 - Release Date: 17/12/2008 19:21

No virus found in this incoming message.
Checked by AVG.
Version: 7.5.552 / Virus Database: 270.9.19/1854 - Release Date: 17/12/2008 19:21

No virus found in this outgoing message. Checked by AVG. Version: 7.5.552 / Virus Database: 270.9.19/1854 - Release Date: 17/12/2008 19:21

SER 291

**From:** Eric Santos <eric.santos@corp.power.com>
**Sent time:** Thursday, December 18, 2008 2:30:29 a.m.
**To:** SteveVachani <steve@stevevachani.com>
**Subject:** RES: RES: RES: Integrating new changes regarding Facebook, Facebook Connect URGENT

---

Ok.
Remember that the number 1 priority is the correction of bugs and the improvement of the infrastructure (including being ready for blocks). Number 2 is the improvement of the campaign and communication to maximize the action. The 3rd priority is to develop the Facebook Connect solution and the solution for the Integration of Networks (to keep us from having the username and password).


Hug


Eric

---

**From:** steve@stevevachani.com [mailto:steve@stevevachani.com]
**Sent date:** Thursday, December 18, 2008 5:22 a.m.
**To:** Eric Santos
**Subject:** Re: RES: RES: Integrating new changes regarding Facebook, Facebook Connect - URGENT

Ok.

Hopefully Facebook will give us an extension to keep Facebook working while we work on this new solution. I will need to present a presentation to Facebook with our product plan and progress on this. Hopefully we will be able to keep the site working while we do this and keep improving Facebook.

Also, during this time, we can make sure that our Amazon solution is working to distribute IP's through Amazon and other places.

Thanks,

Steve

---On **Wed, 12/17/08, Eric Santos *<eric.santos@corp.power.com>* wrote:**

> From: Eric Santos <eric.santos@corp.power.com>
> Subject: RES: RES: Integrating new changes regarding Facebook, Facebook Connect URGENT
> To: "SteveVachani" <steve@stevevachani.com>
> Date: Wednesday, December 17, 2008, 11:09 p.m.
>
> Bruno is not involved in this activity; only Carol. In order to begin the specification, I will need Carlos Bacelar to finish the study. As I already told you, we are going to have to remove Facebook and maintain the site without Facebook for now…I will request that they work so that Power.com is ready to be without Facebook, and I will await your confirmation.
>
> Regards,
>
> Eric

---

**From:** steve@stevevachani.com [mailto:steve@stevevachani.com]
**Sent on:** Thursday, December 18, 2008 4:31a.m.
**To:** Eric Santos; Felipe Herrera; Bruno Carvalho; Eric Santos
**Cc:** Cornelius Conboy
**Subject:** Re: RES: Integrating new changes regarding Facebook, Facebook Connect URGENT

Eric, after Carole and Bruno finish the initial specifications and designs, please provide me a Power point showing visually how everything will work with this new version. I will take this to Facebook to show them our progress and work for them to provide additional time.

Please keep me updated.

Thanks,
Steve

---On **Wed, 12/17/08, steve@stevevachani.com *<steve@stevevachani.com>* wrote:**

From: steve@stevevachani.com <steve@stevevachani.com>
Subject: Re: RES: Integrating new changes regarding Facebook, Facebook Connect URGENT
To: "Eric Santos" <eric@power.com>, "Felipe Herrera" <felipe.herrera@corp.power.com>, "Bruno Carvalho"
<bruno.carvalho@corp.power.com>, "Eric Santos" <eric.santos@corp.power.com>
Cc: "Cornelius Conboy" <cornelius.conboy@corp.power.com>
Date: Wednesday, December 17, 2008, 10:22 p.m.

Eric, if we make a lot of progress on the presentation and other parts of the implementation, I will return to Facebook and make a presentation with our product plan and implementation and ask them if they can give us an extra week. Do not REMOVE it without talking to me. Please be ready to remove it if necessary.

Please let me know after Carol and Bruno finish the full product presentation of how it will work.

Thanks,
Steve

----On **Wed, 12/17/08, Eric Santos <*eric.santos@corp.power.com*> wrote:**

From: Eric Santos <eric.santos@corp.power.com>
Subject: RES: Integrating new changes regarding Facebook, Facebook Connect URGENT
To: "SteveVachani" <steve@stevevachani.com>, "Eric Santos" <eric@power.com>, "Felipe Herrera"
<felipe.herrera@corp.power.com>, "Bruno Carvalho"
<bruno.carvalho@corp.power.com>
Cc: "Cornelius Conboy" <cornelius.conboy@corp.power.com>
Date: Wednesday, December 17, 2008, 8:07 a.m.

Steve,

Realistically we will NOT be able to implement Facebook Connect on Power.com until the 24th. Until that date, I can only guarantee the removal of the PowerSite Facebook from Power.com. In addition, we do not have a team with this specific knowledge. I am putting Carlos Bacelar to dedicate 100% time to this activity, even though it is not going to be sufficient for us to have a solution ready before next year.

We have the following stages that we need to go through to do something with Facebook Connect:

1 – Study Facebook Connect and realize a comparative study with our technology. Verify what we can and can't do. [Carlos Bacelar]

2 – Develop project of new powersite of Facebook with Facebook Connect on Power.com. [Carolina Fialho]

3 – Develop infrastructure to access Facebook Connect. [Carlos Bacelar]

4 – Develop the integration of the Facebook Connect powersite on Power.com. [Elmo – Tyago and Leandro]

*We still have the effort to remove the current solution.

Or, rather, is it OK if this solution is live before January 15. Unfortunately I do not think it's appropriate to stop the bug correction activities and performance improvement.

I can try to confirm with you the removal of Facebook from Power.com on the 24th. We will lose approximately 30k users. OK?

Regards,

Eric

---

**From:** steve@stevevachani.com [mailto:steve@stevevachani.com]
**Sent on:** Wednesday, December 17, 2008, 9:28 a.m.
**To:** Eric Santos; Felipe Herrera; Bruno Carvalho
**Cc:** Cornelius Conboy
**Subject:** Integrating new changes regarding Facebook, Facebook Connect URGENT

Eric,

SER 293

As we discussed, we will proceed to make changes to implement Facebook connect for the initial login and our start page.

Please see www.joost.com, www.digsby.com, and some other sites that have integrated Facebook connect.

On the first page, we will put a Login Using Facebook approved logo. Please see the approved logos. When a person clicks that, it will popup the Facebook connect login.

We can customize the text and graphics. Please see how Joost implemented this.

After the person logs in, we can use their Facebook photo with the Facebook logo inside (see Joost). We can also access the Facebook IM inside our Facebook messenger.

Please confirm if we can access updates, Facebook mail, birthdays, and other information on the start page.

Facebook allows the option for a user to remain logged in to a site with their Facebook account.

So if a Power Facebook user returns, we can go automatically to their logged in start page. We can also let Facebook users automatically have a Power account and we can store all their other accounts inside of Power.

We might need to create a separate window for Facebook inside of the Power Start page, but lets see if we can integrate the information more naturally inside.

In the short term, lets be Facebook's most INNOVATIVE partner and then when we are ready, I will request for them to give us more flexibility and allow us to create extensions to Facebook connect.

I don't like to do this, but I think in the short term, we should try. We are not strong enough right now.

Also, if a user enters Facebook, for now, we should just keep a Power Frame open and then past them into Facebook. The user will need to login. If they have a Facebook cookie, they will not need to login. Let's try to keep the Power Frame.

Maybe we can still use the Power Proxy also if Facebook allows us to stay logged in. Let's try to see if we can use the proxy.

I realize that this is a big change, but it is important that we try our best. Diplomatically, this will allow us to have more flexibility to try new things with Facebook,

Facebook has given us a deadline to have EVERYTHING installed and working by next week. We need to complete everything by December 24th.

Let me be clear. THIS IS VERY URGENT.

Let's determine the best possible user experience.

We will not let users login right now directly.

In the short term, we will integrate Facebook Connect inside our Power Login API also.

We will need to follow Facebook connects policies regarding displaying their logo on our site. They have approved logos and other stuff at this link

1. That Power.com has ceased displaying Facebook's trademarks on its website, except as expressly permitted by Facebook's Terms of Use, Developer Terms of Service, and/or Facebook's Connect Policies (see http://wiki.developers.facebook.com/index.php/Facebook_Connect_Policies).

2. That Power.com has implemented Facebook Connect in strict adherence to Facebook's Terms of Use, Developer Terms of Service, and/or Connect Policies.

Eric, please study Facebook connect carefully and please look at Joost, Digsby, and other Facebook connect partners to see how they have implemented. More importantly, lets' try to be Facebook's most innovative partner so they will then work with us on new ideas.

No virus found in this incoming message.
Checked by AVG.
Version: 7.5.552 / Virus Database: 270.9.19/1853 Release Date: 17/12/2008 08:31

No virus found in this outgoing message. Checked by AVG. Version: 7.5.552 / Virus Database: 270.9.19/1853 Release Date: 17/12/2008 08:31

No virus found in this incoming message.
Checked by AVG.
Version: 7.5.552 / Virus Database: 270.9.19/1854 Release Date: 17/12/2008 19:21

No virus found in this outgoing message. Checked by AVG. Version: 7.5.552 / Virus Database: 270.9.19/1854 Release Date: 17/12/2008 19:21

No virus found in this incoming message.
Checked by AVG.
Version: 7.5.552 / Virus Database: 270.9.19/1854 Release Date: 17/12/2008 19:21

No virus found in this outgoing message. Checked by AVG. Version: 7.5.552 / Virus Database: 270.9.19/1854 Release Date: 17/12/2008 19:21



**TRANSPERFECT**

AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOGOTÁ
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
CLEVELAND
COLUMBUS
DALLAS
DENVER
DUBAI
DUBLIN
DÜSSELDORF
FRANKFURT
GENEVA
HONG KONG
HOUSTON
LONDON
LOS ANGELES
LYON
MEXICO CITY
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SEOUL
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TEL AVIV
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC
ZURICH

City of New York, State of New York, County of New York

I, Casey Dianni, hereby certify that the document:

- RES RES RES Integrating new changes regarding Facebook, Facebook Connect - URGENT - Eric Santos (eric.santos@corp.power.com) - 2008-12-18 0230

is, to the best of my knowledge and belief, a true and accurate translation from Portuguese to English.

Casey Dianni

Sworn to before me this
November 14, 2011

Signature, Notary Public

SARAH E MULLEN
Notary Public - State of New York
No. 01MU6245919
Qualified in New York County
Commission Expires Aug 08, 20 15

Stamp, Notary Public

THREE PARK AVENUE, NEW YORK, NY 10016  T 212.689.5555  F 212.689.1059  WWW.TRANSPERFECT.COM

# EXHIBIT A



1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
PHONE: 206.359.8000
FAX: 206.359.9000
www.perkinscoie.com

December 1, 2008

**SENT VIA EMAIL**

Power Assist, Inc.
Attn: Leigh Power
210 Kineth Point Place
Coupeville, Washington 98239-9569

hostmaster1@poweremail.org

**Re:    Cease and Desist Soliciting Login Credentials and Scraping Facebook Content**

Dear Ms. Power:

We represent Facebook Inc., based in Palo Alto, California.  It has come to Facebook's attention that your company is soliciting and storing Facebook user login information, scraping content from Facebook, and sending unsolicited commercial messages to Facebook users through your website: http://www.power.com.  These activities violated Facebook's Terms of Use, which specifically prohibit:

- Solicitation of Facebook user login information;

- Using or attempting to use another person's Facebook account without authorization from the Company;

- Use of automated scripts to collect information from, or otherwise interact with, the Facebook website;

- Uploading, posting, transmitting, sharing or otherwise making available any unsolicited or unauthorized advertising, solicitations, promotional materials, "junk mail," "spam," "chain letters," "pyramid schemes," or any other form of solicitation;

- Using the Facebook service or site for commercial purposes, except under formal advertising programs offered by Facebook; and

LEGAL14988339. 1
ANCHORAGE · BEIJING · BELLEVUE · BOISE · CHICAGO · DENVER · LOS ANGELES · MENLO PARK
OLYMPIA · PHOENIX · PORTLAND · SAN FRANCISCO · SEATTLE · SHANGHAI · WASHINGTON, D.C.
Perkins Coie LLP and Affiliates

Power.com
December 1, 2008
Page 2

- ▪ Incorporating any Facebook site content or information in any other database or compilation.

*See* http://www.facebook.com/terms.php.

In addition to breaching Facebook's Terms of Use, your website's functionality may violate the California Comprehensive Computer Data Access and Fraud Act, CA Penal Code § 502(c); the California Anti-Phishing Act of 2005, CA Bus. and Prof. Code § 22948, *et. seq.*; the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; the CAN-SPAM Act, 15 U.S.C. § 7701 *et seq.*; and state laws prohibiting interference with Facebook's business expectations and interests.

You are also displaying the Facebook trademark on your website without Facebook's authorization, which likely causes visitors to your website to incorrectly believe that your website is approved by or in some way affiliated with Facebook.

Facebook takes the protection of its users' privacy very seriously and is committed to keeping Facebook a safe place for users to interact and share information. Facebook has developed Terms of Use to protect its users and to facilitate these goals. As set forth above, your website violates Facebook's Terms of Use.

Facebook offers an open development platform that allows third parties to develop applications that integrate with Facebook, subject to Facebook's Developer Terms of Service. *See* http://developers.facebook.com/terms.php and http://developers.facebook.com/guidelines.php. You may also wish to familiarize yourself with "Facebook Connect," which allows Facebook users to connect their Facebook identity, friends and privacy to any site. For more information on Facebook Connect, please visit http://developers.facebook.com. These resources may allow you to integrate existing functionality with Facebook in an authorized manner.

Please respond to me in writing no later than close of business on Wednesday, December 3, 2008, confirming that you: (1) have ceased and desisted in, and will refrain from, soliciting, using and/or retaining Facebook user login information, or any other Facebook Site Content as defined by the Facebook Terms of Use, (2) ceased and desisted in, and will refrain from, sending any manner of unsolicited commercial messages to Facebook users; (3) removed compatibility with Facebook from your website, (4) removed references to Facebook from your website and other promotional material, (5) ceased using/and or displaying Facebook's trademark on your website and/or other promotional material, and (6) that in the future you and your company will strictly comply with Facebook's Terms of Use.

LEGAL14988339. 1

Power.com
December 1, 2008
Page 3

Very truly yours,

Joseph P. Cutler

JPC:jpc

# EXHIBIT B

**Dalton, Amy**

| | |
|---|---|
| **From:** | steve@stevevachani.com |
| **Sent:** | Friday, December 26, 2008 9:50 PM |
| **To:** | felipe.herrera@powerinc.net; Cutler, Joseph P. (Perkins Coie) |
| **Cc:** | Demetrescu, Nicole (Perkins Coie); McCullagh, James R. (Perkins Coie); steve@power.com |
| **Subject:** | Power.com Update - sent December 26th, 2008 |

Dear Joseph,

I am writing to follow up to our discussions regarding Power.com's integration of Facebook connect, your requests for us to take down our current Power browser compatability with Facebook, and your complaints regarding our users storing their Facebook login information inside the Power Browser. I hope you will pass this letter on to Sam and other appropriate parties inside of Facebook to communicate our sincere desire to diplomaticaly resolve our current disagreement and help you reduce these disagreements with well intentioned companies like Power.

Power.com is very committed to working with Facebook and we sincerely hope that this message of diplomacy and good intention is very clear in this letter. We would like to reiterate that we have made the decision to make every diplomatic effort possible to cooperate with Facebook to integrate your Facebook Connect solution on our login page. We had originally expected that it would take us 2 weeks to complete this integration, but with the holidays and the amount of work necessary to complete this integration, we realistically don't expect have this new solution fully integrated until January 30th. as we had previously discussed. After careful consideration and after previously thinking that it would better to take Facebook comptability down while we implemented this new solution, we have made the business decision to not prevent the interruption of service to our millions of users while working closely to make these changes to address Facebook's concerns. We sincerely hope that while this is not your desired action, you will respect our reasons for doing this and keep the door open and approve Power.com inside of Facebook connect when we go live in one month. Furthermore, we would like to work with Facebook to offer our complete browser tools to users with Facebook's consent and input into the user experience.

The Power.com browser provides our users value added features across their Internet experience. Like most browsers, we have little interest to cause harm to Facebook or reduce Facebook's revenues. On the contrary, we are taking proactive steps to pass all Facebook ads through to the user inside our browser. Similar to Firefox, Internet Explorer, Flock, and other browsers and browser add-ons, we provide our users a browser to navigate and continue to use their existing sites and do not in any way attempt to obstruct users from using the sites they are accustomed to using every day. Like most browsers, we do offer our users the option to either start their experience on our home page or start on their default social network.

Furthermore, we are about to launch a new solution which will pass Facebook ads inside of all Facebook content which is displayed outside of Facebook. This is something we can have ready by the end of January and which we can also enable for you to offer to other develpment partners whose only desire is to create positive applications for Facebook users. We are committed to working with the entire industry to responsibly create a borderless web where all parties interests are respected when widgets, apps, messages, and other content are distributed outside of Facebook or outside the host site of any other web publisher.

Power strives for complete transparency with our users by providing them explicit statements on our front page in two different places about the nature of our application, the fact that we are a value added browser with no endorsement by other sites, and we also require a user before using our service to read

1

SER 302

through and proactively accept our terms and conditions where we for the third time clarify the users consent and understanding that we are in no way affiliated with or endorsed by Facebook.

We completely understand Facebook's position to not begin any business discussions with Power.com until we have become compliant with Facebook requests. We request that you please reconsider this decision and enable us to meet with Facebook as early as possible to diplomatically resolve this issue in a way that will allow us to keep creating new applications for Facebook and also help Facebook better accommodate other innovators and application developers like Power.com who only want to enrich your user's experiences. We are working to implement this complete solution with Facebook's cooperation by January 30th and sincerely hope that you will not misinterpret this delay and our decision to not interrupt the user experience of our mutual users as our lack of desire to work together with Facebook.

If you maintain that you cannot faciliate a direct meeting, we will happily use our own contacts to start these discussions with Facebook, but it is difficult to start these discussions until after the holidays are over. We have no problem using our own contacts to get to the appropriate people at Facebook engaged in discussions in January to resolve this, but naturally prefer your assistance to speed things up.

We believe that it would be a serious strategic mistake to disrupt the experience of the millions of Power.com users while we are actively working to complete the integration of Facebook connect. We believe that this would create unnecessary attention and disruption among users, the media, and the industry around what we believe is a discussion that can be handled maturely and quietly between our companies.

I believe that Facebook understands the current challenges as Meebo and soon thousands of other sites that will connect to Facebook using open source technology solutions and other user driven solutions that are not endorsed by Facebook. We respect Facebook's objectives to create an open Internet which respects and protects users and enables developers to create new innovations to serve Facebook users. We think that it is important that we all diplomatically work together to achieve these goals for the best interests of users. The borderless web is inevitable and we all need to work together to define the best practices for this new and exciting Internet which Facebook has already played such a pivotal role in helping create over the past years.

Power.com is very interested in sitting down with Facebook to discuss together the future of the borderless internet and work to address all of Facebook's concerns. I am willing to fly to San Francisco as early as possible to proactively present our solutions or we are happy to wait until after January 30th when we complete our integration of Facebook connect on our initial login page.

We believe that that your number one concern of protecting a users username and password will be resolved by our implemention of Facebook connect or by Facebook using an extension to Facebook connect that we would like to present to you which would allow Power and other outside developers maximum flexibility to innovate on top of Facebook while keeping the users username and password locked securely and safely outside the reach of Power.com or any other developer. We are currently supporting and helping introduce a new industry wide solution that will ensure that sites like Power.com, Meebo, eBuddy, and thousands of others will never have access or store Facebook usernames and passwords, but still have the maximum flexibility to innovate new applications on top of Facebook and all other sites on the Internet. We all share similar investors and partners and we are all striving for the same objectives.

We believe that Facebook's second concern is the potential loss of revenues when Facebook content is accessed outside of Facebook. This coming month, Power.com will be introducing a solution which will pass all Facebook advertising through with your content that is displayed outside of Facebook. We are proceeding with this without being asked in order to further demonstrate our desire to diplomatically and responsibly address the issues of distributed content inside of mashed up websites. Power.com has no interest to

interfere or to prevent Facebook from receiving revenue from all its content and will go out of its way to showcase to the industry how to responsibly solve this problem. We would welcome the opportunity to work with you to define these standards together with the leading sites on the web and introduce these standards together to the industry and inside of Facebook connect.

Finally, as a browser, most of our users experience is actually inside of Facebook and other destination sites and we do not in any way prevent users from viewing the entire Facebook experience with all ads and revenues streams intact.

While we understand your current requests to take down the current Facebook compatibility with the Power Browser today, we strongly believe that it is a mistake to disrupt the user experience of our millions of users and create attention around our private discussions.

Unlike some other sites that you are dealing with that may truly be causing harm to Facebook, Power.com's only goal is to enable new applications which enhance Facebook's users experience inside your site.

Therefore, we diplomatically request that you please grant us an extension until January 30th to work to achieve compliance with Facebook's request and to have time to diplomatically sit down with Facebook to present solutions that will assist you in dealing with these core issues not only with Power.com, but with the hundreds of other well intentioned developers who are only looking to create new innovations for Facebook, but who do not yet have the flexibility from Facebook to support their innovations. The floodgates are about to open and we would love to work proactively to solve these challenges together.

We sincerely hope you respect our decision on this and look forward to building a healthy and diplomatic dialogue with Facebook to address your true concerns of protecting your users. And we apologize for the lack of clarity on our position until today and for any confusion we may have created from this lack of clarity. Facebook's initial strong reaction did catch us off guard and after careful consideration, we have crafted this letter to make clear our position and desire and commitment to work together.


Best Regards,

Steve Vachani

CEO, Power.com



--- On **Tue, 12/16/08, Cutler, Joseph P. (Perkins Coie)** <*JCutler@perkinscoie.com*> wrote:

From: Cutler, Joseph P. (Perkins Coie) <JCutler@perkinscoie.com>
Subject: RE: Power.com
To: steve@stevevachani.com, felipe.herrera@powerinc.net
Cc: "Demetrescu, Nicole (Perkins Coie)" <NDemetrescu@perkinscoie.com>, "McCullagh, James R. (Perkins Coie)" <JMcCullagh@perkinscoie.com>
Date: Tuesday, December 16, 2008, 10:41 AM

Steve,


I imagine you are in the air right now, but upon landing – could you confirm whether you are still available

3

at 12:00 Pacific Time?  My schedule moved a bit today – and I now have either 12-12:30 or after 2:00 available.  I'd like to talk at noon as you originally proposed.  Will that work?

If I haven't heard from you then, I'll call you at noon.

Thanks,

Joe

---

**From:** steve@stevevachani.com [mailto:steve@stevevachani.com]
**Sent:** Monday, December 15, 2008 6:05 PM
**To:** Cutler, Joseph P. (Perkins Coie); filipe.herrera@powerinc.net
**Cc:** Demetrescu, Nicole (Perkins Coie); McCullagh, James R. (Perkins Coie)
**Subject:** Re: Power.com

I will be free to go over these terms tomorrow. I am on a flight all morning, but should be free to talk around noon.

Thanks,
Steve

Thanks,
Steve

Sent via BlackBerry by AT&T

---

**From:** "Cutler, Joseph P. (Perkins Coie)"
**Date**: Mon, 15 Dec 2008 17:00:53 -0800
**To:** <steve@stevevachani.com>; <filipe.herrera@powerinc.net>
**Subject**: RE: Power.com

Steve and Felipe,

I am sorry that we were not able to match schedules on Friday.  Facebook has reviewed this letter, and is willing to accept your offer to have Facebook Connect implemented by EOD December 26 – which is two weeks from the date you sent the letter.

4

**SER 305**

Meanwhile, as you may know, Facebook has taken technical measures to limit the interaction between Power.com and its network at this time. In order to fully initialize your integrated Facebook Connect status, and to lift those technical measures, Facebook requires <u>written confirmation</u> of the following:

1. That Power.com has purged and destroyed all data that it obtained from the Facebook network or from Facebook users prior to implementation of Facebook Connect, including all login information and/or any other data obtained or scraped from Facebook's site.
2. That Power.com has ceased displaying Facebook's trademarks on its website, except as expressly permitted by Facebook's Terms of Use, Developer Terms of Service, and/or Facebook's Connect Policies (see http://wiki.developers.facebook.com/index.php/Facebook_Connect_Policies).
3. That Power.com has implemented Facebook Connect in strict adherence to Facebook's Terms of Use, Developer Terms of Service, and/or Connect Policies.
4. That Power.com has removed all compatibility with Facebook's site that does not comply with Facebook's Terms of Use, Developer Terms of Service and/or Connect Policies.
5. That Power.com will in the future adhere to all of Facebook's Terms of Use, Developer Terms of Service, Connect Policies.

While Facebook does not object to Power.com's efforts to interact with Facebook's developer teams via normal channels, it will not set up any special developer meetings for Power.com.

Lastly, regarding your proposed notice to Facebook users: your Connect interaction must strictly comply with Facebook's applicable Terms and Policies. Posting a notice that casts Facebook's Connect system in a negative light will likely become counterproductive to your stated goals of working together with Facebook's developers. Facebook reserves its right to deny approval for any Facebook Connect application for any reason.

I would still like to go over these items together on the phone. Are you available for a call tomorrow (Tuesday)? If so, what time?

Please confirm that you agree with these terms, and that you will commit to integrating Facebook Connect by EOD, December 26, 2008. Please also confirm that you intend to provide the written confirmation as described above by that time.

Thanks,

Joe

5

SER 306

**From:** steve@stevevachani.com [mailto:steve@stevevachani.com]
**Sent:** Friday, December 12, 2008 1:24 PM
**To:** Cutler, Joseph P. (Perkins Coie)
**Cc:** felipe.herrera@corp.power.com; Eric Santos
**Subject:** Power.com

Thank you for patience to allow us to clarify our plan of action on Power in regards to our discussion on Wednesday.

We decided to move forward with the following steps

1) We will implement Facebook connect on our main login page and work with the capabilities of Facebook connect for the login to our site. Instead of a login for Facebook, users will have a button which then opens the Facebook connect window and allows them to login through Facebook connect. We will say that Facebook connects current capabilities are extremely limited and we would love the opportunity to provide a Facebook connect extension to Facebook that would allow us to enrich the experience for Facebook users. We will show that to the bus dev guys when we have a chance to meet with them.

2) We will delete any Facebook friend information we currently have.

3) We will move forward and use the Facebook features to utilize Facebook's IM, updates, and some other functionality that is already available. After we finish the implementation, we would like the opportunity to get Facebook's feedback. We have some simple innovative ideas that will follow Facebook connects system, but allow for better usability and integration. As stated earlier, we do believe that the user experience of Facebook connect is extremely limited at this stage and we hope to have an open and friendly relationship with the Facebook team to share ideas and complete solutions to allowing partners to do greater integration while addressing Facebook's concerns.

4) We are finishing a solution that we have already been discussing with other sites that is an extension to Facebook connect that Facebook could enable that will allow us to provide more functionality to Facebook users while protecting all the concerns of Facebook.

5) We do understand that there is no guarantee that Facebook will accept this solution, but our only request is

6

that


6) We estimate that it will take us 2 weeks to completely finish this integration with Facebook connect and shift the user experience for our current users.


7) While have made the decision today to do this, we would request only one thing. We would like to meet with the business dev and guys involved on the product for thinking about solution for providing more flexibility with partners and at least present our simple code that Facebook could add that would allow us to provide a richer experience to our users and at the same time do it in a way that Facebook finds compatible with you they are envisioning their partners working with them in the future.


I believed that this email addresses everything we discussed.


The two requests we have and hope you will faciliate.


1) Can we get an email introduction to the correct people inside Facebook. We only ask for the introduction and we will follow up and see their interest to meet.


2) Provide us 2 (instead of one you offered) to implement this new solution.


We did study Digsby and others and saw the changes they made in their UI to implement Facebook connect.


Please call me now and we can discuss this further. I am heading to a flight shortly.


NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

7

# EXHIBIT 5

1   LAW OFFICES OF SCOTT A. BURSOR
    Scott A. Bursor (*pro hac vice*)
2   369 Lexington Avenue, 10th Floor
    New York, NY  10017
3   Telephone:  (212) 989-9113
    Facsimile:  (212) 989-9163
4
    BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
5   Alan R. Plutzik (State Bar No. 077785)
    L. Timothy Fisher (State Bar No. 191626)
6   2125 Oak Grove Road, Suite 120
    Walnut Creek, CA  94598
7   Telephone:  (925) 945-0200
    Facsimile:  (925) 945-8792
8
    Attorneys for Defendants Power
9   Ventures, Inc. and Steve Vachani

10                  UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12

13

14  FACEBOOK, INC.,

15                              Plaintiff,        Case No. 5:08-cv-05780 JF (RS)

16  -against-                                     **DEFENDANT POWER VENTURES,
                                                  INC.'S RESPONSES TO
17  POWER VENTURES, INC. d/b/a POWER.COM, a       FACEBOOK, INC.'S FIRST SET OF
    California corporation; POWER VENTURES, INC.  INTERROGATORIES**
18  a Cayman Island Corporation, STEVE VACHANI,
    an individual; DOE 1, d/b/a POWER.COM, an
19  individual and/or business entity of unknown nature;
    DOES 2 through 25, inclusive, individuals and/or
20  business entities of unknown nature,

21                              Defendants.

22

23

24

25

26

27

28

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF INTERROGATORIES
CASE NO.  5:08-CV-05780 JF  (RS)
63173

Power is presently unaware of any Facebook accounts created by Power employees for purposes of their employment with Power.

**INTERROGATORY NO. 5:**

Describe in detail how AND IDENTIFY when YOU first became aware that FACEBOOK had IP blocks to keep YOU OR POWER USERS from accessing the FACEBOOK WEBSITE.

**RESPONSE TO INTERROGATORY NO. 5:**

Power objects that this interrogatory is vague and ambiguous. Subject to and without waiving those objections, Power states that on or about December 15, 2008 it received an email from Facebook's counsel, Joseph P. Cutler, stating that "Facebook has taken technical measures to limit the interaction between Power.com and its network at this time."

**INTERROGATORY NO. 6:**

Describe in detail how AND IDENTIFY when YOU first learned that YOU did not have FACEBOOK's permission to access the FACEBOOK WEBSITE.

**RESPONSE TO INTERROGATORY NO. 6:**

Power objects that this interrogatory is vague and ambiguous, overbroad, unduly burdensome, and seeks information that is not within Power's possession, custody or control. Subject to and without waiving those objections, Power states that on or about December 1, 2008 it received a letter from Facebook's counsel, Joseph P. Cutler, stating that Power's activities violated "Facebook's Terms of Use."

**INTERROGATORY NO. 7:**

Describe in detail and IDENTIFY the process by which YOU continued to access, OR provide POWER USERS' with the means to access, the FACEBOOK WEBSITE following FACEBOOK's IP blocking, including, but not limited to the POWER employee(s) OR director(s) responsible for that process OR decision.

/      /      /

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF INTERROGATORIES     4
CASE NO. 5:08-CV-05780 JF  (RS)
63173

SER 312

1

**RESPONSE TO INTERROGATORY NO. 7:**

2

3          Power objects that this interrogatory is vague and ambiguous, overbroad, unduly

4   burdensome, and seeks information that is not within Power's possession, custody or control.

5   Subject to and without waiving those objections, Power had implemented an industry standard

6   practice to refresh, randomize, and rotate IP addresses.  Power's IP addresses were regularly

7   updated for all Power users on all social networks.  These processes for updating IPs are

8   commonplace industry standard practices which Power had implemented prior to the dispute with

9   Facebook.  Power did not change its process for providing users with access to their Facebook

10  accounts in response to any attempted "IP blocking" by Facebook.  The person responsible for

11  Power's conduct in this regard was its CEO, Steven Vachani.

**INTERROGATORY NO. 8:**

12

13          IDENTIFY the POWER employee OR director responsible for developing the technology

14  to allow POWER OR POWER USERS to access the FACEBOOK WEBSITE.

15  **RESPONSE TO INTERROGATORY NO. 8:**

16

17          Steven Vachani.

**INTERROGATORY NO. 9:**

18

19          IDENTIFY the POWER employee OR director responsible for developing the technology

20  to allow POWER OR POWER USERS to continue to access the FACEBOOK WEBSITE

21  following FACEBOOK's IP blocking.

22  **RESPONSE TO INTERROGATORY NO. 9:**

23

24          Steven Vachani.

**INTERROGATORY NO. 10:**

25

26          IDENTIFY the POWER employee OR director responsible for creating the e-mail

27  messages sent to FACEBOOK USERS asking FACEBOOK USERS to use the POWER

28  WEBSITE to access the FACEBOOK WEBSITE.

---

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF INTERROGATORIES        5
CASE NO.  5:08-CV-05780 JF  (RS)
63173

**RESPONSE TO INTERROGATORY NO. 10:**

Steven Vachani.

**INTERROGATORY NO. 11:**

Describe in detail the creation of POWER's internet user Bill of Rights including, but not limited to, the individual(s) responsible for drafting it, the date(s) it was drafted and the date it was posted on the POWER WEBSITE.

**RESPONSE TO INTERROGATORY NO. 11:**

Power objects that this interrogatory seeks to elicit information protected by the attorney client privilege, the attorney work product doctrine. Subject to and without waiving those objections, Power states that Power's internet user Bill of Rights was posted to Power.com on or about July 1, 2010.

**INTERROGATORY NO. 12:**

IDENTIFY the members of YOUR "product team" responsible for integrating the POWER WEBSITE with FACEBOOK Connect, as referenced in YOUR December 17, 2008 e-mail to FACEBOOK's legal counsel. Dkt. No. 56 at Ex. A.

**RESPONSE TO INTERROGATORY NO. 12:**

Eric Santos, 305 West Broadway, Suite 137, New York, NY 10013.

**INTERROGATORY NO. 13:**

Explain in detail what actions, if any, YOU took to integrate the POWER WEBSITE with FACEBOOK Connect.

**RESPONSE TO INTERROGATORY NO. 13:**

Pursuant to Fed. R. Civ. P. 33(d), Power refers to its business records including its email correspondence concerning these issues, which will be produced upon entry of an appropriate protective order. Power's team worked relentlessly and diligently to integrate Facebook Connect

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF INTERROGATORIES
CASE NO. 5:08-CV-05780 JF (RS)
63173

6

SER 314

and explicitly communicated these efforts to Facebook.   In December 2008 and January 2009, it was Power's highest priority to innovate and launch Facebook connect through Power.com.

**INTERROGATORY NO. 14:**

Describe in detail YOUR "detailed product plan" regarding the "reintegration of Facebook with Facebook connect," referenced in YOUR December 17, 2008 e-mail to FACEBOOK's legal counsel.  Dkt. No. 56 at Ex. A.

**RESPONSE TO INTERROGATORY NO. 14:**

Pursuant to Fed. R. Civ. P. 33(d), Power refers to its business records including its email correspondence concerning these issues, which will be produced upon entry of an appropriate protective order.

**INTERROGATORY NO. 15:**

IDENTIFY ALL facts in support of YOUR contention that POWER had "concerns" regarding the integration of the POWER WEBSITE with FACEBOOK Connect on the schedule requested by FACEBOOK, as asserted in POWER's Answer and Counterclaim to FACEBOOK. Dkt. No. 41 at ¶ 60.

**RESPONSE TO INTERROGATORY NO. 15:**

Pursuant to Fed. R. Civ. P. 33(d), Power refers to its business records including its email correspondence concerning these issues, which will be produced upon entry of an appropriate protective order.

**INTERROGATORY NO. 16:**

IDENTIFY the individual(s) responsible for the "business decision" not to remove existing compatibility while implementing POWER's integration with FACEBOOK Connect, as referenced in YOUR December 26, 1008 e-mail to FACEBOOK's legal counsel.  Dkt. No. 56 at Ex. A.

**RESPONSE TO INTERROGATORY NO. 16:**

Steven Vachani.

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF INTERROGATORIES
CASE NO. 5:08-CV-05780 JF  (RS)
63173

7

SER 315

their personal data. Power respects and honors the trust that Power users have placed in Power to securely access and store their date. Power responsibly and securely stores its users' data, and Power has never had a security breach. Unless a user requests that his or her data be deleted, Power does not delete users' data. Power has a responsibility to preserve and store this data for the user, and Power respects and honors that responsibility. Power does not delete data that users have expect us to store and to maintain for them, just as Yahoo, Gmail and Facebook, for example, do not delete data that their users expect them to store and to maintain.


Dated: December 15, 2010                    BRAMSON, PLUTZIK, MAHLER &
                                            BIRKHAEUSER, LLP


                                            By_____/s/_____
                                                       L. Timothy Fisher

                                            Alan R. Plutzik (State Bar No. 77785)
                                            L. Timothy Fisher (State Bar No. 191626)
                                            2125 Oak Grove Road, Suite 120
                                            Walnut Creek, CA 94598
                                            Telephone: (925) 945-0200
                                            Facsimile: (925) 945-8792

                                            LAW OFFICES OF SCOTT A. BURSOR
                                            Scott A. Bursor (*pro hac vice*)
                                            369 Lexington Avenue, 10th Floor
                                            New York, NY 10017-6531
                                            Telephone: (212) 989-9113
                                            Facsimile: (212) 989-9163

                                            Attorneys for Defendants Power
                                            Ventures, Inc. and Steve Vachani

## **VERIFICATION**

I, Steve Vachani, declare that:

I am a defendant in the above-captioned action.  I have read POWER VENTURES INC.'S RESPONSES TO FACEBOOK'S FIRST SET OF INTERROGATORIES, and know the contents thereof.  The responses are true of my own knowledge except as to the matters therein stated on information and belief and as to those matters I believe them to be true.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed at 5:00pm in San Francisco on December 15, 2010.

_____   Steve Vachani

# PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is Bramson, Plutzik, Mahler & Birkhaeuser, LLP, 2125 Oak Grove Road, Suite 120, Walnut Creek, CA  94598.  On December 15, 2010, I served the within documents:

- **DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS**
- **DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF INTERROGATORIES**
- **DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION**

☒   by placing a copy of the document(s) listed above for collection and mailing following the firm's ordinary business practice in a sealed envelope with postage thereon fully prepaid for deposit in the United States mail at Walnut Creek, California addressed as set forth below.

☐   by depositing a true copy of the same enclosed in a sealed envelope with delivery fees provided for a Federal Express pick up box or office designated for overnight delivery, and addressed as set forth below.

☐   By causing a process server to personally deliver a copy of the document(s) listed above to the person(s) at the address(es) set forth below

☐   by facsimile transmission on that date.  This document was transmitted by using a Canon LC 710 facsimile machine that complies with California Rules of Court Rule 2003(3), telephone number (925) 945-8792.  The transmission was reported as complete and without error.

☐   by personally delivering a copy of the document(s) listed above to the person(s) at the address(es) set forth below.

☒   by pdf transmission.  These documents were transmitted via e-mail to the following e-mail addresses as set forth below.

| | |
|---|---|
| I. Neel Chatterjee<br>Thomas J. Gray<br>Julio C. Avalos<br>Orrick, Herrington & Sutcliffe, LLP<br>1000 Marsh Road<br>Menlo Park, Ca  94025<br>Telephone:  1-650-614-7400<br>Facsimile:  1-650-614-7401<br>Email:  nchatterjee@orrick.com'<br>tgray@orrick.com<br>javalos@orrick.com | Jessica Susan Pers<br>Orrick Herrington & Sutcliffe, LLP<br>The Orrick Building<br>405 Howard Street<br>San Francisco, CA  94105-2669<br>Telephone:  1-415-773-5700<br>Facsimile:  1-415-773-5759<br>Email:  jpers@orrick.com<br><br>Attorneys for Facebook, Inc. |

Attorneys for Facebook, Inc.

Proof of Service
63193

1

2　Law Offices of Scott A. Bursor
　　Scott A. Bursor (pro hac vice)
3　369 Lexington Avenue, 10th Floor
　　New York, NY 10017
4　Telephone: d 212-989-9113
　　Facsimile: 212-989-9163
5　Email: scott@bursor.com

6　　　I am readily familiar with the firm's practice of collecting and processing correspondence for
　　mailing. Under that practice it would be deposited with the U.S. Postal Service on the same day
7　with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of
　　the party served, service is presumed invalid if postal cancellation date or postage meter date is
8　more than one day after date of deposit for mailing in affidavit.

9　　　I declare under penalty of perjury under the laws of the State of California that the above is true
　　and correct, executed on December 15, 2010, at Walnut Creek, California.

10

11

12

13　——————————————————
　　　Peggy Toovey

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Proof of Service
63193

SER 319

# EXHIBIT 6

1   LAW OFFICES OF SCOTT A. BURSOR
    Scott A. Bursor (*pro hac vice*)
2   369 Lexington Avenue, 10th Floor
    New York, NY 10017
3   Telephone: (212) 989-9113
    Facsimile: (212) 989-9163
4
    BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
5   Alan R. Plutzik (State Bar No. 077785)
    L. Timothy Fisher (State Bar No. 191626)
6   2125 Oak Grove Road, Suite 120
    Walnut Creek, CA 94598
7   Telephone: (925) 945-0200
    Facsimile: (925) 945-8792
8
    Attorneys for Defendants Power
9   Ventures, Inc. and Steve Vachani

10                  UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12

13

14  FACEBOOK, INC.,

15                              Plaintiff,          Case No. 5:08-cv-05780 JF (RS)

16  -against-                                       **DEFENDANT POWER VENTURES,
                                                    INC.'S RESPONSES TO
17  POWER VENTURES, INC. d/b/a POWER.COM, a         FACEBOOK, INC.'S FIRST SET OF
    California corporation; POWER VENTURES, INC.    REQUESTS FOR ADMISSIONS**
18  a Cayman Island Corporation, STEVE VACHANI,
    an individual; DOE 1, d/b/a POWER.COM, an
19  individual and/or business entity of unknown nature;
    DOES 2 through 25, inclusive, individuals and/or
20  business entities of unknown nature,

21                              Defendants.

22

23

24

25

26

27

28

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR
ADMISSIONS
CASE NO. 5:08-CV-05780 JF (RS)

## REQUESTS FOR ADMISSIONS

### REQUEST FOR ADMISSION NO. 1:

Admit that in a letter dated December 1, 2008, FACEBOOK requested confirmation that YOU "have ceased and desisted in…soliciting, using and/or retaining Facebook user login information"

### RESPONSE TO REQUEST FOR ADMISSION NO. 1:

Admitted.

### REQUEST FOR ADMISSION NO. 2:

Admit that in a letter dated December 1, 2008, FACEBOOK requested confirmation that YOU "ceased and desisted in …sending any manner of unsolicited commercial messages to Facebook users."

### RESPONSE TO REQUEST FOR ADMISSION NO. 2:

Admitted.

### REQUEST FOR ADMISSION NO. 3:

Admit that in a letter dated December 1, 2008, FACEBOOK requested confirmation that YOU "removed compatibility with Facebook from your website."

### RESPONSE TO REQUEST FOR ADMISSION NO. 3:

Admitted.

### REQUEST FOR ADMISSION NO. 4:

Admit that in a letter dated December 1, 2008, FACEBOOK told YOU that "scraping content from Facebook" violated FACEBOOK's Terms of Use.

### RESPONSE TO REQUEST FOR ADMISSION NO. 4:

Admitted.

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO. 5:08-CV-05780 JF (RS)

3

**REQUEST FOR ADMISSION NO. 5:**

Admit that in a letter dated December 1, 2008, FACEBOOK told YOU that Facebook's Terms of Use prohibited "[s]olicitation of Facebook user login information."

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Admitted.

**REQUEST FOR ADMISSION NO. 6:**

Admit that in a letter dated December 1, 2008, FACEBOOK told YOU that Facebook's Terms of Use prohibited "[u]sing or attempting to use another person's Facebook account without authorization from the Company," i.e., FACEBOOK.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Admitted.

**REQUEST FOR ADMISSION NO. 7:**

Admit that in a letter dated December 1, 2008, FACEBOOK told YOU that Facebook's Terms of Use prohibited "[u]se of automated scripts to collect information from, or otherwise interact with, the Facebook website."

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Admitted.

**REQUEST FOR ADMISSION NO. 8:**

Admit that in a letter dated December 1, 2008, FACEBOOK told YOU that Facebook's Terms of Use prohibited "[u]ploading, posting, transmitting, sharing or otherwise making available any unsolicited or unauthorized advertising, solicitations, promotional materials, 'junk mail,' 'spam,' 'chain letters,' 'pyramid schemes,' or any other form of solicitation."

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Admitted.

---

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO. 5:08-CV-05780 JF (RS)

4

**REQUEST FOR ADMISSION NO. 9:**

Admit that in a letter dated December 1, 2008, FACEBOOK told YOU that Facebook's Terms of Use prohibited "[u]sing the Facebook service or site for commercial purposes, except under formal advertising programs offered by Facebook."

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Admitted.

**REQUEST FOR ADMISSION NO. 10:**

Admit that in a letter dated December 1, 2008, FACEBOOK told YOU that Facebook's Terms of Use prohibited "[i]ncorporating any Facebook site content or information in any other database or compilation."

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Admitted.

**REQUEST FOR ADMISSION NO. 11:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, you continued to access the FACEBOOK WEBSITE through the services available at the POWER WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

Objection vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 12:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU allowed OR provided POWER USERS with the means to access the FACEBOOK WEBSITE through the POWER WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Admitted.

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

5

SER 324

**REQUEST FOR ADMISSION NO. 13:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU provided POWER USERS with the means to access the FACEBOOK WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

Admitted.

**REQUEST FOR ADMISSION NO. 14:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU solicited FACEBOOK USER login information, including, but not limited to, user login names, e-mail addresses OR passwords.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

Objection vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 15:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU stored FACEBOOK USER login information, including, but not limited to, user login names, e-mail addresses OR passwords.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

Admitted.

**REQUEST FOR ADMISSION NO. 16:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU used the FACEBOOK WEBSITE for commercial purposes.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

Denied.

/     /     /

/     /     /

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO. 5:08-CV-05780 JF (RS)

6

SER 325

**REQUEST FOR ADMISSION NO. 17:**

Admit that YOU have never entered into a formal advertising agreement with FACEBOOK.

**RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

Objection vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 18:**

Admit that YOU developed OR created programming scripts OR language that would provide POWER with an automated mechanism to extract data from the FACEBOOK WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

Admitted.

**REQUEST FOR ADMISSION NO. 19:**

Admit that YOU copied OR made use of at least some part, excerpt, OR portion of FACEBOOK's source code to develop, test implement, use OR provide POWER's aggregating services.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

Objection compound, vague and ambiguous. Subject to and without waiving these objections, denied.

**REQUEST FOR ADMISSION NO. 20:**

Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU incorporated FACEBOOK WEBSITE content, DATA, or information into the POWER WEBSIT OR that services located thereon.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

Objection compound, vague and ambiguous. Subject to and without waiving these objections, denied.

/          /          /

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO. 5:08-CV-05780 JF (RS)

7

1    **REQUEST FOR ADMISSION NO. 21:**

2           Admit that in or about December 2008, YOU agreed to access the FACEBOOK WEBSITE

3    OR cause others to access the FACEBOOK WEBSITE through means permitted by FACEBOOK.

4    **RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

5           Admitted.

6    **REQUEST FOR ADMISSION NO. 22:**

7

8           Admit that after receiving notice that YOUR use of or access to FACEBOOK was not

9    permitted by FACEBOOK, YOU took, copied, OR made use of DATA from the FACEBOOK

10   WEBSITE without FACEBOOK'S permission to do so.

11   **RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

12          Admitted.

13

14   **REQUEST FOR ADMISSION NO. 23:**

15          Admit that FACEBOOK implemented technical measures to block YOU from accessing

16   the FACEBOOK WEBSITE through the POWER WEBSITE.

17   **RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

18          Admitted.

19   **REQUEST FOR ADMISSION NO. 24:**

20

21          Admit that, in or about December 2008, FACEBOOK blocked YOUR IP address(es) from

22   accessing the FACEBOOK WEBSITE.

23   **RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

24          Objection compound, vague and ambiguous. Subject to and without waiving these

25   objections, denied.

26   /        /        /

27   /        /        /

28

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR
ADMISSIONS                                                                                                    8
CASE NO.  5:08-CV-05780 JF  (RS)

1   **REQUEST FOR ADMISSION NO. 36:**

2        Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU used or attempted

3   to another person's FACEBOOK WEBSITE account information without authorization from

4   FACEBOOK.

5   **RESPONSE TO REQUEST FOR ADMISSION NO. 36:**

6        Objection compound, vague and ambiguous. Subject to and without waiving these

7   objections, denied.

8   **REQUEST FOR ADMISSION NO. 37:**

9        Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU used automated

10   scripts or COMPUTER CODE to collect information from, or otherwise interact with, the

11   FACEBOOK WEBSITE.

12   **RESPONSE TO REQUEST FOR ADMISSION NO. 37:**

13        Admitted.

14   **REQUEST FOR ADMISSION NO. 38:**

15        Admit that after receiving FACEBOOK's December 1, 2008 letter, YOU uploaded, posted,

16   OR made available promotional materials OR solicitations on the FACEBOOK WEBSITE.

17   **RESPONSE TO REQUEST FOR ADMISSION NO. 38:**

18        Objection compound, vague and ambiguous. Subject to and without waiving these

19   objections, denied.

20   **REQUEST FOR ADMISSION NO. 39:**

21        Admit that on December 26, 2008, Steve Vachani sent an e-mail to Facebook stating

22   YOUR "business decision" to continue accessing or using the FACEBOOK WEBSITE without

23   implementing the Facebook Connect platform.

24   **RESPONSE TO REQUEST FOR ADMISSION NO. 39:**

25        Objection vague and ambiguous. Subject to and without waiving these objections, Power

26   admits that Mr. Vachani sent an email to Facebook's counsel on December 26, 2008 stating:

27        Dear Joseph,
         I am writing to follow up to our discussions regarding Power.com's

28        integration of Facebook connect, your requests for us to take down

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO. 5:08-CV-05780 JF (RS)
     12

SER 328

**REQUEST FOR ADMISSION NO. 41:**

Admit that, between January 1, 2008 and present date, YOU displayed the FACEBOOK name OR logo on the POWER WEBSITE.

**RESPONSE TO REQUEST FOR ADMISSION NO. 41:**

Objection compound vague and ambiguous. Subject to and without waiving these objections, Power admits that it used the word Facebook on its website.

**REQUEST FOR ADMISSION NO. 42:**

Admit that on or before December 26, 2008, YOU began a "Launch Promotion" that promised POWER USERS the chance to win one hundred dollars if they successfully invited AND signed up new POWER USERS.

**RESPONSE TO REQUEST FOR ADMISSION NO. 42:**

Admitted.

**REQUEST FOR ADMISSION NO. 43:**

Admit that as part of the "Launch Promotion" described in Request for Admission No. 42, YOU provided POWER USERS with a list of their FACEBOOK friends that might be solicited to take part in the "Launch Promotion."

**RESPONSE TO REQUEST FOR ADMISSION NO. 43:**

Admitted.

**REQUEST FOR ADMISSION NO. 44:**

Admit that as part of the "Launch Promotion" described in Request for Admission No. 42, YOU requested that POWER USERS' select which of their FACEBOOK friends should receive an invitation to the "Launch Promotion" event.

**RESPONSE TO REQUEST FOR ADMISSION NO. 44:**

Admitted.

**REQUEST FOR ADMISSION NO. 45:**

Admit that as part of the "Launch Promotion" described in Request for Admission No. 42, YOU created a FACEBOOK event titled, "Bring 100 friends and win 100 bucks!" scheduled for March 20, 2009 at 1 a.m.

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS
CASE NO. 5:08-CV-05780 JF (RS)

17

SER 329

1   **REQUEST FOR ADMISSION NO. 50:**

2       Admit that the "Launch Promotion" invitation described in Paragraphs 65 through 70 of

3   Facebook's First Amended Complaint against YOU (Dkt. No. 9) does not contain a valid e-mail

4   address, by which recipients of the invitation could contact YOU.

5   **RESPONSE TO REQUEST FOR ADMISSION NO. 50:**

6       Admitted.

7   **REQUEST FOR ADMISSION NO. 51:**

8       Admit that between January 1, 2008 and present date, YOU stored, saved, or otherwise

9   retained FACEBOOK user log-in information, such as user names and/or passwords.

10  **RESPONSE TO REQUEST FOR ADMISSION NO. 51:**

11      Admitted.

12  **REQUEST FOR ADMISSION NO. 52:**

13      Admit that in an e-mail dated December 12, 2008, 1:24 p.m., YOU wrote that YOU "will

14  delete any Facebook friend information we currently have."

15  **RESPONSE TO REQUEST FOR ADMISSION NO. 52:**

16      Admitted.

17  **REQUEST FOR ADMISSION NO. 53:**

18      Admit that in an e-mail dated December 15, 2008, 5:01 p.m., FACEBOOK, by and through

19  its counsel, wrote to YOU:  "Meanwhile as you may know, Facebook has taken technical measure

20  to limit the interaction between Power.com and its network at this time.  In order to fully initialize

21  your integrated Facebook Connect status, and to lift those technical measures, Facebook requires

22  written confirmation of the following: 1. That Power has purged and destroyed all data that it

23  obtained from the Facebook network or from Facebook users prior to implementation of Facebook

24  Connect including all login information and/or any other data obtained or scraped from Facebook's

25  website."

26  **RESPONSE TO REQUEST FOR ADMISSION NO. 53:**

27      Admitted.

28  /      /      /

---

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR
ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

19

1    **REQUEST FOR ADMISSION NO. 54:**

2          Admit that, between December 1, 2008 and February 1, 2008, YOU did not delete the

3    "Facebook friend information" in YOUR possession.

4    **RESPONSE TO REQUEST FOR ADMISSION NO. 54:**

5          Admitted.

6    **REQUEST FOR ADMISSION NO. 55:**

7          Admit that, to present date, you have not deleted, purged or destroyed all data that YOU

8    obtained from the FACEBOOK network.

9    **RESPONSE TO REQUEST FOR ADMISSION NO. 55:**

10         Admitted.

11   **REQUEST FOR ADMISSION NO. 56:**

12         Admit that, to present date, you have not deleted, purged or destroyed all FACEBOOK

13   login information obtained from POWER users, including, but not limited to, FACEBOOK user

14   names and/or passwords.

15   **RESPONSE TO REQUEST FOR ADMISSION NO. 56:**

16         Admitted.

17   Dated:  December 15, 2010              BRAMSON, PLUTZIK, MAHLER &
18                                          BIRKHAEUSER, LLP

19
20                                          By_____/s/_____
                                                        L. Timothy Fisher

21                                          Alan R. Plutzik (State Bar No. 77785)
22                                          L. Timothy Fisher (State Bar No. 191626)
                                            2125 Oak Grove Road, Suite 120
23                                          Walnut Creek, CA  94598
                                            Telephone:  (925) 945-0200
24                                          Facsimile:  (925) 945-8792

25                                          LAW OFFICES OF SCOTT A. BURSOR
                                            Scott A. Bursor (*pro hac vice*)
26                                          369 Lexington Avenue, 10th Floor
                                            New York, NY  10017-6531
27                                          Telephone:  (212) 989-9113
                                            Facsimile:   (212) 989-9163
28

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR       20
ADMISSIONS
CASE NO.  5:08-CV-05780 JF  (RS)

Attorneys for Defendants Power
Ventures, Inc. and Steve Vachani

DEFENDANT POWER VENTURES, INC.'S RESPONSES TO FACEBOOK, INC.'S FIRST SET OF REQUESTS FOR
ADMISSIONS
CASE NO. 5:08-CV-05780 JF (RS)

21

**EXHIBIT 2**

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN JOSE DIVISION
 4
 5   FACEBOOK, INC.            :
 6              Plaintiff,     :
 7                             :
 8        v.                   :
 9                     :
10   POWER VENTURES, INC. d/b/a:
11   POWER.COM, a California   :
12   corporation; POWER        :      Case No.
13   VENTURES, INC. a Cayman   :      5:08-CV-05780
14   Island Corporation, STEVE :      JW (HRL)
15   VACHANI, an individual;   :
16   DOE 1, d/b/a POWER.COM, an:
17   individual and/or business:
18   entity of unknown nature; :
19   DOES 2 through 25,        :
20   inclusive, individuals    :
21   and/or business entities  :
22   of unknown nature,        :
23              Defendants.    :
24   _____
25        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
```

1

BARKLEY
Court Reporters

09:57  1    having worked as a product manager, but I could not

09:57  2    code in any of this.

09:57  3              Q.      And how about Perl?

09:57  4              A.      I'm familiar -- familiar with it

09:57  5    again, but no -- no programming experience.

09:57  6              Q.      Are you familiar with the term

09:57  7    "script" as it's used in computer programming?

09:57  8              A.      Yes.

09:57  9              Q.      All right.  What would your

09:57 10    understanding of a script be?

09:57 11              A.      A script is a -- an auto -- it's

09:58 12    something that you instruct a -- a computer to do

09:58 13    something.

09:58 14              Q.      Have you ever been involved in the

09:58 15    development of any types of scripts?

09:58 16              A.      Personally?

09:58 17              Q.      Yes.

09:58 18              A.      I mean, I've been involved as a

09:58 19    product manager.  Not as a programmer or coder.

09:58 20              Q.      Okay.  In the level --

09:58 21              A.      Project manager -- as a CEO

09:58 22    leading products.

09:58 23              Q.      As a CEO or as a project manager --

09:58 24              A.      Yes.  That's correct.

09:58 25              Q.      -- working with scripts, what

15

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

10:04 1         A.      Legally, no.  As I mentioned at

10:04 2  the moment, any new activities that I'm pursuing,

10:04 3  I'm pursuing under this entity, so I'm currently

10:04 4  engaged in conversations with -- with people.

10:04 5         Q.      And when did you join Power?

10:04 6         A.      Power was founded in -- It was

10:04 7  2006 is when our -- our primary activities started.

10:04 8  We incorporated Power, I believe it was, if I'm not

10:04 9  mistaken, late 2006 and -- but the activities

10:05 10  started previously as a start-up, we started

10:05 11  working on it.

10:05 12         Q.      Were you one of the creators of

10:05 13  Power?

10:05 14         A.      I was the founder of the company.

10:05 15         Q.      Now, when you say it was

10:05 16  incorporated in 2006 but started before then, was

10:05 17  it started under the Web site title www.power.com?

10:05 18         A.      No.  It was originally -- When we

10:05 19  originally started it, there was no Web site.  It

10:05 20  was a -- Like many startups we were -- we were

10:05 21  working on a core, you know, product idea, and

10:05 22  later the name power.com came about in 2007.  I

10:05 23  believe we acquired the domain in 2007.

10:05 24         Q.      Who helped -- Besides yourself,

10:05 25  who helped create Power.com.  You used the --

21

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

```
02:33  1            Q.        Do you know if there were
02:33  2    documents reflecting Power's ideas being bantered
02:33  3    about describing how they could get new members?
02:33  4            A.        Yes.  I believe we provided those
02:33  5    to you.
02:33  6            Q.        Do you know -- How many documents
02:33  7    do you believe you provided to Facebook
02:34  8    approximately?
02:34  9            A.        I think it was -- not -- less -- I
02:34 10    don't know.  It was less than ten, I believe.
02:34 11            Q.        The -- And how often were
02:34 12    marketing schemes discussed internally at Power, if
02:34 13    you know?
02:34 14            A.        How often?  They would be in
02:34 15    conversations, like, we'd have -- we -- meetings.
02:34 16    There would be conversations if anything became
02:34 17    relevant or useful.  There would be -- Most of them
02:34 18    were e-mail discussions, so e-mail discussions
02:34 19    would be where most of conversations took place,
02:34 20    but obviously they were also verbal conversations.
02:34 21            Q.        Do you know if any particular
02:34 22    discussions ever occurred relating to soliciting
02:34 23    members from Facebook?
02:34 24            A.        Soliciting members from Facebook?
02:34 25    What do you mean?
```

181

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

**BARKLEY**
Court Reporters

02:34　1　　　　Q.　　　　To join -- To join Power.

02:34　2　　　　A.　　　　We didn't have access to -- The

02:35　3　users could invite their friends.  So that was a

02:35　4　feature that -- One of our promotions in our

02:35　5　features was that you could invite your friends to

02:35　6　join, invite your friends on Facebook to join, and

02:35　7　so people could -- they could make promotions so

02:35　8　they could create events around -- around a power

02:35　9　creativity around Power.  So we gave our user -- We

02:35　10　encourage our users, in fact, to bring their

02:35　11　friends in the same way that Facebook encourages

02:35　12　its users to bring their friends from other sites.

02:35　13　But we employed same tactics that are used by --

02:35　14　similar tactics where you invite your friends, so

02:35　15　we did use invite friends features and promotions.

02:35　16　　　　Q.　　　　If you go back to Exhibit 103, you

02:35　17　see various -- "Displayed a Launch Promotion" in

02:35　18　the upper left-hand corner?

02:35　19　　　　A.　　　　Yup.

02:35　20　　　　Q.　　　　It says, "First 100 people who

02:35　21　bring 100 new friends to power.com earn $100?

02:36　22　　　　A.　　　　Yes.

02:36　23　　　　Q.　　　　Is that an example of a pop-up

02:36　24　that was made available on the site that was

02:36　25　designed to encourage new users to the site?

182

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

**BARKLEY**
Court Reporters

SER 338

02:36  1          A.          I don't know if this was a pop-up.

02:36  2    You can see it was prominently displayed on the

02:36  3    front page.  That's not more than that, it's not a

02:36  4    pop-up.  I think the terminology is not pop-up it's

02:36  5    an ad -- In fact, it's a prime-placed ad on the

02:36  6    home page.

02:36  7          Q.          Do you know whose idea it was for

02:36  8    this particular promotion?

02:36  9          A.          That was mine.

02:36 10          Q.          Do you know when you came up with

02:36 11    it?

02:36 12          A.          While I was sleeping.  I just

02:36 13    thought a hundred, hundred, hundred was a good

02:36 14    idea.

02:36 15          Q.          All right.  And when you clicked

02:36 16    on the Number 100, what would happen?

02:36 17          A.          It gave you a chance to -- to

02:36 18    select which friends you wanted to -- to, I guess,

02:36 19    invite to -- to join -- to join Power.

02:36 20          Q.          All right.  And was that -- Would

02:36 21    you agree that, as reflected on Exhibit 103, that

02:37 22    particular promotion was made available at the time

02:37 23    that you were connected to Facebook?

02:37 24          A.          Yes.  It was.

02:37 25          Q.          And if you clicked on 100 people,

183

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



SER 339

02:37 1  you would be invited to ask your friends to join

02:37 2  power.com?

02:37 3          A.          No.  You would have the option to

02:37 4  invite your friends to join just like you have the

02:37 5  option on Facebook to invite your friends to join

02:37 6  Facebook and every other site on the Internet, and

02:37 7  if they did, if they reach a hundred friends that

02:37 8  joined, they would earn $100.

02:37 9          Q.          And if you accepted the feature

02:37 10  that came up saying would you -- it said something

02:37 11  like, "Would you like to invite your friends to

02:37 12  Power"?

02:37 13          A.          Yes.

02:37 14          Q.          If you hit "yes" or "I agree" --

02:37 15          A.          Yes.

02:37 16          Q.            -- how -- what -- what

02:37 17  automation would occur at that point?

02:37 18          A.          So first of all, you have to

02:38 19  remember that 99 percent of our users were not --

02:38 20  were not using -- were not using Facebook.  They

02:38 21  were users on other sites, so we actually -- I

02:38 22  guess you could say we were actually a big source

02:38 23  of providing users to Facebook in Brazil.  In fact,

02:38 24  as -- I guess you could say it was a gift, but we

02:38 25  -- we brought a large amount of Orkut users to

184

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



02:38 1   Facebook, so that's where a lot of our promotions

02:38 2   were -- Because our users already, as you know,

02:38 3   have -- Prior to having Facebook, we had millions

02:38 4   of users who have hundreds of friends already in

02:38 5   the system, and that represented 99 percent of our

02:38 6   contacts in our system.  Facebook was a very small

02:38 7   part of this world.  At that time, obviously it's a

02:38 8   much larger site today but in our world, in our

02:38 9   growth it was -- it was introduced later.  So we

02:38 10   were encouraging our friends -- our users to go and

02:38 11   register at Facebook and become Facebook users.

02:38 12   Because in our -- in our view, the more social

02:39 13   networks that users were using, the more value it

02:39 14   would be to, you know, to aggregate different

02:39 15   sites.  So we encouraged users to sign up for

02:39 16   Facebook.  In fact, we're giving free marketing to

02:39 17   Facebook.  So to answer your question, a lot of

02:39 18   these users -- You could see all your friends from

02:39 19   all your sites and say, "Hey.  Join Facebook when

02:39 20   you're at Facebook."  That was a big part of our

02:39 21   promotions.  That was the largest part of our

02:39 22   promotions.  And then, of course, if they have

02:39 23   friends that are already using Facebook -- Facebook

02:39 24   and they wanted to invite their friends to come use

02:39 25   Power, that's the smaller part.  But the biggest

185

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



SER 341

02:39 1   one were obviously the friends that the user had

02:39 2   already put in the system.

02:39 3          Q.      The promotion itself had to have

02:39 4   an attribute created for it in the MSQL database.

02:39 5   Correct?

02:39 6          A.      Yes.  That's correct.

02:39 7          Q.      And that attribute would then be

02:40 8   assigned to anybody who clicked on the promotion.

02:40 9   Correct?

02:40 10         A.      What do you mean "the attribute"?

02:40 11         Q.      Well, if someone clicked on the

02:40 12  promotion, their user name would then be assigned

02:40 13  to the attribute associated with the promotion.

02:40 14  Correct?

02:40 15         A.      If they selected to invite a

02:40 16  friend, they could send an invitation to that

02:40 17  friend.

02:40 18         Q.      That's not what I'm talking about.

02:40 19  The minute that -- Let's say I'm Ms. Almeirda who's

02:40 20  being shown on the screen shot.

      21         A.      Okay.

02:40 22         Q.      If Ms. Almeirda clicks on the

02:40 23  launch promotion --

02:40 24         A.      Yes.

02:40 25         Q.       -- she would have received a --

186

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



SER 342

02:42  1    technically it was -- it was much easier just to

02:42  2    manually look and I believe -- We can see how many

02:42  3    friends people invited so -- and then we just

02:42  4    manually took those people out.  I think they were

02:42  5    -- When we provided it, I think there might have

02:42  6    been 30 or 40 people that achieved it, so it was

02:42  7    literally just looked on the list of people who

02:42  8    invited friends to Power who had more than a

02:43  9    hundred.

02:43 10           Q.       All right.  But when say, "looked

02:43 11    on the list" you were looking in a database table.

02:43 12    Correct?

02:43 13           A.       Yeah.  We went to our database.

02:43 14    Importing friends is a -- is a feature.  It's a --

02:43 15    It's a -- As I mentioned many times, it's one of

02:43 16    our features on our site.

02:43 17           Q.       And in order to see how the

02:43 18    promotion was set up in terms of identification of

02:43 19    those who were participating in it, I'd need to see

02:43 20    the database.  Correct?

02:43 21           A.       To see the -- Every single user on

02:43 22    our site has the option to invite friends.  Who

02:43 23    achieved a hundred, I can tell you.  I don't know

02:43 24    the number but it was 30 something people that

02:43 25    received -- that reached a hundred friends, so I

189

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

02:44  1    looked in the database.  Correct?

02:44  2            A.        We looked in our database,

02:44  3    correct.  And we provided the numbers, I believe,

02:44  4    on that promotion to you guys.

02:45  5            Q.        When somebody clicked on the

02:45  6    launch promotion and they were given, like you to

02:45  7    invite your friend" --

02:45  8            A.        That's correct.

02:45  9            Q.            -- and they hit yes, at that

02:45 10    point the importer, as we've been calling it, would

02:45 11    automatically contact all friends on Facebook to

02:45 12    invite them to --

02:45 13            A.        Let's be clear.  We don't have

02:45 14    access to any friends' e-mail addresses, so there

02:45 15    was not a single E mail sent by Face -- by Power

02:45 16    for -- We have e-mail addresses for friends on

02:45 17    other sites, but on -- so we -- If they wanted to

02:45 18    invite, as I said 99 -- well over 90 percent of our

02:45 19    users were Orkut users and Orkut friends and had

02:45 20    friends from other sites where they -- on sites

02:45 21    that allowed their E mails, but Facebook didn't --

02:45 22    didn't allow E mails, otherwise, we would have been

02:45 23    happy to send an invitation to those friends to

02:45 24    invite them; so that was not available for us for

02:46 25    Facebook.

                                191

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



02:46 1    Q.        At this point, I haven't even

02:46 2    talked about E mail.  All I meant is at the point

02:46 3    at which someone said yes they'd like to invite

02:46 4    their friends, the database would then recognize,

02:46 5    using its importer function and the idea of the

02:46 6    registered user Power, who the friends were.

02:46 7    Correct?

02:46 8    A.        It would show you a list of all

02:46 9    your friends, yes, from your friends list.

02:46 10    Q.        And the invitation to join was

02:46 11    then automatically forwarded to those friends

02:46 12    whether through E mail if you're on Orkut or some

02:46 13    other way on Facebook.  Correct?

02:46 14    A.        A user had to say, "I want to

02:46 15    invite this friend," so it's -- An authorized user

02:46 16    said, "Yes, these are my friends, and these are the

02:46 17    friends I want to invite to this site."  That is

02:46 18    correct.

02:46 19    Q.        All right.  And at that point, an

02:46 20    automated script would contact whatever friends

02:46 21    were identified.  Correct?

02:46 22    A.        Depends on -- So if the friend was

02:46 23    a non-- Facebook did not provide E mails.  If the

02:47 24    friend was, like, on another site and they had the

02:47 25    E mail, they could -- they could send on E mail

192

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



SER 345

02:51 1  copy their friends and say, "Sign up with this

02:51 2  link." They were unlimited ways that people can

02:51 3  communicate with their friends.

02:51 4       Q.     All right. But the link was

02:51 5  provided in the communication by Power. Correct?

02:51 6       A.     The link was given -- Power

02:51 7  provided a link to our users to encourage them to

02:51 8  invite their friends.

02:51 9       Q.     And did Power also prepare the

02:51 10 script that was included with that invitation?

02:51 11      A.     I think, yeah, we provided them --

02:51 12 we provided them a script, yeah. As every single

02:51 13 -- As Facebook does and everybody else does.

02:51 14      Q.     Now, in the case of Facebook, you

02:51 15 say that Facebook didn't permit you to contact

02:51 16 through E mails?

02:51 17      A.     What do you mean "Facebook doesn't

02:51 18 permit"? Facebook did -- It has nothing to do with

02:51 19 permitting it. We wanted -- If we wanted to -- We

02:51 20 just didn't have access to the E mails because

02:52 21 Facebook -- If we wanted to, we could have -- We

02:52 22 didn't get to that, but we would be happy to build

02:52 23 a feature that imported your E mail contacts, but

02:52 24 we didn't -- we didn't do that. We never got to

02:52 25 that point.

197

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



SER 346

02:53 1   that you could determine how many Facebook

02:53 2   registered users were contacted as part of this

02:53 3   promotion?

02:53 4        A.        Facebook registered users?

02:53 5   Meaning if they were contacted -- In what manner?

02:53 6   If they happened -- If they were contacted at Orkut

02:53 7   and they happened to have an account on Facebook

02:53 8   but were not contacted through -- through the help

02:53 9   of Facebook?

02:53 10       Q.        No.  I'm talking about were there

02:53 11  individuals at Facebook contacted on the Facebook

02:53 12  -- through the Facebook system --

02:53 13       A.        Yes.

02:53 14       Q.        -- as a result of this promotion?

02:53 15       A.        Yes.  Of course.

02:53 16       Q.        Is there a way to determine how

02:53 17  many were contacted?

02:54 18       A.        Well, we could do -- If you take a

02:54 19  few minutes, we can probably figure out -- It's

02:54 20  obviously very small, but -- Because the Facebook

02:54 21  users were so small, but let's think about -- So

02:54 22  people created events on Facebook, so promoting it,

02:54 23  because our users were -- You know, some of them

02:54 24  created events saying, "Come on Facebook," about

02:54 25  come and joining, they created messages.  They

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

**BARKLEY**
Court Reporters

02:57 1  at that time, but I know it's usually standard, you

02:58 2  know, more common to have a default to invite all

02:58 3  your friends.  I think Facebook does that, in fact.

02:58 4       Q.       Setting aside what the default

02:58 5  was, as part of the invitation, would list the

02:58 6  friends that could be contacted?

02:58 7       A.       That's correct.

02:58 8       Q.       And that would list the friends

02:58 9  who were available as friends on Facebook.

02:58 10 Correct?

02:58 11      A.       I believe so, yes.

02:58 12      Q.       And for the friends who were

02:58 13 contacted on Facebook, an invitation to join Power

02:58 14 would then be set if the person had that person

02:58 15 selected as, "Yes.  I would like them to be

02:58 16 invited"?

02:58 17      A.       Yeah.  If they could communicate

02:58 18 to invite them, they would be invited.

02:58 19      Q.       And earlier you said that however

02:58 20 the mechanism was, whether it was events or E mails

02:58 21 for other Web sites or whatever -- setting aside

02:58 22 the telephone call, if it was in a text-based

02:58 23 communication --

02:58 24      A.       Yes.

02:58 25      Q.       -- Power would provide the text

203

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



SER 348

02:58  1   and the URL link to Power as part of that

02:58  2   communication so --

02:58  3              A.        Yes.

02:59  4              Q.        -- so the friends would know

02:59  5   where to go to be invited.  Correct?

02:59  6              A.        We would provide them text that

02:59  7   they could use.  Correct.  Of course.

02:59  8              Q.        And the list of friends was

02:59  9   recovered from the database and the variables that

02:59  10  were associated with friends with that user ID?

02:59  11             A.        Every -- I think -- Every user --

02:59  12  One of our core features is you can access all your

02:59  13  friends and create a friends list.  So, yes, I

02:59  14  mean, you have a friends list and you can select

02:59  15  from your aggregated friends list who you want to

02:59  16  invite.

02:59  17             Q.        Now, earlier you said while most

02:59  18  people contacted their Web site dynamically inside

02:59  19  the browser, the functionality existed to have the

02:59  20  automation available on through the PowerScript

02:59  21  also contact the Web sites.  Correct?

02:59  22             A.        What do you mean?

02:59  23             Q.        In other words, you -- In order to

02:59  24  obtain -- user content, for instance, from Web

02:59  25  sites, you could use the automated script available

                                    204

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

**BARKLEY**
Court Reporters

| | | |
|---|---|---|
| 02:59 | 1 | through PowerScript to download -- |
| 02:59 | 2 | A.        That's what any importer does. |
| 03:00 | 3 | When you use an importer, you're -- you're |
| 03:00 | 4 | basically authorizing a script to go to another |
| 03:00 | 5 | site and access certain data.  So, like, when |
| 03:00 | 6 | Facebook -- as your Facebook import you authorize a |
| 03:00 | 7 | script written by Facebook to go to another site, |
| 03:00 | 8 | take that data, bring it back, and then Facebook |
| 03:00 | 9 | sends an invitation on behalf of the user.  That's |
| 03:00 | 10 | the same process that we go through.  That is |
| 03:00 | 11 | correct. |
| 03:00 | 12 | Q.        And in the invitation that was |
| 03:00 | 13 | then sent as part of the launch promotion to a |
| 03:00 | 14 | Facebook user, how would the Power site know what |
| 03:00 | 15 | function or what feature on Facebook to populate |
| 03:00 | 16 | the invitation to?  In other words, how would it |
| 03:00 | 17 | know to send it to an event or say an instant |
| 03:00 | 18 | message or whatever medium of communication? |
| 03:00 | 19 | A.        Well, Facebook doesn't have |
| 03:00 | 20 | instant message.  You know, a user can go and -- If |
| 03:00 | 21 | a user wanted to manually click on a friend and |
| 03:01 | 22 | say, "Hey," I don't believe even they had Facebook |
| 03:01 | 23 | chat at that time, so there wasn't even -- I don't |
| 03:01 | 24 | think it was a feature, so we didn't even interact |
| 03:01 | 25 | with that.  They could write a message to their |

205

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

03:01 1   friend.  They could create an event or they could

03:01 2   go and, I guess, take that link up and paste it and

03:01 3   write an E mail to their friend.

03:01 4         Q.     Was one of the ways that Power was

03:01 5   able to make the invitation available to Facebook

03:01 6   users is that the PowerScript would set up an event

03:01 7   on Facebook on behalf of the user who had clicked

03:01 8   on --

03:01 9         A.     If the user authorized for the

03:01 10   creation of the event, yes.

03:01 11         Q.     And if the -- How did the -- How

03:01 12   did Power know it was to set up an event as opposed

03:01 13   to any other way of communicating --

03:01 14         A.     Because the user said, "Create an

03:01 15   event for me," so user authorized the creation of

03:01 16   an event.

03:01 17         Q.     Was that made available on the

03:01 18   promotion -- on the pop-up that made -- would come

03:02 19   up --

03:02 20         A.     That was -- As I said, if you

03:02 21   clicked that, that was one of the options that the

03:02 22   user had an option to create an event.

03:02 23         Q.     What other options did the user

03:02 24   have?  We can take a break here.

03:02 25                THE VIDEOGRAPHER:  It's 3:01.  Off

206

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



03:02  1   the record, Tape 4.

03:02  2                    (Whereupon, a recess is taken.)

03:14  3                    THE VIDEOGRAPHER:  3:13, on the

03:14  4   record.  Beginning of Tape 5.

03:14  5        Q.        Mr. Vachani, just before the break

03:14  6   you indicated that in the instance of Facebook

03:14  7   being contacted by Power --

03:14  8                    MR. COOPER:  Strike that.

03:14  9        Q.        That in the instance in which a

03:14 10   friend of somebody who had indicated their interest

03:14 11   in participating in the launch promotion, the

03:14 12   friend was on Facebook, that one option that was

03:14 13   available to contact that friend was events.  Do

03:14 14   you recall that before the break saying?

03:15 15        A.        I believe creating a event.

03:15 16        Q.        Do you recall what the other

03:15 17   options were?

03:15 18        A.        I don't offhand, but I think they

03:15 19   provided a link where they could -- So everyone was

03:15 20   given a unique link so they could go do whatever

03:15 21   they want with that link, write E mails to friends,

03:15 22   call on the phone, whatever so that was -- When

03:15 23   they clicked, they were made available a link, and

03:15 24   I think that maybe send in a message so Facebook --

03:15 25   While they can't send an E mail, they can send a

                              207



03:15  1    message to friends on Facebook, so they could

03:15  2    message their friend.  So if the user said, "I want

03:15  3    to send a message, private message," they could

03:15  4    send a private message to their friend, if I'm not

03:15  5    mistaken.

03:15  6          Q.      Let me -- Any other options?

03:15  7          A.      I don't remember offhand, but

03:15  8    those are the -- I think the primary ones, but

03:15  9    obviously they had -- they had a link that they

03:15 10    could use whatever way they wanted to.  They could

03:15 11    create an event -- create an event, send a message.

03:16 12    Those are the ones I could think of off hand, but I

03:16 13    believe whatever details on this were also provided

03:16 14    in the past in the previous declarations.

03:16 15          Q.      In the case of providing a link,

03:16 16    in what way was the link displayed on Facebook?

03:16 17          A.      When the user is provided a link

03:16 18    on Power, and they can copy and paste and do

03:16 19    whatever they want to -- to go promote that link.

03:16 20          Q.      I see.

03:16 21          A.      So just as any invitation process

03:16 22    on sites.  You give a unique link which has your

03:17 23    unique identifier in it, so if someone signs up

03:17 24    from that link you -- you get credit for it.

03:17 25          Q.      And that link would be the URL to

                                        208

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



03:20  1    that was sent to Facebook --

03:20  2          A.      Usually --

03:20  3          MR. BURSOR: Objection. Vague and

03:20  4    ambiguous.

03:20  5          Q.      Do you know who created the text

03:20  6    that was prepared through the automated script that

03:20  7    was sent by Power to Facebook users?

03:20  8          MR. BURSOR: Objection. Vague and

03:20  9    ambiguous. Assumes facts not in evidence. Lacks

03:20 10    foundation. You can answer.

03:20 11          A.      I'm repeating what he said.

03:20 12    Objecting. It's vague and ambiguous.

03:21 13          MR. BURSOR: I objected. If you

03:21 14    can understand it, you can answer it.

03:21 15          Q.      Mr. Vachani, as I said at the

03:21 16    beginning, your attorney has the right to interject

03:21 17    actions unless he instructs you not to answer --

03:21 18          A.      Okay.

03:21 19          Q.      Let me -- One of the ways that you

03:21 20    said that Facebook users would be contacted for

03:21 21    this promotion was the Power user could say they

03:21 22    wanted to participate and contact friends to create

03:21 23    an event?

03:21 24          A.      Correct.

03:21 25          Q.      And you said the automatic script

212

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



03:21 1   -- the automated script created by Power would, in

03:21 2   fact, create an event on Facebook?

03:21 3          A.      If the user authorized it and

03:21 4   indicated they wanted to do that.  That's correct.

03:21 5          Q.      As part of the creation of that

03:21 6   event, was text included as part of event set up --

03:21 7          A.      They were shown texts just like

03:21 8   standard practice.  They were shown it and

03:21 9   authorized it.

03:21 10         Q.      And that text included the same

03:22 11  link to the URL to Power?

03:22 12         A.      I would assume it has the link in

03:22 13  it, yes.

03:22 14         Q.      The E mails that you said were

03:22 15  sent to users of, like, Orkut that had e-mail

03:22 16  addresses available on your site --

03:22 17         A.      Correct.

03:22 18         Q.      To the best of your knowledge --

03:22 19  And you said the link itself was one way that you

03:22 20  would be allowed to contact users.  Correct?

03:22 21         A.      Well, you could take the link and

03:22 22  pass the link.  It's -- You provide them a unique

03:22 23  link and they can go to messenger and copy that

03:22 24  link and say, "Hey, go sign up for -- for Power."

03:22 25         Q.      Do you know if that URL had an ID

213

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

**BARKLEY**
Court Reporters

SER 355

04:14 1    create an event as part of $100 promotion use the

04:14 2    language, "Bring 100 friends and 100 bucks"?

04:14 3                    MR. BURSOR:  Hold on a second.

04:14 4    Objection.  Vague, ambiguous.  Assumes facts not in

04:14 5    evidence.  Lacks foundation.  If you could clarify

04:14 6    whether you're referring to PowerScript or Facebook

04:14 7    script, that might help clear up some of the --

04:14 8                    MR. COOPER:  I asked specific -- I

04:14 9    will say it again.  Was the language, "Bring 100

04:14 10   friends and win 100 bucks," language that was used

04:14 11   in the Power automated script when it set up the

04:14 12   event on Facebook?

04:14 13                   MR. BURSOR:  Objection.  Vague,

04:14 14   ambiguous.  Assumes facts not in evidence.  Lacks

04:15 15   foundation.  Listen to the question carefully, and

04:15 16   if you can understand it, you can answer it.

04:15 17          A.        Bring 100 friends and 100 bucks

04:15 18   was our -- our tag line, so -- but I don't --

04:15 19   whether the user entered that in on their own or

04:15 20   whether they -- they put this.  I cannot say from

04:15 21   this -- from looking at this, but that was the

04:15 22   language that we suggested to users to use.  But

04:15 23   many users changed the language, too, and put other

04:15 24   language in those events, so I can't -- This is one

04:15 25   example of a user creating an event.  I cannot say

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters

```
04:15  1   what -- you know, how this was specifically created
04:15  2   because they -- they had -- they could have created
04:15  3   this event and the language was -- That was the tag
04:15  4   line we were promoting, but I do not know if this
04:15  5   was specifically -- this specific E mail or if they
04:16  6   copied and pasted it if they did whatever.  But
04:16  7   what I do know is, this was an event where the user
04:16  8   specifically authorized us and said -- either
04:16  9   created this event manual or specifically
04:16 10   authorized us to create this event.
04:16 11               MR. COOPER:  We've got to go off
04:16 12   the record.
04:16 13               THE VIDEOGRAPHER:  It's 4:15.  Off
04:16 14   the record.  End of Tape 5.
04:16 15               (Whereupon, a recess is taken.)
04:23 16               THE VIDEOGRAPHER:  4:22, on the
04:23 17   record.  Beginning of Tape 6.
04:23 18        Q.     Before the break you indicated
04:23 19   that, "Bring 100 friends and win 100 bucks" was the
04:23 20   tag line but you couldn't say for sure how the --
04:23 21               MR. COOPER:  Strike that.
04:23 22        Q.     Before the break, you indicated
04:23 23   that "Bring 100 friends and win 100 bucks" was the
04:23 24   tag line employed by Power.  Correct?
04:23 25        A.     That was the tag line of the
```

257

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



04:23 1    campaign and the suggested text and promotion that

04:23 2    we encourage our users to promote in any kind of

04:23 3    promotion they made in the acquisition of and

04:23 4    invitation of friends.

04:23 5         Q.        Where would I find documentation

04:23 6    reflecting precisely what language was suggested

04:23 7    that users use with Facebook events?

04:23 8         A.        That would have been on the -- the

04:23 9    power -- on this page.  On the page after they

04:24 10   clicked on this promotion, so it came up with a

04:24 11   page --

04:24 12        Q.        Talking about Exhibit 103?

04:24 13        A.        I don't know if that page -- Does

04:24 14   it exist?

04:24 15        Q.        I'm asking if you're talking about

04:24 16   Exhibit 103.

04:24 17        A.        I'm talking about this page.  I

04:24 18   don't know if there's an exhibit.

04:24 19        Q.        You're pointing to Exhibit 103?

04:24 20        A.        Exhibit 103, I'm sorry.  So if

04:24 21   they clicked on that, there was a page that they

04:24 22   went to.

04:24 23        Q.        And --

04:24 24        A.        Gave them those options.

04:24 25        Q.        Where, if at all, does that

                              258

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

BARKLEY
Court Reporters



259

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO





260

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO





261

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



| 04:28 | 1 | application PowerScript application? |
| 04:28 | 2 | A. The actual language? |
| 04:28 | 3 | Q. Yes. |

04:28  1    application PowerScript application?

04:28  2          A.      The actual language?

04:28  3          Q.      Yes.

04:28  4          A.      Was -- That was -- That phrase

04:28  5    "Bring 100 friends, 100 bucks" was created by me.

04:28  6          Q.      Do you know if the remainder of

04:28  7    any text that was employed in suggested text in

04:28  8    private messages that were used on Facebook as a

04:29  9    result of automated script were prepared by you?

04:29  10                MR. BURSOR:  Could you read that

04:29  11   back, please?

04:29  12                (Whereupon, the last question is

04:29  13   read back by the reporter.)

04:29  14                MR. BURSOR:  Objection.  Vague,

04:29  15   ambiguous.  Assumes facts not in evidence.  Lacks

04:29  16   foundation.  You can answer.

04:29  17         A.      Repeat the question one more time.

04:29  18         Q.      You earlier indicated private

04:29  19   messages were one of the ways that the automated

04:29  20   script would permit somebody using this campaign to

04:29  21   contact friends on Facebook.

04:29  22         A.      Okay.  So to be clear --

04:29  23         Q.      Yes or no.

04:29  24         A.      I want to clarify.  Earlier I said

04:29  25   that could be one of the ways that someone could

262

04:29  1    send it.  I honestly don't know if we actually ever

04:29  2    used private messages.  It was a long time ago.  To

04:29  3    my recollection, I don't -- I don't remember us

04:29  4    sending private messages, but it was definitely

04:30  5    something we -- we discussed, but I don't know if

04:30  6    we actually ever got to employing that method.

04:30  7    It's been a long time since that happened.  It's

04:30  8    possible that users took suggested text and wrote

04:30  9    messages to friends and if -- I don't remember if

04:30  10   we actually employed that technique, but it's

04:30  11   something we obviously would have been happy to do

04:30  12   because if the user authorized us to do it, I just

04:30  13   don't remember if we actually did it.

04:30  14            Q.       Looking at Exhibit 103, the launch

04:30  15   promotion --

04:30  16            A.       Yup.

04:30  17            Q.        -- who prepared the PowerScript

04:30  18   that is reflected in that launch promotion?

04:30  19            A.       It could have been Carlos or

04:30  20   Danilo.

04:30  21            Q.       What documentation shows how that

04:30  22   launch promotion was implemented on power.com?

04:30  23            A.       It was either -- It was either a

04:30  24   verbal, "Hey, use this text," in a meeting, said,

04:31  25   "Hey, this is the text you should use," and they

263



04:31 1    took it or there was an E mail.  I don't know.

04:31 2         Q.    But you see the box, "Launch

04:31 3    Promotion."  Correct?

04:31 4         A.    Yes.

04:31 5         Q.    That is a feature that is made

04:31 6    available to the power.com user through the

04:31 7    power.com Web site.  Right?

04:31 8         A.    Yes.

04:31 9         Q.    None of the aggregated social

04:31 10   networks prepared the contents shown in that

04:31 11   promotional box.  Correct?

04:31 12        A.    Right.

04:31 13        Q.    Where would I find documentation

04:31 14   showing me how that launch promotion was

04:31 15   implemented on power.com?

04:31 16        A.    So it either was in a meeting that

04:31 17   we had where I said, "Hey, this is the text you

04:31 18   want to use for this promotion," and they would

04:31 19   have noted it down, or it would have been an E mail

04:31 20   that was sent saying, "Use this text."  One of

04:31 21   those two.  I don't know which one it was because

04:31 22   we had weekly meetings where we discussed ideas and

04:31 23   this was -- this was an idea that I had come up

04:32 24   with.  So many times I would share my idea.  I

04:32 25   would say, "Eric, use this text.  This is a

264

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO





266

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



| 04:41 | 1 | Q.          And it was sued, in part, because |
| 04:41 | 2 | of Facebook's allegations relating to how this |
| 04:41 | 3 | launch promotion was employed.  Correct? |
| 04:41 | 4 | A.          I don't know what Facebook made |
| 04:41 | 5 | allegations to is right there. |
| 04:41 | 6 | Q.          Earlier you said that Facebook is |
| 04:41 | 7 | responsible for sending the E mail notification |
| 04:41 | 8 | about the invite. |
| 04:41 | 9 | A.          Yeah.  That was sent by Facebook |
| 04:42 | 10 | servers. |
| 04:42 | 11 | Q.          But Facebook's E mail servers |
| 04:42 | 12 | would not send the invite, but for the initiation |
| 04:42 | 13 | of the event.  Correct? |
| 04:42 | 14 | A.          A user has to authorize -- A user |
| 04:42 | 15 | has to create an event for Facebook to do that and |
| 04:42 | 16 | a user has to log in with their user name and |
| 04:42 | 17 | password and do this, so Facebook authorizes its |
| 04:42 | 18 | users to create events as part of their -- That's |
| 04:42 | 19 | the relationship Facebook has with its users. |
| 04:42 | 20 | Q.          You indicated some of the events |
| 04:42 | 21 | are set up through the automated scripted? |
| 04:42 | 22 | A.          No.  What I indicated is that |
| 04:42 | 23 | users -- users created these events.  Whether the |
| 04:42 | 24 | user authorized -- whether they authorized an agent |
| 04:42 | 25 | to go do it for them or they did it, it's the same |

273

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

**BARKLEY**
Court Reporters

04:42 1   thing.  It's initiated by the user, that's what we

04:42 2   know.

04:42 3         Q.       The automated script, though, is

04:42 4   operated by power.com?

04:42 5         A.       It's a -- An automated script for

04:42 6   PowerScript, are initiated by users and executed by

04:42 7   power.com in the same way that an exporter is

04:43 8   initiated by user and managed by the site that's

04:43 9   doing it on behalf of the user.  Did you get that?

04:43 10  Yes.

04:43 11              (Whereupon, Exhibit 107 is marked

04:43 12  for identification by the reporter.)

04:43 13        Q.       Mr. Vachani, Exhibit 107 is

04:43 14  Exhibit A to the first amended complaint that was

04:43 15  106.  Have you seen this document before today?

04:43 16        A.       What is this document I'm looking

04:43 17  at?

04:43 18        Q.       Exhibit A to the first amended

04:43 19  complaint.

04:43 20        A.       Is this the Facebook Terms and

04:43 21  Conditions?

04:43 22        Q.       Yes.

04:44 23        A.       I have -- Vaguely -- I've seen

04:44 24  this before, yes.  I don't know if I've seen this

04:44 25  specific version.  I've read the Facebook Terms and

                            274

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



04:45 1   says Page 415?

04:45 2           A.      Yes.

04:45 3           Q.      Can you read the first bullet

04:45 4   point to yourself and tell me when you've finished?

04:45 5           A.      The first bullet point?  Yes.

04:45 6                   Okay.

04:45 7           Q.      As of December 1st, 2008, do you

04:45 8   know one way or another whether anybody at Power

04:45 9   had read that particular provision in the Facebook

04:45 10  Terms of Service?

04:45 11          A.      Yes.

04:45 12          Q.      Had you read it?

04:45 13          A.      Yes.

04:45 14          Q.      All right.  Did you have an

04:46 15  understanding whether power.com enabled users to

04:46 16  registered users to violate the Terms of Service?

04:46 17          A.      I don't understand how a message

04:46 18  that a user wants to send to another friend --

04:46 19  First of all, it's an unsolicited message; and

04:46 20  second, I don't understand what this Terms and

04:46 21  Conditions has anything to do with -- with -- I

04:46 22  don't understand how the relevance to the

04:46 23  questions.

04:46 24          Q.      Did you have an understanding

04:46 25  whether or not power.com to enabled its registered

                           276

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



04:47 1   and not only Facebook but the entire Internet, that

04:47 2   what we were doing definitely has a pretty strong

04:48 3   grounds to be value.  Obviously, there's no legal

04:48 4   precedent whatsoever anywhere that exists relating

04:48 5   to this issue, so that's why I don't understand

04:48 6   what this discussion is about.

04:48 7           Q.      Mr. Vachani, whether you

04:48 8   understand what it's about, my question is simply

04:48 9   did Power have an understanding whether it was

04:48 10  enabling registered users of Power to violate the

04:48 11  Terms of Service of Facebook?

04:48 12          A.      Let me be clear.  You specifically

04:48 13  asked about unsolicited communications and we did

04:48 14  not send any unsolicited E mails or communications.

04:48 15  Neither did our users.  If our users wanted to send

04:48 16  a message to their friend, they have the right to

04:48 17  send a message or authorize the sending of a

04:48 18  message.  This is a -- This is something that it's

04:48 19  commonplace and used by every site including

04:48 20  Facebook as a core part of their business.  That's

04:48 21  why I don't understand why we're talking about

04:48 22  unsolicited communications.

04:48 23          Q.      Mr. Vachani, again, I asked simply

04:49 24  -- you don't need to even look at the any of the

04:49 25  bullet points.  Did power.com, as of December 1st,

                          278



04:50 1    the question read back and then just answer the

04:50 2    question.

04:50 3            A.        So what's the question?

04:50 4                      (Whereupon, the last question is

04:50 5    read back by the reporter.)

04:50 6                      MR. BURSOR:  Is the question:

04:50 7    Does he see that in the agreement?

      8                      MR. COOPER:  Yeah, that's all I

      9    asked.

     10                      MR. BURSOR:  Yeah, so do you see

04:50 11   that -- do you see that --

04:50 12           A.        I see that in the agreement.

04:50 13                     MR. BURSOR:  Yeah, so then you've

04:50 14   answered the question.

     15            A.        Okay.  Yeah, I see that in your

04:50 16   agreement.

04:50 17           Q.        Have you read that language as of

04:50 18   December 1st, 2008?

04:50 19           A.        Yes.  I had read it many times.

04:50 20           Q.        Had anybody else at power.com read

04:50 21   that language as of December 1st, 2008?

04:50 22           A.        I don't know if they read it.  It

04:51 23   was my job to read it and I think Filipe probably

04:51 24   read it.  Those are the two people that I know.

04:51 25           Q.        As of December 1st, 2008, had you

                                  280

BARKLEY
Court Reporters

04:56  1    I think she was one of the lawyers, but I could --

04:56  2    Yeah.

04:56  3         Q.       All right.  All I'm just asking if

04:56  4    you can recall the name of lawyers who handle --

04:56  5    I'm not even asking any specific legal matter --

04:56  6         A.       We did have counsel in the United

04:56  7    States, and at a later point Wilson Sonsini was our

04:56  8    lawyer after we moved from Skadden to Wilson

04:56  9    Sonsini.

04:56 10         Q.       Who at Wilson Sonsini?

04:56 11         A.       I apologize.  It was -- The

04:56 12    interactions were not extensive with those

04:56 13    companies.

04:56 14         Q.       Besides Mr. Herrera, did you ever

04:57 15    have any discussions with anybody at Power about

04:57 16    Facebook's Terms of Service?

04:57 17         A.       It would be with Eric.

04:57 18         Q.       Eric Santos?

04:57 19         A.       Eric and Filipe were the two

      20    primary people that I would consult on these

      21    issues.

      22         Q.       Okay.  So Filipe --

04:57 23         A.       Not on -- Primarily Filipe.

04:57 24         Q.       Mr. Herrera, my understanding --

04:57 25    Was he listed as general counsel by Power?

                             286

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO



|       |    |                                                          |
|-------|----|----------------------------------------------------------|
| 05:00 | 1  | A.       No.  From Facebook.  I received an              |
| 05:01 | 2  | E mail from Mr. Cutler.                                   |
| 05:01 | 3  | Q.       Did you receive the E mail or the               |
| 05:01 | 4  | letter from Facebook first?                              |
| 05:01 | 5  | A.       The E mail.                                      |
| 05:01 | 6  | Q.       Did the E mail include this                     |
| 05:01 | 7  | letter?                                                   |
| 05:01 | 8  | A.       Yes.  This was sent on December                 |
| 05:01 | 9  | 1st, if I remember correctly.                            |
| 05:01 | 10 | Q.       All right.  Going back to Exhibit               |
| 05:01 | 11 | 107, could you turn to Page 9 of 107.  Do you see        |
| 05:01 | 12 | the bottom of Page 9 there's a discussion of             |
| 05:01 | 13 | Facebook Connect?                                        |
| 05:01 | 14 | A.       Yes.                                             |
| 05:01 | 15 | Q.       As of December 1st, 2008, had                   |
| 05:01 | 16 | Power ever evaluated whether they could use              |
| 05:01 | 17 | Facebook Connect to connect the Power site or            |
| 05:01 | 18 | integrate the Power site with Facebook?                  |
| 05:02 | 19 | A.       Extensively.                                     |
| 05:02 | 20 | Q.       All right.  And do you recall how               |
| 05:02 | 21 | long that evaluation lasted?                             |
| 05:02 | 22 | A.       I don't remember, but we                         |
| 05:02 | 23 | definitely talked about it, looked at it, and I          |
| 05:02 | 24 | made a conclusion that it did not in any way.  It        |
| 05:02 | 25 | would not in any way enable the functionality that       |

290

STEVEN VACHANI- HIGHLY CONFIDENTIAL, AEO

**BARKLEY**
Court Reporters

05:02  1    our users were expecting from us.

05:02  2           Q.       When did these -- How were these

05:02  3    -- First of all, who were you referring to that we

05:02  4    discussed this when you --

05:02  5           A.       Typically, it would be in a weekly

05:02  6    meeting.  It would probably come up on the agenda,

05:02  7    Facebook Connect, and Eric would usually lead this.

05:02  8    He probably would have looked at -- with his team

05:02  9    he would have evaluated and played with Facebook

05:02  10   Connect to see what they could do and what its

05:02  11   capable in evaluating stuff and would have reported

05:02  12   on this at a meeting, at a weekly meeting.

05:02  13          Q.       Who participated in these weekly

05:02  14   meetings?

05:02  15          A.       It would be members of program --

05:02  16   members of the -- Typically, it would be management

05:03  17   but if there was a specific person other than

05:03  18   management that was necessary such as a member of

05:03  19   the team, we would -- they would come in and

05:03  20   consult on an issue.

05:03  21          Q.       Let me be clear.  Did you

05:03  22   participate in these weekly meetings?

05:03  23          A.       In many of them.  Not all of them.

05:03  24          Q.       Who do you recall besides yourself

05:03  25   and Mr. Santos?

291



SER 373

# C E R T I F I C A T I O N

I, PATRICIA MULLIGAN CARRUTHERS, a Certified Shorthand Reporter and Notary Public of the State of New Jersey and a Notary Public of the State of New York, do hereby certify that prior to the commencement of the examination the witness was sworn by me to testify as to the truth, the whole truth, and nothing but the truth.

I do further certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I do further certify that I am neither of counsel nor attorney for any party in this action and that I am not interested in the event nor outcome of this litigation.

_Patricia M Carruthers_
Patricia Mulligan Carruthers, CSR
Certificate No. XI00780
Notary Public of the State of New York
Notary Public of the State of New Jersey

Dated: JULY 27, 2011

My commission expires October 28, 2015 (N.J.)
My commission expires December 21, 2013 (N.Y.)

361

SER 374

EXHIBIT 100

1  I. NEEL CHATTERJEE (STATE BAR NO. 173985)
   nchatterjee@orrick.com
2  MONTE M.F. COOPER (STATE BAR NO. 196746)
   mcooper@orrick.com
3  THERESA A. SUTTON (STATE BAR NO. 211857)
   tsutton@orrick.com
4  MORVARID METANAT (STATE BAR NO. 268228)
   mmetanat@orrick.com
5  ORRICK, HERRINGTON & SUTCLIFFE LLP
   1000 Marsh Road
6  Menlo Park, CA 94025
   Telephone:      650-614-7400
7  Facsimile:      650-614-7401

8  Attorneys for Plaintiff
   FACEBOOK, INC.

9

                      UNITED STATES DISTRICT COURT

10
                   NORTHERN DISTRICT OF CALIFORNIA

11
                       SAN FRANCISCO DIVISION

12

13
   FACEBOOK, INC.,                        Case No.  5:08-cv-05780 JW

14
                    Plaintiff,            **DECLARATION OF LAWRENCE
15                                         MELLING IN SUPPORT OF
              v.                           FACEBOOK, INC.'S MOTION FOR
16                                         PARTIAL SUMMARY JUDGMENT
   POWER VENTURES, INC. a Cayman Island    ON COUNT 1 OF THE CAN-SPAM
17 Corporation; STEVE VACHANI, an          ACT**
   individual; DOE 1, d/b/a POWER.COM,
18 DOES 2-25, inclusive,                   Date:      December 19, 2011
                                           Time:      9:00 A.M.
19                  Defendants.            Courtroom: 9, 19th Floor
                                           Judge:     Honorable James Ware
20

21              **CONFIDENTIAL - FILED UNDER SEAL**

22

23

24

25

26

27

28

1    I, Lawrence Melling, declare as follows:

2    **I.    SUMMARY OF FINDINGS**

3         1.    I am a research engineer at Zeidman Consulting.  I make this declaration in support

4    of Facebook, Inc.'s Motion for Partial Summary Judgment On Count 1 Of The CAN-SPAM Act.  I

5    have personal knowledge of the matters stated herein, and if called as a witness could and would

6    testify competently thereto.  For my work on this matter, Zeidman Consulting is being compensated

7    at a rate of $200 per hour.

8         2.    I have been retained to review and analyze the source code and databases produced

9    by Defendants in this action.  I reviewed code and databases produced by Defendants on August

10   25-26, 29-30, September 6-7, and October 19 and 25, 2011.  Copies of my "Power Source Code

11   Inspection Log" maintained in accordance with the Protective Order entered in this case are

12   attached hereto as **Exhibit B**.

13        3.    Based upon the source code produced by Power to date, I have concluded the

14   following:  (a) Defendants developed software to extract user information including friends' lists

15   from Facebook.  Defendants designed their software to automatically send Facebook Event

16   Invitations and post Power Invitations on Facebook users' Walls; (b) 39,137 Power users had

17   Facebook accounts. Because of missing information, I was unable to quantify how many

18   transactions took place between Power and Facebook;  (c) The software that Power used to

19   automatically create Event notifications and post Facebook Wall messages was used to create

20   content on Facebook's website that would result in automated "spam" email messages being sent

21   on Defendants' behalf to Facebook users; (d) Defendants' software initiated the sequence of events

22   that resulted in these spam emails being sent to Facebook users; and (e) Defendants had built

23   mechanisms designed to circumvent technical barriers – such as blocks of IP addresses – that

24   Facebook put in place to block Power's access.  Defendants' source code includes routines that

25   create a list of proxy servers.  These proxy servers are continuously monitored to determine if they

26   are blocked by a website like Facebook.

27   **II.   BACKGROUND**

28        4.    This introductory section of my Declaration gives information about my

- 1 -

DECLARATION OF LAWRENCE MELLING

1  qualifications, as well as offers explanations of technical terms that are needed to understand this

2  Declaration.

3     **A.     Personal experience and background of Lawrence Melling**

4        5.      I am a research engineer at Zeidman Consulting.  I have over 30 years of executive

5  management and engineering experience in developing new hardware and software technologies

6  and bringing them to market.  I have been engaged in applications engineering and marketing of

7  electronic design automation (EDA) tools at major companies and small startups.  I have also been

8  involved in the development of sophisticated tools for source code and object code analysis for

9  finding intellectual property infringement.  My resume is attached as **Exhibit A** to this Declaration.

10    **B.     Website**

11       6.      A "website" is a location on the World Wide Web that contains a group of web

12  pages typically created using a popular programming language called the Hypertext Markup

13  Language (HTML).  Websites are usually connected to each other using "hyperlinks," and are made

14  available to the public by an individual, company, educational institution, government body, or

15  other organization.  These web pages are hosted on one or more computers called "web servers"

16  and are viewed by users on "client computers" that are connected to the web servers via the

17  Internet.  The web pages are viewed using an Internet browser, such as Microsoft's Internet

18  Explorer.  In conjunction with this Declaration, I make extensive reference to two websites located

19  at the Uniform Resource Locators ("URLs") http://www.facebook.com (the "Facebook website")

20  and http://www.power.com (the "Power website").

21    **C.     Internet Browser**

22       7.      An "Internet browser" or web browser is a typical client application used to navigate

23  the Internet.  The browser accesses information such as web pages, images, videos, and games from

24  Internet servers.  The URL is the "address" through which online information is located and

25  retrieved by the user from her client computer.  Servers may provide static information to an

26  Internet browser or may dynamically generate the information that is transmitted to an Internet

27  browser based on input from the user and the internal state of the server.  The browser provides the

28  graphical user interface (GUI) to the web pages on the server.  However, some websites make use

DECLARATION OF LAWRENCE MELLING

of client-side software to offload processing from the server to use the client's computer. This is important because the browsers include functionality to execute client-side "web scripts," which concept I discuss below. Three popular Internet browsers in use today are: Microsoft's Internet Explorer, Mozilla's Firefox, and Google's Chrome.

**D.  Client**

8.      A "client" is a computer that makes a service request to a server (defined below); the server fulfills the request. Computer interactions using the client/server model are very common. For example, when an individual checks a bank account from his or her computer, a client program on the individual's computer forwards the request to a server program at the bank. The bank's program may respond, or it may in turn forward the request to its own client program that makes a request to another bank computer. With regard to the World Wide Web, the browser on an individual's computer is a client program. The client program can be used to access and control the data from a server-side database via the individual user's client computer. A client application can also be referred to as the "front-end" and the server application is often called the "back-end."

**E.  Server**

9.      A "server" is a computer on a network (such as an internal corporate network or the Internet) that is dedicated to a particular purpose; it stores information and performs critical functions. For example, a "database server" could store all of an organization's data on a single machine, while providing database services to multiple users anywhere in the office, or even the world, while also allowing access and control over the data. A typical "database server" will allow users to access their data through custom applications designed to meet their specific needs. Server software refers to software running on the server computer that "serves up" information to a client computer. With regard to the World Wide Web, a web server responds to web client requests to view web pages. These pages can be static (content does not change) or dynamic (content is determined when requested).

**F.  Web Scripts**

10.      "Web scripts" are written to generate dynamic web pages; that is, web pages with rapidly changing content and imagery or content that must be calculated for example to display the

- 3 -

DECLARATION OF LAWRENCE MELLING

1  total visitor count to a web site.  Such scripts are written in a variety of scripting languages such as .

2  PHP, CGI, Perl, and JavaScript.  Some scripts run on the web server (server-side) while other

3  scripts run on the user's machine (client-side).  Of the languages mentioned, JavaScript is the

4  language of choice for client-side scripting and is supported by all the Internet browsers popularly

5  in use, while PHP, CGI, and Perl are popular for server-side scripting.

6  **G.  Web Crawler or Spider**

7  11.  A "web crawler" or "spider" is a computer program used to browse the Internet in a

8  systematic, comprehensive way. Web crawlers are typically associated with search engines and are

9  used to collect website information for search engine indexing.  Nonetheless, spiders and web

10  crawlers are now commonly being used to collect or "harvest" web page information for non-search

11  related applications such as web scraping. Web scraping can be used to locate input fields and

12  variable fields allow a program to automatically fill out forms to login, send messages, request

13  information, or any other website activity initiated by filling out a form.  Because web scraping

14  often is employed by entities for unwanted or unlawful purposes (like Power's harvesting of user

15  information such as "friends' lists," and similar data from Facebook in order to later use that

16  information to send "spam" email and electronic mail messages), many website operators

17  (including Facebook) publish Terms of Use provisions that prohibit the use of web scrapers on their

18  websites by their registered users-.

19  **H.  Computer Database**

20  12.  A "computer database" consists not only of data, such as user names and addresses,

21  but also consists of schema and procedures represented by source code.  The term "schema" refers

22  to the structure of the database including where to place the data, how to organize the data, and the

23  relationships between the data. For example, customer names may be placed in a field called

24  "Name" and that name may be in a table called "Customers."  A table is like a spreadsheet and a

25  field in that table corresponds to a particular column in the spreadsheet.  In a database there are

26  many different tables. Each customer name may have an associated table with fields that contain

27  the customer's address, credit card number, account balance, and comments about the customer.

28  The table names, field names, types of data in the fields, and relationships between different tables

- 4 -

DECLARATION OF LAWRENCE MELLING

1  and different fields constitute the schema of the database which is generated using special

2  programming language such as the Structured Query Language, also known as SQL.

3      13.    Procedures for manipulating the data may also be stored in the database. These

4  procedures are also utilized in conjunction with a special programming language such as SQL.

5  These "stored procedures" can be used by programs that access the database to manipulate the data

6  in the database.  For example, a stored procedure may exist to compute the average outstanding

7  balance for a list of bank customers.  A program that is written to access the database could also

8  access the stored procedure in order to calculate this average.

9      **I.    Source Code**

10     14.    In computer science, "source code" is a kind of text that is written using the format

11  and syntax of the programming language that it is being written in, and typically is the only format

12  that is readable by humans.  Computer programs can be written using complex instructions that

13  look like English. For example, the instruction a = b*c+2 tells the computer to take the number

14  stored in memory and represented by variable b, multiply that by the number stored in memory and

15  represented by the variable c, add 2 and store the result in memory represented by the variable a.

16  Similarly, the statement printf("Hello world!") tells the computer to print the words "Hello world!"

17  to the computer screen. These high-level, English-like instructions are the "source code." Computer

18  programs are made up of many lines of source code and the process of writing these lines of code is

19  called programming. Eventually these lines of source code are turned into instructions that a

20  computer understands, consisting of sequences of electronic ones and zeroes. The process of

21  turning human-readable source code into a file containing computer instructions is called

22  "compiling" and is performed by a special computer program called a "compiler." In some cases,

23  source code is run directly by a computer, without creating any file of computer instructions.

24  **III.    SCOPE OF OPINIONS**

25     15.    Based on my background and experience and inspection to date of the source code

26  produced by Defendants, I have been asked to provide my opinions and conclusions related to (1)

27  whether  Defendants' source code contained evidence of attempts to access Facebook, download

28  data from Facebook, contact Facebook, and/or establish invitations to events whereby Facebook

DECLARATION OF LAWRENCE MELLING

1    users would automatically receive email messages procured by Defendants can be ascertained at

2    this time from an initial review of the source code; and (2) whether Defendants developed

3    technology to circumvent blocks by Facebook and others of the IP addresses associated with the

4    Power website.

5        16.    I have reviewed literally hundreds of thousands of lines of code to reach my

6    opinions.  In addition,  in reaching the opinions and conclusions discussed herein, I received,

7    considered, and/or relied upon the following materials, copies of which are not attached but can be

8    provided upon request:

- Power Source Code Documents which includes 299,763 lines of code,
- Four SQL Server database backup files.
- I used Understand by Scientific Toolworks, Inc. to help analyze the software.
- Microsoft SQL Server 2008 Express to extract the databases from the backup files and to review the database contents.
- Two PowerScript Source files extracted from the PowerScript_bkp_full.bak database backup file: PN_SEND_PRIVATE_MESSAGE_FACEBOOK and CREATE_EVENT_FACEBOOK
- Projetos\Power.PowerNetwork.Core\dal\AccountNetworkDAL.cs
- Projetos\src\configuration\ConfigurationPowerProxy.cs
- Java\PowerInfra\powerproxy\com\powerscrap\proxy\manager\UpdateServerListManager.java
- Java\PowerInfra\powerproxy\com\powerscrap\proxy\PowerProxy.java
- The transcript of the July 20, 2011 deposition of Steve Vachani.
- Facebook's source code for "Create and Event"
- Additional source code documents delivered on October 25, 2011.
- Additional databases delivered on October 19, 2011 and October 25, 2011.

**IV.**    **ANALYSIS**

    17.    Power's software, operated by Defendants, was responsible for initiating the

sequence of events that resulted in these spam electronic mail messages being sent to Facebook

users.  Specifically, I have found that Defendants created software and expected to automatically

create Event notifications and post Facebook Wall messages was used to create content on

Facebook's website that resulted in automated "spam" electronic mail messages being sent on

Power's behalf to Facebook users.

    18.    For instance, one script in Defendants' code is called

CREATE_EVENT_FACEBOOK.  This script created an Event on Facebook that promulgated

invitations to Facebook users by Defendants.  That script automatically set Power as the host of the

- 6 -        DECLARATION OF LAWRENCE MELLING

1    event, and identified Power as the "location" for the event in Facebook's Event tool.  *See* **Exhibit**

2    **C,** CREATE_EVENT_FACEBOOK.xml, at lines 37 and 41.

3         19.    The script also generated a guest list if one was not provided.  To generate the guest

4    list, Defendants' software accesses the user's Facebook "friendsList" and extracts the user ID of

5    each friend to create the guest list.  *See id.* at lines 46-51.  The PowerScript executes this code, if no

6    guest list is provided, to automatically create a guest list from the user's list of friends on Facebook.

7    Specifically, the PowerScript application checks a "variable" (a named element to store

8    information) called the Guestlist ("listaConvidados"), and then executes a sequence of

9    programming commands inside a "rule block," identified by the beginning tag "<rule>" and

10   terminated by the ending tag "</rule>," if it is empty.  Through this process, the PowerScript

11   software creates a new variable called "friendsList," and another variable called "ids," which

12   combine to create the Event guest list made from one Facebook user's list of Facebook "friends."

13        20.    The script also automatically sends Facebook Event invitations to each Facebook

14   user in the guest list on behalf of Power.  *See id.* at lines 58-74.

15        21.    I also looked to determine if Defendants, or the user, caused the "events" to be

16   initiated.  From the code that has been provided to date, I could not locate any code in

17   CREATE_EVENT_FACEBOOK that requested the user's approval to send the "event" invitations.

18   I also was unable to find any other code requesting that the user accept or approve sending the

19   Facebook Event invitations on behalf of Power.

20        22.    The PowerScript software also created the text used to invite Facebook friends to

21   participate in the "100x100x100" campaign.  The message contents were stored in resource files,

22   which are files used by Microsoft Visual Studio development tools to store information for access

23   by a program.  Notably, in this example there were three resource files found with the same content

24   in three different languages:, English, Spanish, and Portuguese.  *See* **Exhibit D,**

25   PowerCallBack.aspx.en.resx, found in

26   SVN\power.com\Power.Com\Pub\Http\App_LocalResources directory, at lines 132-137.

27        132 <data name="CAMPAIGNMESSAGE" xml:space="preserve">

28        133  <value>#BREAK##BREAK#I am competing for the $100 prize in the

- 7 -                    DECLARATION OF LAWRENCE MELLING

100x100x100 promotion and recommend you to participate
too!#BREAK#Learn more at:</value>
134 </data>
135 <data name="CAMPAIGNMESSAGE2" xml:space="preserve">
136 <value>First 100 people who bring 100 new friends to Power.com
earn $100. Come and participate too:</value>
137 </data>

These files would only be here if the authors of the text created and authored it.

23.     These strings include the actual language that was sent to Facebook users as a result of the Power.com website's execution of the "CREATE_EVENT_FACEBOOK" script. This excerpt shows the text string stored for CAMPAIGNMESSAGE and another for CAMPAIGNMESSAGE2 are both human-readable messages used in promoting the 100x100x100 campaign to Facebook users.

24.     In the same resource file listed above, an additional human-readable messages generated by the PowerScript software also were used to invite Facebook friends to Power. *See* **Exhibit D** at lines 147-149. For example, I found the following code:

147 <data name="INVITEMESSAGE" xml:space="preserve">
148 <value>Hi ##friendname##,#BREAK#How would you like all your
friends in just one place?#BREAK#Login to Power.com to
discover all of its advantages and enhance your
Internet experience.</value>
149 </data>

25.     This excerpt shows a message string that includes a placeholder to insert a "friendname." This message was used in other electronic messages to registered Power users' Facebook friends through the Facebook system.

26.     The alternative function that uses this "INVITEMESSAGE" string is named "SendMessageInviteToPower()." *See* **Exhibit D** at line 2623. The code excerpt below shows that the script "INVITEMESSAGE" is used to form the body of the message to be sent as part of the invitation. *See id.,* found in the SVN\power.com\Power.Com\Pub\Http directory, at line 2681.

- 8 -                         DECLARATION OF LAWRENCE MELLING

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2681 dataMessage.BodyMessage = Translate("INVITEMESSAGE")
.Replace("##name##", name)
.Replace("##friendname##", friendName)

This line of code retrieves the appropriate language translation for the "INVITEMESSAGE" (English, Spanish, or Portuguese) message, and then replaces the "friendname" placeholder in the text of the message that is sent with the actual friend's name in order to complete the content of the invitation to join Power. Then at *id.*, line 2716, it calls the following function to send the message:

PowerMessageManager.SendMessage(dataMessage);

27. How the invitation is sent depends upon the network (*e.g.* Facebook) to which the invited friend belongs. The PowerMessageManager.SendMessage() method, which can be used to send invitations to users on Facebook, can be found starting at line 24 in the PowerMessageManager.cs file found in the SVN\power.com\Power.Message.Core directory, which is attached hereto as **Exhibit E**. The related SendMessage() code is responsible for calling the PowerMessageFactory.CreatePowerMessage(), attached hereto as **Exhibit F**, at line 42, and between the two scripts can ensure that Facebook users receive electronic mail invitations initiated by the Power website.

28. Further, a CreatePowerMessage() method that appears in the PowerScript code uses the relevant network name (*e.g.* "Facebook") to determine how and where to send the electronic invitation. For the case where the network is Facebook, the following PowerScript code would be executed when PowerScript created Event invitations. *See id.*, PowerMessageFactory.cs, found in the SVN\power.com\Power.Message.Core directory, at lines 45-50. This code shows Power would actually send an electronic message to someone from Facebook inviting them to join the Power website, but would use the Power user's email instead of Power. The code to send the message uses a PowerScript which posts the message to the Facebook Wall of the friend. The code to retrieve and execute the PowerScript can be found in Write.cs, found in the SVN\power.com\Power.Message.Core\Engines directory, which is attached hereto as **Exhibit G**, at

- 9 -

DECLARATION OF LAWRENCE MELLING

lines 87-94.

29.     The code identifies the name of the PowerScript PN_SEND_SCRAP_FACEBOOK as that which was used for initiating the electronic invitations to join Power. The code was retrieved from a database where it was added by using the following SQL command. *See* **Exhibit H**, InsertMessageScript.sql, found in SVN\power.com\Power.Message.Core\Database, at line 7. The PN_SEND_SCRAP_FACEBOOK script itself was retrieved from the PowerScript database. *See* **Exhibit I**, PN_SEND_SCRAP_FACEBOOK.pdf, at lines 1-23.

30.     The PowerScript automatically posts the message content from the INVITEMESSAGE string to the Wall of a Facebook friend. Using these automatically generated messages, Power initiated electronic mail invitations for Facebook users to join the Power website.

31.     In addition to the code analysis, I also examined the related databases provided in an effort to determine how many Facebook Event or Wall electronic mail messages were initiated by the PowerScript software. I determined that while certain of the databases were the ones of interest in which I would have expected to locate information about the numbers of electronic invitations that were sent by Power to Facebook, the databases produced by Power that should contain logs of the number of Events and Power invitations sent actually do not contain the information for the time period in question.

32.     For instance, the Power database named Async is a log of PowerScript jobs run. The Async log would contain the information related to the number of electronic messages sent by the PowerScript software. The Async database found on the SQL 7 DVD only logged jobs from 2/19/2011 to 4/1/2011, and the Async database in SQL 6 DVD was corrupted. However, the DVD that was provided that fixed the corrupted version only included logs from 08/03/2007 to 11/23/2008 – which does not cover the December 2008 period when the Facebook activity was seen. Power has not offered a reason for why the data was missing after 11/23/2008.

33.     In addition, I reviewed the content of the Power_Logger database in the expectation that it might include the information about how many Facebook Events and Wall messages that the PowerScript software initiated. I did so because this database appears to include tables to log information about messages sent, including 10 MessageLog tables, a MessageLogHistory table, 10

- 10 -

Scraplog tables, and a ScraplogHistory table.  Nonetheless, all these tables were empty except for the ScrapLoghistory, which only had 141 entries from 12/6/2009 to 11/9/2010, all on the Orkut network.  Again, Power has not offered a reason for why the Facebook Event and Wall message database information does not appear in the databases I reviewed.

34.  Because the information about Events and Wall messages sent to Facebook during December 2008 was not included in the databases I received from Power, I was unable to determine precisely how many wall messages were posted and how many "Power 100" campaign event notifications actually were sent to Facebook users.  Besides the data missing from the time period of interest, I also still don't have the source code repository files so that I could examine the exact revisions of the code used during the December 2008 time frame.  I am aware such files have been requested from Defendants.  I myself made oral requests for them as early as August of 2011.  I have yet to be told where they are, or why they remain missing.

35.  However, I also examined the Power database of the Power users, and I was able to determine that there were at least 39,137 Power users with Facebook accounts in the database.

I.  **DEFENDANTS' EFFORTS TO CIRCUMVENT IP BLOCKS**

36.  I also uncovered evidence that Defendants implemented technology to circumvent Facebook's efforts to block the Power website.  Specifically, the latest delivery included the source code files that run the CREATE_EVENT_FACEBOOK script.  *See* **Exhibit J**, CreateCampaignEvent.cs from SVN\power.com\Power.Com.Core\Campaign100x100x100 directory, at lines 25-40.  In this code, the PowerScript retrieved and executed the "CREATE_EVENT_FACEBOOK" script from one of Defendants' servers.  Significantly, the IP address of the relevant server that executes the "CREATE_EVENT_FACEBOOK" script is set by the Defendants' proxy server software.  This shows that the PowerScript software is monitored by the Power.com system to ensure that it is not being blocked by Facebook as a result of creating these Events.

37.  Additionally, I investigated certain routines in the Power source code to determine whether Defendants employed tools that allowed Power to circumvent technical barriers – such as

DECLARATION OF LAWRENCE MELLING

blocks of IP addresses – that Facebook or other websites put in place to block Power's access to their own websites. Certain ones that create a list of proxy servers, which are continuously monitored to determine, among other matters, if they are blocked by a website like Facebook. I have been able to identify connection-type methods in the source code that allow Defendants to use a proxy server to change the IP addresses by the Power website that are visible to and are detected by third parties like Facebook. By tracing the execution of a PowerScript, I found that part of the process was to use ConfigurationPowerProxy to get a proxy server to use for connecting with Facebook, in this example. The code found shows how an array of proxy servers is created from a list provided by the proxy manager and then the server is selected randomly from that list. *See* **Exhibit K**, ConfigurationPowerProxy.cs found in the SVN\powerinfra\trunk\Projetos\src\configuration directory, at lines 20-26.

38. The Defendants' source code includes routines I have identified that create a list of proxy servers, which are continuously monitored to determine, among other matters, if they are blocked by Facebook. The updateServerListThread shows the server list is updated on a regular interval stored in the timeToUpdate property. *See* **Exhibit L**, UpdateServerListManager.java, at lines 107-118.

39. While the previous routine is used to update the server list on regular intervals, there are two other methods that are used to update the server list. The definirServidor method is used to add a server to the list. The removerServidor method is used to remove a server from the list. *See* **Exhibit M**, PowerProxy.java, at lines 82-108 and lines112-135, respectively.

40. Finally the listen method at *id.* lines 144-165 monitors each proxy server and calls the removerServidor routine if it detects a block of the Power website. The IP address of the Power website can then be replaced with another IP address from the Power Proxy Manager. In this way, Power can ensure that it can circumvent deliberate blocks of its services by entities such as Facebook.

**V.**     <u>**DEFENDANTS HAVE DELETED IMPORTANT DATA**</u>

41. Since first getting access to some code on August 23, 2011, I have continually found deficiencies in the scope of code produced by Defendants. Despite repeated and diligent requests, I

DECLARATION OF LAWRENCE MELLING

1    still have not received all of the Power database information associated with how many invitations

2    were sent by Power. From correspondence from Mr. Fisher, I now believe this highly important

3    information was deleted after this litigation was underway.

4    **VI.**    **CONCLUSION**

5         42.     Based on my analysis to date, Power developed software to extract information from

6    Facebook which it used to automatically send Facebook Event Invitations and post Power

7    Invitations on Facebook users' Walls. The software that Power used to automatically create Event

8    notifications and post Facebook Wall messages could be used, and was used, to create content on

9    Facebook's website that would result in automated "spam" email messages being sent on Power's

10    behalf to Facebook users. It was Power's software that initiated the sequence of events that

11    resulted in these spam emails being sent to Facebook users.

12         43.     It is my understanding that discovery in this case is ongoing. Accordingly, I reserve

13    the right to supplement or amend my opinions in light of any additional evidence, testimony, or

14    information that may be provided to me after the date of this report. I also reserve the right to

15    supplement or amend my opinions in response to any expert reports served by any other party in the

16    lawsuit.

17         I declare under the penalty of perjury under the laws of the United States of America that

18    the foregoing is true and correct. This Declaration is executed on this 14th day of November,

19    2011, at Cupertino, California.

20

21                                Lawrence Melling

22

23

24

25

26

27

28

- 13 -

DECLARATION OF LAWRENCE MELLING

1   I. NEEL CHATTERJEE (STATE BAR NO. 173985)
    nchatterjee@orrick.com
2   MONTE M.F. COOPER (STATE BAR NO. 196746)
    mcooper@orrick.com
3   THERESA A. SUTTON (STATE BAR NO. 211857)
    tsutton@orrick.com
4   MORVARID METANAT (STATE BAR NO. 268228)
    mmetanat@orrick.com
5   ORRICK, HERRINGTON & SUTCLIFFE LLP
    1000 Marsh Road
6   Menlo Park, CA  94025
    Telephone:     650-614-7400
7   Facsimile:     650-614-7401

8   Attorneys for Plaintiff
    FACEBOOK, INC.

9
                    UNITED STATES DISTRICT COURT
10
                 NORTHERN DISTRICT OF CALIFORNIA
11
                      SAN FRANCISCO DIVISION
12

13
    FACEBOOK, INC.,                    Case No.  5:08-cv-05780 JW
14
                    Plaintiff,         **DECLARATION OF JOSEPH**
15                                      **CUTLER IN SUPPORT OF**
           v.                          **FACEBOOK, INC.'S MOTION FOR**
16                                      **PARTIAL SUMMARY JUDGMENT**
    POWER VENTURES, INC. a Cayman Island **FOR LIABILITY UNDER THE CAN-**
17  Corporation; STEVE VACHANI, an     **SPAM ACT**
    individual; DOE 1, d/b/a POWER.COM,
18  DOES 2-25, inclusive,              Date:      December 19, 2011
                                        Time:      9:00 a.m.
19                  Defendants.        Judge:     Hon. James Ware
                                        Courtroom: 9, 19th Floor
20
                    CONFIDENTIAL – FILED UNDER SEAL
21

22

23

24

25

26

27

28

I, Joseph Cutler, declare as follows:

1.     I make this declaration in support of Facebook, Inc.'s Motion for Partial Summary Judgment For Liability Under the CAN-SPAM Act.  I have personal knowledge of the matters stated herein, and if called as a witness could and would testify competently thereto.

2.     I am an associate at the Seattle, Washington office of the law firm Perkins Coie LLP.  I am a member of the firm's litigation group.  In that role, I have in the past been engaged by the Plaintiff in this case, Facebook, Inc, ("Facebook"), to help it take legal action against illegal spamming, phishing, and other forms of malicious Internet behavior.

3.     Along with Facebook's in house counsel (Sam O'Rourke) and Facebook's internal technical team (such as Ryan McGeehan), I was involved in the original investigation of the activities related to the commercial website located at www.power.com.

4.     On or about December 1, 2008, I investigated the activities related to a website located at the IP address 70.38.96.7.  The commercial website located at that address had the URL http://www.power.com ("Power's website").

5.     When I was first engaged, I visited the Power.com website.  I found that the Power website asked for my usernames and passwords, including my Facebook username and password.  I also found that the Power website displayed Facebook user data and Facebook's trademarked logo.

6.     Based upon my investigation, on December 1, 2008, I prepared a Cease and Desist letter.  I sent the letter to the apparent owners of the Power website advising them of their legal violations.  A true and accurate copy of that Cease and Desist letter is attached hereto as **Exhibit A**.

7.     Following my sending the cease and desist letter, I was contacted by Power Ventures' CEO, Steve Vachani.  Mr. Vachani said he was the owner of Power Ventures, that he operated the Power website, and that he had the ability to continue or cease Power's activities.

8.     In December 2008 through early 2009, I had numerous discussions with Mr. Vachani about the functionality of the Power website.  Through our discussions and additional investigation, I learned of numerous other activities by Defendants, and I also asked that those

- 1 -

1  activities stop.  In nearly all of our discussions, I continued to demand that Defendants cease their

2  unlawful activities.  Our discussions occurred via email as well as on the telephone.

3         9.      During our discussions, Mr. Vachani repeatedly assured me that the functionality

4  of the Power website would be changed to comply with Facebook's requests and that the Power

5  website's connection to Facebook would use Facebook's authorized "Facebook Connect" service.

6  Despite his repeated assurances, Mr. Vachani failed to make the changes to the Power website

7  that he had committed to make.  One example is described below.

8        10.     On or about December 12, 2008, Facebook implemented technical measures to

9  limit access from Power's website to Facebook by blocking the IP address that the Power website

10  used to connect to Facebook.  On the same day, I received an email from Mr. Vachani wherein he

11  agreed that the Power website would be modified to connect to Facebook using the authorized

12  "Facebook Connect" technology and that all user data gathered from Facebook to date would be

13  deleted and purged from their systems.  In that email, Mr. Vachani estimated that it would take

14  two weeks to complete the change to Facebook Connect.

15        11.     On December 15, 2008, I sent an email to Mr. Vachani responding to his

16  December 12, 2008 email.  In that message, I reconfirmed that Facebook expected the Power

17  website to delete all user data and to fully comply with the Facebook Connect policies and all

18  other applicable Facebook Terms of Use and guidelines within two weeks, or by December 26,

19  2008.

20        12.     On or about December 26, 2008, instead of finding that the Power website had

21  been changed to comply with Facebook's terms as Mr. Vachani had promised me it would, I

22  learned that the Power website had purposely circumvented Facebook's latest IP blocking

23  measures to continue its unauthorized access to Facebook by moving the services used to access

24  Facebook to a shared IP address owned by Amazon.com.

25        13.     On December 27, 2008, I received an email from Mr. Vachani informing me that

26  he and Power Ventures would not honor his earlier promises to me.  Instead, the email notified

27  Facebook that the Power website would not remove any Facebook content, would not use the

28  authorized Facebook Connect implementation, and would not discontinue its spam campaign

- 2 -

DECLARATION OF JOSEPH CUTLER
5:08-cv-05780 JW

1    aimed at soliciting Facebook users to join the Power Website. A true and correct copy of the

2    email I received from Mr. Vachani informing me of this decision is attached hereto as **Exhibit B**.

3        14.     Left with no recourse, Facebook filed the present suit on December 30, 2008. I

4    prepared a chronology of the events that led to this action, including an accurate characterization

5    of my discussions with Mr. Vachani, which is attached hereto as **Exhibit C**. After Facebook filed

6    suit, it continued its attempts to reach an agreement with the owners of the Power website to stop

7    its violations of the company's Terms of Use. Those efforts are also reflected in the attached

8    chronology.

9        15.     From the late fall of 2008 until early 2009, I estimate that Facebook spent

10   approximately \$75,000 on my firm related to Defendants' actions. In December alone, Facebook

11   incurred approximately \$5,059 for my time associated with Defendants activities. I also know

12   that Mr. O'Rourke and Mr. McGeehan dedicated substantial additional time to address

13   Defendants' actions.

14        I declare under the penalty of perjury under the laws of the United States of America that

15   the foregoing is true and correct. This Declaration is executed on this 14th day of November,

16   2011, at Seattle, Washington.

17

18

19                                       Joseph Cutler

20

21

22

23

24

25

26

27

28

-3-             

1    I. NEEL CHATTERJEE (STATE BAR NO. 173985)
     nchatterjee@orrick.com
2    MONTE M.F. COOPER (STATE BAR NO. 196746)
     mcooper@orrick.com
3    THERESA A. SUTTON (STATE BAR NO. 211857)
     tsutton@orrick.com
4    MORVARID METANAT (STATE BAR NO. 268228)
     mmetanat@orrick.com
5    ORRICK, HERRINGTON & SUTCLIFFE LLP
     1000 Marsh Road
6    Menlo Park, CA  94025
     Telephone:     650-614-7400
7    Facsimile:     650-614-7401

8    Attorneys for Plaintiff
     FACEBOOK, INC.

9
                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11
                      SAN FRANCISCO DIVISION
12

13
     FACEBOOK, INC.,                    Case No.  5:08-cv-05780 JW
14
                  Plaintiff,            **DECLARATION OF RYAN
15                                      MCGEEHAN IN SUPPORT OF
            v.                          FACEBOOK'S MOTION FOR
16                                      PARTIAL SUMMARY JUDGMENT
     POWER VENTURES, INC. a Cayman Island   ON COUNT 1 UNDER THE CAN-
17   Corporation; STEVE VACHANI, an     SPAM ACT**
     individual; DOE 1, d/b/a POWER.COM,
18   DOES 2-25, inclusive,              Date:      December 19, 2011
                                        Time:      9:00 a.m.
19                Defendants.           Judge:     Hon. James Ware
                                        Courtroom: 9, 19th Floor
20
21                   CONFIDENTIAL – FILED UNDER SEAL

22

23

24

25

26

27

28

I, Ryan McGeehan, declare as follows:

1.     I make this declaration in support of Facebook, Inc.'s Motion for Partial Summary Judgment pursuant to the CAN-SPAM Act, 15 U.S.C. § 7701 et seq. I am the Security Manager at Facebook in Facebook's Security Incident Response team ("SIR"). I have personal knowledge of the matters stated herein, and if called as a witness could and would testify competently thereto.

A.     **Facebook Services and Users**

2.     Facebook owns and operates the popular social networking website located at the universal resource locator ("url") http://www.facebook.com.  In 2008, Facebook had approximately 132 million active users.  This user base has grown significantly during the last few years.  Presently, Facebook has over 800 million monthly active users.

3.     Facebook users are offered a number of different kinds of online messaging tools, such as private messaging, posting of messages on another user's Facebook "wall" or "timeline," status updates, and "Event" invitation messages.  Facebook's "Events" are one of the many messaging tools provided by Facebook.  Facebook "Events" are entries on an electronic calendar that reside on the Facebook website, and to which Facebook assigns a unique Event identification number ("eid") that appears in the url associated with the Event.  A user can create a calendar entry and then send his or her friends invitations through the website to attend the Event.  If the user has notifications enabled, the invitation to the Event also generates an electronic mail message sent to the Facebook user's email address notifying the recipient of the invitation to the Event.

B.     **Business Enterprises Target Facebook And Its User Base**

4.     Facebook takes great measures to protect its user experience.  Facebook's popularity and immense user base attracts many outside business enterprises that seek to interact with Facebook's ever-growing user population.  Some of the business enterprises send messages that are unauthorized by Facebook and interfere with the user experience.  We refer to such messages as "spam."  "Spam" messages often contain false and misleading header information –

- 1 -

DECLARATION OF RYAN MCGEEHAN
5:08-CV-05780 JW

1   whether in the electronic messages sent through Facebook, such as Event messages, or in the

2   email notifications automatically generated by Facebook triggered by the spam message. As

3   Facebook has grown, Facebook has also seen a concomitant increase in activity by entities that

4   improperly use Facebook to send spam messages to Facebook users. These spam messages tax

5   Facebook's system because there is a finite volume of mail that Facebook can handle without

6   further investment in infrastructure.

7       5.      These spam messages detract from the overall Facebook experience and are

8   sometimes a source of complaints by Facebook users. For instance, in the fourth quarter of 2008,

9   Facebook received 71,256 "tickets" (*i.e.*, complaints by users) that used the word "spam" in them.

10  **C.      Facebook Invests Resources To Protect Its User Experience**

11      6.      Facebook has committed substantial resources to ensure a positive Facebook

12  experience. Some of the efforts taken by Facebook are described below.

13          a.      **Human Resources.**  In late 2007 or early 2008, Facebook created SIR.

14  SIR is responsible for protecting the user experience from security attacks. Part of SIR's job is to

15  deal with problems associated with spam attacks on Facebook. Our responsibilities include

16  identifying the source of spam, analyzing the complexity of spam attacks, and determining the

17  best method to prevent and contain spam attacks. Based upon this information, we stop spam

18  manually and through implementation of new technologies.

19          b.      **Technical Development.**  Facebook also uses technical measures to

20  prevent spammers from accessing the Facebook website and services. Facebook develops and

21  employs software designed to block access to links identified as abusive from the IP address or

22  addresses where it determines the spam has originated. This system is called the "Facebook

23  Immune System" ("FIS"). Thanks to FIS and other systems, Facebook currently has been able to

24  limit the amount of spam reaching the website's users to approximately less than one percent of

25  the site's population.

26          c.      **Terms of Use and Cease and Desist Letters.**  Facebook also relies on its

27  terms of use and cease and desist letters to protect the Facebook user experience. For example,

28  Facebook publishes and enforces policies prohibiting spam by its users. A copy of the version of

- 2 -

DECLARATION OF RYAN MCGEEHAN
5:08-CV-05780 JW

1    Facebook's Terms of Use in effect on December 1, 2008 is attached hereto as Exhibit 1.  At all

2    times during 2008, Facebook's Terms of Use were posted on its website and prohibited the

3    transmission of spam.  Facebook also regularly sends out cease and desist letters to those

4    spamming its users, notifying them that their conduct is unauthorized and unlawful.  Facebook

5    also asks its users to report "spam or scams" or any suspicious looking activity on Facebook.

6              d.      **Court Intervention**.  Where Facebook is unable to stop the spammer via

7    cease and desist letters and other efforts, it often turns to the court system.  Facebook has filed

8    numerous lawsuits alleging violations of the CAN-SPAM Act, the Computer Fraud and Abuse

9    Act ("CFAA"), and California Penal Code Section 502 in its effort to enjoin the conduct, deter

10   further activity by others, and prevent damage to its systems, disruption of the users' experience

11   and reduce harm to Facebook's goodwill.

12   **D.      Defendants' Efforts To Access Facebook And Send SPAM To Users**

13            7.      On or around December 1, 2008, following an initial half-day investigation, SIR

14   determined that the website located at the url http://www.power.com ("the Power website") was

15   running an automated scripting routine to crawl and scrape the Facebook website to harvest and

16   download user data to the Power website.  We believed that the purpose of the scripting routine

17   was to "proxy" Facebook – that is, we believed that Power sought to enable users to log into

18   Facebook  through an IP address belonging to the Power website.  I observed that the Power

19   website also displayed the Facebook logo as part of such proxying.  Such conduct violates

20   Facebook's terms of use.  As a result of this initial investigation, Facebook began a more detailed

21   investigation of the harvesting and use of Facebook user data by the operators of the Power

22   website.

23            8.      In the course of investigating the Power website's harvesting of Facebook user

24   data and proxying of the Facebook website, Facebook learned that communications from the

25   Power website initiated a marketing campaign whereby the scripting routine running on the

26   Power website automatically created Facebook Events that resulted in the Power website

27   spamming Facebook users.  Normally, when a user creates an Event, they select a name, date,

28   time, location, provide a title and select invitees from their friends.  The invitees then receive a

- 3 -

DECLARATION OF RYAN MCGEEHAN
5:08-CV-05780 JW

SER 396

1  message that they have been invited to the Event and, if they have notifications enabled, they

2  receive an email with the Event details.  My understanding is that Power used automated software

3  to complete these steps and invite all of the user's friends to an arbitrary Event requesting they

4  register as users of the Power website.  I also understand that this marketing scheme used other

5  forms of Facebook electronic messaging to solicit Facebook users to join the Power website, such

6  as direct Facebook messaging solicitations.

7          9.      I had occasion to review an example of electronic messages Power caused to be

8  sent via its marketing promotion.  The electronic messages came from Facebook as they included

9  the term "Facebook" in the "from" lines.  Moreover, "@facebookmail.com" addresses were

10  included both with the Event eid and the eventmaster emails sent to users, and the phrase "The

11  Facebook Team" showed up in the signature lines of these messages.  These messages would not

12  have been sent except for Power's actions accessing users' accounts, generating all the content

13  contained in the messages, placing them on the Facebook system, and automatically causing them

14  to be sent through their proxying activities.

15  **E.      Facebook Tried To Stop Defendants' Spamming Activities**

16          10.     The Power website's activities had the potential to harm Facebook's goodwill, and

17  likewise the activity was violating Facebook's Terms of Use.  I immediately consulted

18  Facebook's in-house legal department to notify them of my findings.  I then also met with

19  Facebook's "Site Integrity" team to determine the best methods by which to stop the Power

20  website's attack, and to prevent further attacks.  The Site Integrity team is responsible for

21  ensuring the integrity of Facebook by employing various measures to end and prevent incursions,

22  spam, scraping, fake account creation, malware distribution, and other harmful activities.  I was

23  part of a weekly meeting of engineers that included members of the Site Integrity team, and

24  which regularly discussed throughout the month of December 2008 the Power website's activities

25  aimed at Facebook, including the spamming of Facebook users.  Those discussions also included

26  how we could stop the Power website from proxying Facebook and block its unauthorized access

27  to Facebook.

28

- 4 -

Declaration of Ryan McGeehan
5:08-CV-05780 JW

**SER 397**

11.     I am aware that on or after December 1, 2008, Facebook's outside counsel sent to the individuals associated with operating the Power website a Cease and Desist letter demanding that they cease connecting to Facebook without Facebook's permission and without compliance with Facebook's Terms of Use.  In conjunction with that act, I personally was asked to investigate the source of the spam.

**F.    Facebook Suffered Harm**

12.     Stopping the activity originating from Power.com was a substantial effort taking a considerable amount of time. My investigation included analyzing the complexity of the attack was, and involved a substantial amount of my time being spent determining how much effort was needed to contain the spamming.  Part of that effort required SIR to determine how many IP addresses were being used to send spam, and also if other spam was coming from those IP addresses.  Due to the numerous methods used by the Power website to connect to and spam the site in conjunction with its marketing scheme, Facebook is not certain exactly how many electronic messages were generated by the Power website's automated software.  However, we determined that at least 60,627 Event invitations appear to have been sent to Facebook users through the Facebook system due to the Power website's spamming activities and adversely affected Facebook. Notably, this number does not include Events created by the Power website that were deleted by affected users. Because the use of Event electronic messages was not the exclusive way that the Power website solicited Facebook users, it is likely significantly more electronic messages were sent, however, and both taxed and adversely affected the Facebook network.

13.     Because the Power website did not stop connecting to Facebook even after Facebook's counsel sent its owners and operators the cease and desist letter, on or about December 12, 2008, Facebook decided to block the Power website's access to Facebook by blocking what appeared to be the Power website's primary IP address of 70.38.96.7.  Following this block, however, Facebook determined that the Power website was circumventing the block by changing its primary IP address to other IP addresses.  Facebook tried to block these IP addresses too in a game of "cat and mouse."

- 5 -

14.     On or about December 22, 2008, my own further investigations revealed that the Power website had again circumvented Facebook's blocks and resumed establishing connections to Facebook through new IP addresses associated with a shared amazon.com server.  Due to Amazon's configuration, the new IP addresses that Power utilized were shared with numerous innocent third parties, some of whom could be Facebook users and/or application developers.  We could not block these IP addresses without also blocking the innocent third parties.  Facebook therefore elected not to block these IP addresses.

15.     On or about December 31, 2008, I learned that Power supposedly had removed "compatibility" with Facebook, and ceased to connect to the site via the IP address associated with the amazon.com hosted servers.  However, on January 5, 2009, SIR was able to determine that there continued to be hundreds of instances of login activity from IP addresses associated with Power.com.  I attach hereto as Exhibits 2 and 3 a copy of my records (FBPOWER0007 & FBPOWER0008-26) ) reflecting that continued login activity.

16.     In early 2009 Facebook blacklisted the term "power.com," which prevented the term from appearing anywhere on the Facebook website. That block remains in use.

17.     In addition to the many hours of time I spent investigating and discussing with Facebook personnel the problems associated with the Power website's proxying of Facebook, I estimate I spent at least three to four days of my own engineering time addressing other security issues Power presented for Facebook and its users.  I attach hereto as Exhibit 4 a true and correct copy of the "ticket" called "Power.com contact importer" (FBPOWER0001-4) that I generated between December 1, 2008 and March 23, 2009 from my activities aimed at stopping the Power website's proxying of Facebook and spamming of Facebook users, including Facebook's attempts to block Power's access to Facebook's website.

- 6 -

DECLARATION OF RYAN MCGEEHAN
5:08-CV-05780 JW

SER 399

1  **G.    Facebook Commenced Litigation**

2      18.    I am aware that Facebook filed this lawsuit on December 30, 2008, after having

3  made numerous attempts to stop Power from accessing Facebook's website and sending spam

4  messages to its users and to integrate with Facebook in a manner consistent with Facebook's term

5  of use.

6      I declare under penalty of perjury that the foregoing is true and correct to the best of my

7  knowledge.  Executed this 13 th day of November 2011 at Palo Alto, California.

8

9                                         Ryan McGeehan

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 7 -

DECLARATION OF RYAN MCGEEHAN
5:08-CV-05780 JW

Pages 1 - 10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE

```
FACEBOOK, INC.,                    )
                                   )
            Plaintiff,             )
                                   )
  VS.                              ) NO. C 08-5780 JW (JCS)
                                   )
POWER VENTURES, INC.,              )
                                   )San Francisco, California
            Defendant.            )  Friday
                                   )  November 4, 2011
_____ )  1:30 p.m.
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff**:        Orrick, Herrington & Sutcliffe
                          1000 Marsh Road
                          Menlo Park, California  94025
                     BY:  **INDRA NEEL CHATTERJEE, ESQ.**
                          **MORVARID METANAT, ESQ.**


**For Defendant**:        Bursor & Fisher, P.A.
                          1900 North California Boulevard
                          Suite 940
                          Walnut Creek, California 94596
                     BY:  **LAWRENCE TIMOTHY FISHER, ESQ.**



Also Present:             Steven Vachani

*Reported By:*  *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
              *Official Reporter - US District Court*
              *Computerized Transcription By Eclipse*

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

```
 1                    P R O C E E D I N G S
 2  NOVEMBER 4, 2011                                    1:36 p.m.
 3
 4           THE CLERK:  Calling Case No. C08-5780, FaceBook
 5  versus Power Ventures.
 6           MR. FISHER:  Good afternoon, your Honor.  Timothy
 7  Fisher for the defendants.
 8           THE COURT:  Mr. Fisher, welcome.
 9           MS. METANAT:  Your Honor, Morvarid Metanat and Neel
10  Chatterjee for plaintiff Facebook.
11           THE COURT:  Welcome, welcome.  So you probably caught
12  the gist of where I'm going from our last discussion.  I
13  don't -- having reviewed the papers, I think the search was
14  transparently inadequate, both in the sense of figuring out
15  what the scope ought to be in terms of what computers, email
16  accounts, et cetera are to be searched and the rigor with which
17  they were searched, and -- and the rigor with which they were
18  searched.
19           I also think that it's clear that all the
20  interrogatories that were done, were answered, were inadequate.
21           So what I want to do is order additional production
22  and additional interrogatories as sought, but I want to figure
23  out what that means.  So what I was going to do -- and I know
24  that your client is showing up soon, but I want you to start
25  thinking about it now -- is order you all to go into the jury
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 402

1   room and start working out a protocol.  The protocol must have

2   what's going to be searched, where, by whom and how.  In other

3   words, who is going to do it, under what supervision, with what

4   search terms, et cetera, so that we have a true search for

5   electronics because it's pretty clear to me that this was

6   inadequate both from the way it was done and described by the

7   defendant, by the individual who runs the defendant, and by the

8   fact that so many other things are showing up in other email

9   accounts, et cetera, et cetera.

10          So that's what I propose to do.  I'm happy to hear

11  some discussion of that, if you want, or you can just go in

12  there and work it out.

13          **MR. FISHER:**  Sure, your Honor.  Following the

14  telephonic conference last week, we contacted our client and he

15  began immediately searching for additional documents.  And this

16  week we've produced a substantial amount of additional

17  documents, several hundred.  I think about 700 emails were

18  produced, 50 PowerPoint presentations, internal software

19  manuals and a variety of other things like that.  More than

20  five gigabytes of documents were turned over to Facebook on

21  Tuesday or Wednesday of this week, because we wanted to produce

22  them in advance of the hearing today so they would have some

23  time to review it.

24          We're happy to sit and talk with them about

25  additional things that they would like.  As I indicated to the

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 403

1  clerk, my client is on his way from Brazil to be here so that

2  he can participate in the discussions.

3          THE COURT:  Excellent.  As soon as he comes in, we'll

4  send him in to talk to you.

5          MR. FISHER:  All right.  Wonderful.

6          THE COURT:  You understand why the fact that you have

7  produced five gigabytes of material in the last two weeks might

8  make me less comfortable, not more comfortable.

9          MR. FISHER:  I understand, your Honor.

10         THE COURT:  Right?  So let's talk about protocol as

11  well.

12         Okay?  So don't leave without talking to me.  You're

13  welcome to go into my jury room.  It's very comfortable.  There

14  are probably some jury snacks in there, some stale cookies.  Is

15  it unlocked?

16         THE CLERK:  Yes.

17         THE COURT:  See you later.

18         MS. METANAT:  Your Honor, if I could make one

19  request?  There is another matter coming on for case

20  management.  If somebody could just get me for it when the need

21  arises?

22         THE COURT:  Sure, yes.

23         MS. METANAT:  Thank you, your Honor.

24         (Whereupon there was a recess in the proceedings

25         from 2:40 p.m. until 3:35 p.m.)

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 404

```
 1          (Mr. Steven Vachani present.)

 2          THE CLERK:  We're back on the record.  Recalling case

 3   No. C08-5780, Facebook versus Power Ventures.

 4          Counsel, state your appearances please.

 5          MR. CHATTERJEE:  Neel Chatterjee and Morvarid Metanat

 6   for Facebook.

 7          MR. FISHER:  Good afternoon your Honor.  Timothy

 8   Fisher for defendants.  And my client Mr. Vachani is here in

 9   the courtroom.

10          THE COURT:  Excellent.  So what did you on come up

11   with.

12          MR. CHATTERJEE:  Okay, your Honor.  So I think what

13   I'll do is I'll kind of go through what we've agreed to and

14   then what I'd like -- I'll make a couple requests that are

15   pretty straightforward at the end.

16          THE COURT:  I need to be upstairs with Judge Breyer

17   in seven minutes.

18          MR. CHATTERJEE:  I will finish in seven minutes.

19          So Mr. Vachani has represented to us that there are

20   two places where electronic documents and evidence will be

21   located.  One is an on-line backup drive called the ASA Drive,

22   and then the other is -- he says all of the emails that he

23   receives are forwarded to his Yahoo email account.

24          He has said that he has changed laptops about 10

25   times over the past several years, so his current laptop is
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 405

1  only about a week old and does not have any documents related
2  to this dispute.
3          What Mr. Vachani and Power has agreed to do is give
4  us access to the ASA Drive and the email account, and he'll
5  give us the passwords and whatever access information we need
6  to evaluate it by next Wednesday.
7          There is also one remaining issue on some code
8  production that was ordered.  We sent them an email today about
9  that, and they will give us a response to what the status of
10 the things we believe are missing is by next Wednesday.
11         The one thing that we request is that Mr. Vachani
12 somehow affirm to your Honor that those two places, the Yahoo
13 email account and the ASA Drive, are the only places where
14 documents may be maintained that are related to this lawsuit.
15 Mainly because if we find out that that's untrue, we want to
16 have some vehicle to hold him accountable.
17         **THE COURT:**  Okay.  Is that all right?
18         **MR. FISHER:**  That's fine, your Honor.
19         **THE COURT:**  All right.  Mr. Vachani, why don't you
20 come up here?
21         **MR. VACHANI:**  Sure.
22         **THE CLERK:**  Raise your right hand, please.
23         (Whereupon, Defendant Steven Vachani was
24         placed under oath.)
25         **MR. VACHANI:**  I do.

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 406

```
 1            THE COURT:  All right.  I understand that you've
 2   represented to the defendants that the only places --
 3            MR. FISHER:  Plaintiffs, your Honor.
 4            THE COURT:  Plaintiffs, sorry.  Thank you.
 5            MR. CHATTERJEE:  I know.  I'm normally on the other
 6   side of the room.
 7            THE COURT:  I'm confused.
 8            I understand that you have represented to counsel for
 9   the plaintiffs that the only place where electronic information
10   is stored that might have any conceivable relevance to this
11   dispute with Facebook is on the ASA Drive, which I understand
12   is online?
13            MR. VACHANI:  It's an on-line backup of all of our
14   servers.
15            THE COURT:  Online backup drive.  Or on your Yahoo
16   email account.
17            MR. VACHANI:  It's where all emails that I've sent or
18   received in the last five years for all accounts are all there.
19            THE COURT:  So there wouldn't be any -- all existent
20   electronic information that might have any relevance to this
21   dispute that exists in the world, there would -- the
22   only place, if it exists, it can be found on one of those two
23   sources.
24            MR. VACHANI:  That pertains to me.  Something that I
25   have sent or received.  They have already gone through the
```

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 407

1    process with every other relevant person.  So anything that

2    relates to me.

3            **MR. CHATTERJEE:**  Or Power.

4            **MR. VACHANI:**  Well, I can't speak for every single

5    employee of Power, 150 employees.

6            **MR. CHATTERJEE:**  So...

7            So, your Honor, the issue here is the employees are

8    gone.  The representation is that everything that would be

9    within Power Venture's control, custody or control, are those

10   two things.

11           **MR. VACHANI:**  Yes.  This is what is in Power Ventures

12   control, correct.

13           **THE COURT:**  Let me do it again.

14           **MR. CHATTERJEE:**  Thanks.

15           **THE COURT:**  Is it true that everything, every bit or

16   byte of electronic information that is in any way related to

17   this dispute that is either within your control or within the

18   control, custody and control of Power Ventures, Inc., copies of

19   all that electronic information, to the extent exists anywhere

20   in the world, would be on one of these two sources, the ASA

21   Drive or use who email account, is that correct?

22           **MR. VACHANI:**  That's correct.

23           **THE COURT:**  Okay.

24           **MR. CHATTERJEE:**  Thank you, your Honor.

25           **THE COURT:**  So I will order -- I'm granting the

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 408

1  motion.  You'll see it's reflected and I'll order the protocol

2  that's been suggested; that the defendants are given access to

3  the ASA Drive and to the Yahoo email account with passwords and

4  anything you need to get into them by next Wednesday and

5  respond -- and, also, respond regarding the code issue so that

6  that can be worked out by next Wednesday as well.

7           **MR. VACHANI:**  Can I make one statement?

8           I believe between now and Wednesday when we provide

9  anything, I'm going to obviously -- to the best of my

10 knowledge, these are the two places.  I'm going to -- if there

11 are any other changes between now and Wednesday, I'll let you

12 know.

13          **THE COURT:**  I'll let them know.

14          **MR. VACHANI:**  I'll let them know so you can document

15 the record, but if there is no other thing, then you can take

16 his statement.

17          **MR. CHATTERJEE:**  And, your Honor, just to make sure

18 it's clear.  Once we get access, we can also get information,

19 like produce the documents and --

20          **THE COURT:**  You get access so that you can search

21 them and examine them and take copies.

22          **MR. CHATTERJEE:**  Thank you, your Honor.

23          **MR. FISHER:**  Your Honor, just for the record, also,

24 we're not waiving -- Mr. Vachani's email does include a number

25 of privileged communications.  So we're not waiving privilege

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 409

1   or ability to designate under the protective order.

2          **THE COURT:**  Designate appropriately under the

3   protective order to preserve the privilege so there's no issue.

4   Okay.

5          **MR. CHATTERJEE:**  Thank you, your Honor.

6          **MR. FISHER:**  Thank you.

7          **THE COURT:**  Thank you.

8          (Whereupon, further proceedings in the

9           above matter were adjourned.)


11                          --oo--

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 410

**CERTIFICATE OF REPORTER**


I, DEBRA L. PAS, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 08-5780 JW (JCS), FACEBOOK, INC. vs POWER VENTURES, et al were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


_____
/s/ Debra L. Pas

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, November 21, 2011


*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

SER 411

1    LAW OFFICES OF SCOTT A. BURSOR
     Scott A. Bursor
2    369 Lexington Avenue, 10th Floor
     New York, NY 10017
3    Telephone: (212) 989-9113
     Facsimile: (212) 989-9163
4

5    BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
     Alan R. Plutzik (State Bar No. 077785)
     Michael S. Strimling (State Bar No. 96135)
6    L. Timothy Fisher (State Bar No. 191626)
     2125 Oak Grove Road, Suite 120
7    Walnut Creek, CA 94598
     Telephone: (925) 945-0200
8    Facsimile: (925) 945-8792

9    Attorneys for Defendants Power
     Ventures, Inc. and Steve Vachani
10

11               UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13

14

| | |
|---|---|
| 15   FACEBOOK, INC., | |
| 16                  Plaintiff, | Case No. 5:08-cv-05780 |
| 17   -against- | |
| 18   POWER VENTURES, INC. d/b/a POWER.COM, a California corporation; POWER VENTURES, INC. a Cayman Island Corporation, STEVE VACHANI, an individual; DOE 1, d/b/a POWER.COM, an individual and/or business entity of unknown nature; DOES 2 through 25, inclusive, individuals and/or business entities of unknown nature, | **AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI** |
| 23               Defendants. | |

24

25

26

27

28

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND
STEVE VACHANI

Defendants Power Ventures, Inc. and Steve Vachani (hereafter collectively referred to as "Defendants" or "Power") hereby answer the First Amended Complaint ("Complaint") filed by Plaintiff Facebook, Inc. ("Facebook").

## I. INTRODUCTION AND BACKGROUND

Power believes in a borderless Internet where users have the right to own and control their own data. Indeed, Power recently published an Internet User Bill of Rights detailing three fundamental rights of Internet users that must be protected – rights to ownership, control and privacy. Power's Internet User Bill of Rights details these three fundamental rights as follows:

**Ownership**
The right to complete and total ownership of their content—including profiles, messages, media, contacts and all other data.

**Control**
The right to access, disseminate, transfer or aggregate their content on any platform, or to authorize third-parties to do so for them.

**Privacy**
The right to protect their content and personal information from other users and corporate entities alike.

Power's core mission is to protect and to defend these rights and to provide users with the tools they need to exercise them. Facebook, on the other hand, has attempted to thwart its users' ability to exercise these rights with respect to their own data.

The bulk of the Facebook site is comprised of "User Content." This "User Content" includes "photos, profiles, messages, notes, text, information, music, video, advertisements, listings, and other content that [users] upload, publish or display" on the Facebook site. This data is not owned by Facebook. It is owned by the user. Although users' ownership of their own data seems self-evident, and it has been one of our core principles since Power was founded, Facebook historically has been criticized for not respecting its users' rights to ownership of their own content – and that is the crux of the dispute. Facebook is attempting to prevent Power from providing tools to Internet users that allow those users to exercise ownership and control over their own data.

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

1

Facebook is also attempting to stifle the development of Power's innovative new technologies that will liberate Internet users from proprietary restrictions that prevent them from controlling access to their own data.

> **A.** **Facebook's Allegation That Power.com Has Made "Unauthorized" Use Of Users' Login Passwords Is False And Frivolous**

One example of Facebook improperly restricting their users' ownership and control of their own data is Facebook's purported "security measure" of prohibiting users from providing their own username and password to third parties, such as Power. This purported "security measure" is discussed at paragraph 3 of Facebook's complaint. But this is not a "security measure" at all. The entry of usernames and passwords to access a website through a third-party site poses no threat to security. On the contrary, it is commonplace in the industry. Indeed, it is a practice that Facebook itself employs on its own site to allow its users to access other websites through Facebook. For example, below is a screen capture from http://www.facebook.com/gettingstarted.php?

1

2          On this page, Facebook solicits users to enter their account names and passwords for users'

3   email accounts at Google's Gmail, AOL, Yahoo, Hotmail, or other third party websites.  Facebook

4   then uses the account information to allow the user to access those accounts through Facebook, and

5   to import information – *i.e.*, to "scrape" data – from those third-party sites into Facebook.  This

6   practice fueled Facebook's growth by allowing Facebook to add millions of new users, and to

7   provide users with convenient tools to encourage their friends and contacts to join Facebook as

8   well.

9          Facebook seeks to stifle competitors from using the same type of utility.  Facebook's

10  purported "security measure" – prohibiting Facebook users from logging into Facebook through

11  third-party sites, such as Power.com – unduly restricts users' ability to access their own data.  It

12  thwarts the development of innovative technologies, platforms, and applications that users might

13  wish to use, such as those offered by Power.com.

14         In this lawsuit Facebook alleges that Power has made "unauthorized" use of Facebook

15  users' login credentials (usernames and passwords).  *See* Complaint ¶ 50 ("In order for a visitor to

16  integrate a Facebook account into Power.com's website, Power.com requires that users provide it

17  with their Facebook username and password.").  Power permits users to enter their account

18  information to access the Facebook site through Power.com, just as Facebook does with respect to

19  other sites.  This is a common industry practice.  Is not "unauthorized."  It is clearly authorized by

20  the user who enters his own account information.  Facebook's complaint does not identify a single

21  instance of "unauthorized" use of a username or password.  Nor does Facebook's complaint

22  identify a single instance in which anyone's account security was compromised by Power in any

23  way.  As we point out above, users' right to security of their data is one of the three fundamental

24  principles underlying Power's Internet User Bill of Rights.  Power has taken every appropriate

25  measure to protect that security.

26

27

28

---

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.
AND STEVE VACHANI                                                                                  3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.** **Facebook's Allegation That Power.com Has Sent Unsolicited Commercial Messages To Facebook's Users Is False; In Fact, Facebook Itself Sent The "Unsolicited Message" Referenced In The Complaint**

Facebook's complaint alleges that Power sent "unsolicited" email messages to Facebook users which were "deceptive and misleading." *See* Complaint ¶ 65-73. That allegation is false. Power did not send the email message referenced in the complaint. Facebook did.

Facebook allows users to create "events," which Facebook then invites friends to attend. The screen captures from www.facebook.com below illustrates the event creation process.



AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

4

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15   After the user has created the event and selected the friends to be invited, Facebook then sends the
16   invitations by email:
17
18
19
20
21
22
23
24
25
26
27
28



AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.
AND STEVE VACHANI

5

This email is sent by Facebook. Facebook determines the address that appears in the "From:" field *See* Complaint ¶ 68 ("From: Facebook<eventmaster+zOs9a6jc@facebookmail.com>"). Facebook also adds the closing signature from "The Facebook Team." *See* Complaint ¶ 69 ("The message … is signed by "The Facebook Team," which is both misleading and false."). Neither the user nor Power has any control over these elements of the email message. All content in these email messages that Facebook alleges to be misleading and false was written and appended to the message by Facebook itself.

Notably, Facebook's complaint is devoid of any allegation that any user was actually misled by any of these messages. Facebook's pleading is also devoid of any allegation that any user, or any recipient of such messages, has complained about the contact or about the message being unsolicited. Facebook's allegations concerning these "unsolicited" emails are trumped-up and frivolous. As Facebook well knows, Facebook itself was the source of these messages. And Facebook was the source of every element that Facebook contends is false or misleading. Every email referenced in Complaint ¶ 65-73 was generated and transmitted by Facebook as a result of a conscious action taken by users.

### C. Facebook's Allegations That Power.com Has Violated Facebook's Intellectual Property Rights Are Frivolous

Power.com believes strongly in intellectual property rights, including the right of users to own and to control their own data. That is the intellectual property of the user. Facebook does not own that intellectual property. The users do.

Facebook's complaint broadly alleges that Power.com has violated Facebook's rights by copying the Facebook website. But the complaint does not identify either the copyrighted work or the allegedly infringing work. It refers generically to 'Facebook's website,' but does not identify any portion of the website, any graphics or text, or any computer program that is alleged to have been copied 'and/or' the source for a derivative work. *See* Complaint ¶ 125. The complaint also refers generically to "copies and/or derivative works created by Defendants," *id.* ¶ 127, but it does not identify the "copies and/or derivative works" in any intelligible way. This is probably the most vague allegation of copyright infringement that has ever been filed.

The Facebook website is massive.  It includes many different elements – some of which are subject to copyrights owned by Facebook and some of which clearly are not.  The bulk of the Facebook site is comprised of "User Content."  This "User Content" includes "photos, profiles, messages, notes, text, information, music, video, advertisements, listings, and other content that [users] upload, publish or display" on the Facebook site.  *See* Facebook Terms of Use (rev. Sept. 23, 2008), available at http://www.facebook.com/terms.php.  Facebook owns no copyright to such User Content.  Indeed, Facebook's own Terms of Use expressly state that "Facebook does not assert any ownership over your User Content."  *Id.*  The Facebook site also contains "articles, photographs, text, graphics, pictures, designs, music, sound, video, information applications, software and other content or items belonging to or originating from third parties."  *Id.* (section headed "Third Party Websites and Content").  Facebook does not own the copyrights to these third party materials.

Power.com provides users with utilities that allow them to copy their own User Content for purposes of updating it and making it portable to other sites – without copying other elements of the Facebook website.  The Complaint does not allege that Power.com has copied any element of the Facebook site that is subject to a copyright owned by Facebook.

The applicable copyright statute, 17 U.S.C. § 512, requires a notification of copyright infringement to include "[i]dentification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site."  17 U.S.C. § 512(c)(3)(A)(ii).  It also requires "[i]dentification of the material that is claimed to be infringing or the subject of infringing activity."  *Id.* § 512(c)(3)(A)(iii).  Indeed, even Facebook's own DMCA Notice of Copyright Infringement, which it uses to address reports of potential copyright infringement on its own site, *requires* this information.  *See* Facebook DMCA Notice of Copyright Infringement, available at http://www.facebook.com/copyright.php?copyright_notice=1 ("Identify the copyrighted work that you claim has been infringed. … Identify the content on our site that you claim infringes your copyright. … Where does the infringing content appear on our site?  In almost all instances the

best way to help us locate the content you are reporting is to provide us with the URL.").
Facebook's complaint does not include even the most basic information that it requires from its
own users in order to report copyright infringement.

Unable to identify any actual infringement of a copyright-protected element of its website,
Facebook has resorted to arguing that Power "created cached copies of the [Facebook] website."
*See* Facebook's 4/17/09 Opposition to Power's Motion to Dismiss at 9:13-15. What that means is
that Facebook alleges that every time the Facebook website is displayed on a computer it is
"copied," albeit momentarily, in the computer's cached memory. This allegation of copying is
akin to charging the Dell company with copyright infringement whenever a user accesses the
Facebook website through a Dell computer; or charging the Lexmark company with copyright
infringement every time a user prints a page from the Facebook website on a Lexmark printer.
Furthermore, even if Facebook could premise a copyright claim on the ephemeral and momentary
copying of a website in a computer's cached memory, such temporary and intermediate copying in
order to extract non-copyrighted elements – such as the User Content at issue here – falls squarely
within the fair use doctrine.

## II. GENERAL DENIAL

Pursuant to Fed. R. Civ. P. 8(b)(3), Defendants generally deny all allegations in the
complaint except those specifically admitted herein.

## III. SPECIFIC DENIALS

1.    Defendants deny the allegations in paragraph 1.

2.    Defendants deny knowledge or information sufficient to form a belief as to the truth
of the allegations in ¶ 2, except that Defendants admit that Facebook operates a social networking
site.

3.    Defendants deny knowledge or information sufficient to form a belief as to the truth
of the allegations in ¶ 3, except that Defendants deny that Facebook's attempt to prohibit users
from sharing their login information is a "security measure." Facebook solicits login information

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.
AND STEVE VACHANI

8

for third-party sites. This is a common industry practice. Facebook's attempt to prohibit others from doing the same is an illegal and anticompetitive practice.

4. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in ¶ 4.

5. Defendants deny the allegations in ¶ 5, except that Defendants admit that they operate a website, www.power.com, which offers to integrate multiple social networking accounts into a single experience on Power.com.

6. Defendants deny the allegations in ¶ 6.

7. Defendants deny the allegations in ¶ 7.

8. Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 8.

9. Defendants deny the allegations in ¶ 9.

10. Defendants deny the allegations in ¶ 10, except that Defendants admit that Power Ventures, Inc. is a corporation incorporated in the Cayman Islands, doing business in the State of California.

11. Defendants deny the allegations in ¶ 11, except that Defendants admit that Vachani is CEO of Power.com.

12. Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 12.

13. Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 13.

14. No response needed.

15. The allegations of ¶ 15 state conclusions of law to which no response is required.

16. The allegations of ¶ 16 state conclusions of law to which no response is required.

17. The allegations of ¶ 17 state conclusions of law to which no response is required.

18.     Defendants deny the allegations in ¶ 18, except that Defendants admit that Power permits users to enter their account information to access the Facebook site through Power.com, just as Facebook does with respect to other sites.  This is a practice common in the industry.

19.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 19.

20.     Defendants admit the allegations in ¶ 20.

21.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 21, except that Defendants admit that Facebook users register with a unique user name and password.

22.     Defendants admit the allegations in ¶ 22.

23.     Defendants admit the allegations in ¶ 23.

24.     Defendants admit the allegations in ¶ 24.

25.     Defendants admit the allegations in ¶ 25.

26.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 26.

27.     Defendants deny the allegations in ¶ 27.

28.     Defendants deny the allegations in ¶ 28, except that Defendants admit that Facebook permits limited integration with third party websites through Facebook Connect.

29.     Defendants admit the allegations in ¶ 29, except that Defendants deny that the Terms of Use attached as Exhibit A are current.  Defendants also deny that certain of the terms of use are legally enforceable.

30.     Defendants admit that the allegations in ¶ 30, except that Defendants deny that certain of the terms of use are legally enforceable.

31.     The allegations of ¶ 31 state conclusions of law to which no response is required.

32.     Defendants deny the allegations in ¶ 32.

33.     Defendants deny the allegations in ¶ 33.

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.
AND STEVE VACHANI

10

34.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 34.

35.     Defendants deny the allegations in ¶ 35.

36.     Defendants deny the allegations in ¶ 36.

37.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 37.

38.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 38.

39.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 39.

40.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 40.

41.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 41.

42.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 42.

43.     Defendants admit the allegations in ¶ 43.

44.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 44.

45.     Defendants deny the allegations in ¶ 45, except that Defendants admit that Power permits users to enter their account information to access the Facebook site through Power.com, just as Facebook does with respect to other sites.  This is a practice common in the industry.

46.     Defendants deny the allegations in ¶ 46, except that Defendants admit that Vachani and other Power employees have registered for personal Facebook accounts.

47.     Defendants deny the allegations in ¶ 47.

48.     Defendants deny the allegations in ¶ 48.

49.     Defendants admit the allegations in ¶ 49.

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

11

50.     Defendants deny the allegations in ¶ 50, except that Defendants admit that Power permits users to enter their account information to access the Facebook site through Power.com, just as Facebook does with respect to other sites.  This is a practice common in the industry.

51.     Defendants deny the allegations in ¶ 51.

52.     Defendants deny the allegations in ¶ 52.

53.     Defendants admit the allegations in ¶ 53.

54.     Defendants deny the allegations in ¶ 54.

55.     Defendants deny the allegations in ¶ 55.

56.     Defendants deny the allegations in ¶ 56.

57.     Defendants deny the allegations in ¶ 57, except that Defendants admit that Facebook has communicated such claims to Mr. Vachani.

58.     Defendants deny the allegations in ¶ 58, except that Defendants admit that Vachani offered to attempt to integrate Power.com with Facebook Connect.

59.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 59.

60.     Defendants deny the allegations in ¶ 59, except that Defendants admit that Vachani communicated concerns about Power's ability to integrate Power.com with Facebook Connect on the schedule that Facebook was demanding.

61.     Defendants deny the allegations in ¶ 61.

62.     Defendants deny the allegations in ¶ 62.

63.     Defendants deny the allegations in ¶ 63, except that Defendants admit that Facebook implemented technical measures to block users from accessing Facebook through Power.com.

64.     Defendants deny the allegations in ¶ 64, except that Defendants admit that Power provided users with tools necessary to access Facebook through Power.com.

65.     Defendants admit the allegations in ¶ 65.

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

12

66.    Defendants admit the allegations in ¶ 66, except that Defendants deny that Power.com sent unsolicited commercial emails, and Defendants deny that any of their conduct was "unauthorized." All of Defendants conduct was fully authorized by the users.

67.    Defendants deny the allegations in ¶ 67.

68.    Defendants admit the allegations in ¶ 68. In fact, Facebook sent the referenced message, and it was Facebook that designated the message with an "@facebookmail.com" address.

69.    Defendants deny the allegations in ¶ 69, except that Defendants admit that the email message purports to be "signed by 'The Facebook Team.'" In fact, Facebook appended that signature to the message.

70.    Defendants admit the allegations in ¶ 70, except that Defendants deny that the message was "unsolicited."

71.    Defendants deny the allegations in ¶ 71.

72.    Defendants deny the allegations in ¶ 72, except that Defendants admit that Power.com's offer of potential monetary compensation may have induced some Facebook users to participate in Power's launch program.

73.    Defendants deny the allegations in ¶ 73.

74.    Defendants admit the allegations in ¶ 74. Facebook has also "developed computer software and other automated devices and programs to access and obtain information" from other websites, as detailed above, for example. This is a common industry practice.

75.    Defendants deny the allegations in ¶ 75, except that Defendants admit that Power creates temporary cached copies of the Facebook website in order to display it through the Power browser. This is a standard practice used by all browsers. For example, the Microsoft company also creates "cached copies" every time a user views the Facebook site through the Internet Explorer browser. Similarly Google creates and stores "cached copies" of nearly every website on the internet, including Facebook.com. (Other search engines do the same.) Power does not store or retain these cached copies. Facebook has also accessed and copied third party websites

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.       13
AND STEVE VACHANI

(including but not limited to, creation of cached copies of the website) to develop, test, implement, use and provide" Facebook's services. This too is a common industry practice.

76. Defendants deny the allegations in ¶ 76.

77. Defendants deny the allegations in ¶ 77.

78. Defendants deny the allegations in ¶ 78.

79. Defendants deny the allegations in ¶ 79.

80. Defendants deny the allegations in ¶ 80.

81. Defendants deny the allegations in ¶ 81.

82. Defendants deny the allegations in ¶ 82.

83. Defendants deny the allegations in ¶ 83.

84. Defendants deny the allegations in ¶ 84.

85. Defendants deny the allegations in ¶ 85.

86. Defendants deny the allegations in ¶ 86.

### First Claim For Relief

**Violation of Controlling The Assault of Non-Solicited Pornography And Marketing ("CAN-SPAM"), 15 U.S.C. § 7701, *et seq.***

87. Paragraph 87 simply refers back to the allegations of prior paragraphs. No further response is required.

88. Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 88.

89. The allegations of ¶ 89 state conclusions of law to which no response is required.

90. The allegations of ¶ 90 state conclusions of law to which no response is required.

91. Defendants deny the allegations in ¶ 91.

92. Defendants deny the allegations in ¶ 92.

93. Defendants deny the allegations in ¶ 93.

94. Defendants deny the allegations in ¶ 94.

95. Defendants deny the allegations in ¶ 95.

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

14

96.     Defendants deny the allegations in ¶ 96.

97.     Defendants deny the allegations in ¶ 97.

98.     Defendants deny the allegations in ¶ 98.

99.     Defendants deny the allegations in ¶ 99.

100.    Defendants deny the allegations in ¶ 100.

101.    Defendants deny the allegations in ¶ 101.

102.    Defendants deny the allegations in ¶ 102.

**Second Claim For Relief**

**Violation of The Computer Fraud And Abuse Act, 18 U.S.C.
§ 1030, *et seq.***

103.    Paragraph 103 simply refers back to the allegations of prior paragraphs.  No further response is required.

104.    The allegations of ¶ 104 state conclusions of law to which no response is required.

105.    Defendants deny the allegations in ¶ 105.

106.    Defendants deny the allegations in ¶ 106.

107.    Defendants deny the allegations in ¶ 107.

108.    Defendants deny the allegations in ¶ 108.

109.    Defendants deny the allegations in ¶ 109.

110.    Defendants deny the allegations in ¶ 110.

111.    Defendants deny the allegations in ¶ 111.

**Third Claim For Relief**

**California Comprehensive Computer Data Access And Fraud
Act, California Penal Code § 502**

112.    Paragraph 112 simply refers back to the allegations of prior paragraphs.  No further response is required.

113.    Defendants deny the allegations in ¶ 113.

114.    Defendants deny the allegations in ¶ 114.

115.    Defendants deny the allegations in ¶ 115.

116.    Defendants deny the allegations in ¶ 116.

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.
AND STEVE VACHANI

15

117.    Defendants deny the allegations in ¶ 117.

118.    Defendants deny the allegations in ¶ 118.

119.    Defendants deny the allegations in ¶ 119.

120.    Defendants deny the allegations in ¶ 120.

121.    Defendants deny the allegations in ¶ 121.

### Fourth Claim For Relief

**Copyright Infringement (Direct Vicarious And Contributory)**
**17 U.S.C. § 101, *et seq.***

122.    Paragraph 122 simply refers back to the allegations of prior paragraphs.  No further response is required.

123.    Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 123.

124.    Defendants admit the allegations in ¶ 124.

125.    Defendants deny the allegations in ¶ 125.

126.    Defendants deny the allegations in ¶ 126.

127.    Defendants deny the allegations in ¶ 127.

128.    Defendants deny the allegations in ¶ 128.

129.    Defendants deny the allegations in ¶ 129.

130.    Defendants deny the allegations in ¶ 130.

131.    Defendants deny the allegations in ¶ 131.

132.    Defendants deny the allegations in ¶ 132.

133.    Defendants deny the allegations in ¶ 133.

### Fifth Claim For Relief

**Violation Of The Digital Millennium Copyright Act ("DMCA"),**
**17 U.S.C. § 1201, *et seq.***

134.    Paragraph 134 simply refers back to the allegations of prior paragraphs.  No further response is required.

135.    Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 135.

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

16

136.    Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 136.

137.    Defendants deny the allegations in ¶ 137.

138.    Defendants deny the allegations in ¶ 138.

139.    Defendants deny the allegations in ¶ 139.

140.    Defendants deny the allegations in ¶ 140.

141.    Defendants deny the allegations in ¶ 141.

142.    Defendants deny the allegations in ¶ 142.

143.    Defendants deny the allegations in ¶ 143.

144.    Defendants deny the allegations in ¶ 144.

## Sixth Claim For Relief
### Trademark Infringement, 15 U.S.C. §§ 1114 and 1125(a)

145.    Paragraph 145 simply refers back to the allegations of prior paragraphs. No further response is required.

146.    Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 146.

147.    Defendants deny the allegations in ¶ 147.

148.    Defendants deny the allegations in ¶ 148.

149.    Defendants deny the allegations in ¶ 149.

150.    Defendants deny the allegations in ¶ 150.

151.    Defendants deny the allegations in ¶ 151.

152.    Defendants deny the allegations in ¶ 152.

153.    Defendants deny the allegations in ¶ 153.

## Seventh Claim For Relief
### Trademark Infringement Under California Law

154.    Paragraph 154 simply refers back to the allegations of prior paragraphs. No further response is required.

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

17

155.     Defendants deny knowledge sufficient to form a belief as to the truth of the allegations in ¶ 155.

156.     Defendants deny the allegations in ¶ 156.

### Eighth Claim For Relief

### Unlawful, Unfair, And Fraudulent Competition Under California Business & Professions Code § 17,200, *et seq.*

157.     Paragraph 157 simply refers back to the allegations of prior paragraphs.  No further response is required.

158.     Defendants deny the allegations in ¶ 158.

159.     Defendants deny the allegations in ¶ 159.

## IV.  AFFIRMATIVE DEFENSES

### First Affirmative Defense

### Fair Use, 17 U.S.C. § 107

161.     Power.com provides users with utilities that allow them to copy their own User Content for purposes of updating it and making it portable to other sites – without copying other elements of the Facebook website.

162.     The only allegation of copying by Facebook is the allegation that third parties – Internet users – utilizing Power's utilities have "created cached copies of the [Facebook] website." *See* Facebook's 4/17/09 Opposition to Power's Motion to Dismiss at 9:13-15.  What that means is that Facebook alleges that every time the Facebook website is displayed on a computer it is "copied," albeit momentarily, in the computer's cached memory.  That allegation of copying is akin to charging the Dell company with copyright infringement whenever a user accesses the Facebook website through a Dell computer; or charging the Lexmark company with copyright infringement every time a user prints a page from the Facebook website on a Lexmark printer.  The Microsoft company also creates "cached copies" of the Facebook website every time a user views the Facebook site through the Internet Explorer browser.  Similarly Google creates and stores "cached copies" of nearly every website on the internet, including Facebook.com.  (Other search engines do the same.)

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

18

163.     Even if Facebook could premise a copyright claim on the ephemeral and momentary copying of a website in a computer's cached memory, such temporary and intermediate copying in order to extract non-copyrighted elements – such as the User Content at issue here – falls squarely within the fair use doctrine.

164.     The "copying," if any, constituted fair use under 17 U.S.C. § 107, and thus is not copyright infringement.  *See, e.g.*, *Sega v. Accolade*, 977 F.2d 1510, 1514 (9th Cir. 1992) (holding intermediate copying of copyrighted computer work to gain understanding of unprotected functional elements was fair use); *Sony v. Connectix*, 203 F.3d 596, 608 (9th Cir. 2000) (holding intermediate copying of BIOS that was necessary to access unprotected functional elements constituted fair use).

## Second Affirmative Defense
### Copyright Misuse

165.     Copyright misuse is a defense to copyright infringement. The copyright misuse doctrine "forbids the use of the [copyright] to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which is contrary to public policy to grant." *Altera Corp. v. Clear Logic, Inc.,* 424 F.3d 1079, 1090 (9th Cir.2005).  "The misuse defense prevents copyright holders from leveraging their limited monopoly to allow them control of areas outside the monopoly." *A & M Records v. Napster, Inc., 239 F.3d 1004, 1026 (9th Cir.2001).*

166.     The Facebook website is massive.  It includes many different elements – some of which are subject to copyrights owned by Facebook and some of which clearly are not.  The bulk of the Facebook site is comprised of "User Content."  This "User Content" includes "photos, profiles, messages, notes, text, information, music, video, advertisements, listings, and other content that [users] upload, publish or display" on the Facebook site. *See* Facebook Terms of Use (rev. Sept. 23, 2008), available at http://www.facebook.com/terms.php.  Facebook owns no copyright to such User Content.  Indeed, Facebook's own Terms of Use expressly state that "Facebook does not assert any ownership over your User Content." *Id.*  The Facebook site also contains "articles, photographs, text, graphics, pictures, designs, music, sound, video, information

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.                    19
 AND STEVE VACHANI

applications, software and other content or items belonging to or originating from third parties."
*Id.* (section headed "Third Party Websites and Content"). Facebook does not own the copyrights to
these third party materials.

167. Power.com provides users with utilities that allow them to copy their own User
Content for purposes of updating it and making it portable to other sites – without copying other
elements of the Facebook website. The Complaint does not allege that Power.com has copied any
element of the Facebook site that is subject to a copyright owned by Facebook.

168. Facebook has committed copyright misuse by attempting to use its copyright in the
Facebook website control areas outside of their copyright monopoly, such as by restricting users'
ability to access their own User Content, which is not within the limited monopoly granted by
Facebook's copyright to the Facebook website.

### Third Affirmative Defense
### Additional Defenses

166. Defendants reserve the right to allege additional defenses as they become known
during discovery and to amend this Answer accordingly.

### V.  COUNTERCLAIMS

### First Counterclaim

### Unfair Competition In Violation Of
### California Business & Professions Code §§ 17200 *Et Seq.*
### (Unfair Business Practices)

167. Defendants incorporate by reference all allegations of all prior paragraphs as though
fully set forth herein.

168. Facebook is subject to the Unfair Competition Law, Sections 17200 *et seq.* of the
California Business & Professions Code (the "UCL"). The UCL provides, in pertinent part:
"Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and
unfair, deceptive, untrue or misleading advertising…"

169. Facebook violated the unfair business practices prong of the UCL (i) by committing
copyright misuse systematically and on a massive scale as described in ¶¶ 165-168, (ii) by
soliciting internet users to provide their account names and passwords for users' email and social

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.
AND STEVE VACHANI

20

networking accounts, such as Google's Gmail, AOL, Yahoo, Hotmail, or other third party websites, and running automated scripts on those third-party websites while simultaneously prohibiting users from utilizing the same type of utilities to access their own user data when it is stored on the Facebook site, and (iii) by engaging in a campaign of threats and intimidation against competitors, including by threatening dozens of new entrants since 2006 with baseless intellectual property claims to discourage market entry and to stifle competition from new entrants.

### Second Counterclaim
### Monopolization, 15 U.S.C. § 2

170. Defendants incorporate by reference all allegations of all prior paragraphs as though fully set forth herein.

171. Facebook possesses market power in the market for social networking websites.

172. The relevant market for social networking websites includes websites that allow users to create personal profiles, manage contacts, and provide a variety of ways for users to interact with contacts. The relevant geographic market is the United States. As of September 2009, the market share of the five largest social networking websites in the United States, ranked by market share of U.S. visits, as reported by Experian Hitwise, was as follows:

| Rank | Name | Domain | Market Share |
|---|---|---|---|
| 1 | Facebook | www.facebook.com | 58.59% |
| 2 | MySpace | www.myspace.com | 30.26% |
| 3 | Tagged | www.tagged.com | 2.38% |
| 4 | Twitter | www.twitter.com | 1.84% |
| 5 | myYearbook | www.myYearbook.com | 1.05% |

See http://www.hitwise.com/us/press-center/press-releases/social-networking-sept-09/. In addition to holding a dominant share of the U.S. market, "Facebook … is well on its way to establishing dominance in several parts of the world." *See* Alex Salkever, "Facebook, aiming for global domination, is gaining quickly in Asia," Daily Finance (Nov. 16, 2009), available at

http://www.dailyfinance.com/2009/11/16/facebook-aiming-for-global-domination-is-gaining-quickly-in-as/print/.

173.    Power.com is a competitor in the market for social networking websites.

174.    Facebook has acquired and maintained market power through two devices:

(1)    Facebook solicited (and continues to solicit) internet users to provide their account names and passwords for users' email and social networking accounts, such as Google's Gmail, AOL, Yahoo, Hotmail, or other third party websites.  Facebook then uses the account information to allow the user to access those accounts through Facebook, and to run automated scripts to import their lists of friends and other contacts – *i.e.*, to "scrape" data – from those third-party sites into Facebook.  This practice fueled Facebook's growth by allowing Facebook to add millions of new users, and to provide users with convenient tools to encourage their friends and contacts to join Facebook as well.  On information and belief it is estimated that at least approximately 35% to 50% of Facebook's "132 million active users" (Facebook Amended Complaint, ¶ 2, Docket Entry No. 9), registered with Facebook as a result of an invitation generated using this device.

(2)    Facebook simultaneously prohibited (and prohibits) users from using the same type of utility to access their own user data when it is stored on the Facebook site.  Thus, Facebook prohibits users from logging into Facebook through third-party sites, such as Power.com, and also restricts users from running automated scripts to retrieve their own user data from the Facebook site.

175.    Device (1) is commonplace in the industry.  Many social networking web sites, and other types of websites, permit users to access their accounts through third-party websites.  For example, as noted above, Google's Gmail, AOL, Yahoo, Hotmail, MySpace, and many other websites allow for such access.  Device (2) is unique to Facebook.  Defendant is aware of no comparable website that at the same time solicits access to user accounts on third-party sites while attempting to prohibit such access to user data stored on its own site.

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.
AND STEVE VACHANI

22

176. Facebook has also maintained its monopoly power by systematically threatening new entrants, such as Power.com and others, who seek to attract users through the same device (Device (1) described in ¶ 174, above) that Facebook itself used to fuel its own growth. On information and belief, for approximately the past 36 months, Facebook has threatened dozens of new entrants since 2006 with baseless intellectual property claims, and has engaged in systematic and widespread copyright misuse as described in ¶¶ 165-168, above, to discourage market entry and to stifle competition from new entrants.

177. Facebook's efforts in this regard have been highly successful. Since Facebook embarked on this campaign of intimidation, no new entrant has amassed a market share of more than 2.38%. The only competitor with more than a 2.38% market share is MySpace, which was an established market leader for years before Facebook rose to dominance. Through the predatory conduct described herein, Facebook has reduced MySpace's market share by more than half in the past year, and has prevented any other entrant from garnering more than 2.38% of the market.

178. Facebook's conduct constitutes monopolization of the market for social networking website services in violation of Section 2 of the Sherman Act.

### Third Counterclaim
### Attempted Monopolization, 15 U.S.C. § 2

179. Defendants incorporate by reference all allegations of all prior paragraphs as though fully set forth herein.

180. The relevant market for social networking websites includes websites that allow users to create personal profiles, manage contacts, and provide a variety of ways for users to interact with contacts. The relevant geographic market is the United States. As of September 2009, the market share of the five largest social networking websites in the United States, ranked by market share of U.S. visits, as reported by Experian Hitwise, was as follows:

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

23

| Rank | Name | Domain | Market Share |
|------|------|--------|--------------|
| 1 | Facebook | www.facebook.com | 58.59% |
| 2 | MySpace | www.myspace.com | 30.26% |
| 3 | Tagged | www.tagged.com | 2.38% |
| 4 | Twitter | www.twitter.com | 1.84% |
| 5 | myYearbook | www.myYearbook.com | 1.05% |

See http://www.hitwise.com/us/press-center/press-releases/social-networking-sept-09/.  In addition to holding a dominant share of the U.S. market, "Facebook … is well on its way to establishing dominance in several parts of the world."  *See* Alex Salkever, "Facebook, aiming for global domination, is gaining quickly in Asia," Nov. 16, 2009 Daily Finance, available at http://www.dailyfinance.com/2009/11/16/facebook-aiming-for-global-domination-is-gaining-quickly-in-as/print/.

181.    Power.com is a competitor in the market for social networking websites.

182.    Facebook has engaged in predatory and anticompetitive conduct, as follows:

(1)    Facebook solicited (and continues to solicit) internet users to provide their account names and passwords for users' email and social networking accounts, such as Google's Gmail, AOL, Yahoo, Hotmail, or other third party websites.  Facebook then uses the account information to allow the user to access those accounts through Facebook, and to run automated scripts to import their lists of friends and other contacts – *i.e.*, to "scrape" data – from those third-party sites into Facebook.  This practice fueled Facebook's growth by allowing Facebook to add millions of new users, and to provide users with convenient tools to encourage their friends and contacts to join Facebook as well.  On information and belief it is estimated that at least approximately 35% to 50% of Facebook's "132 million active users" (Facebook Amended Complaint, ¶ 2, Docket Entry No. 9), registered with Facebook as a result of an invitation generated using this device.

(2)    Facebook simultaneously prohibited (and prohibits) users from using the same type of utility to access their own user data when it is stored on the Facebook site.  Thus,

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

24

Facebook prohibits users from logging into Facebook through third-party sites, such as Power.com, and also restricts users from running automated scripts to retrieve their own user data from the Facebook site. Device (1) is commonplace in the industry. Many social networking web sites, and other types of websites, permit users to access their accounts through third-party websites. For example, as noted above, Google's Gmail, AOL, Yahoo, Hotmail, MySpace, and many other websites allow for such access. Device (2) is unique to Facebook. Defendant is aware of no comparable website that at the same time solicits access to user accounts on third-party sites while attempting to prohibit such access to user data stored on its own site.

(3)     Facebook has threatened dozens of new entrants since 2006 with baseless intellectual property claims, and has engaged in systematic and widespread copyright misuse as described in ¶¶ 165-168, above, to discourage market entry and to stifle competition from new entrants.

183.     Facebook engaged in the conduct described at ¶¶ 183(1)-(3) with a specific intent to monopolize the market for social networking websites.

184.     Facebook has already achieved monopoly power, and/or there is a dangerous probability that Facebook will achieve monopoly power, if the conduct described in ¶ 183 continues unabated. Within a single year, from September 2008 through September 2009, Facebook increased its market share nearly three-fold, from 19.94% to 58.59%, while no other entrant has been able to garner more than a 2.38% share.

185.     Facebook's conduct constitutes an unlawful attempt to monopolize the market for social networking website services in violation of Section 2 of the Sherman Act.

**VI.  PRAYER FOR RELIEF**

WHEREFORE, Defendants Power and Vachani pray for judgment as follows:

1.     That plaintiffs take nothing by the Complaint, and that judgment be entered against Plaintiffs and in favor of Power and Vachani;

2.     That Power and Vachani be awarded costs of suit incurred in defending this action, including reasonable attorneys' fees;

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC. AND STEVE VACHANI

25

3. That Facebook be permanently enjoined from the unlawful and anticompetitive practices identified herein;

4. That Power and Vachani be awarded monetary damages for the injuries caused by Facebook's unlawful and anticompetitive practices;

5. That such damages be tripled under 15 U.S.C. § 15(a);

6. That Power and Vachani be awarded reasonable attorneys' fees, expenses and costs associated with prosecuting their claims; and

7. For such further relief as this Court deems necessary, just or proper.

## DEMAND FOR JURY TRIAL

Defendants demand a trial by jury.

Respectfully submitted,

Dated: November 23, 2009

BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP

By_____/s/_____
             Alan R. Plutzik

Alan R. Plutzik (State Bar No. 77785)
Michael S. Strimling (State Bar No. 96135)
L. Timothy Fisher (State Bar No. 191626)
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0200
Facsimile: (925) 945-8792

LAW OFFICES OF SCOTT A. BURSOR
Scott A. Bursor
369 Lexington Avenue, 10th Floor
New York, NY 10017-6531
Telephone: (212) 989-9113
Facsimile: (212) 989-9163

Attorneys for Defendants Power
Ventures, Inc. and Steve Vachani

AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANTS POWER VENTURES, INC.
AND STEVE VACHANI

26

1   BURSOR & FISHER, P.A.
    L. Timothy Fisher (State Bar No. 191626)
2   Sarah N. Westcot (State Bar No. 264916)
    1990 North California Blvd., Suite 940
3   Walnut Creek, CA 94596
    Telephone: (925) 300-4455
4   Facsimile: (925) 407-2700
    E-Mail: ltfisher@bursor.com
5         swestcot@bursor.com

6   BURSOR & FISHER, P.A.
    Scott A. Bursor (State Bar No. 276006)
7   369 Lexington Avenue, 10th Floor
    New York, NY 10017
8   Telephone: (212) 989-9113
    Facsimile: (212) 989-9163
9   E-Mail: scott@bursor.com

10   BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
    Alan R. Plutzik (State Bar No. 077785)
11   Michael S. Strimling (State Bar No. 96135)
    2125 Oak Grove Road, Suite 120
12   Walnut Creek, CA 94598
    Telephone: (925) 945-0200
13   Facsimile: (925) 945-8792
    E-Mails: aplutzik@bramsonplutzik.com
14          mstrimling@bramsonplutzik.com

15   *Attorneys for Defendants Power*
    *Ventures, Inc. and Steve Vachani*

16

                UNITED STATES DISTRICT COURT
17
                NORTHERN DISTRICT OF CALIFORNIA
18

| | |
|---|---|
| 19   FACEBOOK, INC., | Case No. 5:08-CV-05780 JW |
| 20               Plaintiff, | **[PROPOSED] ORDER** |
| 21   -against- | **PERMITTING THE PUBLIC FILING OF PORTIONS OF FACEBOOK INC.'S** |
| 22   POWER VENTURES, INC. d/b/a POWER.COM, a | **SUPPLEMENTAL BRIEF REGARDING DAMAGES AND** |
| 23   California corporation; POWER VENTURES, INC. a Cayman Island Corporation, STEVE VACHANI, | **LIABILITY OF DEFENDANT STEVE VACHANI** |
| 24   an individual; DOE 1, d/b/a POWER.COM, an individual and/or business entity of unknown nature; | |
| 25   DOES 2 through 25, inclusive, individuals and/or business entities of unknown nature, | |
| 26 | |
| 27             Defendants. | |

28

[PROPOSED] ORDER PERMITTING THE PUBLIC FILING OF PORTIONS OF FACEBOOK INC.'S SUPPLEMENTAL
BRIEF REGARDING DAMAGES AND LIABILITY OF DEFENDANT STEVE VACHANI
CASE NO. 5:08-CV-05780 JW

1    The Court, having considered the Declaration of L. Timothy Fisher Pursuant to Civil Rule

2    79-5(d) which removes the confidential designation of the documents referenced in Facebook

3    Inc.'s Motion for Administrative Relief to File Under Seal (Dkt. No. 291), the Court hereby orders

4    the documents referenced below to be filed publicly:

5    • Portions of Facebook's Supplemental Brief Regarding Damages and Liability of

6       Steve Vachani that have not been previously designated by Facebook

7    • Portions of the January 9, 2012 Deposition of Defendant Power Ventures, Inc.

8       ("Power") pursuant to Fed. R. Civ. P. 30(b)(6) attached as Exhibit 14 to the

9       Declaration of Monte M.F. Cooper in Support of Facebook's Supplemental Brief

10      Regarding Damages and Liability of Defendant Steve Vachani.

11   • Portions of the March 7, 2012 deposition of Defendant Power pursuant to F. R. Civ.

12      P. 30(b)(6) attached as Exhibit 2 to the Declaration of Monte M.F. Cooper in Support

13      of Facebook's Supplemental Brief Regarding Damages and Liability of Defendant

14      Steve Vachani.

15   • Exhibit Nos. 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 20, 24, 26, 27, 28, 29, 34,

16      and 36 attached to the Declaration of Monte M.F. Cooper in Support of Facebook's

17      Supplemental Brief Regarding Damages and Liability of Defendant Steve Vachani.

18

19

20

    Dated:  April 17, 2012                          _____

21                                                  HONORABLE JAMES WARE

22                                                  UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28

---

[PROPOSED] ORDER PERMITTING THE PUBLIC FILING OF PORTIONS OF FACEBOOK INC.'S SUPPLEMENTAL
BRIEF REGARDING DAMAGES AND LIABILITY OF DEFENDANT STEVE VACHANI
CASE NO. 5:08-CV-05780 JW

1　BURSOR & FISHER, P.A.
　　L. Timothy Fisher (State Bar No. 191626)
2　Sarah N. Westcot (State Bar No. 264916)
　　1990 North California Blvd., Suite 940
3　Walnut Creek, CA 94596
　　Telephone: (925) 300-4455
4　Facsimile: (925) 407-2700
　　E-Mail: ltfisher@bursor.com
5　　　　　　swestcot@bursor.com

6　BURSOR & FISHER, P.A.
　　Scott A. Bursor (State Bar No. 276006)
7　369 Lexington Avenue, 10th Floor
　　New York, NY  10017
8　Telephone:  (212) 989-9113
　　Facsimile:  (212) 989-9163
9　E-Mail: scott@bursor.com

10　BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
　　Alan R. Plutzik (State Bar No. 077785)
11　Michael S. Strimling (State Bar No. 96135)
　　2125 Oak Grove Road, Suite 120
12　Walnut Creek, CA  94598
　　Telephone:  (925) 945-0200
13　Facsimile:  (925) 945-8792
　　E-Mails: aplutzik@bramsonplutzik.com
14　　　　　　mstrimling@bramsonplutzik.com

15　Attorneys for Defendants Power
　　Ventures, Inc. and Steve Vachani
16

17　　　　　　　UNITED STATES DISTRICT COURT

18　　　　　　NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 19　FACEBOOK, INC., | Case No. 5:08-CV-05780 JW (JCS) |
| 20　　　　　　　　　　Plaintiff, | **[PROPOSED] ORDER SEALING CERTAIN PORTIONS OF FACEBOOK, INC.'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND FACEBOOK'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| 21　-against- | |
| 22　POWER VENTURES, INC. d/b/a POWER.COM, a | |
| 23　California corporation; POWER VENTURES, INC. a Cayman Island Corporation, STEVE VACHANI, | |
| 24　an individual; DOE 1, d/b/a POWER.COM, an individual and/or business entity of unknown nature; | |
| 25　DOES 2 through 25, inclusive, individuals and/or business entities of unknown nature, | |
| 26　 | |
| 27　　　　　　　　　　Defendants. | |
| 28　 | |

[PROPOSED] ORDER SEALING CERTAIN PORTIONS OF FACEBOOK, INC.'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT
AND FACEBOOK'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW

SER 441

Defendants Power Ventures, Inc. and Steve Vachani seek to file under seal, pursuant to Civil L.R. 79-5(d), all or portions of the following documents: (1) Exhibits 2, 3, 4 and 9 to the Declaration of Monte M.F. Cooper in Support of Facebook, Inc.'s Motion for Partial Summary Judgment on Count 1 under the CAN-SPAM Act; (2) Exhibit 1 to the Declaration of Theresa Sutton in Support of Plaintiff Facebook, Inc.'s Opposition to Defendants' Motion for Summary Judgment; (3) the November 14, 2011 Declaration of Lawrence Melling in Support of Facebook, Inc.'s Motion for Partial Summary Judgment on Count 1 of the CAN-SPAM Act ; (4) the December 2, 2011 Declaration of Lawrence Melling in Support of Facebook, Inc.'s Opposition to Defendants' Motion for Summary Judgment; and (5) Exhibit 10 to the November 17, 2011 Declaration of Morvarid Metanat in Support of Facebook, Inc.'s Motion for Partial Summary Judgment Under Penal Code § 502 and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. Having considered the papers filed in support of the motion, the Court HEREBY ORDERS that the motion is GRANTED and hereby seals the following documents:

- Pages 259-261 and 266-267 of the transcript of the deposition of Steve Vachani attached as Exhibit 2 to the Declaration of Monte M.F. Cooper in Support of Facebook, Inc.'s Motion for Partial Summary Judgment on Count 1 under the CAN-SPAM Act.

- Pages 259-261 and 266-267 of the transcript of the deposition of Steve Vachani attached as Exhibit 1 to the Declaration of Theresa Sutton in Support of Plaintiff Facebook, Inc.'s Opposition to Defendants' Motion for Summary Judgment.

- Exhibits 3, 4 and 9 to the Declaration of Monte M.F. Cooper in Support of Facebook, Inc.'s Motion for Partial Summary Judgment on Count 1 under the CAN-SPAM Act.

- The entire November 14, 2011 Declaration of Lawrence Melling in Support of Facebook, Inc.'s Motion for Partial Summary Judgment on Count 1 of the CAN-SPAM Act.

- The entire December 2, 2011 Declaration of Lawrence Melling in Support of Facebook, Inc.'s Opposition to Defendants' Motion for Summary Judgment.

[PROPOSED] ORDER SEALING CERTAIN PORTIONS OF FACEBOOK, INC.'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT     1
AND FACEBOOK'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW

SER 442

- Exhibit 10 to the November 17, 2011 Declaration of Morvarid Metanat in Support of Facebook, Inc.'s Motion for Partial Summary Judgment Under Penal Code § 502 and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

IT IS SO ORDERED.

Dated: December 19, 2011

_____
HONORABLE JAMES WARE
CHIEF JUDGE
UNITED STATES DISTRICT COURT

[PROPOSED] ORDER SEALING CERTAIN PORTIONS OF FACEBOOK, INC.'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND FACEBOOK'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:08-CV-05780 JW                                                                 2

SER 443

1   I. NEEL CHATTERJEE (STATE BAR NO. 173985)
    nchatterjee@orrick.com
2   MONTE M.F. COOPER (STATE BAR NO. 196746)
    mcooper@orrick.com
3   THERESA A. SUTTON (STATE BAR NO. 211857)
    tsutton@orrick.com
4   MORVARID METANAT (STATE BAR NO. 268228)
    mmetanat@orrick.com
5   ORRICK, HERRINGTON & SUTCLIFFE LLP
    1000 Marsh Road
6   Menlo Park, CA 94025
    Telephone:    650-614-7400
7   Facsimile:    650-614-7401

8   Attorneys for Plaintiff
    FACEBOOK, INC.
9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13

14  FACEBOOK, INC.,                         Case No.   5:08-cv-05780 JW

15            Plaintiffs,                    [PROPOSED] ORDER GRANTING
                                             FACEBOOK INC.'S MOTION FOR
16       v.                                  ADMINISTRATIVE RELIEF TO
                                             FILE UNDER SEAL PURSUANT TO
17  POWER VENTURES, INC. a Cayman Island     CIVIL LOCAL RULE 79-5(B)
    Corporation,; STEVE VACHANI, an
18  individual; DOE 1, d/b/a POWER.COM,
    DOES 2-25, inclusive,                    Dept:      Courtroom 9, 19th Floor
19                                           Judge:     Hon. Chief Judge James Ware
            Defendants.
20

21

22

23

24

25

26

27

28
                                             [Proposed] Order Granting Facebook's Motion to
                                                         File Under Seal
                                                         5:08-cv-05780 JW

SER 444

1       Facebook seeks to file under seal, pursuant to Civil Local Rule 79-5(b), portions of

2  Exhibits 8 and 9 to the Declaration of Morvarid Metanat in Support of Facebook's Motion of

3  Partial Summary Judgment Under California Penal Code Section 502 and The Computer Fraud

4  and Abuse Act, 18 U.S.C. § 1030 ("Metanat Declaration"), and portions of Facebook's Motion

5  for Partial Summary Judgment incorporating or citing from said Declarations.  Having considered

6  the papers filed in support of and in opposition to the motion, and other matters relevant to the

7  determination of this motion, the Court HEREBY ORDERS that the motion is GRANTED, as

8  follows:

9       (1)     Portions of Exhibit 8, the Declaration of Joseph Cutler, attached to the Metanat

10  Declaration shall be filed under seal.

11       (2)     Portions of Exhibit 9, the Declaration of Ryan McGeehan, attached to the Metanat

12  Declaration shall be filed under seal.

13       (3)     The portions of Facebook's Motion for Partial Summary Judgment under

14  California Penal Code § 502 and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030,

15  referencing the portions of Exhibits 8 or 9 that have been designated as "HIGHLY-

16  CONFIDENTIAL-ATTORNEY' EYES ONLY."

17       **IT IS SO ORDERED.**

18

19

20  Dated:  11/28/11

21

22                                          Honorable James Ware

23                                          Chief Judge
Northern District of California

24

25

26

27

28

1   I. NEEL CHATTERJEE (STATE BAR NO. 173985)
    nchatterjee@orrick.com
2   MONTE M.F. COOPER (STATE BAR NO. 196746)
    mcooper@orrick.com
3   THERESA A. SUTTON (STATE BAR NO. 211857)
    tsutton@orrick.com
4   MORVARID METANAT (STATE BAR NO. 268228)
    mmetanat@orrick.com
5   ORRICK, HERRINGTON & SUTCLIFFE LLP
    1000 Marsh Road
6   Menlo Park, CA  94025
    Telephone:    650-614-7400
7   Facsimile:    650-614-7401

8   Attorneys for Plaintiff
    FACEBOOK, INC.
9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12              SAN FRANCISCO DIVISION

13

14  FACEBOOK, INC.,                        Case No.   5:08-cv-05780 JW

15              Plaintiffs,                 [PROPOSED] ORDER GRANTING
                                            FACEBOOK INC.'S MOTION FOR
16         v.                               ADMINISTRATIVE RELIEF TO
                                            FILE UNDER SEAL THE
17  POWER VENTURES, INC. a Cayman Island    DECLARATIONS OF RYAN
    Corporation,; STEVE VACHANI, an         MCGEEHAN AND JOSEPH CUTLER
18  individual; DOE 1, d/b/a POWER.COM,     AND PORTIONS OF FACEBOOK'S
    DOES 2-25, inclusive,                   MOTION FOR PARTIAL SUMMARY
19                                          JUDGMENT PURSUANT TO CIVIL
                                            LOCAL RULE 79-5(B)
20              Defendants.

21                                          Dept:      Courtroom 9, 19th Floor
                                            Judge:     Hon. James Ware
22

23

24

25

26

27

28

1    Facebook seeks to file under seal, pursuant to Civil Local Rule 79-5(b), the Declarations

2    of Ryan McGeehan and Joseph Cutler in Support of Facebook's Motion for Partial Summary

3    Judgment on Count 1, and portions of Facebook's Motion for Partial Summary Judgment

4    incorporating or citing from said Declarations.  Having considered the papers filed in support of

5    and in opposition to the motion, and other matters relevant to the determination of this motion,

6    the Court HEREBY ORDERS that the motion is GRANTED, as follows:

7    (1)    The Declaration of Ryan McGeehan in Support of Facebook's Motion for Partial

8    Summary Judgment on Count 1, and Exhibits 2, 3, and 4 shall be filed under seal.

9    (2)    Paragraphs 3-6, 10 and 12, as well as portions of Exhibit C, to the Declaration of

10   Joseph Cutler in Support of Facebook's Motion for Partial Summary Judgment on Count 1, shall

11   be filed under seal.

12   (3)    The portions of Facebook's Motion for Partial Summary Judgment on Count 1 of

13   the CAN-SPAM Act referencing the McGeehan and Cutler Declarations.

14   **IT IS SO ORDERED.**

15

16

17   Dated: 11/28/11                          ORRICK, HERRINGTON & SUTCLIFFE LLP

18

19                                            _____

20                                            Honorable James Ware
                                              United States District Judge

21

22

23

24

25

26

27

28

[PROPOSED] ORDER GRANTING FACEBOOK'S  MOTION TO
FILE UNDER SEAL
5:08-CV-05780 JW

SER 447

*E-FILED 02-04-2011*

1
2
3
4
5
6
7          UNITED STATES DISTRICT COURT
8          NORTHERN DISTRICT OF CALIFORNIA
9
10

| | |
|---|---|
| 11  FACEBOOK, INC., | Case No. 5:08-cv-05780 JW (HRL) |
| 12          Plaintiff, | STIPULATED PROTECTIVE ORDER FOR STANDARD LITIGATION |
| 13     v. | |
| 14  POWER VENTURES, INC. a Cayman Island Corporation; STEVE VACHANI, an individual; DOE 1, d/b/a POWER.COM, DOES 2-25, inclusive, | **(MODIFIED BY THE COURT)** |
| 16          Defendants. | |

17
18
19     1.     PURPOSES AND LIMITATIONS

20          Disclosure and discovery activity in this action are likely to involve production of

21  confidential, proprietary, or private information for which special protection from public

22  disclosure and from use for any purpose other than prosecuting this litigation may be warranted.

23  Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated

24  Protective Order. The parties acknowledge that this Order does not confer blanket protections on

25  all disclosures or responses to discovery and that the protection it affords from public disclosure

26  and use extends only to the limited information or items that are entitled to confidential treatment

27  under the applicable legal principles. The parties further acknowledge, as set forth in Section

28  13.3, below, that this Stipulated Protective Order does not entitle them to file confidential

STIPULATED PROTECTIVE ORDER
FOR STANDARD LITIGATION
CASE NO. 08-5780-JW (HRL)

1    information under seal; Civil Local Rule 79-5 sets forth the procedures that must be followed and

2    the standards that will be applied when a party seeks permission from the court to file material

3    under seal.

4           2.    DEFINITIONS

5                 2.1    Challenging Party: a Party or Non-Party that challenges the designation of

6    information or items under this Order.

7                 2.2    "CONFIDENTIAL" Information or Items: information, documents, and

8    things the Designating Party believes in good faith is not generally known to others, and which

9    the Designating party (i) would not normally reveal to third parties except in confidence or has

10   undertaken with others to maintain in confidence, or (ii) believes in good faith is protected by a

11   right to privacy under federal or state law or any other applicable privilege or right related to

12   confidentiality or privacy.

13                2.3    "HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY"

14   Information or Items: information, documents and things the Designating Party believes in good

15   faith is not generally known to others and has significant competitive value such that unrestricted

16   disclosure to others would create a substantial risk of serious injury, and which the Designating

17   Party (i) would not normally reveal to third parties except in confidence or has undertaken with

18   others to maintain in confidence, or (ii) believes in good faith is significantly sensitive and

19   protected by a right to privacy under federal or state law or any other applicable privilege or right

20   related to confidentiality or privacy.  The designation is reserved for information that constitutes

21   proprietary financial or technical or commercially sensitive competitive information that the

22   Producing Party maintains as highly confidential in its business, including information obtained

23   from a nonparty pursuant to a current Nondisclosure Agreement ("NDA"), information relating to

24   future products, strategic plans, non-public financial data, documents that would reveal trade

25   secrets, licensing documents and licensing communications, and settlement agreements or

26   settlement communications, the disclosure of which is likely to cause harm to the competitive

27   position of the Producing Party.

28

STIPULATED PROTECTIVE ORDER
FOR STANDARD LITIGATION
CASE NO. 08-5780-JW (HRL)

2.4    "HIGHLY CONFIDENTIAL—SOURCE CODE" Information or Items: extremely sensitive "Confidential Information or Items" representing computer code and associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software of hardware designs, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.5    Counsel (without qualifier): Outside Counsel of Record and House Counsel (as well as their support staff).

2.6    Designating Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL—SOURCE CODE."

2.7    Disclosure or Discovery Material: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.8    Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action.

2.9    House Counsel: attorneys who are employees of a party to this action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.10    Non-Party: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.11    Outside Counsel of Record: attorneys who are not employees of a party to this action but are retained to represent or advise a party to this action and have appeared in this action on behalf of that party or are affiliated with a law firm which has appeared on behalf of that party.

2.12    Party: any party to this action, including all of its officers, directors,

- 3 -

1  employees, consultants, retained experts, and Outside Counsel of Record (and their support

2  staffs).

3          2.13    <u>Producing Party</u>: a Party or Non-Party that produces Disclosure or

4  Discovery Material in this action.

5          2.14    <u>Professional Vendors</u>: persons or entities that provide litigation support

6  services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and

7  organizing, storing, or retrieving data in any form or medium) and their employees and

8  subcontractors.

9          2.15    <u>Protected Material</u>: any Disclosure or Discovery Material that is designated

10  as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY," or

11  "HIGHLY CONFIDENTIAL—SOURCE CODE."

12          2.16    <u>Receiving Party</u>: a Party that receives Disclosure or Discovery Material

13  from a Producing Party.

14      3.    <u>SCOPE</u>

15      The protections conferred by this Stipulation and Order cover not only Protected Material

16  (as defined above), but also (1) any information copied or extracted from Protected Material; (2)

17  all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony,

18  conversations, or presentations by Parties or their Counsel that might reveal Protected Material.

19  However, protections conferred by this Stipulation and Order do not cover the following

20  information: (a) any information that is in the public domain at the time of disclosure to a

21  Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as

22  a result of publication not involving a violation of this Order, including becoming part of the

23  public record through trial or otherwise; and (b) any information known to the Receiving Party

24  prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who

25  obtained the information lawfully and under no obligation of confidentiality to the Designating

26  Party.  Any use of Protected Material at trial shall be governed by a separate agreement or order.

27      4.    <u>DURATION</u>

28      Even after final disposition of this litigation, the confidentiality obligations imposed by

- 4 -

STIPULATED PROTECTIVE ORDER
FOR STANDARD LITIGATION
CASE NO. 08-5780-JW (HRL)

1   this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court

2   order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all

3   claims and defenses in this action, with or without prejudice; and (2) final judgment herein after

4   the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action,

5   including the time limits for filing any motions or applications for extension of time pursuant to

6   applicable law. **For a period of six months after the final disposition of this litigation, this court will retain jurisdiction to enforce the terms of this order.**

7        5.      <u>DESIGNATING PROTECTED MATERIAL</u>

8        5.1     <u>Exercise of Restraint and Care in Designating Material for Protection</u>.

9   Each Party or Non-Party that designates information or items for protection under this Order

10   must take due care to limit any such designation to specific material that qualifies under the

11   appropriate standards. The Designating Party must designate for protection only those parts of

12   material, documents, items, or oral or written communications that qualify – so that other portions

13   of the material, documents, items, or communications for which protection is not warranted are

14   not swept unjustifiably within the ambit of this Order.

15       Mass, indiscriminate, or routinized designations are prohibited. Designations that

16   are shown to be clearly unjustified or that have been made for an improper purpose (e.g. to

17   unnecessarily encumber or retard the case development process or to impose unnecessary

18   expenses and burdens on other parties) expose the Designating Party to sanctions.

19       If it comes to a Designating Party's attention that information or items that it

20   designated for protection do not qualify for protection, that Designating Party must promptly

21   notify all other Parties that it is withdrawing the mistaken designation.

22       5.2     <u>Manner and Timing of Designations</u>. Except as otherwise provided in this

23   Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered,

24   Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so

25   designated before the material is disclosed or produced.

26       Designation in conformity with this Order requires:

27       (a)     <u>for information in documentary form</u> (e.g., paper or electronic documents,

28   but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing

STIPULATED PROTECTIVE ORDER
FOR STANDARD LITIGATION
CASE NO. 08-5780-JW (HRL)

1   Party affix the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL—ATTORNEYS'

2   EYES ONLY," or "HIGHLY CONFIDENTIAL—SOURCE CODE" in the margin of each page

3   that contains protected material.  If only a portion or portions of the material on a page qualifies

4   for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by

5   making appropriate markings in the margins) and must specify, for each portion, the level of

6   protection being asserted (either "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL—

7   ATTORNEYS' EYES ONLY").

8          A Party or Non-Party that makes original documents or materials available for

9   inspection need not designate them for protection until after the inspecting Party has indicated

10  which material it would like copied and produced.  During the inspection and before the

11  designation, all of the material made available for inspection shall be deemed "HIGHLY

12  CONFIDENTIAL—ATTORNEYS' EYES ONLY." After the inspecting Party has identified the

13  documents it wants copied and produced, the Producing Party must determine which documents,

14  or portions thereof, qualify for protection under this Order.  Then, before producing the specified

15  documents, the Producing Party must affix the appropriate legend  ("CONFIDENTIAL,"

16  "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY," or "HIGHLY

17  CONFIDENTIAL—SOURCE CODE") at the top of each page that contains Protected Material.

18  If only a portion or portions of the material on a page qualifies for protection, the Producing Party

19  also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the

20  margins) and must specify, for each portion, the level of protection asserted (either

21  "CONFIDENTIAL," "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY," or

22  "HIGHLY CONFIDENTIAL—SOURCE CODE").

23          (b)    for testimony given in deposition or in other pretrial or trial proceedings,

24  unless otherwise designated before the close of deposition, pre-trial or trial proceedings,

25  testimony given therein shall be treated as "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES

26  ONLY" for at least fifteen (15) calendar days after the final transcript has been sent by the court

27  reporter to counsel for the Producing Party whose information has been disclosed (or until such

28  other date as may be agreed upon by the parties).  Receipt of rough transcripts shall not trigger

- 6 -

STIPULATED PROTECTIVE ORDER
FOR STANDARD LITIGATION
CASE NO. 08-5780-JW (HRL)

1    this 15-day period.  Such testimony may be designated "CONFIDENTIAL," "HIGHLY

2    CONFIDENTIAL—ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL—SOURCE

3    CODE" during the 15-day (or other agreed upon) period by written notice to all counsel

4    indicating the specific testimony to be designated (by page and line numbers or other specific

5    reference) and the level of protection being asserted ("CONFIDENTIAL," "HIGHLY

6    CONFIDENTIAL—ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL—SOURCE

7    CODE").  Unless so designated, any confidentiality is waived after the expiration of the 15-day

8    (or other agreed upon) period, unless otherwise stipulated or ordered.

9            (c)    for information produced in some form other than documentary and for any

10   other tangible items, that the Producing Party affix in a prominent place on the exterior of the

11   container or containers in which the information or item is stored the legend "CONFIDENTIAL,"

12   "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY," or "HIGHLY

13   CONFIDENTIAL—SOURCE CODE."  If only a portion or portions of the information or item

14   warrant protection, the Producing Party, to the extent practicable, shall identify the protected

15   portion(s), specifying whether they qualify as "CONFIDENTIAL," "HIGHLY

16   CONFIDENTIAL—ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL—SOURCE

17   CODE."

18           5.3    Inadvertent Failures to Designate. If timely corrected, an inadvertent failure

19   to designate qualified information or items as "CONFIDENTIAL," "HIGHLY

20   CONFIDENTIAL—ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL—SOURCE

21   CODE" does not, standing alone, waive the Designating Party's right to secure protection under

22   this Order for such material.  If material is appropriately designated as "CONFIDENTIAL,"

23   "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY," or "HIGHLY

24   CONFIDENTIAL—SOURCE CODE" after the material was initially produced, the Receiving

25   Party must make reasonable efforts to assure that the material is treated in accordance with the

26   provisions of this Order.

27       6.    CHALLENGING CONFIDENTIALITY DESIGNATIONS

28           6.1    Timing of Challenges. Any Party or Non-Party may challenge a

- 7 -

SER 454

designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2    <u>Meet and Confer</u>. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order. The parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3    <u>Judicial Intervention</u>.  If the Parties cannot resolve a challenge without court intervention, the Designating Party shall file and serve a motion to retain confidentiality under Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) within 21 days of the initial notice of challenge or within 14 days of the parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier. Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed in the preceding paragraph. Failure by the Designating Party to make such a motion including the required declaration within 21 days (or 14 days, if applicable) shall automatically waive the confidentiality designation for each challenged designation. In

- 8 -

STIPULATED PROTECTIVE ORDER
FOR STANDARD LITIGATION
CASE NO. 08-5780-JW (HRL)

SER 455

1    addition, the Challenging Party may file a motion challenging a confidentiality designation at any

2    time if there is good cause for doing so, including a challenge to the designation of a deposition

3    transcript or any portions thereof. Any motion brought pursuant to this provision must be

4    accompanied by a competent declaration affirming that the movant has complied with the meet

5    and confer requirements imposed by the preceding paragraph.

6            The burden of persuasion in any such challenge proceeding shall be on the

7    Designating Party. Frivolous challenges, and those made for an improper purpose (e.g., to harass

8    or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party

9    to sanctions. Unless the Designating Party has waived the confidentiality designation by failing to

10   file a motion to retain confidentiality as described above, all parties shall continue to afford the

11   material in question the level of protection to which it is entitled under the Producing Party's

12   designation until the court rules on the challenge.

13       7.    ACCESS TO AND USE OF PROTECTED MATERIAL

14           7.1    Basic Principles. A Receiving Party may use Protected Material that is

15   disclosed or produced by another Party or by a Non-Party in connection with this case only for

16   prosecuting, defending, or attempting to settle this litigation. Such Protected Material may be

17   disclosed only to the categories of persons and under the conditions described in this Order.

18   When the litigation has been terminated, a Receiving Party must comply with the provisions of

19   section 13 below (FINAL DISPOSITION).

20           Protected Material must be stored and maintained by a Receiving Party at a

21   location and in a secure manner that ensures that access is limited to the persons authorized under

22   this Order.

23           7.2    Disclosure of "CONFIDENTIAL" Information or Items.  Unless otherwise

24   ordered by the court or permitted in writing by the Designating Party, a Receiving Party may

25   disclose any information or item designated "CONFIDENTIAL" only to:

26           (a)    the Receiving Party's Outside Counsel of Record in this action, as well as

27   employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the

28   information for this litigation;

- 9 -

STIPULATED PROTECTIVE ORDER
FOR STANDARD LITIGATION
CASE NO. 08-5780-JW (HRL)

1         (b)     the officers, directors, and employees (including House Counsel) of the

2 Receiving Party to whom disclosure is reasonably necessary for this litigation and who have

3 signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

4         (c)     Experts (as defined in this Order) of the Receiving Party to whom

5 disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment

6 and Agreement to Be Bound" (Exhibit A);

7         (d)     the court and its personnel;

8         (e)     court reporters and their staff, professional jury or trial consultants, and

9 Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have

10 signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

11         (f)     during their depositions, witnesses in the action to whom disclosure is

12 reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound"

13 (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court. Pages of

14 transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be

15 separately bound by the court reporter and may not be disclosed to anyone except as permitted

16 under this Stipulated Protective Order.

17         (g) the author of the document or the original source of the information.

18         7.3     Disclosure of "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES

19 ONLY" and "HIGHLY CONFIDENTIAL—SOURCE CODE" Information or Items. Unless

20 otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving

21 Party may disclose any information or item designated "HIGHLY CONFIDENTIAL—

22 ATTORNEYS' EYES ONLY" and "HIGHLY CONFIDENTIAL—SOURCE CODE" only to:

23         (a)     the Receiving Party's Outside Counsel of Record in this action, as well as

24 employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the

25 information for this litigation;

26         (b)     Experts of the Receiving Party (as defined in this Order) (1) to whom

27 disclosure is reasonably necessary for this litigation, (2) who have signed the "Acknowledgment

28 and Agreement to Be Bound" (Exhibit A), and (3) as to whom the procedures set forth in

- 10 -

STIPULATED PROTECTIVE ORDER
FOR STANDARD LITIGATION
CASE NO. 08-5780-JW (HRL)

1  paragraph 7.4, below, have been followed;

2          (c)     the court and its personnel;

3          (d)     court reporters and their staff, professional jury or trial consultants, and

4  Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have

5  signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A); and

6          (e)  the author of the document or the original source of the information.

7          7.4     Procedures for Approving Disclosure of "HIGHLY CONFIDENTIAL—

8  ATTORNEYS' EYES ONLY" Information or Items to "Experts":

9          (a)     Unless otherwise ordered by the court or agreed in writing by the

10  Designating Party, a Party that seeks to disclose to an "Expert" (as defined in this Order) any

11  information or item that has been designated "HIGHLY CONFIDENTIAL—ATTORNEYS'

12  EYES ONLY" first must make a written request to the Designating Party which shall include: (1)

13  the individual's name and business title; (2) business address; (3) business or profession; (4) the

14  individual's CV, including, but not limited to, a list of any publications; (5) any previous or

15  current relationship (personal or professional) with any of the parties; (6) a list of other cases in

16  which the individual has testified (at trial or deposition) within the last seven years; (7) and a list

17  of all companies with which the individual has consulted or by which the individual has been

18  employed within the last four years.

19          (b)     A party that makes a request and provides the information specified in the

20  preceding paragraph may disclose the subject Protected Material to the identified Expert unless,

21  within ten (10) court days of delivering the request, the Party receives a written objection from

22  the Designating Party.  Any such objection must set forth in detail the grounds on which it is

23  based, and must provide times during which the Designating Party is available to meet and confer

24  on the issue during the succeeding three business days.

25          (c)     A Party that receives a timely written objection must meet and confer with

26  the Designating Party (through direct voice to voice dialogue to try to resolve the matter by

27  agreement.  If no agreement is reached, the Party seeking to prevent the disclosure to the Expert

28  may file a motion within ten court days of the meet and confer in Civil Local Rule 7 (and in

- 11 -

1    compliance with Civil Local Rule 79-5, if applicable).  Failure to bring the motion within the

2    required time period shall be deemed a withdrawal of the objection.  Any such motion must

3    describe the circumstances and reasons for why the disclosure to the Expert presents a risk of

     **or other additional means**

4    harm and why protection of this Order would not suffice to ameliorate such risk.

                                                    ^

5          8.    <u>SOURCE CODE</u>

6                (a)    To the extent production of source code becomes necessary in this case, a

7    Producing Party may designate source code as "HIGHLY CONFIDENTIAL—SOURCE CODE"

8    if it is confidential, non-public source code.

9                (b)    Protected Material designated as "HIGHLY CONFIDENTIAL—SOURCE

10   CODE" shall be subject to all of the protections afforded to "HIGHLY CONFIDENTIAL—

11   ATTORNEYS' EYES ONLY" information, and may be disclosed only to the individuals to

12   whom "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY" information may be

13   disclosed, as set forth in Paragraphs 7.3 and 7.4.

14               (c)    Any source code covered by the "HIGHLY CONFIDENTIAL—SOURCE

15   CODE" designation shall be made available for inspection in a format through which it could be

16   reasonably reviewed and searched during normal business hours or other mutually agreeable

17   times, at an office of the producing Party's Outside Counsel.  The Receiving Party may designate

18   in which of the Producing Party's New York or California offices production shall be made.  The

19   source code shall be made available for inspection on a secured computer in a secured room

20   without Internet access or network access to other computers, and the Receiving Party shall not

21   copy, remove, or otherwise transfer any portion of the source code onto any recordable media or

22   recordable device.  The secured computer shall have all external data access ports disabled,

23   including, but not limited to, external media drives, USB slots, and/or peripheral slots.  The

24   Producing Party may visually monitor the activities of the Receiving Party's representatives

25   during any source code review, but only to ensure that there is no unauthorized recording,

26   copying, or transmission of the source code.

27               (d)    The Receiving Party may request paper copies of limited portions of source

28   code that are reasonably necessary for the preparation of court filings, pleadings, expert reports,

                                          - 12 -          STIPULATED PROTECTIVE ORDER
                                                          FOR STANDARD LITIGATION
                                                          CASE NO. 08-5780-JW (HRL)

1    or other papers, or for deposition or trial, but shall not request paper copies for the purposes of

2    reviewing the source code other than electronically as set forth in paragraph (c) in the first

3    instance.  The Producing Party shall provide all such source code in paper form including bates

4    numbers and the label "HIGHLY CONFIDENTIAL—SOURCE CODE."  The Producing Party

5    may challenge the amount of  source code requested in hard copy form pursuant to the dispute

6    resolution procedure and timeframes set forth in Paragraph 6 whereby the Producing Party is the

7    "Challenging Party" and the Receiving Party is the "Designating Party" for purposes of dispute

8    resolution.

9    (e)    The Receiving Party shall maintain a record, or inspection log, of any

10    individual who has inspected any portion of the source code in electronic or paper form.  The

11    Receiving Party shall maintain all paper copies of any printed portions of the source code in a

12    secured, locked area.  The Receiving Party shall not create any electronic or other images of the

13    paper copies and shall not convert any of the information contained in the paper copies into any

14    electronic format.  The Receiving Party shall only make additional paper copies if such additional

15    copies are (1) necessary to prepare court filings, pleadings, or other papers (including a testifying

16    expert's expert report), (2) necessary for deposition, or (3) otherwise necessary for the preparation

17    of its case.  Any paper copies used during a deposition shall be retrieved by the Producing Party

18    at the end of each day and must not be given to or left with a court reporter or any other

19    individual. Upon written request to the Producing Party, the Receiving Party shall within a

20    reasonable time following the request produce to the Producing Party a copy of the Receiving

21    Party's inspection log showing any and all individuals who have inspected any portion of the

22    source code in electronic or paper form.

23    9.  <u>PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN</u>

24    <u>OTHER LITIGATION</u>

25    If a Receiving Party is served with a subpoena or a court order issued in other

26    litigation that compels disclosure of any information or items designated by the Designated Party

27    in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES

28    ONLY," that Party must:

- 13 -

1          (a)    notify the Designating Party, in writing (by fax, if possible) immediately

2    and in no event more than three court days after receiving the subpoena or order.  Such

3    information must include a copy of the subpoena or court order;

4          (b)    immediately notify in writing the party who caused the subpoena or order

5    to issue in the other litigation that some or all of the material covered by the subpoena or order is

6    subject to this Protective Order. Such notification shall include a copy of this Stipulated

7    Protective Order; and

8          (c)    cooperate with respect to all reasonable procedures sought to be pursued by

9    the Designating Party whose Protected Material may be affected.

10         If the Designating Party timely seeks a protective order, the Party served with the

11   subpoena or court order shall not produce any information designated in this action as

12   "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY" before a

13   determination by the court from which the subpoena or order issued, unless the Party has obtained

14   the Designating Party's permission.  Nothing in these provisions should be construed as

15   authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from

16   another court.  **The Designating Party shall bear the burden and expense of seeking protection in that court of its Protected Material.**

17       10.    <u>A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED</u>

18   <u>IN THIS LITIGATION</u>

19         (a)    The terms of this Order are applicable to information produced by a Non-

20   Party in this action and designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL—

21   ATTORNEYS' EYES ONLY."  Such information produced by Non-Parties in connection with

22   this litigation is protected by the remedies and relief provided by this Order. Nothing in these

23   provisions should be construed as prohibiting a Non-Party from seeking additional protections.

24         (b)    In the event that a Party is required, by a valid discovery request, to

25   produce a Non-Party's confidential information in its possession, and the Party is subject to an

26   agreement with the Non-Party not to produce the Non-Party's confidential information, then the

27   Party shall:

28             1.    promptly notify in writing the Requesting Party and the Non-Party

STIPULATED PROTECTIVE ORDER
FOR STANDARD LITIGATION
CASE NO. 08-5780-JW (HRL)

1  that some or all of the information requested is subject to a confidentiality agreement with a Non-

2  Party;

3          2.     promptly provide the Non-Party with a copy of the Stipulated

4  Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific

5  description of the information requested; and

6          3.     make the information requested available for inspection by the

7  Non-Party.

8       (c)    If the Non-Party fails to object or seek a protective order from this court

9  within 14 days of receiving the notice and accompanying information, the Receiving Party may

10  produce the Non-Party's confidential information responsive to the discovery request. If the Non-

11  Party timely seeks a protective order, the Receiving Party shall not produce any information in its

12  possession or control that is subject to the confidentiality agreement with the Non-Party before a

13  determination by the court.[1] Absent a court order to the contrary, the Non-Party shall bear the

14  burden and expense of seeking protection in this court of its Protected Material.

15       11.    UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

16       If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed

17  Protected Material to any person or in any circumstance not authorized under this Stipulated

18  Protective Order, the Receiving Party must immediately (a) notify in writing the Designating

19  Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of

20  the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were

21  made of all the terms of this Order, and (d) request such person or persons to execute the

22  "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

23       12.    INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE

24  PROTECTED MATERIAL

25       When a Producing Party gives notice to Receiving Parties that certain

26

27  ---

[1] The purpose of this provision is to alert the interested parties to the existence of confidentiality rights of a Non-Party and to afford the Non-Party an opportunity to protect its confidentiality interests in this Court.

28

STIPULATED PROTECTIVE ORDER
FOR STANDARD LITIGATION
CASE NO. 08-5780-JW (HRL)

1   inadvertently produced material is subject to a claim of privilege or other protection, the

2   obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure

3   26(b)(5)(B). This provision is not intended to modify whatever procedure may be established in

4   an e-discovery order that provides for production without prior privilege review. Pursuant to

5   Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of

6   disclosure of a communication or information covered by the attorney-client privilege or work

7   product protection, the parties may incorporate their agreement in the stipulated protective order

8   submitted to the court.

9       13.   MISCELLANEOUS

10          13.1   Right to Further Relief. Nothing in this Order abridges the right of any

11  person to seek its modification by the court in the future.

12          13.2   Right to Assert Other Objections. By stipulating to the entry of this

13  Protective Order no Party waives any right it otherwise would have to object to disclosing or

14  producing any information or item on any ground not addressed in this Stipulated Protective

15  Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of

16  the material covered by this Protective Order.

17          13.3   Filing Protected Material. Without written permission from the Designating

18  Party or a court order secured after appropriate notice to all interested persons, a Party may not

19  file in the public record in this action any Protected Material. A Party that seeks to file under seal

20  any Protected Material must comply with Civil Local Rule 79-5. Protected Material may only be

21  filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material

22  at issue. Pursuant to Civil Local Rule 79-5, a sealing order will issue only upon a request

23  establishing that the Protected Material at issue is privileged, protectable as a trade secret, or

24  otherwise entitled to protection under the law. If a Receiving Party's request to file Protected

25  Material under seal pursuant to Civil Local Rule 79-5(d) is denied by the court, then the

26  Receiving Party may file the information in the public record pursuant to Civil Local Rule 79-5(e)

27  unless otherwise instructed by the court.

28          14.   FINAL DISPOSITION.  Within 60 days after the final disposition of this

- 16 -

STIPULATED PROTECTIVE ORDER
FOR STANDARD LITIGATION
CASE NO. 08-5780-JW (HRL)

1    action, as defined in paragraph 4, each Receiving Party must return all Protected Material to the

2    Producing Party or destroy such material. As used in this subdivision, "all Protected Material"

3    includes all copies, abstracts, compilations, summaries, and any other format reproducing or

4    capturing any of the Protected Material. Whether the Protected Material is returned or destroyed,

5    the Receiving Party must submit a written certification to the Producing Party (and, if not the

6    same person or entity, to the Designating Party) by the 60 day deadline that (1) identifies (by

7    category, where appropriate) all the Protected Material that was returned or destroyed and (2)

8    affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries

9    or any other format reproducing or capturing any of the Protected Material. Notwithstanding this

10   provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial,

11   deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial

12   exhibits, expert reports, attorney work product, and consultant and expert work product, even if

13   such materials contain Protected Material. Any such archival copies that contain or constitute

14   Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

15

16   IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD:

17

18   DATED: February 1, 2011          _/s/ Theresa A. Sutton /s/_____

19                                    Theresa A. Sutton
                                      ORRICK HERRINGTON & SUTCLIFFE, LLP
20                                    1000 Marsh Road
                                      Menlo Park, CA  94025
21                                    Attorneys for Plaintiff
                                      FACEBOOK, INC.
22

23   DATED: February 1, 2011          _/s/ Scott A. Bursor /s/_____

24                                    Scott A. Bursor
                                      Bursor & Fisher, P.A.
25                                    369 Lexington Ave., 10th Floor
                                      New York, NY  10017
26                                    Attorneys for Defendant
                                      POWER VENTURES, INC., STEVE VACHANI, and
                                      POWER.COM
27   / / /

28   / / /

- 17 -                    STIPULATED PROTECTIVE ORDER
                          FOR STANDARD LITIGATION
                          CASE NO. 08-5780-JW (HRL)

1    **Filer's Attestation:**  Pursuant to General Order No. 45, §X(B), I attest under penalty of

2    perjury that concurrence in the filing of the document has been obtained from its signatory.

3    Dated: February 1, 2011                    Respectfully submitted,

4                                                      /s/ Theresa A. Sutton /s/

5                                                    Theresa A. Sutton

6

7

8                        **AS MODIFIED BY THE COURT,**
     PURSUANT TO STIPULATION, IT IS SO ORDERED:

9                                        ^

10

11   DATED: _____February 4, 2011_____    _____

12                                            ~~JAMES J. WARE~~ HOWARD R. LLOYD
                                              United States ~~District~~ Judge
13                                                    Magistrate

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 18 -                    STIPULATED PROTECTIVE ORDER
                          FOR STANDARD LITIGATION
                          CASE NO. 08-5780-JW (HRL)

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of
_____ [print or type full address], declare under penalty of perjury that I have read
in its entirety and understand the Stipulated Protective Order that was issued by the United States
District Court for the Northern District of California on [date] in the case of _____ [insert]
formal name of the case and the number and initials assigned to it by the court.]. I agree to
comply with and to be bound by all the terms of this Stipulated Protective Order and I understand
and acknowledge that failure to so comply could expose me to sanctions and punishment in the
nature of contempt. I solemnly promise that I will not disclose to any person or entity except in
strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for
the Northern District of California for the purpose of enforcing the terms of this Stipulated
Protective Order, even if such enforcement proceedings occur after termination of this action.

I hereby appoint _____ [print or type full name] of __
_____ [print or type full address and telephone number] as my California
agent for service of process in connection with this action or any proceedings related to
enforcement of this Stipulated Protective Order.

Date: _____

City and State where sworn and signed: _____

Printed name: _____
        [printed name]

Printed name: _____
        [signature]

- 19 -

STIPULATED PROTECTIVE ORDER
FOR STANDARD LITIGATION
CASE NO. 08-5780-JW (HRL)

**FACEBOOK, INC.,**

**PLAINTIFF,**

**V.**

**POWER VENTURES, INC. DBA POWER.COM, ET AL,**

**DEFENDANTS**

_____

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

**CASE NO. C-08-05780-JW**

**EXPERT REPORT OF BOB ZEIDMAN AND LAWRENCE MELLING**

**ZEIDMAN CONSULTING**

**DECEMBER 19, 2011**

CONFIDENTIAL                                                                                                      I

## Table of Contents

I.      SUMMARY OF FINDINGS ............................................................................. 1

II.     BACKGROUND ........................................................................................... 2

    A.   PERSONAL EXPERIENCE AND BACKGROUND OF BOB ZEIDMAN .................3

    B.   PERSONAL EXPERIENCE AND BACKGROUND OF LAWRENCE MELLING......4

III.    DEFINITIONS.............................................................................................. 4

    A.   WEBSITE ...........................................................................................4

    B.   INTERNET BROWSER .........................................................................5

    C.   CLIENT..............................................................................................5

    D.   SERVER.............................................................................................6

    E.   PROXY SERVER .................................................................................6

    F.   WEB SCRIPTS ...................................................................................7

    G.   WEB CRAWLER OR SPIDER ...............................................................7

    H.   COMPUTER DATABASE.......................................................................8

    I.   SQL SERVER ....................................................................................9

    J.   SOURCE CODE ..................................................................................9

IV.     SCOPE OF REPORT.................................................................................. 10

V.      COMPENSATION .................................................................................... 11

VI.     ANALYSIS.............................................................................................. 12

    A.   DEFENDANT'S SOFTWARE USED TO CONNECT TO THE FACEBOOK
WEBSITE, SPIDER THE FACEBOOK WEBSITE, SCRAPE FACEBOOK USER
INFORMATION FROM THE FACEBOOK WEBSITE, DOWNLOAD FACEBOOK
USER INFORMATION TO THE POWER WEBSITE, AND TO "PROXY"
FACEBOOK ....................................................................................................13

    B.   DEFENDANTS' SOFTWARE USED TO INITIATE SPAM EMAILS .......................17

    C.   POWER DATABASES ..........................................................................24

    D.   DEFENDANTS' EFFORTS TO CIRCUMVENT IP BLOCKS ...................................26

    E.   DEFENDANTS HAVE DELETED IMPORTANT DATA ...........................................29

    F.   TECHNICAL ANALYSIS OF DECLARATION OF MR. VACHANI ........................30

    G.   CONCLUSION .........................................................................................33

EXHIBIT A: RESUME OF ROBERT ZEIDMAN ....................................................... 1

EXHIBIT B: LARRY MELLING RESUME............................................................... 1

EXHIBIT C: EXPERT REPORT SOURCE CODE INSPECTION LOG 2011-12-19 ................. 1

EXHIBIT D: CREATE_EVENT_FACEBOOK.XML ................................................. 1

CONFIDENTIAL                                                                                                    II

EXHIBIT E: POWERCALLBACK.ASPX.EN.RESX...................................................... 1

EXHIBIT F: POWERCALLBACK.ASPX.CS.................................................................... 1

EXHIBIT G: POWERMESSAGEMANAGER.CS ......................................................... 1

EXHIBIT H: POWERMESSAGEFACTORY.CS .......................................................... 1

EXHIBIT I: WRITE.CS................................................................................................... 1

EXHIBIT J: INSERTMESSAGESCRIPT.SQL .............................................................. 1

EXHIBIT K: PN_SEND_SCRAP_FACEBOOK.XML ................................................... 1

EXHIBIT L: HTTPPROXYCONFIG.CS......................................................................... 1

EXHIBIT M: ASYNCSETUP ASYNCHTTPPROXY.CSV ......................................... 1

EXHIBIT N: SERVERMANAGER.JAVA ...................................................................... 1

EXHIBIT O: CREATECAMPAIGNEVENT.CS............................................................. 1

EXHIBIT P: CONFIGURATIONPOWERPROXY.CS.................................................... 1

EXHIBIT Q: UPDATESERVERLISTMANAGER.JAVA ............................................. 1

EXHIBIT R: POWERPROXY.JAVA .............................................................................. 1

EXHIBIT S: FRIENDLIST2.XML .................................................................................. 1

CONFIDENTIAL                                                                                    III

We, Bob Zeidman and Lawrence Melling, on behalf of Zeidman Consulting, provide the following expert disclosures.

## I.    SUMMARY OF FINDINGS

1.  Based upon the review of Defendants' source code for various code projects named PowerScript, PowerNavigtor, PowerProxy, and spider, as well as other documentation produced to date, we have concluded the following:

    (a) Defendants developed proprietary software named PowerScript and spider in order to crawl various social network websites, including particularly www.facebook.com ("Facebook"), to extract or "scrape" website user information such as Facebook photo images, wall content, friends' lists, and the like, and to then reformat that user information on Defendants' own website, www.power.com ("Power.com" or "the Power website"), in order to "proxy" Facebook and permit Defendants' own website users to log into Facebook through Defendants' own Graphical User Interface ("GUI"), rather than through Facebook's interface.

    (b) Defendants designed their proprietary PowerScript and spider software to automatically post on the Facebook website new Events soliciting Facebook users to join Power.com as part of what Defendants called the "Power 100" or "100x100x100" Campaign. Defendants likewise designed their software to automatically post Power Invitations on Facebook users' Walls soliciting them to join Power.com.

    (c) Based upon available information from Defendants' databases, at least 39,137 users of the Power website also had Facebook accounts. Because of missing information from those databases that is solely in the control of Defendants, we were unable to quantify exactly how many Facebook Event or wall posting transactions took place between the Power website and Facebook in which Facebook users were solicited to join Power.com.  We are able to state that both kinds of solicitations did occur, however, and were initiated by Defendants' proprietary software.

CONFIDENTIAL                                                                                          1

(d) In addition to the electronic mail communications that Defendants' software automatically posted on the Facebook website when it created Facebook Events and when it posted Facebook wall messages, the same proprietary software that Defendants used to automatically create Event notifications and post Facebook Wall messages also would initiate automated "spam" email messages being sent on Defendants' behalf to Facebook users as a result of the software's ability to exploit Facebook's own email notification processes.

(e) Defendants designed their network architecture to circumvent technical barriers – such as blocks of IP addresses – that Facebook and other websites put in place to block the Power website's continued access. Defendants' source code includes routines that create a list of proxy servers. These proxy servers were continuously monitored by Defendants' software to determine if they were blocked by a website like Facebook. When blocked, the software could add a new host IP address for the PowerScript to access that would be employed to ensure continued access to the blocking website.

(f) Defendants formerly maintained "Power_Logger" and Async databases which logged information concerning the number of times Facebook users were contacted by the Power website and/or Power users. Among the information that was formerly contained in one or both of those databases was information identifying how many times Facebook users were sent invitations, either through Event notifications or Wall posts, to join Power.com as part of the "Power 100" or 100x100x100 campaign. That information, which was solely within the control of Defendants to document in its databases, has been deleted, preventing Facebook from knowing the true total number of spam invitations that were sent as a result of the execution by Defendants of their PowerScript software.

## II.    BACKGROUND

2. This introductory section of our report gives information about our qualifications.

CONFIDENTIAL                                                                                            2

## A. PERSONAL EXPERIENCE AND BACKGROUND OF BOB ZEIDMAN

3. Robert is an engineer and the founder and president of Zeidman Consulting, which provides engineering consulting services to high-tech companies. Among the types of services Robert provide are hardware and software design. My clients have included Fortune 500 computer and technology companies as well as smaller companies and startups. A copy of my resume is attached hereto as Exhibit A.

4. Robert holds a Master's degree from Stanford University in Electrical Engineering and two Bachelor's degrees from Cornell University, one in Electrical Engineering and one in Physics.

5. Robert has been a computer software and hardware designer for over 25 years. Robert have designed and developed a variety of computer hardware and software products. These software products include Internet-based training courses and web-based course administration software, an operating system synthesis tool, a source code comparison tool, a network emulation software bridge, and a remote backup system whereby user data is automatically transmitted and stored at a remote location. Robert have founded several companies including eVault, a remote backup company; the Chalkboard Network, an e-learning company; Zeidman Technologies, a company that develops software tools for enabling and improving hardware and software development; and Software Analysis and Forensic Engineering Corporation, a company that develops software analysis tools.

6. Robert has written a variety of papers, books, and presentations on computer hardware and software and other engineering subjects. Robert am the developer of the Universal Design Methodology, a process for efficiently developing reliable systems, about which Robert have written extensively. A list of my publications is included in my resume attached as Exhibit A.

7. Robert holds a number of patents for software synthesis, hardware emulation, hardware synthesis, hardware simulation, and software code comparison. Robert have created a tool called CodeSuite® that incorporates BitMatch®, CodeCross®, CodeDiff®, CodeMatch®,

CONFIDENTIAL                                                                                              3

CodeCLOC®, and SourceDetective® for detecting whether one computer program has been plagiarized from another computer program.

8. Robert has consulted on matters involving intellectual property disputes, including instances of alleged misappropriation and infringement. My work in this capacity has included, among other things, reviewing and analyzing software source code, reviewing and analyzing patents, reverse engineering hardware and software, writing expert reports, and testifying in court.

9. Robert has testified at deposition and at trial in a number of cases involving software copyright infringement, trade secret theft, and patent infringement. The specific cases can be found in my resume, attached as Exhibit A.

**B.  PERSONAL EXPERIENCE AND BACKGROUND OF LAWRENCE MELLING**

10. Lawrence is a research engineer at Zeidman Consulting. Lawrence has over 30 years of executive management and engineering experience in developing new hardware and software technologies and bringing them to market. Lawrence has been engaged in applications engineering and marketing of electronic design automation (EDA) tools at major companies and small startups. Lawrence has also been involved in the development of sophisticated tools for source code and object code analysis for finding intellectual property infringement. Lawrence has not previously testified at trial or in a deposition. My resume is attached as Exhibit B to this report.

**III.  DEFINITIONS**

This section provides a discussion of technical terms needed to understand this report, which we are prepared to further explain at trial.

**A.  WEBSITE**

11. A "website" is a location on the World Wide Web that contains a group of web pages typically created using a popular programming language called the Hypertext Markup Language (HTML).  Websites are usually connected to each other using "hyperlinks," and

CONFIDENTIAL                                                                                              4

are made available to the public by an individual, company, educational institution, government body, or other organization. These web pages are hosted on one or more computers called "web servers" and are viewed by users on "client computers" that are connected to the web servers via the Internet. The web pages are viewed using an Internet browser, such as Microsoft's Internet Explorer. In conjunction with this Expert Report, we make extensive reference to two websites located at the Uniform Resource Locators ("URLs") http://www.facebook.com (the "Facebook website") and http://www.power.com ("Power.com" or the "Power website").

**B.    INTERNET BROWSER**

12. An "Internet browser" or web browser is a typical client application used to navigate the Internet. The browser accesses information such as web pages, images, videos, and games from Internet servers. The URL is the "address" through which online information is located and retrieved by the user from her client computer. Servers may provide static information to an Internet browser or may dynamically generate the information that is transmitted to an Internet browser based on input from the user and the internal state of the server. The browser provides the graphical user interface (GUI) to the web pages on the server. However, some websites make use of client-side software to offload processing from the server to use the client's computer. This is important because the browsers include functionality to execute client-side "web scripts," which concept we discuss below. Three popular Internet browsers in use today are: Microsoft's Internet Explorer, Mozilla's Firefox, and Google's Chrome.

**C.    CLIENT**

13. A "client" is a computer that makes a service request to a server (defined below); the server fulfills the request. Computer interactions using the client/server model are very common. For example, when an individual checks a bank account from his or her computer, a client

CONFIDENTIAL                                                                                              5

program in the individual's computer forwards the request to a server program at the bank. The bank's program may respond, or it may, in turn, forward the request to its own client program that makes a request to another bank computer. With regard to the World Wide Web, the browser on an individual's computer is a client program. A client application can also be referred to as the "front-end" and the server application is often called the "back-end."

**D. SERVER**

14. A "server" is a computer on a network (such as an internal corporate network or the Internet) that is dedicated to a particular purpose; it stores information and performs critical functions. For example, a "database server" could store all of an organization's data on a single machine, while providing database services to multiple users anywhere in the office, or even the world, and while also allowing access and control over the data. A typical "database server" will allow users to utilize their data from custom applications designed to meet their specific needs. Server software refers to software running on the server computer that "serves up" information to a client computer. With regard to the World Wide Web, a web server responds to web client requests to view web pages. These pages can be static (content doesn't change) or dynamic (content is determined when requested).

**E. PROXY SERVER**

15. A proxy server is a machine used to relay Internet transactions between clients and websites such that the transactions with the website appear to originate from the proxy server's IP address. An IP address is the Internet Protocol address used to identify a machine, such as a server or proxy server, connected to the Internet. Proxy servers are used for a number of purposes, including the following activities: (a) keeping machines behind the proxy (such as the website's actual host servers) anonymous; (b) speeding up access to resources frequently used by multiple users behind the proxy by using caching techniques; (c) controlling access

CONFIDENTIAL                                                                                        6

to website content or services;  (d) accessing websites from a computer whose own IP address otherwise would be blocked by the accessed website;  (e) logging or auditing Internet use;  and (f) circumventing security procedures or controls aimed at limiting access to or blocking a particular IP address.

## F.     WEB SCRIPTS

16. "Web scripts" are written to generate dynamic web pages -- that is, web pages with rapidly changing content and imagery or content that must be somehow calculated via software mechanisms. For example, webscripts can be used to calculate and display the total visitor count to a website.  Such scripts are written in a variety of scripting languages such as PHP, CGI, Perl, and JavaScript.  Some scripts run on the web server (server-side), while other scripts run on the user's machine (client-side).  Such webscripts also can be embedded within HTML in order to affect the behavior of web pages.  Of the languages mentioned, JavaScript is the language of choice for client-side scripting and is supported by all the Internet browsers popularly in use, while PHP, CGI, and Perl are popular for server-side scripting.

17. In Microsoft Windows systems, component-based scripting is implemented through a technology called "Active Scripting," and employs what are commonly called "script engines."  One particularly popular form of a server-side Active Scripting engine is called ASP, or "Active Server Pages," which is used to develop dynamically-generated web page content.

## G.     WEB CRAWLER OR SPIDER

18. A "web crawler" or "spider" is a computer program used to browse the Internet in a systematic, comprehensive way. Web crawlers are typically associated with search engines and are used to collect website information for search engine indexing.  Nonetheless, spiders and web crawlers are now commonly being used to collect or "harvest" web page information for non-search related applications such as web scraping. Web scraping can be

CONFIDENTIAL                                                                                                      7

used to locate input fields and variable fields that allow a program to automatically fill out forms to login, send messages, request information, or any other website activity initiated by the filling out of a form.  Because web scraping often is employed by entities for unwanted or unlawful purposes (like Defendants' harvesting of user information such as "friends' lists," and similar data from Facebook in order to later use that information to send "spam" email and electronic mail messages), many website operators (including Facebook) publish Terms of Use provisions that prohibit the use of web scrapers on their websites by their registered users.

## H.     COMPUTER DATABASE

19. Computer databases consist not only of data, such as user names and addresses, but also consist of schema and procedures represented by source code. The term "schema" refers to the structure of the database, including where to place the data, how to organize the data, and the particular relationships between the data. For example, customer names may be placed in a field called "Name," and that name is referenced in a table called "Customers." A table can be visualized as a spreadsheet and the field would correspond to a particular column in the spreadsheet. In a database there are many different tables. Each customer name may have an associated table that has fields that contain the customer's address, credit card number, account balance, and comments about the customer. The table names, field names, types of data in the fields, and relationships between different tables and different fields constitute the schema of the database, which is described using a special programming language such as the Structured Query Language, also known as SQL. Two popular forms of SQL servers are MySQL, an open source relational database management system, and Microsoft SQL Server (MSSQL).

20. Procedures for manipulating the data may also be stored in databases and are represented by a special programming language such as SQL. These "stored procedures" can be used by programs that access the database to manipulate the data in the database. For example, a

CONFIDENTIAL                                                                                          8

stored procedure may exist to compute the average outstanding balance for a list of customers. A program that is written to access the database could also access the stored procedure in order to calculate this average.

## I.  SQL SERVER

21. Microsoft SQL Server (MSSQL) is a relational database management system. A relational database is a sophisticated method of grouping data together based upon common attributes to provide greater speed and reliability for data access.

22. SQL tables will often involve common English words, but the sequence of items is usually arbitrary. The tables are used to organize data, and do not have to be in any specific order to function correctly. Each specific category of data is known as a tuple. There is no order imposed upon how the tuples are organized. The order of tuples in a relational database is arbitrary. If similar or identical sequences of elements are found in a SQL table, it can be a sign of copying despite the elements having common names.

## J.  SOURCE CODE

23. In computer science, "source code" is a kind of text that is written using the format and syntax of the programming language that it is being written in, and typically is the only format that is readable by humans.  Computer programs can be written using complex instructions that look like English. For example, the instruction a = b*c+2 tells the computer to take the number stored in memory and represented by variable b, multiply that by the number stored in memory and represented by the variable c, add 2 and store the result in memory represented by the variable a. Similarly, the statement printf("Hello world!") tells the computer to print the words "Hello world!" to the computer screen. These high-level, English-like instructions are the "source code." Computer programs are made up of many lines of source code and the process of writing these lines of code is called programming. Eventually these lines of source code are turned into instructions that a computer

CONFIDENTIAL                                                                                           9

SER 478

understands, consisting of sequences of electronic ones and zeroes. The process of turning human-readable source code into a file containing computer instructions is called "compiling" and is performed by a special computer program called a "compiler." In some cases, source code is run directly by a computer, without creating any file of computer instructions.

24. Source code comes in a variety of programming languages, some of which are called "low level" programming languages, and others which are called "high level" programming languages. PHP, Perl, Java, JavaScript, and SQL all are examples of high level programming languages. Other popular examples of high level source code programming languages are ones called C, C++, C#, Smalltalk, APL, AppleScript, Ruby and Python.

## IV. SCOPE OF REPORT

25. Based on our background and experience, we have been asked to provide our opinions and conclusions related to (1) whether Defendants' source code contained evidence of attempts by Defendants to access Facebook, scrape Facebook, download data from Facebook, contact Facebook, and/or use information scraped/and or downloaded from Facebook to "proxy" the Facebook website; (2) whether Defendants' source code reflects evidence that Defendants used their software to establish Facebook Events and/or wall messages inviting Facebook witnesses to automatically receive electronic mail messages or email messages inviting them to join the Power website; (3) whether Defendants developed technology to circumvent any attempted block by Facebook of the IP addresses used by Power.com to connect with Facebook; and (4) whether there is evidence that Defendants ever included information related to their Power100 (or 100x100x100) marketing campaign in their Power_Logger or Async databases. We have reviewed literally hundreds of thousands of lines of code to reach our opinions. In addition, in reaching the opinions and conclusions discussed herein, we received, considered, and/or relied upon the following materials, copies of which are not attached but can be provided upon request:

CONFIDENTIAL                                                                10

- Power Source Code Documents, which now include 5,743,505 lines of code.

- Sixty-nine SQL Server database backup files.

- We used Understand by Scientific Toolworks, Inc. to help analyze the software.

- Microsoft SQL Server 2008 to extract the databases from the backup files and to review the database contents.

- Fifty-five PowerScript Source files extracted from the PowerScript_bkp_full.bak database backup file.

- Numerous source code files provided as exhibits to this report.

- The transcript and Exhibits from the July 20, 2011 deposition of Defendant Steve Vachani, and the testimony from, and Exhibits used at, the December 14, 2011 deposition of Zak Mandhro.

- The December 12, 2011, Declaration of Steve Vachani in Support of Defendants' Oppositions to Facebook's motions for summary judgment.

- Facebook's source code for "Create an Event."

- Emails, technical documents and marketing documents produced by Defendants and third-party witnesses in discovery in this litigation, which are referenced in this Report.

26. We have been retained to review and analyze the source code and databases produced by Defendants in this action. We reviewed code and databases produced by Defendants on August 25-26, 29-30, September 6-7, October 19 and 25, 2011, November 1-4, 7-9, 11, 16, and 19-21, December 12-13 and December 15-16. Copies of our "Power Source Code Inspection Logs" maintained in accordance with the Protective Order entered in this case are attached hereto and combined as Exhibit C.

## V. COMPENSATION

For the work of Lawrence Melling on this matter Zeidman Consulting is being compensated at a

CONFIDENTIAL                                                                                        11

rate of $200 per hour. For the work of Bob Zeidman, Zeidman Consulting is being compensated at a rate of $750 per hour

## VI.    ANALYSIS

Our analysis is broken into five sections:

- We analyze how Defendants' software was used to connect to the Facebook website, spider the Facebook website, scrape Facebook user content and user information from the Facebook website, download Facebook user information and user content to the Power website, and to emulate or "proxy" Facebook as part of the Power website's social aggregation services.

- We analyze how Defendants' software was used to initiate spam emails via the PowerScripts developed to create content on Facebook. We provide a detailed analysis of the CREATE_EVENT_FACEBOOK and PN_SEND_SCRAP_FACEBOOK scripts that were used to create Facebook Events for the Power 100x100x100 campaign, and which were also used to post Power invitations on Facebook users' Walls.

- We discuss how the Power databases identify Facebook information stored in the databases. We also show why we were unable to determine how many Power.com transactions occurred with Facebook users, because the relevant information was deleted some time after it was originally stored.

- We analyze Defendants' efforts to circumvent Facebook's IP Blocks: The Power proxy system developed to manage and control a pool of proxy servers used to access sites like Facebook in order to circumvent IP blocks like the ones put in place by Facebook.

CONFIDENTIAL                                                                                     12

- We have also included a short section providing a review of the technical accuracy of certain arguments made by Defendant Steve Vachani in his December 12, 2001 declaration.

**A.    DEFENDANT'S SOFTWARE USED TO CONNECT TO THE FACEBOOK WEBSITE, SPIDER THE FACEBOOK WEBSITE, SCRAPE FACEBOOK USER INFORMATION FROM THE FACEBOOK WEBSITE, DOWNLOAD FACEBOOK USER INFORMATION TO THE POWER WEBSITE, AND TO "PROXY" FACEBOOK**

27. In analyzing the Defendants' source code, we determined that there were two core software components developed to retrieve information and post information to social network sites like Facebook. The two components are the PowerScript system and the PowerProxy system. The PowerScript system is best described as a web scraping system. A web scraper is software that can programmatically access web sites and perform operations intended to be done by a person, such as filling out forms, sending messages, and reading content. Web scrapers are also referred to as webbots, or simply "bots." Web scraping is generally not allowed under most websites' terms of use, and is considered a form of pirating by those websites. Also, because programmed transactions with a website can occur much faster than human transactions, a website's access can be slowed down or halted through a rapid succession of programmed transactions. Web sites that do allow other sites to programmatically access information would typically offer these services through a web service interface or an API (application program interface), as Facebook does with its Facebook Connect service, in order to manage and control these programmed transactions and maintain a reliable website.

28. Because web scraping is prohibited by most websites, one challenge to creating a web scraper is to avoid detection. One of the easiest ways to detect a web scraper is to look at the number of transactions coming from a specific Internet Protocol Address (IP address). To avoid detection it is common for sophisticated web scrapers to use proxy servers to scrape information. A proxy server is a machine that acts as a relay, so the website sees the IP address of the proxy server, and not of the actual machine running the scraper. By using a

CONFIDENTIAL                                                                                     13

pool of proxy servers it is possible to reduce a website's ability to detect the scraper by dispersing the transactions across the pool of proxy servers. Additionally, if one of the proxy servers is detected, the other servers can continue to maintain access even if the website blocked access for the detected server.

29. Our analysis shows that the Defendants developed the PowerScript system and PowerProxy system to scrape information from Facebook, proxy the Facebook website and avoid detection when engaged in such activities. In addition, our analysis shows how Defendants' programmed access initiated actions that resulted in unwanted commercial "spam" messages being sent to Facebook users soliciting them to join Power.com.

30. We analyzed 33 out of 55 PowerScripts written to perform transactions with Facebook's website. PowerScript is a scripting language developed by Power to programmatically obtain information from web pages, and write or post information, to web pages without requiring user interaction. Table 1 categorizes the scripts we reviewed. Of those, scripts use HTTP GET to read information from the Facebook website, and others use HTTP POST to post information on the Facebook website. These scripts were developed by Defendants for performing transactions on the Facebook site, are specific to Facebook, and would not work if targeted to another site. The developers writing these scripts would have been required to access Facebook via a Facebook user account to examine the HTML source in order to write a script to get or post Facebook information.

| PowerScript Name | Function |
|---|---|
| PN_LOGIN_FACEBOOK | Post to login to Facebook |
| PN_VALID_CONTEXT_FACEBOOK | Get logout link to verify login is active |
| accept_friend_invitation_FACEBOOK | Post to accept Facebook friend invitation |
| CREATE_EVENT_FACEBOOK | Post to create Facebook Event and invite list of friends or all friends if no list is provided |
| JOIN_COMMUNITY_FACEBOOK | Post to join a Facebook group |
| PN_SEND_SCRAP_FACEBOOK | Post message to Facebook friend Wall |
| PHOTO_CREATE_ALBUM_FACEBOOK | Post a new Facebook photo album |
| PN_SEND_PRIVATE_MESSAGE_FACEBOOK | Post send private Facebook message to a Facebook friend |
| TUBESPREE.PutQuickEmbedInFacebook | Post new video link to Facebook |

CONFIDENTIAL                                                                14

| | |
|---|---|
| PN_SET_STATUS_FACEBOOK | Posts Facebook status update |
| PN_GET_FRIEND_PICKER_FACEBOOK | Get Facebook friend id and name |
| PN_GET_BIRTHDAYS_FACEBOOK | Get Facebook friends' birthdays |
| PN_GET_COMMUNITIES_FACEBOOK | Get Facebook group information (id, name, description, photo link, number of members) |
| PN_GET_PRIVATE_MESSAGE_FACEBOOK | Get Facebook messages for subject, message, friend Id, name, photo and message link, reply link, PrivateLock |
| PN_GET_ALBUM_LIST_FACEBOOK | Get Facebook photos for album id, name, date, dateorder, image, link |
| PN_GET_ALL_SCRAP_MESSAGE_FACEBOOK | Get Facebook Wall posts and messages - messages same as PN_GET_PRIVATE_MESSAGE_FACEBOOK and wall posts the same as PN_GET_SCRAP_FACEBOOK |
| PN_GET_FRIENDS_INVITATIONS_FACEBOOK | Get friend invitations for friend id, photo, name, and link |
| PN_GET_FRIENDSUPDATES_FACEBOOK | Get friend update, name, id,fullname, and update link |
| PHOTO_GET_ALBUM_LIST_FACEBOOK | Get list of photo albums |
| GET_HTML_PAGE | Get an entire HTML page |
| GETALBUMLIST_FACEBOOK | Get photo album list |
| OBTERIMAGEMFACEBOOK | Get photo page |
| GET_PROFILE_FACEBOOK | Get profile information (id, name,photo link, gender,birthday, email, phone, mobile phone,website link, city, country, relationship status, interests, favorite music, favorite TV shows) |
| PN_GET_SCRAP_FACEBOOK | Get Wall for friends photo, ID, Name, Date of post, content, encoded content, post id, post link, subject and showPrivateLock |
| PN_GET_AMOUNT_COMMUNITIES_FACEBOOK | Get/counts number of groups |
| DELETEALBUMPHOTO_FACEBOOK | Post to remove a Facebook photo album |
| PN_DELETE_SELECTED_PRIVATE_MESSAGE_FACEBOOK | Post to remove Facebook message |
| UNJOIN_COMMUNITY_FACEBOOK | Post to remove user from Facebook group |
| PN_DELETE_SELECTED_SCRAP_FACEBOOK | Post to remove Wall message |
| PHOTO_DELETE_PHOTO_FACEBOOK | Post to remove a Facebook photo |
| GET_VIDEO_FACEBOOK | Get a Facebook video (name, id, url, thumbnail, width, height) |
| PN_GET_FRIENDS_FACEBOOK | Get a list of friends(ids, names,and photo urls) |
| PN_LOAD_ATTRIBUTES_FACEBOOK | Gets name, id, photo url, gender, country |

**Table 1: PowerScripts analysis summary**

CONFIDENTIAL                                                                    15



**Figure 1: Power.com Screenshot including a Facebook friend**

31. The Power.com screenshot (found on page 2 of the toolbar_en.ppt presentation in directory SVN\apresentacoes\20081210 – toolbar) shown in Figure 1 is an example of how information from Facebook, gathered using PowerScripts, including the ones analyzed in Table 1, was included and framed inside the Power.com web page. In this example the scraped information includes a Facebook friend's photo (see red circle).

32. Defendants sometimes misleadingly call their Power.com website a "browser." For instance, Mr. Vachani referred to Power.com as a browser both at his deposition and in his December 12, 2011 Declaration. We don't believe that is an accurate description of Power.com's functionality. From our examination of Defendants' source code, and as further discussed below in conjunction with our discussion of Mr. Vachani's December 12, 2011 Declaration, Defendants developed software called Power Navigator which supported a browser style interface where the Facebook website could be displayed within Power.com, as shown in

Figure 2.



**Figure 2: Screenshot of Facebook webpage embedded in Power.com web page**

However, as we noted, the majority of PowerScript scripts directed to Facebook were not directed to browsing functions, but instead were written to programmatically obtain and post information to Facebook without user interaction. Such functionality cannot rationally be called browsing..

**B.      DEFENDANTS' SOFTWARE USED TO INITIATE SPAM EMAILS**

33. We also examined two of the PowerScripts (`CREATE_EVENT_FACEBOOK` and `PN_SEND_SCRAP_FACEBOOK`) in more detail and found that each was responsible for initiating a sequence of programmed transactions to create a Facebook Event and post

CONFIDENTIAL                                                                                      17

Facebook Wall messages. These PowerScripts require Power's software and infrastructure to execute and, once executed, resulted in SPAM electronic messages being sent to Facebook users. These scripts were developed for a specific purpose, and that was to automate the creation of Facebook Events and posting of Facebook Wall messages.

34. The `CREATE_EVENT_FACEBOOK` script automatically set Power as the host of the event, and identified Power as the "location" for the event in Facebook's Event tool (see Exhibit D, `CREATE_EVENT_FACEBOOK.xml`, at lines 37 and 41).

35. The script also generated a guest list if one was not provided. To generate the guest list, Defendants' software accesses the user's Facebook "friendsList" and extracts the user ID of each friend to create the guest list. See Exhibit D, at lines 46-51. The PowerScript executes this code, if no guest list is provided, to automatically create a guest list from the user's list of friends on Facebook. Specifically, the PowerScript application checks a "variable" (a named element to store information) called the Guestlist ("`listaConvidados`"), and then executes a sequence of programming commands inside a "rule block," identified by the beginning tag "`<rule>`" and terminated by the ending tag "`</rule>`," if it is empty. Through this process, the PowerScript software creates a new variable called "`friendsList`," and another variable called "`ids`," which combine to create the Event guest list made from one Facebook user's list of Facebook "friends."

36. The script also automatically sends Facebook Event invitations to each Facebook user in the guest list on behalf of the Power website (see Exhibit D, at lines 58-74), and these Event invitations initiate spam messages being sent to the Facebook invitees.

37. We also looked to determine if Defendants, or the user, caused the Facebook "Events" to be initiated. From the code that has been provided to date, we could not locate any code in `CREATE_EVENT_FACEBOOK` that requested the user's approval to send the "Event" invitations. We also were unable to find any other code requesting that the user accept or approve sending the Facebook Event invitations on behalf of the Power.com website.

38. The PowerScript software also created the text used to invite Facebook friends to

CONFIDENTIAL                                                                                    18

participate in the "100x100x100" campaign. The message contents were stored in resource files, which are files used by Microsoft Visual Studio development tools to store information for access by a program. Notably, in this example there were three resource files found with the same content in three different languages: English, Spanish, and Portuguese (*see* Exhibit E, `PowerCallBack.aspx.en.resx`, found in directory `SVN\power.com\Power.Com\Pub\Http\App_LocalResources`, at lines 132-137).

```
132 <data name="CAMPAIGNMESSAGE" xml:space="preserve">
133  <value>#BREAK##BREAK#I am competing for the $100
prize in the 100x100x100 promotion and recommend you to
participate too!#BREAK#Learn more at:</value>
134  </data>
135  <data name="CAMPAIGNMESSAGE2" xml:space="preserve">
136  <value>First 100 people who bring 100 new friends to
Power.com earn $100. Come and participate too:</value>
137  </data>
```

These messages were created and authored by Defendants to promote joining Power.com. When used with the `CREATE_EVENT_FACEBOOK` script, the messages would result in all of a Power.com user's Facebook friends being automatically invited to join Power.com, and the friends then receiving spam emails as a result.

39. These strings include the actual language that was sent to Facebook users as a result of the Power.com website's execution of the "`CREATE_EVENT_FACEBOOK`" script. The excerpt above shows that the text string stored for `CAMPAIGNMESSAGE` and another for `CAMPAIGNMESSAGE2` are both human-readable messages used in promoting the 100x100x100 campaign to Facebook users.

40. The html code for the Power.com web page that would initiate the creation of Facebook Events for this campaign was not found in the software sources provided. We believe this omission arises from the fact the Power 100 campaign was from an earlier date than the source provided. Since the source repository that would allow us to return to earlier software

CONFIDENTIAL                                                                                              19

releases was corrupted when we received it from Defendants, we were unable to find the html code that initiated these campaign events. However, we know from other sources, such as Mr. Vachani's deposition and the PowerScript source code that we reviewed, that such initiation of Facebook Events by the Power.com web page did, in fact, occur.  For instance, in Figure 3, we offer a screenshot that shows a Power 100x100x100 campaign message posted on a Facebook user's Wall.  This screen capture image produced by Defendants corroborates the occurrence of the Facebook Event and Wall posting transactions. See facebook.jpg found in directory `SVN\apresentacoes\20090120 - Intersite Connect\Source\ícones`  image file:



**Figure 3:** Facebook Wall screenshot showing Power 100x100x100 campaign invitation

41. Additionally, we were  able to examine some of the actual email messages sent when a wall

message was posted in response to Defendants creating an Event to invite a user to the Power100 or 100x100x100 campaign. The messages shown in Figure 4 are actual emails sent to Defendant Steve Vachani when his friends used the Power.com site to execute the PowerScript software made available through the html code to create Power 100 Events, and to thereby invite their Facebook friends to participate in the campaign.





**Figure 4: Screenshots of emails sent as a result of creating a Facebook Wall post and Facebook Event to invite friends to join Power 100 campaign**

CONFIDENTIAL                                                                 22

42. We also found another promotional message authored by the Defendants in the same resource file referenced above that was also used to invite Facebook friends to Power. *See* Exhibit E, at lines 147-149.

```
147  <data name="INVITEMESSAGE" xml:space="preserve">
148  <value>Hi ##friendname##,#BREAK#How would you
like all your friends in just one place?#BREAK#Login
to Power.com to discover all of its advantages and
enhance your Internet experience.</value>
149  </data>
```

43. This message includes a placeholder to insert a "`friendname`." In this case, we were able to find the Power.com software that would initiate sending these messages. The function that uses this "INVITEMESSAGE" string is named "`SendMessageInviteToPower()`." See Exhibit F, `PowerCallBack.aspx.cs`, found in the directory `SVN\power.com\Power.Com\Pub\Http`, at line 2623. The code excerpt below shows that the "INVITEMESSAGE" is used to form the body of the message to be sent as part of the invitation (see Exhibit F, at line 2681):

```
dataMessage.BodyMessage = Translate("INVITEMESSAGE")

.Replace("##name##", name)

.Replace("##friendname##", friendName)
```

44. This line of code retrieves the appropriate language translation for the "INVITEMESSAGE" (English, Spanish, or Portuguese) message, and then replaces the "friendname" placeholder in the text of the message that is sent with the actual friend's name in order to complete the content of the invitation to join Power.com. See Exhibit F, at line 2716, it calls the following function to send the message:

```
PowerMessageManager.SendMessage(dataMessage);
```

45. How the invitation is sent depends upon the network (e.g. Facebook) to which the invited friend belongs. The `PowerMessageManager.SendMessage()` method, which can be used to send invitations to users on Facebook, can be found starting at line 24 in the

CONFIDENTIAL                                                                                                  23

SER 492

`PowerMessageManager.cs` file found in the directory

`SVN\power.com\Power.Message.Core`, which is attached hereto as Exhibit G. The

related `SendMessage()` code is responsible for calling the

`PowerMessageFactory.CreatePowerMessage()`, see Exhibit G, at line 42.

Further, a `CreatePowerMessage()` method that appears in the code uses the relevant

network name (*e.g.* "Facebook") to determine how and where to send the electronic invitation.

For the case where the network is Facebook, the following code would be executed (see Exhibit

H, `PowerMessageFactory.cs`, found in the directory

`SVN\power.com\Power.Message.Core`, at lines 45-50). This code shows Defendants

would actually send an electronic message to someone from Facebook inviting them to join the

Power.com website. The code to send the message uses a PowerScript which posts the message

to the Facebook Wall of the friend to be invited. The code to retrieve and execute the

PowerScript can be found in Exhibit I, `Write.cs`, found in the directory

`SVN\power.com\Power.Message.Core\Engines`, at lines 87-94.

46. The code identifies the name of the PowerScript `PN_SEND_SCRAP_FACEBOOK` as that

    which was used for initiating the electronic invitations to join Power.com. The code was

    retrieved from a database where it was added by using the following SQL command (see

    Exhibit J, file `InsertMessageScript.sql`, found in directory

    `SVN\power.com\Power.Message.Core\Database`, at line 7). The

    `PN_SEND_SCRAP_FACEBOOK` script itself was retrieved from the PowerScript database

    (see Exhibit K, file `PN_SEND_SCRAP_FACEBOOK.xml`, at lines 1-23).

47. The PowerScript automatically posts the message content from the `INVITEMESSAGE` string

    to the Wall of a Facebook friend. Using these automatically generated messages, Defendants

    initiated electronic invitations for Facebook users to join the Power.com website.

## C.    POWER DATABASES

48. In addition to the code analysis, we also examined the related databases provided in an effort

CONFIDENTIAL                                                                                    24

to determine how many Facebook Event or Wall electronic mail messages were initiated by the PowerScript software. We determined that while certain of the databases were the ones of interest in which we would have expected to locate information about the numbers of electronic invitations that were sent by Power.com to Facebook, the databases produced by Defendants that should contain logs of the number of Events and Power.com invitations sent actually do not contain the information for the time period in question.

49. For instance, the Power.com database named Async is a log of PowerScript jobs run. The Async log would contain the information related to the number of electronic messages sent by the PowerScript software. The Async database found on the SQL 7 DVD only logged jobs from 2/19/2011 to 4/1/2011, and the Async database in SQL 6 DVD was corrupted. However, the disk that was provided that fixed the corrupted version only included logs from 08/03/2007 to 11/23/2008 – which does not cover the December 2008 period when the Facebook activity was seen. We understand that, according to information received from Mr. Timothy Fisher, Defendants stopped logging the PowerScript transactions into the database in November of 2008 as a result of migration of the company's servers to amazon.com as a host for the website. Whether true or not, the loss of information is prejudicial to Facebook, as only Defendants ever maintained such database logs.

50. In addition, we reviewed the content of the Power_Logger database in the expectation that it might include the information about the number of Facebook Events and Wall messages that the PowerScript software initiated. We did so because this database appears to include tables to log information about messages sent, including 10 MessageLog tables, a MessageLogHistory table, 10 Scraplog tables, and a ScraplogHistory table. Nonetheless, all of these tables were empty except for the ScrapLoghistory, which only had 141 entries from 12/6/2009 to 11/9/2010, all on the Orkut network.

51. Again, we understand that based on information received from Mr. Fisher, Defendants ceased daily operations sometime in April of 2011, at which time Defendants transferred all files onto a separate backup service. We further understand that, according to Mr. Fisher, the

CONFIDENTIAL                                                                                      25

SER 494

Power_Logger database was supposedly too large to transfer, and therefore was removed. In our opinion, by deleting the Power_Logger database, Defendants effectively erased arguably the most relevant and useful information concerning the number of electronic mail messages that Defendants initiated through execution of their PowerScirpt software associated with the 100x100x100 campaign.

52. Because the information about Events and Wall messages sent to Facebook during December of 2008 was not included in the databases we received from Power, we were unable to determine precisely how many wall messages were posted and how many "Power 100" campaign Event notifications actually were sent to Facebook users.

53. However, we also examined the Power database of the Power website's users, and we were able to determine that there were at least 39,137 Power.com users with Facebook accounts in the database. These database records include the stored email addresses used by the Power.com users in order to login on Facebook, and the stored passwords for their Facebook accounts.

### D.     DEFENDANTS' EFFORTS TO CIRCUMVENT IP BLOCKS

54. We have found that the Power.com website utilized a pool of proxy servers to connect with social network sites, including Facebook, through different IP addresses. The Power software allowed the Defendants to configure a list of proxy servers for each social network site (see Exhibit L, file `HttpProxyConfig.cs`, found in the directory `SVN\powerinfra\Projectos\Power.PowerNetwork.Core\bll`, lines 107-141).

55. In one of the databases provided by Defendants, we were able to find an entry for the proxy server used to access Facebook. The IP address for the server was `174.129.224.81`, and a reverse directory lookup of this IP address identifies the host as `ec2-174-129-224-81.compute-1.amazonaws.com`. This IP address is associated with Amazon Web Services (see Exhibit M, file `AsyncSetup AsyncHttpProxy.csv`, extracted from the

CONFIDENTIAL                                                                          26

database SQL 7\AsyncSetup_full_bkp.bak, database AsyncSetup, table: AsyncHttpProxy, row: 1). However, since the database only included a single IP address, and we understand that there were other IP addresses that Facebook attempted to block in December of 2008, it is clear this is not a complete list of the IP addresses that Defendants used to access Facebook. Additionally, the database did not include any history of which IP addresses were used for the critical time period of December of 2008 prior to when Defendants switched to Amazon Web Services. Based upon the proxy system software, it is clear that the Defendants could remove servers from service and replace servers both manually and automatically to circumvent IP blocks, such as those employed by Facebook.

56. The Defendants' software includes a command processing system to manage the server pool (see Exhibit N, ServerManager.java found in the directory SVN\powerinfra\trunk\Java\powerproxy\com\powerscrap\proxy\manager, lines 43-84). This command processing system is used to check status and make changes to any of the servers in the pool which may be blocked by a website such as Facebook, ("BLOCK SERVER") and to obtain a new server IP address when such a block is detected ("GETNEXTIP"). The commands can be issued either programmatically or manually. The command processing system effectively permitted Defendants to circumvent any attempts by websites like Facebook to block access by Defendants to those websites.

57. We also uncovered further evidence that Defendants implemented technology to circumvent Facebook's efforts to block the Power.com website by tracing the execution of the software used to create Facebook Events. Specifically, the latest delivery included the source code files that run the CREATE_EVENT_FACEBOOK script (see Exhibit O, CreateCampaignEvent.cs from directory SVN\power.com\Power.Com.Core\Campaign100x100x100, at lines 25-40. In this code, the PowerScript retrieved and executed the "CREATE_EVENT_FACEBOOK" script from one of Defendants' servers. Significantly, the IP address of the relevant server that

executes the "CREATE_EVENT_FACEBOOK" script is set by the Defendants' proxy server software.  This functionality shows that the PowerScript software is intentionally monitored by the Power.com system to ensure that it is not being blocked by Facebook as a result of the software creating Facebook Events.

58. Additionally, we investigated certain routines in Defendants' source code to determine whether Defendants employed tools that allowed Defendants to circumvent technical barriers – such as blocks of IP addresses – that Facebook or other websites put in place to block Power's access to their own websites.  Certain ones of these routines create a list of proxy servers, which are continuously monitored to determine, among other matters, if they are blocked by a website like Facebook. We have been able to identify connection-type methods in the source code that allow Defendants to use a proxy server to change the IP addresses used by the Power.com website that are visible to and are detected by third parties like Facebook.  By tracing the execution of a PowerScript, we found that part of the process was to use ConfigurationPowerProxy to get a proxy server to use for connecting with Facebook. The code found shows how an array of proxy servers is created from a list provided by the proxy manager and then the server is selected randomly from that list.  See Exhibit P, ConfigurationPowerProxy.cs found in the directory, SVN\powerinfra\trunk\Projetos\src\configuration, at lines 20-26.

59. The Defendants' source code includes routines we have identified that create a list of proxy servers, which are continuously monitored to determine, among other matters, if they are blocked by Facebook. The updateServerListThread shows the server list is updated on a regular interval stored in the timeToUpdate property (see Exhibit Q, UpdateServerListManager.java, found in the directory SVN\powerinfra\trunk\Java\PowerInfra\powerproxy\com\powerscrap\proxy\manager, at lines 107-118).

60. While the previous routine is used to update the server list on regular intervals, there are two other methods that are used to update the server list.  The definirServidor method is

CONFIDENTIAL                                                                                                            28

used to add a server to the list. The `removerServidor` method is used to remove a server from the list (see Exhibit R, `PowerProxy.java`, found in the directory `SVN\powerinfra\trunk\Java\PowerInfra\powerproxy\com\powerscrap\proxy`, at lines 82-108 and lines112-135, respectively). Finally the listen method at Exhibit R, lines 144-165 monitors each proxy server and calls the `removerServidor` routine if it detects a block of the Power.com website. The IP address of the Power.com website can then be replaced with another IP address from the Power Proxy Manager. In this way, Defendants ensure that they can circumvent deliberate blocks of its services by entities such as Facebook.

61. Based on the code examined it is clear that significant effort went into the design and development of the proxy system, and that one of the objectives of the system was to reconfigure IP connections if one of Defendants' proxy server's IP addresses used to connect to a website like Facebook was blocked. From our own understanding of the technology, we know that it is common for entities like Power.com to employ proxy pools to circumvent the blocking of IP addresses, especially when such entities are also employing scraping programs to obtain web content. As shown in our analysis above, the PowerScript scripts used by Power to create Facebook Events and write on Facebook friends' Walls are such web scraping programs. Moreover, Defendants' proxy pool infrastructure was designed to support these scraping activities.

62. Starting with the random selection of a proxy server to run each PowerScript, through the server list maintenance software described above, to the pool management command software and proxy server monitoring code also discussed above; Defendants' proxy system clearly was specifically designed to circumvent IP address blocking by entities such as Facebook.

## E.  DEFENDANTS HAVE DELETED IMPORTANT DATA

63. Since first getting access to some code on August 23, 2011, we have continually found

CONFIDENTIAL                                                                                    29

deficiencies in the scope of code produced by Defendants.  For instance, as noted, despite repeated and diligent requests, we still have not received all of the Power database information associated with how many invitations were sent by Power.  From correspondence from Mr. Fisher, we now believe this highly important information was deleted after this litigation was underway.

## F.     TECHNICAL ANALYSIS OF DECLARATION OF MR. VACHANI

64. Finally, we offer some observations about the obvious technical errors contained in statements by Defendant Steve Vachani in his December 12, 2011 Declaration.  For instance, in paragraph 3 of Mr. Vachani's declaration, he states:

> Specifically, Power created a browser that allowed users to login and access all of their various social networking accounts at once. Users could update their photos, messages, music, and videos, and these updates would be portable across various social networking sites.

65. We believe Mr. Vachani's statements reflect his lack of technical acuity and programming skills to functionality understand the functionality of the PowerScript software. From our



**Figure 5: Screenshot of Facebook Wall page included on a Power.com webpage**

examination of the code, we did find that Defendants' software included a function that does resemble a browser – but only slightly. That software is contained in one of the many software directory trees and is named "Navigator." The software provided the user with the ability to open another web page and display it inside a Power.com web page. In Figure 5, a screenshot of the Power.com web page with a Facebook page embedded is shown (s*ee* FBPOWER00099). The screenshot, we believe reflects the functionality Mr. Vachani is referring to in his statement. However, while one function of this software was to allow the user to enter a message, the description of it as a "browser" does not capture the software's programmed crawling and scraping of websites. The Power software that provides this functionality is the "PowerScript" software, scripts, and infrastructure. As we have shown in our analysis above, PowerScripts were written to programmatically perform all the functions required to get and save photos, get and send messages, and get and save video, so as to "proxy" a website like Facebook. This functionality is directly related to a web scraper or webbot, and not a browser. That is so because the program or scripts perform the operation, rather than a user.

66. Also in paragraph 22 of his December 12, 2011 Declaration, Mr. Vachani states:

> Power did not access any nonpublic portion of Facebook's website. Power merely offered users a different and potentially superior browser through which they could access their Facebook accounts to copy, update, and/or port their own "User Content." And users did so by entering their own valid usernames and passwords, which Power never copied or stored for any purpose. Power did not obtain any software, data, or other content of value from Facebook. The only data accessed through Power's utilities were user's own "User Content," over which Facebook has disclaimed any ownership.

67. Again this statement is misleading because it represents that the user was controlling the access to public portions of Facebook's website. What actually occurred is that Defendants' software programmatically created Facebook Events. Unlike a browser, Defendants' software can programmatically create an Event, creates the list of friends to invite, and execute or send the Event invitations, without requiring any user interaction.

CONFIDENTIAL                                                                                           31

68. In addition, Mr. Vachani incorrectly states that Power never copied or stored Facebook usernames and passwords, whereas our examination of the "`power`" database found 39,137 Facebook login names and passwords stored there. An example of three network connections for one Power.com user is shown in Table 2. As can be seen from the table headings, this user belonged to three social networks: Facebook, LinkedIn, and Orkut. It also shows the username and password for each was stored within Defendants' databases. See power database, `dbo.account` table.

| id | iduser | Nameaccountnetwork | username | idnetwork | password |
|---|---|---|---|---|---|
| 17243056 | 977586 | FACEBOOK | luiz.grecco@gmail.com | NULL | giF9I6JMQK8= |
| 17134637 | 977586 | LINKEDIN | luizg@sebraesp.com.br | 1288243 | q5HQ0dzE0bo= |
| 906629 | 977586 | ORKUT | luiz.grecco@gmail.com | 1.35E+19 | giF9I6JMQK8= |

**Table 2: List of three social network accounts, usernames and passwords stored in power database**

69. In the same "`power`" database, we also found that friend lists were also stored. We found 225 records of Facebook friend lists that totaled 31,515 Facebook friends. An example of one of the 225 Facebook friend lists can be found in Exhibit S, friendlist2.xml from the power database, `dbo.FriendsAccount` table. This example friend list contains data for 253 Facebook friends and stores their Facebook IDs, Names and links to their Facebook profile photos.

70. Finally, in paragraph 11 of Mr. Vachani's December 12, 2011 declaration, he states:

> Power did not undertake any effort to circumvent that block, and did not provide users with any tools designed to circumvent it. Nevertheless, Facebook's IP block was ineffective because it blocked only one outdated IP address Power had used, and did not block other IPs that Power was using in the normal course of business.

71. From our analysis of the Power Proxy infrastructure, Defendants developed a flexible system for operating, managing, and maintaining a pool of proxy servers that could be assigned and removed from use easily. Because Defendants fundamentally relied on their software's ability to scrape information from other sites, the Power Proxy infrastructure limited the number of transactions coming from any one proxy server to reduce the likelihood of

CONFIDENTIAL

32

detection by the websites being scraped. Defendants also put in place monitors to detect when errors occurred on one of the proxy servers, which included the ability to remove a failed proxy server from the list of servers. This type of proxy pool is not commonly used by websites, but is commonly used by web scraping services.

### G.     CONCLUSION

72. Based upon the review of Defendants' source code for various code projects named PowerScript, PowerNavigtor, PowerProxy, and spider, as well as other documentation produced to date, we have concluded the following:

(a) Defendants developed proprietary software named PowerScript and spider in order to crawl various social network websites, including particularly www.facebook .com , to extract or "scrape" website user information such as Facebook photo images, wall content, friends' lists, and the like, and to then reformat that user information on Defendants' own website, www.power.com, in order to "proxy" Facebook and permit Defendants' own website users to log into Facebook through Defendants' own Graphical User Interface, rather than through Facebook's interface.

(b) Defendants designed their proprietary PowerScript and spider software to automatically post on the Facebook website new Events soliciting Facebook users to join Power.com as part of what Defendants called the "Power 100" or "100x100x100" Campaign. Defendants likewise designed their software to automatically post Power Invitations on Facebook users' Walls soliciting them to join Power.com.

(c) Based upon available information from Defendants' databases, at least 39,137 users of the Power website also had Facebook accounts. Because of missing information from those databases that is solely in the control of Defendants, we were unable to quantify exactly how many Facebook Event or wall posting transactions took place between the Power website and Facebook in which Facebook users were solicited to join Power.com.  We are able to state that both kinds of solicitations did occur, however, and were initiated by

CONFIDENTIAL                                                                                                  33

Defendants' proprietary software.

　　　　　(d) In addition to the electronic mail communications that Defendants' software automatically posted on the Facebook websites when it created Facebook Events and when it posted Facebook wall messages, the same proprietary software that Defendants used to automatically create Event notifications and post Facebook Wall messages also would initiate automated "spam" email messages being sent on Defendants' behalf to Facebook.

73. It is our understanding that discovery in this case is ongoing. Accordingly, we reserve the right to supplement or amend our opinions in light of any additional evidence, testimony, or information that may be provided to us after the date of this report. We also reserve the right to supplement or amend our opinions in response to any expert reports served by any other party in the lawsuit.

Dated:　19-Dec-2011

_____
　　　　　　　　　　Robert Zeidman

_____
　　　　　　　　　　Lawrence Melling

CONFIDENTIAL　　　　　　　　　　34

Defendants' proprietary software.

      (d) In addition to the electronic mail communications that Defendants' software automatically posted on the Facebook websites when it created Facebook Events and when it posted Facebook wall messages, the same proprietary software that Defendants used to automatically create Event notifications and post Facebook Wall messages also would initiate automated "spam" email messages being sent on Defendants' behalf to Facebook.

73. It is our understanding that discovery in this case is ongoing. Accordingly, we reserve the right to supplement or amend our opinions in light of any additional evidence, testimony, or information that may be provided to us after the date of this report. We also reserve the right to supplement or amend our opinions in response to any expert reports served by any other party in the lawsuit.

Dated: 19-Dec-2011

_____

Robert Zeidman

Lawrence Melling

CONFIDENTIAL

34

**Exhibit A: Resume of Robert Zeidman**

**Exhibit B: Larry Melling Resume**

**Exhibit C: Expert Report Source Code Inspection Log 2011-12-19**

**Exhibit D: CREATE_EVENT_FACEBOOK.xml**

**Exhibit E: PowerCallBack.aspx.en.resx**

**Exhibit F: PowerCallBack.aspx.cs**

**Exhibit G: PowerMessageManager.cs**

**Exhibit H: PowerMessageFactory.cs**

**Exhibit I: Write.cs**

**Exhibit J: InsertMessageScript.sql**

**Exhibit K: PN_SEND_SCRAP_FACEBOOK.xml**

**Exhibit L: HttpProxyConfig.cs**

**Exhibit M: AsyncSetup AsyncHttpProxy.csv**

**Exhibit N: ServerManager.java**

**Exhibit O: CreateCampaignEvent.cs**

**Exhibit P: ConfigurationPowerProxy.cs**

**Exhibit Q: UpdateServerListManager.java**

**Exhibit R: PowerProxy.java**

**Exhibit S: friendList2.xml**

1 | I. NEEL CHATTERJEE (State Bar No. 173985)
nchatterjee@orrick.com
2 | MONTE COOPER (State Bar No. 196746)
mcooper@orrick.com
3 | ROBERT L. URIARTE (State Bar No. 258274)
ruriarte@orrick.com
4 | ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Rd.,
5 | Menlo Park, California 94025
Telephone: 650-614-7400
6 | Facsimile: 650-614-7401

7 | FREDERICK D. HOLDEN, JR. (State Bar No. 61526)
fholden@orrick.com
8 | ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Rd.,
9 | Menlo Park, California 94025
Telephone: 415-773-5958
10 | Facsimile: 415-773-5759

11

12 | Attorneys for Plaintiff
FACEBOOK, INC.

13

14 | UNITED STATES DISTRICT COURT

15 | NORTHERN DISTRICT OF CALIFORNIA

16 | SAN JOSE DIVISION

17

18 | FACEBOOK, INC.,                    | Case No. 5:08-cv-05780-LHK

19 |              Plaintiff,            | **STIPULATION AND [~~PROPOSED~~] ORDER, PURSUANT TO CIVIL LOCAL RULE 7-12, TO FILE PREVIOUSLY LODGED MATERIAL AND UNSEAL PREVIOUSLY SEALED MATERIALS**

20 |       v.

21 | POWER VENTURES, INC. a Cayman Island corporation, STEVE VACHANI, an individual; DOE 1, d/b/a POWER.COM, DOES 2-25, inclusive,

22 | 

23 |              Defendants.           | Dept:    Courtroom 8, 4th Floor
Judge:   Hon. Judge Lucy H. Koh

24

25

26

27

28

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

OHSUSA:758136171.1

STIPULATION AND [PROPOSED] ORDER,
PURSUANT TO CIVIL LOCAL RULE 7-12, TO FILE
PREVIOUSLY LODGED MATER
5:08-CV-05780-LHK

1      This Stipulation is entered into and between Plaintiff Facebook, Inc. ("Facebook"), and

2  Defendants Power Ventures, Inc. and Steven Vachani ("Defendants"). It is hereby stipulated and

3  agreed, pursuant to Civil Local Rule 7-12, that subject to approval of the Court:

4      1.    The Expert Report of Bob Zeidman and Lawrence Melling, previously lodged with

5  and considered by the Court, shall be formally filed so that it may be considered by the Ninth

6  Circuit as part of the record on appeal.

7      2.    For the convenience of the Ninth Circuit, the parties, and the public, certain

8  materials previously sealed by this Court shall now be unsealed: Dkt. Nos. 213-2, 213-4, 217

9  (main declaration only), 300-1, and 372, as well as the Expert Report of Bob Zeidman and

10 Lawrence Melling (main report only).

11

12 Dated: May 28, 2014            ORRICK, HERRINGTON & SUTCLIFFE LLP

13                                 */s/ I. Neel Chatterjee*
                                    I Neel Chatterjee

14                                  Attorney for Plaintiff
                                    FACEBOOK, INC.

15

16 Dated: May 28, 2014                   AROPLEX LAW

17                                 */s/ Amy Sommer Anderson*
                                    Amy Sommer Anderson

18                                  Attorney for Defendant
                                    POWER VENTURES, INC.

19

20

21 Dated: May 28, 2014                   */s/ Steven Vachani*
                                    Steven Vachani

22                                  *Pro Se* Defendant

23

24     **Filer's Attestation:** Pursuant to General Order No. 45, §X(B), I attest under penalty of

25 perjury that concurrence in the filing of the document has been obtained from its signatories.

26 Dated: May 28, 2014                   */s/ I. Neel Chatterjee*
                                    I Neel Chatterjee

27

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

OHSUSA:758136171.1

                    STIPULATION AND [PROPOSED] ORDER,
              PURSUANT TO CIVIL LOCAL RULE 7-12, TO FILE
                    PREVIOUSLY LODGED MATER
                        5:08-CV-05780-LHK

1   PURSUANT TO STIPULATION, IT IS SO ORDERED:

2
    DATED: _ May 29, 2014 _____
3                                              LUCY KOH
                                               United States District Judge
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

OHSUSA:758136171.1

- 2 -

STIPULATION AND [PROPOSED] ORDER,
PURSUANT TO CIVIL LOCAL RULE 7-12, TO FILE
PREVIOUSLY LODGED MATER
5:08-CV-05780-LHK

SER 508

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 5, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ I. Neel Chatterjee*

_____
I. Neel Chatterjee

*Attorney for Plaintiff-Appellee*